# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERROL A. HENDERSON,<br><br>    Plaintiff,<br><br>  v.<br><br>THE PENNSYLVANIA STATE UNIVERSITY,<br><br>    Defendant. | Civil Action No. 4:21-cv-00872<br><br>(Honorable Matthew W. Brann)<br><br>*Electronically Filed* |

## UNREPORTED CASES CITED IN DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS PARTIALLY THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO RULE 12(b)(6)

| UNREPORTED CASES |
|---|
| *Bradshaw v Pennsylvania State University,*<br>No. 10-4893, 2011 WL 1288681 (E.D. Pa. Apr. 5, 2011) |
| *Busch v Oswayo Valley School District,*<br>No. 15-0239, 2016 WL 5394085 (W.D. Pa. Sept. 27, 2016) |
| *Dillard v Morris County Prosecutor's Office,*<br>No. 19-19089, 2020 WL 4932527 (D.N.J. Aug. 24, 2020) |
| *Genevie v Jackson,*<br>No. 05-1733, 2008 WL 793885 (W.D. Pa. Mar. 24, 2008) |
| *Griffin v State of New Jersey Dept of Human Services*,<br>No. 19-2751, 2021 WL 3780078 (3d Cir. Aug 26, 2021) |
| *Helvy v Allegheny County,*<br>No. 14-1686, 2015 WL 672262 (W.D. Pa. Feb. 17, 2015) |

| |
|---|
| *Ingram v Vanguard Group Inc.,*<br>No. 14-3674, 2015 WL 4384274 (E.D. Pa. July 17, 2015) |
| *Kramer v Franklin Covey Co.,*<br>No. 18-1599, 2021 WL 462344 (W.D. Pa. Feb. 9, 2021) |
| *McSparran v Pennsylvania,*<br>No. 13-1932, 2014 WL 1371594 (M.D. Pa. Apr. 8, 2014) |
| *Releford v Pennsylvania State University,*<br>No. 10-1621, 2011 WL 900946 (M.D. Pa. Mar. 14, 2011) |
| *Voss v Manitowoc Cranes LLC,*<br>No. 20-0754, 2021 WL 1174498 (M.D Pa. Mar. 29, 2021) |

2011 WL 1288681
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Simone BRADSHAW

v.

PENNSYLVANIA STATE UNIVERSITY.

Civil Action No. 10–4839.
|
April 5, 2011.

**Attorneys and Law Firms**

William C. Reil, Philadelphia, PA, for Simone Bradshaw.

George C. Morrison, Nancy A. Conrad, White & Williams LLP, Center Valley, PA, for Pennsylvania State University.

**MEMORANDUM**

FULLAM, Senior District Judge.

**\*1** The plaintiff, a former law student, has sued Pennsylvania State University challenging her dismissal from The Dickinson School of Law. Although not a model of clarity and distinctly lacking in detail, the complaint reasonably can be read to allege claims of breach of contract, unjust enrichment, and deprivation of a property interest without due process of law in violation of 42 U.S.C. § 1983. The defendant has filed a motion to dismiss.

The defendant first argues that the plaintiff has not alleged sufficiently that Pennsylvania State University is a state actor for purposes of § 1983, but the Third Circuit has held that it is "clearly establishe[d]" that the university is a state actor. *Am. Future Sys., Inc. v. Pa. State Univ.,* 752 F.2d 854, 861 n. 24 (3d Cir.1984); *see also Nicholas v. Pa. State Univ.,* 227 F.3d 133 (3d Cir.2000) (discussing § 1983 claims brought by former professor against Pennsylvania State University). Dismissal is not warranted on this basis.

Where the university is a state actor, the courts have assumed that a student may have a liberty or property interest in her education such that she may challenge an academic dismissal that fails to comply with procedural or substantive due process. *See Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). The plaintiff in this case has not alleged a valid cause of action under either theory.

The complaint alleges that the plaintiff was not allowed to have representation at her dismissal hearing, was not given adequate notice of alleged deficient performance, was not evaluated by her professors as required by the student handbook, and that a dean who had engaged in "confidential conversations" with the plaintiff should not have presided at the hearing. But none of these alleged deficiencies is sufficient to state a procedural due process claim in the context of an academic dismissal. *See Bd. of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 91, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (holding that no hearing is required as a matter of procedural due process in an academic dismissal case).

The plaintiff attached to the complaint a letter from the Associate Dean explaining that the plaintiff was notified that she had failed to remain in good academic standing, submitted a written statement arguing for reinstatement, and appeared before the Academic Rules Committee, which denied her petition for reinstatement. This document establishes as a matter of law that the plaintiff received all the process she was due. Moreover, the plaintiff has not alleged that the decision to dismiss her was "clearly arbitrary or capricious" as would be necessary to state a substantive due process claim (assuming that such a claim is ever viable). *See id.* at 91–92. I note that this is not merely a failure to recite the words arbitrary and capricious; none of the facts alleged in the complaint would support a finding of arbitrary or capricious action by the school. The § 1983 claim will be dismissed with prejudice.

**\*2** The plaintiff also has alleged state-law claims of breach of contract and unjust enrichment but has failed to state a cause of action under either theory. With regard to the contract claim, the plaintiff has not alleged whether the defendant is a public or private university (a separate question from whether the defendant is a state actor). If Pennsylvania State University is a public university, then the plaintiff cannot state a contract claim pursuant to a university handbook. *See Tran v. State Sys. of Higher Educ.,* 986 A.2d 179, 182–83 (Pa.Commw.Ct.2009). If the defendant is a private institution, then the claim is treated as any other for breach of contract, *Reardon v. Allegheny Coll.,* 926 A.2d 477, 481 (Pa.Super.Ct.2007), requiring the plaintiff to allege: 1) the existence of a contract and its terms; 2) a breach of the duty imposed by the contract; and 3) damages that

2011 WL 1288681

resulted. *CoreStates Bank v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999). The plaintiff does not identify in the complaint the provisions of the handbook that the defendant allegedly breached, but in her response to the Motion to Dismiss, the plaintiff cites to a provision of the student handbook that states that the Academic Rules Committee "shall seek from each faculty member an evaluation of the performance and potential as a law student of each petitioner ." Because it is possible that the plaintiff may be able to allege a viable claim for breach of contract, the plaintiff will be given an opportunity to amend her complaint to allege whether the defendant is a private or public university, and if the former, to allege specifically the terms of the contract in dispute, the defendant's breach thereof, and the harm that resulted.

The unjust enrichment claim fails as a matter of law. The plaintiff alleges that the defendant was unjustly enriched by accepting the plaintiff's tuition and unfairly terminating her. But the plaintiff does not allege that the defendant failed to hold the classes for which she paid her tuition or that

she was prevented from attending such classes. Under these circumstances, the plaintiff cannot allege facts to support a claim of unjust enrichment. This claim will be dismissed with prejudice.

In short, the § 1983 claim and the claim for unjust enrichment are dismissed with prejudice, as any amendment would be futile. The breach of contract claim is dismissed without prejudice, with leave to amend, provided that the plaintiff is able to allege that the amount in controversy exceeds the jurisdictional limit for diversity cases of $75,000. If the plaintiff cannot so allege, then the dismissal is without prejudice to the plaintiff filing an action in the appropriate state court.

An order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1288681

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Busch v. Oswayo Valley School District, Not Reported in Fed. Supp. (2016)

2016 WL 5394085, 2016 A.D. Cases 317,607

2016 WL 5394085
United States District Court, W.D. Pennsylvania.

Jenette BUSCH, Plaintiff,

v.

OSWAYO VALLEY SCHOOL DISTRICT, Defendant.

Civil Action No. 1:15-cv-239
|
Filed 09/27/2016

**Attorneys and Law Firms**

Kelli J. Vandergrift, Steele Schneider, Pittsburgh, PA, for Plaintiff.

G. Jay Habas, Marshall, Dennehey, Warner, Coleman & Goggin, Erie, PA, for Defendant.

**MEMORANDUM OPINION** [1]

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment.

Susan Paradise Baxter, M.J.

*1 Presently pending before this Court is Defendant's motion to dismiss Plaintiff's amended complaint. For the reasons set forth below, the motion to dismiss will be granted in part and denied in part.

**I. Relevant Background and Procedural History**
On August 13, 2007, Defendant hired Plaintiff to teach Business and Computer classes and to serve as the faculty advisor for the Future Business Leaders of America (FBLA). ECF No. 9 ¶¶ 16-17. In December 2007, Plaintiff received an official diagnosis of major fecal incontinence. [2] Id. ¶ 11. Plaintiff's condition substantially impairs her bowel functions and causes her to require immediate access to a bathroom. Id. ¶ 12.

[2] The parties do not contest that a diagnosis of major fecal incontinence qualifies as a disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.

Plaintiff promptly informed Defendant of her condition and requested accommodations. Id. ¶ 18. Initially, Defendant permitted Plaintiff to take antidiarrheal medication and to occasionally sit down for twenty minutes when she felt that she was going to lose control of her bowels. Id. ¶ 19. While these measures did not cure her condition, they allowed her to maintain better bowel control and perform her job. Id. ¶ 20.

In August 2012, Defendant hired Dr. Frank McClard to serve as the district's superintendent and acting principal. Id. ¶ 21. Plaintiff met with McClard at the end of the 2012-2013 school year to discuss her disability. Id. ¶ 22. In order to accommodate her bowel condition, Plaintiff requested that McClard relocate her classroom to a location closer to a bathroom. Id. ¶ 23. McClard ignored her request and, rather than offer alternative accommodations, immediately disciplined Plaintiff for sitting down to control her bowels. Id. ¶¶ 24-25.

In September 2013, McClard sent an email to Plaintiff requesting that she meet him in his office for disciplinary purposes. Id. ¶ 28. McClard informed Plaintiff that Defendant required her to walk around and stand up every moment during the school day, aside from her preparation period. Id. ¶ 31. McClard warned her that she would be disciplined more harshly if she continued to sit down to control her bowels. Id. ¶ 32. McClard also furnished her with a four-page letter of formal discipline and ordered her to provide a written response to the letter by the following day. Id. ¶¶ 35, 38. Plaintiff avers that these punishments were unique to her in that other teachers were not punished for sitting down during the workday or required to respond in writing to disciplinary actions. Id. ¶¶ 34, 39.

Towards the end of October 2013, McClard ordered Plaintiff to attend another disciplinary meeting at which he reiterated that she was not permitted to sit down to control her bowel condition and disciplined her for doing so. Id. ¶¶ 41-43. Plaintiff was again ordered to provide a written response to the disciplinary letter she received from McClard. Id. ¶ 44.

A third disciplinary meeting took place under similar circumstances in November 2013. Id. ¶ 45. At that meeting, McClard handed Plaintiff a memo in which he requested that Plaintiff provide him with a written response as to why he should not fire her. Id. ¶¶ 46-47. Plaintiff contends that the stress and anxiety caused by these repeated

Busch v. Oswayo Valley School District, Not Reported in Fed. Supp. (2016)

Case 4:21-cv-00872-MWB   Document 24-2   Filed 09/15/21   Page 6 of 101

2016 WL 5394085, 2016 A.D. Cases 317,607

disciplinary meetings actively worsened her bowel condition. Id. ¶ 48. McClard also threatened to terminate Plaintiff unless she resigned her position as FBLA advisor, stopped complaining about his treatment of her, stopped requesting accommodations, and "shut up" about her allegations of retaliatory and unfair treatment. Id. ¶¶ 50-51.

**\*2** On March 21, 2014, Plaintiff provided McClard with a note from her doctor requesting an accommodation for her condition. Id. ¶ 53. McClard promised that he would raise her request for accommodations with the school board but failed to do so. Id. ¶ 54. Instead, McClard continued to threaten her with verbal and written discipline for her requests for accommodation. Id. ¶ 55.

Around the same time, Plaintiff began to hear other staff members at the school district openly discussing and joking about her condition. Id. ¶¶ 58-59. Plaintiff avers that McClard must have informed the other staff members about her condition because he was one of the few people within the district that was aware of her bowel troubles. Id. ¶ 57.

On April 15, 2014, McClard notified Plaintiff that he had decided not to present the school board with her request for accommodations. Id. ¶ 62. McClard also confirmed that Plaintiff would not be permitted to sit during the workday and that no other accommodations would be provided. Id. ¶¶63-65. In response, Plaintiff "felt compelled to retire due to the stress and anxiety caused by McClard's actions that actively made her condition worse and [Defendant's] refusal to provide her with an accommodation." Id. ¶ 66. Plaintiff tendered her retirement notice on June 19, 2014. Id. ¶ 67.

On June 27, 2014, Plaintiff filed a detailed Intake Questionnaire with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation based on her disability. Id. ¶ 7; ECF No. 14-1. Plaintiff emphasized two specific instances of discrimination: McClard's refusal to raise her accommodation request with the school board on April 15, 2014, and her discovery that members of the staff were talking and joking about her medical condition. ECF No. 14-1 at 2. Plaintiff also noted that she had first requested accommodations from Defendant beginning on May 31, 2013, but had been threatened with termination and other discipline in response. Id. at 3. Plaintiff checked a box ("Box 2") at the end of the form to indicate that she wanted to file a charge of discrimination and authorize the EEOC to open an investigation. Id. at 4.

Plaintiff followed up by filing a Charge of Discrimination with the EEOC on September 4, 2014, again alleging discrimination and retaliation based on her disability. ECF No. 9 ¶¶ 6, 8; ECF No. 14-2. In response to a box on the form asking about the timeframe of the alleged discrimination, Plaintiff stated that the earliest incident of discrimination took place on April 15, 2014, when McClard refused to consider her request for relocation of her classroom. ECF No. 14-2 at 1. Plaintiff stated that she had experienced further discrimination on May 1, 2014, when she heard co-workers discussing her medical condition, and on June 19, 2014, when she felt compelled to resign her employment. Id. In addition to those three discrete incidents, Plaintiff generally described her previous attempts to seek accommodation:

> I believe I have been discriminated against because of my medical condition...in that, after [McClard] promised to do everything in his power to help me relocate my classroom (reasonable accommodation) when I made several requests, both verbally and written [but he] refused to bring the issue to the Board. Shortly after my initial request, Dr. McClard attempted selective enforcement towards me of incidental issues that went on for months aggravating my medical condition. He threatened to have me fired if I did not resign my position as advisor to a student organization and stop talking to people (referring to legal counsel) with regards to my being discriminated against. When I requested the reasonable accommodations in writing I said that I might file for a disability if it could not be provided. Moreover, Dr. McClard was one of the only staff members aware of my medical condition, which became public information and induced other medical ailments. As a result, I felt compelled to resign my employment because I could no longer tolerate the work environment which not only exacerbated my disability but also induced other medical ailments.

Case 4:21-cv-00872-MWB   Document 24-2   Filed 09/15/21   Page 7 of 101

**Busch v. Oswayo Valley School District, Not Reported in Fed. Supp. (2016)**

2016 WL 5394085, 2016 A.D. Cases 317,607

**\*3** Id. at 2.

Plaintiff received a Right to Sue letter from the EEOC on September 22, 2015. ECF No. 9 ¶ 10. She commenced the instant action on September 30, 2015 (ECF No. 1) and filed a four-count amended complaint on December 11, 2015. ECF No. 9. Her amended complaint asserts claims of disability discrimination (Count I), failure to accommodate (Count II), hostile work environment (Count III), and retaliation (Count IV). Id.

On December 28, 2015, Defendant filed the instant motion to dismiss, arguing that portions of Plaintiff's claims are untimely and/or unexhausted. ECF No. 10. Defendant also contends that Plaintiff has failed to state a claim with respect to her allegations of discrimination, hostile work environment, and retaliation. [3] Id. Plaintiff filed a brief in opposition to Defendant's motion on January 22, 2016. ECF No. 14. This matter is now ripe for disposition.

[3]    Defendant does not challenge the sufficiency of Plaintiff's pleading with respect to her failure to accommodate claim.

## II. Standard of Review

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (rejecting the traditional 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). See also Ashcroft v. Iqbal, 556 U.S. 662 (2009)(specifically applying Twombly analysis beyond the context of the Sherman Act).

A Court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. V. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Nor must the Court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 555, citing Papasan v. Allain, 478 U.S. 265, 286 (1986). See also McTernan v. City of York, Pennsylvania, 577 F.3d 521, 531 (3d Cir. 2009)("The tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions."). A plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556, citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004). Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469, at \*1 (D.Del.) quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.' " Phillips, 515 F.3d at 234, quoting Twombly, 550 U.S. at 556 n.3.

**\*4** The Third Circuit has expounded on the Twombly/Iqbal line of cases:

To determine the sufficiency of a complaint under Twombly and Iqbal, we must take the following three steps:

First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) quoting Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).

"The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." Tacinda Corp. v. DaimlerChrysler AG, 197 F. Supp.2d 42, 53 (D. Del 2002) citing Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). Indeed, the Supreme Court has held that complaint is properly dismissed under Rule 12(b) where it does not allege "enough facts to state a claim to relief that is plausible on its facts," Twombly, 550 U.S. at 570, or where the factual content does not allow the court "to draw the reasonable inference that the defendant

Busch v. Oswayo Valley School District, Not Reported in Fed. Supp. (2016)

2016 WL 5394085, 2016 A.D. Cases 317,607

Case 4:21-cv-00872-MWB   Document 24-2   Filed 09/15/21   Page 8 of 101

is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The question is not whether the plaintiff will prevail in the end but, rather, whether the plaintiff is entitled to offer evidence in support of his or her claims. Swope v. City of Pittsburgh, 90 F.Supp.3d 400, 405 (W.D. Pa. 2015) citing Oatway v. American International Group, Inc., 325 F.3d 184, 187 (3d Cir. 2003).

### III. Defendant's Motion to Dismiss

Defendant's motion seeks partial dismissal of the amended complaint on several grounds. First, Defendant argues that all allegations relating to incidents that occurred prior to November 8, 2013, are untimely. Defendant also contends that Plaintiff has failed to exhaust her administrative remedies with respect to any incidents occurring prior to April 15, 2014. Finally, Defendant contends that Plaintiff cannot maintain her claims for disability discrimination and retaliation because she did not suffer an adverse employment action; cannot establish that she was subjected to a hostile work environment; and cannot demonstrate that she was constructively discharged. These issues will be addressed *seriatim.*

### A. Timeliness

A plaintiff asserting a disability claim pursuant to the ADA "has 300 days from the alleged unlawful employment practice to file a charge of employment discrimination with the EEOC." Patterson v. AFSCME # 2456, 320 Fed.Appx. 143, 145 (3d Cir. 2009) (citing 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a)). Incidents occurring outside of this 300-day timeframe are considered untimely and cannot support a recovery under the ADA. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) ("A claim is time barred if it is not filed within [the 300-day] time limit[ ]"); Oden v. SEPTA, 137 F.Supp.3d 778, 786 (E.D. Pa. 2015) (noting that a claim falling outside of the 300-day time frame "is considered time-barred" and cannot support recovery under the ADA).

*5 In the instant case, Plaintiff filed her Charge of Discrimination with the EEOC on September 4, 2014. Looking back 300 days, Defendant requests dismissal of any incidents that occurred prior to November 8, 2013. This would primarily affect the three alleged instances in which Plaintiff was disciplined in writing by McClard for sitting during the workday and for requesting accommodations. See ECF No. 9 ¶¶ 28-52.

Plaintiff responds that her EEOC Intake Questionnaire, filed on June 27, 2014, constitutes a "charge of employment discrimination" for purposes of tolling the 300-day limitations period. If Plaintiff is correct, the operative look-back date becomes August 31, 2013, and almost all of the incidents alleged in the Amended Complaint would fall safely within the limitations period. [4]

[4] The lone exception would appear to be Plaintiff's allegation that she first sought accommodations "at the end of the 2012-2013 school year" and was disciplined in response. ECF No. 9 ¶¶ 22-25. Based on a typical school schedule, the 2012-2013 school year would almost certainly have concluded prior to August 31, 2013.

The United States Supreme Court has instructed that the EEOC's Intake Questionnaire can be considered a "charge" for exhaustion and timeliness purposes if it meets two requirements. Federal Express Corp. v. Holowecki, 552 U.S. 389, 401-02 (2008). First, it must contain all of the factual information required by the pertinent EEOC regulations, including the name of the charged party and an allegation of discrimination. Id. Next, it must be "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." Id. The latter requirement is satisfied where an employee requests remedial action from the EEOC by checking "Box 2" on the standard Intake Questionnaire. Hildebrand v. Allegheny County, 757 F.3d 99, 113 (3d Cir. 2014).

Under the "permissive" guidelines established by the Supreme Court in Holowecki, Plaintiff's intake paperwork clearly satisfies the requisite elements of a charge. [5] Her Questionnaire details several specific and detailed allegations of discrimination, including McClard's refusal to accommodate her condition by allowing her to sit or moving her classroom, McClard's threats of termination for talking to counsel and attempting to alleviate her bowel condition, and the fact that co-workers were openly talking about her condition. ECF No. 14-1 at 1-3. The form identifies "Oswayo Valley School District" as the organization responsible for the alleged discrimination. Id. at 1. Finally, Plaintiff checked off the critical "Box 2" on the form to indicate a request for action from the EEOC. See, e.g., Hildebrand, 757 F.3d at 113 ("[A]n employee who completes the Intake Questionnaire and checks Box 2 unquestionably files a charge of discrimination."); see also 29 C.F.R. § 1601.12(b) (stating

that a submission to the EEOC will be sufficient to constitute a charge if it is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of"). As each of the Holowecki requirements is plainly satisfied, Plaintiff may seek relief for any alleged violations occurring as far back as August 31, 2013.

5      Although Defendant objects to Plaintiff's failure to attach the Intake Questionnaire to her amended complaint, the Third Circuit has instructed that this type of omission is not fatal:

Hildebrand concedes that the Intake Questionnaire was not attached to his amended complaint. He did, however, submit the questionnaire as an exhibit to his response to Allegheny County's motion to dismiss. While a court is limited to considering the pleadings in deciding a Rule 12(b)(6) motion, we are satisfied that the Intake Questionnaire was properly before the District Court. There was no dispute as to its authenticity, and it directly corroborated Hildebrand's claim that he had satisfied the conditions precedent to filing suit under the ADEA. See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.").

Hildebrand, 757 F.3d at 112 n. 2.

**B. Administrative Exhaustion**

*6 Defendant next contends that Plaintiff failed to exhaust her administrative remedies as to any claims arising prior to April 15, 2014. Plaintiff maintains that each of her claims is fairly encompassed within the scope of her administrative filings.

It is axiomatic that a plaintiff must exhaust her administrative remedies before filing an ADA claim in federal court. Williams v. E. Orange Cmty. Charter Sch., 396 Fed.Appx. 895, 897 (3d Cir. 2010) ("Before filing a complaint, a plaintiff alleging discrimination under the ADA must exhaust her administrative remedies by filing a charge with the EEOC."). The parameters of the ensuing federal court action are defined by "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Hicks v. ABT Associates, Inc., 572 F.2d 960, 966 (3d Cir. 1978); see also Barzanty v. Verizon PA,

Inc., 361 Fed.Appx. 411, 413 (3d Cir. 2010) (limiting suit in district court "to claims that are within the scope of the initial administrative charge."). Thus, a claim that has not been specifically presented in an administrative charge must be evaluated to determine "whether the acts alleged in the subsequent [federal] suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)).

On her EEOC Charge, Plaintiff filled out a box indicating that the "earliest" date of discrimination was April 15, 2014, the date on which McClard denied her written request for accommodations. Defendant suggests that Plaintiff should be prohibited from asserting any earlier instances of discrimination because such incidents would not be within the temporal scope of her administrative filing. However, as noted by the Third Circuit, the exhaustion requirement is not so intractable as to "preclude a plaintiff from asserting a claim for the mere failure to check a box on an EEOC Charge Form." Barzanty, 361 Fed.Appx. at 414; see also Boyle v. City of Phila., 2016 WL 1021131, at *3 (E.D. Pa. Mar. 14, 2016) ("The failure to check a particular box on the charge form does not necessary mean a plaintiff has failed to meet [her] administrative burden."). To the contrary, "[t]he most important consideration in determining whether the plaintiff's judicial complaint is reasonably related to his EEOC charge is the factual statement [contained in the charge]." Ford-Greene v. NHS, Inc., 106 F.Supp.3d 590, 607 (E.D. Pa. 2015) (quoting Doe v. Kohn, Nast & Graf, P.C., 866 F.Supp. 190, 197 (E.D. Pa. 1994)).

In the instant case, each of the incidents described in the amended complaint is set forth in the narrative portion of Plaintiff's EEOC Charge. For example, Plaintiff stated that, shortly after her initial request for reasonable accommodation, "Dr. McClard attempted selective enforcement towards me of incidental issues that went on for months aggravating my medical condition." ECF No. 14-2 at 2. She also averred that her initial verbal request for accommodation was met with threats of termination and orders to stop speaking with counsel and to resign her position as FBLA advisor. Id. Although she did not provide the dates for those incidents on the charge form, the allegations are presented in sufficient detail that the EEOC's investigation would necessarily have encompassed each of those events. See Antol, 82 F.3d at 1295 (holding that a claim is considered exhausted if it is "fairly within" the

2016 WL 5394085, 2016 A.D. Cases 317,607

scope of the administrative complaint of the investigation arising therefrom); Howard v. Phil. Housing Authority, 2013 WL 5761299, at *3 (E.D. Pa. Oct. 24, 2013) (noting that, although plaintiff only checked the box for "retaliation" on her charge form, the accompanying narrative statement detailed instances of race and gender discrimination as well, allowing the court "to reasonably conclude that the scope of the EEOC investigation would have covered race and gender discrimination"). To exclude those incidents from this action based on nothing more than Plaintiff's response in a single box would elevate form over function in the precise manner proscribed by this Circuit's long-standing EEOC jurisprudence. Barzanty, 361 Fed.Appx. at 414; see also Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398 (3d Cir. 1976) (explaining that the preliminary requirements of filing a charge with the EEOC are to be interpreted in "a nontechnical fashion"); Styer v. Frito-Lay, Inc., 2016 WL 406715, at *5 (M.D. Pa. Jan. 11, 2016) (noting that the exhaustion requirement is not to be construed "in a rigid and mechanical fashion"); Schouten v. CSX Transp., Inc., 58 F.Supp.2d 614, 616 (E.D. Pa. 1999) (noting that courts have given "a fairly liberal construction...to EEOC charges").

*7 Having determined that Plaintiff's claims are neither time-barred nor unexhausted, the Court will next consider whether Plaintiff has stated a viable claim for relief for each.

## C. Disability-Based Discrimination (Count I)

To establish a claim for discrimination under the ADA, the plaintiff must establish that: "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998). An adverse employment action "is one that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Cunningham v. Nordisk, 615 Fed.Appx. 97, 100 (3d Cir. 2015) (quoting Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)).

Defendant exclusively challenges Plaintiff's discrimination claim on the third prong, arguing that Plaintiff has failed to plead the existence of a "serious and tangible" adverse employment decision. Id. Defendant characterizes the majority of Plaintiff's allegations as mere complaints of negative performance evaluations and threats of termination, correctly noting that such incidents are typically insufficient

to constitute adverse actions within the meaning of the ADA. See, e.g., Hibbard v. Penn-Trafford Sch. Dist., 2014 WL 640253 (W.D. Pa. Feb. 19, 2014) (holding that placement on a performance improvement plan accompanied by threats of termination were not sufficient to effectuate "a significant change in employment status") (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). However, Defendant's argument overlooks or ignores many of the most serious allegations in the amended complaint. For example, Plaintiff avers that Defendant not only refused to grant reasonable accommodations for her physical condition, but declined to even engage in any sort of interactive process with respect to accommodating her disability. The Third Circuit has explicitly held that "refusing to make reasonable accommodations for a plaintiff's disabilities" is an adverse employment decision. Williams v. Phila. Housing Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004). As explained by the Court:

> The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does " 'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].' " Taylor, 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original). "Reasonable accommodation" further "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith," Mengine v. Runyon, 114 F.3d 415, 416 (3d Cir. 1997), under what has been termed a duty to engage in the "interactive process."

Id. at 761-62. See also Evans v. Cernics, Inc., 2016 WL 4382751, at *9 (W.D. Pa. Aug. 16, 2016) (in the context of an ADA claim, the "adverse employment decision is the refusal to make reasonable accommodations for a plaintiff's disability.") (internal quotations omitted); Pallatto v. Westmorland Cnty. Children's Bureau, 2014 WL 836123, at *10 (W.D. Pa. Mar. 4, 2014) ("The refusal to make reasonable accommodations for a plaintiff's disabilities constitutes an adverse employment decision.").

*8 As noted above, Plaintiff's allegations in this regard are detailed and specific. She alleges that she approached McClard on several occasions to request accommodations and was routinely ignored or disciplined for her requests. ECF No. 9 ¶¶ 28-52. When Plaintiff produced a doctor's note

2016 WL 5394085, 2016 A.D. Cases 317,607

to support her request, McClard again threatened her with discipline and refused to initiate the interactive process by presenting her request to the school board. Id. ¶¶54-55, 62-65. These allegations satisfy the pleading requirements for an adverse employment action in the ADA context. Williams, 380 F.3d at 761, 771.

Plaintiff has also averred that she was constructively discharged from her position. It is well-settled that constructive discharge can constitute an adverse employment decision. Penn. St. Police v. Suders, 542 U.S. 129, 143 (2004). Determining whether an employee was constructively discharged requires a court to consider "whether a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001).

In the context of disability discrimination, several courts have noted that a failure to accommodate or to engage in the interactive process may support an inference of constructive discharge. See, e.g., Rabuffo v. VCA Smoketown Animal Hosp., 2016 WL 3165606, at *6 (E.D. Pa. Jun. 6, 2016) (allegation that defendant refused to accommodate plaintiff's disability after a surgery despite "repeated requests" was sufficient to state a claim for constructive discharge); McIntyre v. Archuleta, 2015 WL 4566730, at *13 (W.D. Pa. Jul. 29, 2015) (holding that the defendant's refusal "to consider accommodating McIntyre, or to engage in the interactive process with her in order to determine whether a reasonable accommodation was possible," along with evidence of disciplinary retaliation, created a genuine issue of fact as to constructive discharge); Pagonakis v. Express LLC, 315 Fed.Appx. 425, 430 n. 4 (3d Cir. 2009) ("To the extent Pagonakis asserts that Express' failure to accommodate...resulted in her constructive discharge, she may present that theory to a jury."). As explained by the Court of Appeals for the Sixth Circuit:

> Assuming that Smith was denied a reasonable accommodation that forced her to work well in excess of her medical restrictions, a jury reasonably could infer that the USPS (through Mullin) knew that Smith's working conditions would become intolerable to a reasonable person suffering from her particular disability.

> As noted, Mullin rescinded and/or refused to honor Smith's hours-of-work accommodation that had been in place since 1997, denied Smith the reasonable accommodation of delegating her non-essential accounting duties, and forced her to work long stretches of over-forty-hour weeks with few or no days off, resulting in the foreseeable consequence that Smith's health would markedly deteriorate. Thus, a reasonable jury could conclude that the USPS knowingly and deliberately "turned its back" on Smith and, therefore, the USPS could foresee that Smith would be compelled to quit her job in order to preserve her health.

Smith v. Henderson, 376 F.3d 529, 537-38 (6th Cir. 2004).

In the instant case, Defendant's alleged refusal to accommodate Plaintiff's disability is compounded by the allegation that McClard actively discouraged her from requesting accommodations by disciplining her and threatening her with termination. As in each of the cases cited above, these allegations are sufficient – at least at this early stage in the proceedings – to suggest that Plaintiff suffered an adverse employment action in the form of a constructive discharge. Accordingly, Defendant's motion to dismiss Plaintiff's discrimination claim will be denied.

### D. Retaliation (Count IV)

*9 A plaintiff asserting a retaliation claim pursuant to the ADA must allege that: (1) she engaged in a protected activity; (2) the employer took an adverse action against the employee; and (3) there was a causal connection between the protected activity and the adverse action. Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). To establish an adverse employment action, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Daniels v. School Dist. of Phila., 776 F.3d 181, 195-96 (3d Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Defendant

Case 4:21-cv-00872-MWB   Document 24-2   Filed 09/15/21   Page 12 of 101

Busch v. Oswayo Valley School District, Not Reported in Fed. Supp. (2016)

2016 WL 5394085, 2016 A.D. Cases 317,607

again challenges only whether Plaintiff sustained an adverse employment action.

As noted above, Plaintiff has alleged facts suggesting that she was constructively discharged after she requested reasonable accommodations for her disability. The same allegations are sufficient to satisfy the adverse action requirement of her retaliation claim. See, e.g., Clegg v. Falcon Plastics, Inc., 174 Fed.Appx. 18, 27 (3d Cir. 2006) ("A constructive discharge can count as an adverse employment action for retaliation purposes."); Hannis-Miskar v. North Schuylkill Sch. Dist., 2016 WL 3965209, at *5 (M.D. Pa. Jul. 22, 2016) (allegation of constructive discharge satisfied adverse employment action requirement for both discrimination and retaliation claims). Defendant's motion to dismiss Plaintiff's retaliation claim fails for the same reasons discussed above.

### E. Hostile Work Environment (Count III)

Finally, Defendant challenges whether Plaintiff can establish a hostile working environment. A successful claim for a hostile work environment under the ADA requires proof that: (1) the plaintiff is a qualified individual with a disability; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was based on her disability or request for an accommodation; (4) the harassment was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999). In considering whether a work environment is sufficiently hostile or abusive to support a claim, courts have held that "the conduct must be extreme [enough] to amount to a change in the terms and conditions of employment." Carver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005). This determination is made after considering the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 263. Simply put, "offhanded comments and isolated incidents" are insufficient to sustain a hostile work environment claim. Id.

Plaintiff largely supports her hostile work environment claim by relying on the fact that Defendant refused to accommodate her disability and forced her to remain standing throughout her workday despite knowing that it would exacerbate her bowel condition. However, "the mere denial of a requested accommodation, with nothing more, will not rise to the level

of a hostile work environment." Floyd v. Lee, 85 F.Supp.3d 482, 517 n. 54 (D.D.C. 2015). Nor may a plaintiff simply "cobbl[e] together a number of distinct, disparate acts" – the same acts that make up a separately actionable claim for failure to accommodate or disparate treatment – and label it "a hostile work environment." Helvy v. Allegheny Cnty., 2015 WL 672262, at * (W.D. Pa. Feb. 17, 2015) (quoting Brantley v. Kempthorne, 2008 WL 2073913, at *8 (D.D.C. May 13, 2008)); see also Mercer v. SEPTA, 608 Fed.Appx. 60, 63 (3d Cir. 2015) (emphasizing that "[a] reasonable accommodation request is a one-time occurrence" or "discrete event"). Rather, the prolonged denial of a reasonable accommodation can underlie a hostile work environment claim only when "all the circumstances" would support such a claim. Floyd, 85 F.Supp.3d at 517 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)); see also Parker v. State of Del., Dept. of Public Safety, 11 F.Supp.2d 467, 475 (D. Del. 1998) (rejecting plaintiff's attempt to claim a hostile work environment based largely on individually actionable instances of discrimination).

*10 In the instant case, Plaintiff alleges that McClard denied her request for reasonable accommodation on two distinct occasions: at the end of the 2012-2013 school year, [6] and on April 15, 2014, when McClard declined to present Plaintiff's request to the school board. ECF No. 9 ¶¶ 22, 53. She further alleges that McClard disciplined her and threatened her with termination on three occasions for sitting down during the workday. Id. ¶¶ 28, 41, 45, 46, 49-51. Finally, she asserts that coworkers "openly discussed" and "joked about" her condition, although she does not provide any specific details to support these conclusory allegations. Id. ¶¶ 58-59. These are precisely the type of "offhand comments" and "isolated incidents" that courts have routinely held to be insufficiently hostile to support a claim under Title VII or the ADA. See, e.g., Koch v. White, 134 F.Supp.3d 158, 168 (D.D.C. 2015) (allegation that the defendant denied plaintiff reasonable accommodations "for years", coupled with angry comments from his supervisor, fell "well short of alleging a hostile work environment"); Lescoe v. Pa. Dept. of Corrections-SCI Frackville, 464 Fed.Appx. 50, 54 (3d Cir. 2012) (holding that frequent "jokes and comments about [plaintiff's] weight, the size of his belly, and not being able to see his groin area" did not "reach a level of sufficient severity or pervasiveness to alter the conditions of Lescoe's employment"); Stough v. Conductive Techs., Inc., 2014 WL 3421069, at *5 (M.D. Pa. Jul. 11, 2014) (granting summary judgment and finding alleged conduct not sufficiently "severe or pervasive" where plaintiff with Parkinson's disease alleged that his employer

Case 4:21-cv-00872-MWB Document 24-2 Filed 09/15/21 Page 13 of 101

**Busch v. Oswayo Valley School District, Not Reported in Fed. Supp. (2016)**

2016 WL 5394085, 2016 A.D. Cases 317,607

sent him a booklet on Parkinson's disease and a supervisor told him that "his new position was 'not so bad' considering that he had Parkinson's disease"); McCutchen v. Sunoco, Inc., 2002 WL 1896586, at *12–13 (E.D. Pa. Aug. 16, 2002) (granting summary judgment in favor of employer on hostile work environment claim where employee with partial blindness alleged coworkers called him "useless" and made comments including "for a guy that can't see you know how to look in a book," and plaintiff "didn't have to see, he merely needed to feel around"). [7] In the absence of any such severe and pervasive conduct, Plaintiff's hostile work environment claim must be dismissed.

[6]     As noted above, this incident is time-barred and cannot be considered by the Court.

[7]     Plaintiff's citation to Owens v. Allegheny Valley Sch., 869 F.Supp.2d 653 (W.D. Pa. 2012), is unavailing. In Owens, the plaintiff was consistently forced to perform menial and degrading tasks due to his race. Id. at 662. Plaintiff suggests that being forced to stand up all day despite her bowel condition is cut from the same cloth. We disagree. Unlike the plaintiff in Owens, Plaintiff was not forced to do anything that was inherently demeaning or degrading; rather, she was instructed to perform her regular tasks in the ordinary manner, but without the benefit of the accommodations that she requested. While this conduct may be actionable as a failure to accommodate, it does not elevate her work conditions to the level of degradation suffered by the plaintiff in Owens.

## IV. Conclusion

For the reasons set forth above, Defendant's motion to dismiss [ECF No. 10] will be granted in part and denied in part. Defendant's motion will be granted as to Plaintiff's hostile work environment claim (Count III) and denied in all other respects.

An appropriate Order follows.

## All Citations

Not Reported in Fed. Supp., 2016 WL 5394085, 2016 A.D. Cases 317,607

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4932527

2020 WL 4932527
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Harrison DILLARD, et al., Plaintiffs,

v.

MORRIS COUNTY PROSECUTOR'S
OFFICE, et al., Defendants.

Civil Action No. 19-19089
|
Signed 08/24/2020

**Attorneys and Law Firms**

Peter C. Lagreca, Timothy R. Smith, Caruso Smith Picini, PC, Fairfield, NJ, for Plaintiffs.

Domenick Carmagnola, Carmagnola & Ritardi, LLC, Karen M. Buerle, O'Donnell McCoy Heleniak, Morristown, NJ, Wayne John Positan, Daniel M. Santarsiero, Lum, Danzis, Drasco & Positan, LLC, Roseland, NJ, Thomas J. Benedetti, Azzonili & Benedetti LLC, Florham Park, NJ, R. Scott Fahrney, Jr., Mark J. Semeraro, Kaufman, Semeraro, & Leibman, LLP, Fort Lee, NJ, for Defendants.

**OPINION**

CECCHI, District Judge.

 **\*1** This matter comes before the Court by way of Defendants' motions to dismiss Plaintiffs' complaint (ECF Nos. 15, 16, 17, 18, 19, 21, 22). Plaintiffs oppose the motions (ECF No. 25). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the motions are **GRANTED in part** and **DENIED in part**.

**I. BACKGROUND**

**A. Factual Background**

According to the Complaint and Jury Demand (the "Complaint") (ECF No. 1), Plaintiffs Harrison Dillard ("Dillard") and Aaron King ("King") are employees of the Morris County Prosecutor's Office (the "MCPO") and the

County of Morris (the "County," or, together with the MCPO, the "Entity Defendants"). [1] *See* Compl. ¶¶ 52, 64. King is a Black male and Dillard is a member of an unspecified "minorit[y]" group. *Id.* ¶¶ 19, 67. Collectively, they claim that over the course of their employment, "higher ranking members" of the MCPO, including Defendants Frederic M. Knapp ("Knapp"), Thomas A. Zelante ("Zelante"), John McNamara ("McNamara"), John Speirs ("Speirs"), Stephen Wilson ("Wilson"), Denise Arseneault ("Arseneault"), "and/ or" Steven Murzenski ("Murzenski"), have used the performance evaluation and internal affairs processes to systematically discredit, disparage, remove from promotional consideration, punitively transfer, target for discipline, and retaliate against "minorities," including Plaintiffs. *Id.* ¶¶ 17-19, 26, 29. They further claim that there has been "a disproportionate number of minorities" who have received poor performance evaluations, been assigned to less desirable units, denied training opportunities, and passed over for promotions. *Id.* ¶¶ 20-23.

[1] While Plaintiffs only specifically plead that King was employed by the MCPO and the County, Compl. ¶ 64, the Complaint, viewed on the whole, suggests that King and Dillard were employees of the same entities. Therefore, construing the allegations in the light most favorable to Dillard, as the Court must at this stage, the Court finds that Dillard has alleged that he is an employee of the MCPO and the County.

The Complaint also contains allegations specific to each Plaintiff.

**1. Plaintiff Dillard**

The Complaint alleges that during the course of his employment at the MCPO, Dillard was subjected to racist remarks, denied promotions, and retaliated against for complaining about discrimination and other employees' misconduct. *See, e.g., id.* ¶¶ 25, 39-40, 44, 46. Specifically, Dillard asserts that in 2012, a co-worker referred to a Black person as a "shine" while Dillard and unnamed supervisors were present, but the supervisors took no disciplinary action. Compl. ¶ 39. Between August 2016 and May 2017, his co-workers "repeatedly referred to minorities as 'scum' and 'those people' who [they] never would want to be around" and who live in areas they "would never want to go anywhere near." *Id.* ¶ 40. On or about March 16, 2017, Dillard reported

this behavior to Speirs and Murzenski, his supervisors. *Id.* ¶ 41. Rather than address his concerns, Murzenski, Speirs, and McNamara used Dillard's complaints against him to give him poor performance evaluations in 2016 and 2017. *Id.* ¶ 42.

**\*2** On or about January 16, 2018, Dillard reported several incidents of insubordination and misconduct by another employee to Chief Wilson. *Id.* ¶ 44. In March 2018, Dillard alleges that Wilson threatened him with disciplinary action after Plaintiff complained that his prior complaint "was being buried." *Id.* ¶ 46. Furthermore, on April 2, 2018, Murzenski gave Dillard "the second poor performance evaluation of his career" and "deceitfully altered" evaluations that others made of Dillard. *Id.* ¶ 47.

In or about May 2018, after being skipped over for a promotion five times, "every time by a White male," Dillard filed a complaint against the MCPO with the Office of the Attorney General, Division on Civil Rights (the "Division"). *Id.* ¶ 48. The Division substantiated Dillard's complaints of discrimination and unlawful retaliation, and Dillard was eventually promoted. *Id.* ¶¶ 49-50 52. Despite his promotion, Dillard alleges that he subsequently "was sent out on loan to the New Jersey State Police as a Task Force Officer," which is "an assignment typically given to young detectives, in the beginning of their law enforcement careers." *Id.* ¶¶ 53-54.

Between January 2019 and February 2019, Plaintiff filed three additional internal affairs complaints, including two against Murzenski. *Id.* ¶¶ 56-57. On April 26, 2019, Murzenski gave Dillard a poor performance evaluation. *Id.* ¶ 58.

### 2. Plaintiff King

King alleges that he was subjected to racist remarks, unwarranted internal affairs investigations, poor performance evaluations, and that he was not permitted to resign. *See, e.g.,* *id.* ¶¶ 30-32, 34, 36-37. He further claims that Defendants "targeted [him] for discipline" because of a "perceived disability" and the fact that he sought alcohol and/or drug dependency treatment. *Id.* ¶ 87.

In or around September 2017, an internal affairs investigation was initiated against King for an incident that had occurred one month prior. *Id.* ¶ 31. By contrast, no action had yet been taken on an internal affairs complaint Dillard made in April 2017 against a non-Black employee. *Id.* ¶¶ 30, 32. That

same month, King became "vocal about the racial disparities and racially charged hostile work environment within the" MCPO and sent a letter to Knapp describing the "hostile work environment" to which he had been subjected. *Id.* ¶ 33. According to the Complaint, the MCPO "did nothing" to address his concerns and the conduct continued. *Id.* ¶ 35. On April 25, 2018, King alleges that he was told to " 'pull a chair and sit outside the room' " while White employees ate breakfast. *Id.* ¶ 37. On May 14, 2018, MCPO employee Brian Walsh allegedly showed King an arrest photograph of a Black male and said to King, " 'It's like looking in the mirror, isn't it?' " *Id.* ¶ 36.

King further claims that Murzenski was permitted to retire "despite having open IA complaints against him," while the MCPO and County refused to process King's resignation due to "open IA matters." *Id.* ¶ 60. Specifically, on October 15, 2019, Plaintiff served Knapp and Chief Chris Kimker with a letter of resignation. *Id.* ¶ 61. The following day, Defendant Lisa Blain ("Blain"), the Director of Personnel, informed King that neither the MCPO nor the County would accept King's resignation letter due to pending disciplinary charges against him. *Id.* ¶ 62. He alleges that he was suspended without pay at the time of his resignation. *Id.* ¶ 64.

### B. Procedural Background

Plaintiffs filed this action on October 17, 2019, alleging: (1) ("Count I") conversion, unlawful employment practices, and violations of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-12, the Federal Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"), and the Thirteenth Amendment to the United States Constitution, U.S. CONST. amend. XIII, on behalf of King; (2) ("Count II") race discrimination under the NJLAD on behalf of both Plaintiffs; (3) ("Count III") violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A §§ 34:19-1 *et seq.*, on behalf of both Plaintiffs; (4) ("Count IV") malicious prosecution and disability discrimination under the NJLAD and Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, on behalf of King; (5) ("Count V") race discrimination under Section 1983 on behalf of both Plaintiffs; and (6) ("Count VI") negligent "and/or" intentional infliction of emotional distress on behalf of both Plaintiffs. *Id.* ¶¶ 63-99. Count I is asserted against the Entity Defendants, Knapp, Blain, and non-moving Defendants John Doe 1-5 and/or John Doe Entity 1-5 only. The remaining Counts are asserted against all Defendants except Blain.

**\*3** By stipulation, the parties agreed to dismiss the Count I conversion claim with prejudice on June 11, 2020. ECF No. 37. Defendants then moved to dismiss the remaining Counts, which Plaintiffs opposed.

## II. LEGAL STANDARD

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Factual allegations must support a right to relief that is more than speculative. *See Twombly*, 550 U.S. at 555. A complaint "that offers 'labels and conclusions' or .... tenders 'naked assertions' devoid of further factual enhancement,' " will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). The party seeking dismissal under Rule 12(b)(6) bears the burden of demonstrating that no claim has been stated. *See Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005). The inquiry under Rule 12(b)(6) "is not whether plaintiff[ ] will ultimately prevail in a trial on the merits, but whether [he] should be afforded an opportunity to offer evidence in support of [his] claims." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002).

## III. DISCUSSION

### A. Group Pleading

As an initial matter, Knapp, Zelante, McNamara, Speirs, Wilson, Arseneault, Murzenski, and Blain (collectively, the "Individual Defendants") argue that the Complaint must be dismissed because it contains impermissible group pleading. The Court agrees with respect to certain claims and will dismiss all claims against the Individual Defendants, except for the Count I claims against Knapp and Blain, and the Count II and Count V claims against Speirs, Murzenski, and McNamara discussed *infra*, on the basis of improper group pleading.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Mere 'conclusory allegations against

defendants as a group' which 'fail to allege the personal involvement of any defendant' are insufficient to survive a motion to dismiss." *Bass v. Howard*, No. 19-17077, 2020 WL 1332007, at \*4 (D.N.J. Mar. 23, 2020) (quoting *Galicki v. N.J.*, No. 14-169, 2015 WL 3970297, at \*2 (D.N.J. June 29, 2015)). In other words, a complaint that "fails to separate out the liability for each defendant" will be dismissed. *Sheeran v. Blyth Shipholding S.A.*, No. 14-5482, 2015 WL 9048979, at \*3 (D.N.J. Dec. 16, 2015).

Here, except as noted above, the Complaint fails to set forth the factual basis for each Individual Defendant's liability. Throughout the Complaint, Plaintiffs generally allege conduct on the part of the "Knapp Administration" and the MCPO's "higher ranking members" collectively without specifying what each Individual Defendant is alleged to have done. As just one example, Plaintiffs assert, in conclusory fashion, that "individuals at the highest levels" of the MCPO, including Knapp, Zelante, McNamara, Speirs, Wilson, Arseneault, "and/or" Murzenski, use the internal affairs process to advance their own agendas and retaliate against minority employees, including Plaintiffs. Compl. ¶ 29. They plead no additional facts that would allow the Court to infer which of the Individual Defendants engaged in this conduct, when the conduct occurred, or the nature of the retaliation. Indeed, King does not allege that any Individual Defendant was involved in his internal affairs investigations, *see* Compl. ¶¶ 31, 34, and Dillard does not assert that he was subjected to an internal affairs investigation. Such general allegations "do[ ] not satisfy Rule 8, because [they do] not place Defendants on notice of the claims against each of them." *Sheeran*, 2015 WL 9048979, at \*3. Therefore, except as specifically noted *infra*, the Court dismisses all claims against the Individual Defendants.

### B. New Jersey Tort Claims Act

**\*4** The Court will dismiss the Count IV malicious prosecution and Count VI negligent and/or intentional infliction of emotional distress claims against the Entity Defendants because Plaintiffs admittedly failed to comply with the notice requirements of the New Jersey Tort Claims Act ("NJTCA"), N.J.S.A. § 59:8-8. Pl.'s Opp. at 26. Under the NJTCA, a plaintiff is "forever barred from recovering against a public entity or public employee" on a tort claim if the plaintiff "failed to file the claim with the public entity within 90 days of accrual of the claim." *Id.* § 59:8-8(a). Notwithstanding this requirement, a court may,

in its discretion, permit a plaintiff to file a late notice of claim within one year of the claim's accrual, provided that: (1) "the public entity or the public employee has not been substantially prejudiced thereby"; and (2) the application for permission is "made upon motion supported by affidavits based upon personal knowledge of the affiant" that demonstrate "extraordinary circumstances for his failure to file notice of claim" within the time prescribed or to seek leave "to file a late notice of claim within a reasonable time thereafter." *Id.* § 59:8-9. No tort action may be filed against a public entity or employee more than two years after the claim accrues. *Id.*

Here, Plaintiffs concede that they did not file a notice of claim and do not proffer any reason for their failure to do so. Instead, they argue that Defendants should be equitably estopped from asserting non-compliance with the NJTCA as a defense because "Defendants' conduct is so outrageous that it offends societal notions of justice, morality, and fairness." Pl.'s Opp. at 26. In support of their position, they rely on *Severino v. Sayreville Police Dep't*, No. 07-546, 2008 WL 5351044, at *1 (D.N.J. Dec. 22, 2008). The *Severino* court, however, declined to apply the doctrine of equitable estoppel because the plaintiff had failed to comply with NJTCA's procedural requirements and the defendants timely raised notice as a defense. *See* 2008 WL 5351044, at *6. Because Defendants here have timely asserted notice as a defense and Plaintiffs have not satisfied the standard for filing a late notice of claim, the Court will not apply the doctrine of equitable estoppel.

However, because Plaintiffs assert that their tort claims accrued on October 15, 2019, *see* Pl.'s Opp. at 27, the Court retains discretion to permit the filing of a late notice of claim, N.J.S.A. § 59:8-9. As discovery has not yet commenced, the Court concludes that the Defendants will not be substantially prejudiced by Plaintiffs' filing of a late notice of claim. Therefore, the Court will grant Plaintiffs 14 additional days beyond the date of this Opinion and accompanying Order to apply for permission to file a late notice of claim. The application must be made upon motion supported by affidavits demonstrating "extraordinary circumstances" in accordance with the requirements of N.J.S.A. § 59:8-9. Defendants may file an opposition within 14 days of the date of Plaintiffs' application. No further briefing on the issue will be permitted.[2]

[2]    In addition to non-compliance with the NJTCA and improper group pleading, Defendant McNamara argues that the Count VI emotional distress

claims should be dismissed on NJLAD preemption grounds, as well. *See* ECF No. 22-1 at 8. Only Defendant Murzenski incorporated McNamara's argument in his opening brief. *See* ECF No. 18-1 at 3 n.3. Although Plaintiffs did not address preemption in their opposition, the Court agrees with Defendants and will dismiss Plaintiffs' emotional distress claims against McNamara and Murzenski to the extent they are duplicative of Plaintiffs' NJLAD claims. *See* Compl. ¶¶ 96-97 (repeating and realleging "all prior allegations" regarding Defendants' "acts and/or omissions described above" to support emotional distress claims); *Whitehead v. Cty. of Monmouth*, No. 15-5352, 2015 WL 5545552, at *3 (D.N.J. Sept. 18, 2015) (dismissing on preemption grounds emotional distress claims based on same facts as NJLAD claim).

**C. Count I (Thirteenth Amendment Claim)**

Plaintiff King brings his claims under Count I against the MCPO, the County, Knapp, Blain, and non-moving Defendants John Doe 1-5 and/or John Doe Entity 1-5 only. Compl. ¶¶ 63-72. While the MCPO, the County, Knapp, and Blain have moved to dismiss Count I in its entirety, their briefs only address the Thirteenth Amendment and conversion claims. *See* ECF No. 15 at 5; ECF No. 16 at 13-15; ECF No. 29 at 3-4. Therefore, as the conversion claim has been dismissed, the Court will limit its discussion to the Thirteenth Amendment claim.[3]

[3]    Due to the sparse allegations in the Complaint and the lack of briefing on the subject, the Court is unable to discern the factual and legal basis for the remaining claims in Count I (unlawful employment practices, NJLAD, and Federal Civil Rights Act) purportedly arising under the Thirteenth Amendment. Therefore, such claims are dismissed.

**\*5** Defendants argue that the Thirteenth Amendment claim must be dismissed because King has not alleged that Defendants coerced him to continue working. *See* ECF No. 16 at 12-14; ECF No. 29 at 4. The Court agrees.

The Thirteenth Amendment prohibits "involuntary servitude enforced by the use or threatened use of physical or legal coercion." *United States v. Kozminski*, 487 U.S. 931, 944 (1988). "Modern day examples of involuntary servitude have

been limited to labor camps, isolated religious sects, or forced confinement." *Steirer by Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 999 (3d Cir. 1993), *abrogated on other grounds by Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1087 (3d Cir. 1995). The Complaint alleges that Defendants forced King into involuntary servitude by refusing to accept or process his resignation "and/or" by taking other unidentified action to prevent him from leaving his employment. Compl. ¶ 68. Absent is any allegation that Defendants did so through the use or threatened use of physical or legal coercion. The Thirteenth Amendment claim is therefore dismissed.

### D. Count II (Violation of NJLAD)

Defendants MCPO, the County, Speirs, McNamara, and Murzenski argue that the Count II NJLAD hostile work environment claims must be dismissed because Plaintiffs: (1) cannot rely on the continuing violation doctrine to revive claims based on untimely discriminatory acts; and (2) have not pled a *prima facie* case. *See* ECF No. 15-1 at 5-8; ECF No. 16-1 at 15-22; ECF No. 17 at 10-12; ECF No. 18-1 at 6-9; ECF No. 22-1 at 9-13. The Court disagrees that Plaintiffs have not stated *prima facie* claims, but agrees that King cannot rely on the continuing violation doctrine.

### 1. Continuing Violation Doctrine

Generally, NJLAD claims are subject to a two-year statute of limitations. *Montells v. Haynes*, 133 N.J. 282, 292-93 (1993). The continuing violation doctrine is an "equitable exception" to this prescriptive period. *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 6 (2002). "To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165-66 (3d Cir. 2013).[4] While "[d]iscrete discriminatory acts are not actionable if time barred," *id.* at 165 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)), "non-time-barred discrete acts can be considered part of the series of separate acts that collectively create a hostile work environment, ... thus rendering a hostile-environment claim timely under the continuing-violation doctrine," *Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 223 (4th Cir. 2016) (internal citation and quotation marks omitted).[5] Courts consider both

the subject matter and frequency of the acts in determining whether the doctrine applies. *Mandel*, 706 F.3d at 166.[6]

[4]  While *Mandel* involved, *inter alia*, a Title VII hostile work environment claim, the Court finds its analysis instructive here. Courts apply the Title VII continuing violation standard to NJLAD hostile work environment claims, *see Makse v. Spirit Airlines, Inc.*, No. 09-2392, 2011 WL 1205484, at *3 (D.N.J. Mar. 28, 2011), and the elements of both claims "closely resemble" one another, *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001).

[5]  Discrete discriminatory acts include "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

[6]  Acts involve the same subject matter when they "constitute the same type of discrimination." *Mandel*, 706 F.3d at 166.

**\*6** Here, Plaintiffs filed this action on October 17, 2019. Therefore, to allege a continuing violation, they must show that at least one non-discrete act comprising part of an ongoing discriminatory practice occurred on or before October 17, 2017. The Court finds that Dillard may invoke the continuing violation doctrine as to certain acts, but King may not.

Dillard alleges that before October 17, 2017: (1) a co-worker made a derogatory remark toward a Black person in 2012 while he and unnamed supervisors were present; (2) his co-workers "repeatedly" subjected him to disparaging comments about "minorities" between August 2016 and May 2017; and (3) Murzenski, Speirs, and McNamara gave him a negative performance evaluation in 2016, where they allegedly criticized him for "not wanting to be around racists." *See* Compl. ¶¶ 39-40, 42.[7] After October 17, 2017, Dillard alleges this racially discriminatory conduct continued. Specifically, he claims that: (1) he was passed over for a promotion on five separate occasions; (2) Speirs and McNamara gave him a negative performance evaluation in 2017 and Murzenski gave him negative performance evaluations in 2017, 2018, and 2019; and (3) he was given undesirable assignments. *See* Compl. ¶¶ 42, 47-48, 54, 58.

[7]
 In Paragraph 42, the Complaint alleges that Dillard received negative performance evaluations in both 2016 and 2017. Compl. ¶ 42. While the Complaint does not specify the date on which Dillard received his 2017 evaluation, the Court construes the allegations in the light most favorable to him and finds that the 2017 allegation is timely at this early pleading stage.

As the 2016 and 2017 pre-limitations comments concerned the same subject matter as the timely acts, and the complained-of conduct amounts to more than isolated incidents, the Court finds that Dillard may invoke the continuing violation doctrine as to those remarks. [8] The doctrine does not apply to the 2016 performance evaluation because it is a discrete act and therefore time-barred. *See O'Connor*, 440 F.3d at 127 (noting that discrete acts include "wrongful discipline"); *Mandel*, 706 F. 3d at 165 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges") (internal citation and quotation mark omitted). [9]

[8]
 The Court need not reach the parties' arguments regarding the 2012 comment at this early stage because it is clear that the doctrine applies to at least some of the alleged pre-limitations remarks, and those remarks, coupled with the within-limitations acts, are sufficient to state a claim for hostile work environment.

[9]
 McNamara relies on *Mandel* to argue that the continuing violation doctrine does not apply to Dillard's claims because the pre-limitations and timely acts were perpetrated by different individuals. ECF No. 22-1 at 11. This argument is unpersuasive. *Mandel* does not foreclose application of the doctrine where different perpetrators are involved, and the *Mandel* district court expressly rejected this contention on remand. *See Mandel v. M & Q Packaging Corp.*, No. 09-0042 2013 WL 1899809, at *8 (M.D. Pa. May 7, 2013).

With respect to King, the Complaint specifically alleges that prior to October 17, 2017, he was subjected to an unwarranted internal affairs investigation in or about September 2017 because of his race. *See* Compl. ¶ 31. Wrongful disciplinary actions and wrongful accusations, however, constitute discrete acts that must be brought within the limitations period. *O'Connor*, 440 F.3d at 127. Therefore,

because the internal affairs investigation occurred outside of the limitations period, King may not rely on it to support his hostile work environment claim.

## 2. *Prima Facie* Case

**\*7** The Court next addresses whether Plaintiffs have alleged a *prima facie* case for hostile work environment. To establish a *prima facie* claim for hostile work environment under the NJLAD, Plaintiffs must show that: " '(1) [they are] in a protected class; (2) [they were] subjected to conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment.' " *Church v. Sears Holding Corp.*, 605 F. App'x 119, 125 (3d Cir. 2015) (quoting *Victor v. State*, 203 N.J. 383 (2010)). To determine whether the conduct at issue is "severe or pervasive," the Court must consider " 'the totality of the relevant circumstances,' including: '(1) the frequency of all the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.' " *Id.* at 125 (quoting *Godfrey v. Princeton Theological Seminary*, 196 N.J. 178 (2008)).

Here, Defendants primarily argue that neither Plaintiff has satisfied his *prima facie* burden because the alleged discriminatory acts are not severe or pervasive. With respect to Dillard, the Court finds that he has stated a claim for hostile work environment. As detailed above, Dillard alleges that he has been subjected to a pattern of racially discriminatory conduct over several years. This alleged racially-motivated conduct included repeated derogatory remarks by colleagues, undesirable assignments, denials of promotions, and negative performance evaluations. He further alleges that his complaints of discrimination were substantiated by the Division. Even disregarding the 2012 comment and 2016 negative performance evaluation, the Court concludes that Dillard has alleged, at this early stage of the litigation, sufficiently severe or pervasive conduct under the totality of the circumstances. *See Toscano v. Borough of Lavallette*, No. 04-4412, 2006 WL 1867197, at *7 (D.N.J. June 30, 2006) (noting that " 'a discrimination analysis must concentrate ... on the overall scenario' ") (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005)).

With respect to King, the Court finds that he has satisfied his *prima facie* burden. King alleges that over the course of his employment, he was subjected to overtly racist conduct.

Specifically, on April 25, 2018, King asserts that he was told to "pull a chair and sit outside the room" while White employees ate breakfast. Compl. ¶ 37. The following month, on May 14, 2018, an MCPO employee allegedly showed King an arrest photograph of a Black male and remarked, " 'It's like looking in the mirror, isn't it?' " *Id.* ¶ 36. He further asserts that after he reported racially discriminatory conduct to the MCPO, the MCPO "did nothing" and the conduct continued through October 2019, when he attempted to resign "as [a] result of the hostile work environment." *Id.* ¶¶ 33-34, 61. According to the Complaint, King was not permitted to resign due to disciplinary charges pending against him, while Murzenski was allowed to resign despite having "open IA complaints." *Id.* ¶¶ 59-62. Drawing all reasonable inferences in King's favor, the Court finds that, based on the totality of the circumstances, King has met his burden at this early pleading stage. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993) (noting that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances" and is not "a mathematically precise test").

The Court also concludes that a sufficient basis exists for imputing liability to the Entity Defendants. Under the NJLAD, "vicarious liability exists when an employer knew, or should have known, about the harassing conduct and failed to take remedial action." *Deresky v. B.J. McGlone & Co.*, No. 14-1930, 2018 WL 3425731, at \*7 (D.N.J. July 16, 2018) (internal citation omitted). Here, both Plaintiffs allege that when they notified the MCPO of the discriminatory conduct, their complaints were disregarded and the conduct continued. *See, e.g.*, Compl. ¶¶ 34-35, 41-42. Moreover, Dillard alleges that even after filing a complaint against the MCPO with the Division, which the Division substantiated, he continued to be subjected to racially discriminatory conduct. On these allegations, Plaintiffs have sufficiently asserted a basis for vicarious liability.

### 3. Aiding and Abetting Liability

 **\*8**  Having concluded that Plaintiffs may proceed on their hostile work environment claims, the Court next considers whether any of the Individual Defendants may be held liable for aiding and abetting the discrimination. The NJLAD makes it unlawful for an employee "to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the statute], or to attempt to do so." N.J. Stat. Ann. § 10:5-12(e). "[I]n order to hold an employee liable as an aider or abettor,

a plaintiff must show that (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004) (quoting *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999)) (international quotation marks omitted)). [10]

[10]     To determine whether an employee "substantially assist[s]" a violation, courts consider the following factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." *Tarr*, 181 N.J. at 84.

Here, Dillard has sufficiently alleged aiding and abetting claims against Speirs, Murzenski, and McNamara. Dillard claims that he personally reported racially discriminatory behavior in the workplace to Speirs and Murzenski, his supervisors, and that McNamara otherwise had knowledge of his complaints. [11] Rather than address his concerns, the Complaint alleges that Speirs, Murzenski, and McNamara affirmatively used Dillard's complaints against him in the performance evaluation process. Dillard also claims that Murzenski altered evaluations that others made of Plaintiff. Viewing the allegations in the light most favorable to Dillard, the Court is satisfied that he has sufficiently alleged aiding and abetting claims as to these three Individual Defendants.

[11]     Although Dillard does not affirmatively plead that McNamara was his supervisor, he does allege that McNamara, along with his supervisors Speirs and Murzenski, used his complaints of discrimination to give him poor performance evaluations. Thus, construing the Complaint in the light most favorable to Dillard, the Court infers from these allegations that McNamara was a supervisory employee.

The Court dismisses Dillard's aiding and abetting claim against Wilson because the Complaint does not allege facts showing that Wilson substantially aided the discrimination. From what the Court can discern, the Complaint alleges that Wilson threatened Dillard with disciplinary action after he reported another employee for unspecified misconduct and

insubordination. There is no allegation that Wilson knew of Dillard's complaints of discrimination. Therefore, because the Complaint does not allege that Wilson aided and abetted the "principal violation" of race discrimination, the Court dismisses this claim.

By contrast, the Court finds that King has not sufficiently alleged an aiding and abetting claim against any Individual Defendant. Even drawing all reasonable inferences in King's favor, the only complained-of conduct that he attributes to an Individual Defendant involved his September 2017 letter to Knapp and October 2019 letter of resignation to Knapp. Specifically, King claims that he notified Knapp by letter in September 2017 that he had been subjected to a hostile work environment. In October 2019, he notified Knapp that he was resigning "as [a] result of the hostile work environment." Compl. ¶ 61. While "claims of inaction may be actionable under the NJLAD," a plaintiff must show that "the inaction 'rises to the level of providing substantial assistance or encouragement.' " *Randall v. Rutgers, State Univ. of N.J.*, No. 13-07354, 2014 WL 6386814, at *4 (D.N.J. Nov. 14, 2014) (quoting *Failla v. City of Passaic*, 146 F.3d 149, 158 n.11 (3d Cir.1998)). Here, the Complaint does not allege any affirmative conduct on the part of Knapp, and there are no other specific allegations that would allow the Court to infer that Knapp substantially assisted or encouraged the discrimination. Thus, King's aiding and abetting liability claims are dismissed. [12]

[12] Plaintiffs have not asserted aiding and abetting claims against Blain, and the aiding and abetting claims against the remaining Individual Defendants fail due to the group pleading defects discussed *supra*.

### E. Count III (Violation of CEPA)

**\*9** The Court next considers whether Plaintiffs have plausibly pled retaliation claims under CEPA. To establish retaliation, a plaintiff must show: "(1) the plaintiff reasonably believed the employer's conduct violated a law or regulation; (2) the plaintiff performed 'whistle-blowing activity' as defined in CEPA; (3) an adverse employment action has been taken against [him]; and (4) the whistle-blowing activity caused such adverse employment action." *Martone v. Jet Aviation Flight Servs. Inc.*, No. 19-21011, 2020 WL 3969919, at *3 (D.N.J. July 13, 2020) (internal citation omitted). Covered "whistle-blowing activity" includes an employee's

disclosure "to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes ... is in violation of a law." N.J.S.A. § 34:19-3(a). The Third Circuit has stated that "in order for actions to qualify under CEPA, they must have impacted on the employee's compensation or rank or be virtually equivalent to discharge." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 241 (3d Cir. 2016) (internal citation and quotation marks omitted). [13] CEPA claims are subject to a one-year statute of limitations. N.J.S.A. § 34:19-5.

[13] The Court acknowledges Plaintiffs' citation to *Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 448 (2003), in which the New Jersey Supreme Court found that an "adverse employment action" under CEPA may include "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." However, in view of the Third Circuit's more recent decision in *Fraternal Order of Police, Lodge 1*, the Court will apply the definition employed by the Third Circuit.

King's retaliation claim must be dismissed because the Complaint does not plausibly allege a causal connection between his protected activity and an adverse employment action. King claims that he engaged in protected activity in September 2017 by reporting workplace discrimination to Knapp. The only timely alleged adverse action, however, occurred more than two years later in October 2019, when King was suspended without pay. These events, without more, are too temporally distant to support a finding of causation. *See Perry v. Lee*, No. 19-17899, 2020 WL 3396805, at *7 (D.N.J. June 19, 2020) (finding one-year period between protected activity and adverse action "tend[ed] to negate any inference of causation"). Furthermore, Plaintiff cannot rely on the allegations that he was subjected to "unwarranted internal affairs investigations and poor performance evaluations" to satisfy the adverse employment action element. Compl. ¶ 34. First, these bald assertions are plainly insufficient under Federal Rule of Civil Procedure 8. *See* Fed. R. Civ. P. 8. Second, there is no allegation that these actions impacted his compensation or rank or were equivalent to a discharge. Therefore, King's CEPA claim is dismissed.

The Court also dismisses Dillard's CEPA claim. Dillard alleges that he was denied a promotion on five occasions after reporting discrimination and other misconduct. Although the

Complaint is sparse on details, the Court can only infer that these denials occurred sometime before May 2018, the month that Dillard filed a complaint with the Division. *See* Compl. ¶ 48 ("In or around May 2018, after having been skipped for Captain five times, ... Dillard lodged a complaint against the [MCPO] with the [Division]"). As these adverse actions occurred more than one year before Dillard filed this civil action on October 17, 2019, they cannot form the basis of his CEPA claim. *See* N.J. Stat. Ann. § 34:19-5 (providing for one-year statute of limitations). Moreover, Dillard's allegations regarding poor performance evaluations, threatened disciplinary action, undesirable assignments, and racist remarks do not qualify as "adverse employment actions" because he does not claim they affected his compensation or rank [14] or were equivalent to a discharge. Thus, Dillard's CEPA claim is dismissed.

[14] While the Complaint alleges that being sent out "on loan" was "an assignment typically given to young detectives, in the beginning of their law enforcement careers," it does not allege that this assignment impacted his rank. Compl. ¶ 55.

### F. Count IV (Disability Discrimination Under the ADA and NJLAD)

**\*10** The Entity Defendants argue that King's Count IV disability discrimination claims must be dismissed because King has failed to state a *prima facie* claim under either the ADA or NJLAD. The Court agrees. [15]

[15] In addition to the group pleading defects noted above, King's ADA claims against seven of the Individual Defendants must fail because "[t]he ADA does not create private causes of action against individuals." *Owens v. Armstrong*, 171 F. Supp. 3d 316, 331 (D.N.J. 2016).

ADA and NJLAD disability discrimination claims are analyzed under the same framework. *See Victor v. State*, 203 N.J. 383, 416 (2010). To state a claim for discrimination under both statutes, "a plaintiff must allege that: (1) he is a disabled person within the meaning of the ADA [and NJLAD]; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Brown v. City of Long Branch*, 380 F. App'x 235, 238 (3d Cir. 2010)

(internal citation and quotation marks omitted). An "adverse employment action" means an action that is " 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.' " *Whitehead v. Cty. of Monmouth*, No. 15-5352, 2015 WL 7776896, at *3 (D.N.J. Dec. 2, 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). "Both the ADA and NJLAD afford protections to a person who does not have a disability, but is 'perceived as' or 'regarded as' having a disability." *Dennis v. Cty. of Atl. Cty.*, 863 F. Supp. 2d 372, 378 (D.N.J. 2012) (citing 42 U.S.C. § 12102(3)(A), N.J.A.C. 13:13–1.3).

Here, King's disability discrimination claim is based on a one-sentence conclusory paragraph in the Complaint. Specifically, the Complaint alleges that Defendants failed to provide him with "reasonable accommodations," "targeted him for discipline" by subjecting him to "internal affairs investigations, causing [him] to be placed in a State Police database and/or registry," and taking other unspecified "administrative actions" against him because of an unidentified "perceived disability" and for "seeking alcohol and/or drug dependency treatment." Compl. ¶ 87. Even assuming that King has alleged a covered disability, the Complaint lacks specific factual allegations regarding his duties, whether he requested an accommodation, his ability to perform the essential functions of his job with or without an accommodation, or a causal connection between a covered adverse action and the alleged discrimination. *Gist v. Princeton Healthcare Sys.*, No. 14-6449, 2015 WL 4619518, at *3 (D.N.J. July 31, 2015). As King cannot rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," the Court grants the Entity Defendants' motion to dismiss the ADA and NJLAD disability discrimination claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Furthermore, to the extent King brings a retaliation claim under the ADA and NJLAD, that claim is dismissed, as well. "To state a claim for retaliation under the ADA or NJLAD, Plaintiff must first show 1) that [ ]he requested a reasonable accommodation, 2) that [ ]he suffered an adverse employment action, and 3) a causal connection between the two events." *Adesanya v. Novartis Pharm. Corp.*, No. 13-05564, 2016 WL 4401522, at *7 n.13 (D.N.J. Aug. 15, 2016) (citing *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004)). Here, the Complaint lacks sufficient factual detail to satisfy any of the *prima facie* elements. Thus, King has not stated a claim for retaliation.

2020 WL 4932527

### G. Count V (42 U.S.C. Section 1983)

**\*11** The MCPO, the County, Speirs, Murzenski, and McNamara argue that Count V must be dismissed because neither Plaintiff has adequately alleged a constitutional violation under Section 1983. The Court disagrees.

Plaintiffs claim that they were subjected to a racially hostile work environment in violation of Section 1983. *See* Compl. ¶ 91; ECF No. 25 at 20-22. Generally, Section 1983 claims require proof: "(1) [of a] violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed or caused by a person amenable to suit under § 1983 and acting under color of state law." *Holley v. Port Auth. of N.Y. & N.J.*, No. 14-7534, 2018 WL 4953008, at \*2 (D.N.J. Oct. 12, 2018) (internal citations omitted). Where the right involved is the denial of equal protection, a plaintiff must "prove the existence of purposeful discrimination" and "demonstrate that they received different treatment from that received by other individuals similarly situated." *Ugorji v. N.J. Envtl. Infrastructure Tr.*, No. 12-5426, 2014 WL 2777076, at \*4 (D.N.J. June 19, 2014).

"Within this framework, a plaintiff can ... advance a hostile work environment claim under the Fourteenth Amendment." *Holley*, 2018 WL 4953008, at \*2. To establish a hostile work environment, a plaintiff must demonstrate: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) a basis for personal liability." *Rayfield v. City of Paterson*, No. 17-5144, 2018 WL 2859528, at \*7 (D.N.J. June 11, 2018).

Here, the Court's analysis of Plaintiffs' NJLAD hostile work environment claims applies equally to the first four elements of their Section 1983 hostile work environment claims. *See Hanani v. State of N.J.*, No. 03-3111, 2005 WL 1308231, at \*15 (D.N.J. May 31, 2005), *aff'd sub nom. Hanani v. State of N.J. Dep't of Envtl. Prot.*, 205 F. App'x 71 (3d Cir. 2006) (analyzing NJLAD and Section 1983 hostile work environment claims under same framework). As set forth above, Plaintiffs have sufficiently alleged that they were subjected to intentional severe or pervasive discrimination based on race. With respect to Dillard, the Complaint alleges that over the course of his employment, he was denied five promotions "every time by a White male," subjected to

racial remarks, and given poor performance evaluations and undesirable assignments after complaining of discrimination. Compl. ¶¶ 25, 40-42, 48, 53-54. It is clear that Dillard was detrimentally affected by this conduct because he alleges that he raised both internal and external complaints about discrimination in the workplace. Moreover, given the nature of the allegations, which include allegations of overtly racist conduct, and the fact that the Division allegedly substantiated his complaint, the Court is satisfied that the complained-of behavior would detrimentally affect a reasonable person of the same race in the same position.

Similarly, the Complaint alleges that King was subjected to overtly racist conduct throughout his employment. According to the Complaint, in April 2018, King was told to "sit outside the room" while White colleagues ate breakfast. *Id.* ¶ 37. The next month, a co-worker showed King an arrest photograph of a Black male and stated that it was "like looking in a mirror." *Id.* ¶ 36. When King attempted to resign due to the alleged hostile work environment, he claims that the MCPO refused to accept his resignation under the pretense that he had disciplinary charges pending against him. Another employee, however, was permitted to retire "despite having open IA complaints." *Id.* ¶ 59. Like Dillard, it is clear that King was detrimentally affected by this conduct because he complained about it internally. Furthermore, the Court finds that such overtly discriminatory conduct would detrimentally affect a reasonable person of the same race in the same position.

**\*12** As to the fifth element, both Plaintiffs have plausibly alleged a basis for liability against the Entity Defendants. Under Section 1983, "liability attaches to a municipality only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.' " *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). A "custom" may include "[a] course of conduct ... when, though not authorized by law, such practices of state officials [are] so permanent and well settled as to virtually constitute law." *Id.* at 1480 (internal citations and quotation marks omitted).

Here, Plaintiffs have sufficiently alleged liability as to the Entity Defendants because they claim to have suffered a constitutional deprivation as a result of the higher-ranking officials' course of conduct.[16] Specifically, the Complaint alleges that higher-ranking officials systematically use the performance evaluation and internal affairs processes to

2020 WL 4932527

disparage, remove from promotional consideration, target for discipline, and retaliate against minority employees. As a result, Dillard claims that he was passed over for promotions and his complaints of discrimination were used against him in the performance evaluation process. Furthermore, King alleges that after he complained of discrimination, his complaints were ignored, and he was not permitted to resign due to pending disciplinary charges against him. The MCPO, however, allowed another employee who had pending disciplinary charges to retire. On these allegations, the Court finds that Plaintiffs have stated Section 1983 claims against the Entity Defendants.

16   In their opposition, Plaintiffs refer to the "policy" of the Entity Defendants. ECF 25 at 22. A "policy" under Section 1983 requires the issuance of "an official proclamation, policy, or edict." *Andrews*, 895 F.2d at 1480 (3d Cir. 1990) (quoting *Monell*, 436 U.S. at 694). The Complaint does not allege any official policy. However, viewing the allegations in the light most favorable to Plaintiffs, the Court finds that the Complaint sufficiently alleges a "custom" under Section 1983.

The Court also concludes that Dillard has stated Section 1983 claims against Speirs, McNamara, and Murzenski. An individual may be held liable under Section 1983 if there is "some affirmative conduct by the supervisor that played a role in the discrimination," which can be shown "through proof of direct discrimination by the supervisor." *Id.* at 1478 (internal citations omitted). As detailed above, the Complaint alleges that Speirs, McNamara, and Murzenski knowingly used Dillard's complaints of discrimination against him in the performance evaluation process. Because the Complaint alleges that Speirs, McNamara, and Murzenski directly participated in the alleged discrimination, Dillard has adequately alleged supervisory liability as to these three Individual Defendants.

With respect to King, the Court finds that he has not plausibly alleged supervisory liability against Knapp. An individual who has "actual knowledge and acquiescence" in discrimination may be held liable under Section 1983. *Id.* at 1478. The Third Circuit has stated that "the existence of ... acquiescence leading to discrimination must be pled ... with appropriate specificity." *Id.* As discussed above, King claims that he notified Knapp of the discrimination, but no action was taken and the conduct continued. While the Complaint alleges that Knapp had knowledge of the discrimination, it lacks specific allegations regarding Knapp's acquiescence. Therefore, the Court will dismiss King's supervisory liability claim without prejudice to replead with the appropriate specificity.

### H. Qualified Immunity

**\*13**   Finally, the Court finds that Speirs, Murzenski, and McNamara are not entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Bayer v. Monroe Cty. Child. & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009) (internal citation and quotation marks omitted). The right to be free from race discrimination in the workplace "is a right that is, objectively, clearly established." *Ugorji*, No. 12-5426, 2014 WL 2777076, at \*6 (D.N.J. June 19, 2014) (citing *Andrews*, 895 F.2d at 1480). As Dillard has sufficiently alleged that their conduct directly contributed to the racially hostile work environment he experienced, the doctrine of qualified immunity does not apply.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motions are **GRANTED in part** and **DENIED in part**. The Court grants Plaintiffs thirty (30) days from the date of this Opinion to file an amended complaint that cures the deficiencies identified herein. An appropriate Order accompanies this Opinion.

### All Citations

Slip Copy, 2020 WL 4932527

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 793885
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Amy Michele GENEVIE, Plaintiff,

v.

Alphonso JACKSON, Secretary of Housing
and Urban Development, Defendant.

Civil Action No. 05-1733.
|
March 24, 2008.

**Attorneys and Law Firms**

Amy Michele Genevie, Moon Township, PA, pro se.

Michael C. Colville, United States Attorney's Office,
Pittsburgh, PA, for Defendant.

*MEMORANDUM OPINION*

CONTI, District Judge.

**\*1** In this memorandum opinion, the court considers the
motion for summary judgment (Docket No. 19) filed by
defendant Alphonso Jackson, Secretary of Housing and
Urban Development ("defendant" or the "Agency"), against
all claims asserted by plaintiff Amy Michele Genevie
("Genevie" or "plaintiff") under Title VII of the Civil Rights
Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title
VII") and the Equal Pay Act of 1963, as amended, 29 U.S.C.
§ 206(d) ("Equal Pay Act"). After considering the joint
statement of material facts ("joint statement" or "J.S."), and
the other submissions of the parties, and based upon the
undisputed facts of record, viewing all disputed facts in favor
of plaintiff and drawing all reasonable inferences in favor of
plaintiff, defendant's motion for summary judgment will be
granted.

**I.** *Factual and Procedural Background*

A. *Plaintiff's Employment with OIG*
Genevie, a female, was hired by the Office of Inspector
General ("OIG") of the Department of Housing and Urban
Development ("HUD") in July 1998 as a GS-7 level auditor
in the Financial Audits Division in Washington, D.C. (J.S., ¶

1.) In July 1999 plaintiff was promoted to GS-9 and in July
2000 she was promoted to GS-11. (*Id.* ¶ 2.) In October 2000
plaintiff transferred to the Pittsburgh, Pennsylvania office.
(*Id.* ¶ 3.) Plaintiff's second level supervisor, the Regional
Inspector General for Audit ("RIGA"), during the time period
relevant to this case was Daniel Temme ("Temme"). (*Id.* ¶
4.) Plaintiff's immediate supervisor, the Assistant Regional
Inspector General for Audit ("ARIGA"), during the time
period relevant to this case was Christine Begola ("Begola").
(*Id.* ¶ 5.)

In July 2001 plaintiff became eligible for promotion to GS-12,
but was not promoted. (*Id.* ¶ 7.) The decision not to promote
plaintiff to GS-12 in July 2001 was made by Temme, Begola's
supervisor. (*Id.* ¶ 8.) On July 24, 2001, plaintiff sent an email
to Temme stating she noticed that she was not promoted.
(*Id .* ¶ 9.) In July 2002, Genevie again was not recommended
for promotion to GS-12. (*Id.* ¶ 60.) In August 2002, Begola
had a mid-year evaluation review with plaintiff. (*Id.* ¶ 61.)
Begola informed plaintiff that she would not be promoted
to GS-12 because of perceived issues with timeliness and
communication with superiors. (*Id.* ¶ 62.) Plaintiff's annual
performance evaluation for the time period February 2001 to
January 2002 stated:

> [The plaintiff] needs to work on
> completing her assignments in a timely
> fashion and providing a more accurate
> status of the work in progress to
> her supervisors.... [T]he work is not
> timely, which in part, helped delay the
> overall issuance of the draft report.

(*Id.* ¶ 63.)

Begola discussed meeting established deadlines with plaintiff
throughout the year preceding her potential promotion date.
(*Id.* ¶ 64.) Plaintiff's End of Assignment Evaluation in April
2002 stated, "she did not prepare her work papers on a timely
basis.... This had an effect on the date of the issuance of the
PHAS audit report." (*Id.* ¶ 65.)

**\*2** The Agency's stated reasons for not promoting plaintiff
were her inability to perform at her existing level and her
failure to demonstrate that she had the ability to perform
at a higher level. (*Id.* ¶ 93.) Since 2000, plaintiff has been
told that her work is untimely and her audit findings need

supporting documentation. (*Id.* ¶ 94.) In 2000, plaintiff's End of Assignment Evaluation provided by Debra Braun ("Braun"), the auditor in charge ("AIC") on one of the audits to which plaintiff was assigned, stated the following:

> Communication as to the actual steps completed and additional work not finished needs to be accurate and clear. I believe the problems with finishing this section of the FS audit occurred to a large degree because thirteen steps were being reported as completed back on November 17, 2000, when one through seven had not been executed.

> Time management is an area needing close attention on assignments. When beginning a W/p [work paper] set a goal for a time of completion. It is important to stay on task and focused.

(*Id.* ¶ 96.) Plaintiff disagrees with the statements in Braun's End of Assignment Evaluation because Braun herself had problems with performance related to the areas of written communication and technical skills and time resources. (*Id.* ¶ 97.)

For the appraisal period from October 2000 to January 2001, plaintiff's review noted that, "Amy and her AIC [Braun] miscommunicated on the status of the job completion and therefore the assignment did not progress according to established timeframes [sic]." (*Id.* ¶ 98.) Plaintiff's performance appraisal for the period between February 2001 and January 2002 stated that, "Ms. Genevie needs to work on completing her assignments in a timely fashion and providing a more accurate status of the work in progress to her supervisors." (*Id.* ¶ 99.) Plaintiff's End of Assignment Evaluation for the period February 2001 to January 2002 stated:

> An area Amy needs to improve on is the timely preparation of her work and providing a more accurate status on the completion of work to her supervisors. During the OHAS audit, she did not prepare her work papers on a timely basis .... This had an effect on the date and issuance of the PHAS audit report.

(*Id.* ¶ 100) (inconsistency in original).

From January 2001 through May 2002 plaintiff alleges that she was doing the job of Chandra Dey ("Dey"), a male, during the "HUD's Utilization of the Public Housing Assessment System" ("PHAS") audit, a national audit. (*Id.* ¶ 15.) Plaintiff alleges that Dey possessed neither the knowledge nor the experience to carry out his responsibilities and therefore she had to assume many of these responsibilities, while being paid at the GS-11 level. (*Id.* ¶ 16.) When asked about plaintiff's allegations that she performed Dey's responsibilities during the PHAS audit, Temme explained that plaintiff was assigned duties during the PHAS audit that comported with her grade level. (*Id.* ¶ 17.)

**\*3** Dey came to HUD as a GS-12 auditor, and applied for and was selected for his current GS-13 senior auditor position. (*Id.* ¶ 18.) Dey was a GS-13 senior auditor during the period from January 2001 through May 2002. (*Id.* ¶ 19.) Plaintiff was a GS-11 auditor during that same period. (*Id.* ¶ 20.) Dey was assigned to the PHAS audit because he had previously conducted a nationwide audit as the AIC. (*Id.* ¶ 21.) Dey was designated the AIC on the PHAS audit because he was the most senior auditor on the audit, and was therefore considered to be the most capable of handling a nationwide review. (*Id.* ¶ 22.)

Plaintiff asserts that she wrote the audit program, conducted portions of the audit alone, supported most of the audit findings, and wrote significant portions of the audit report. (*Id.* ¶ 23.) Temme stated that according to the work papers documenting the audit, the audit program was largely created by the original AIC, Allen Leftwich, who was Dey's predecessor. (*Id.* ¶ 24.) Temme and Begola stated that auditors at the GS-11 grade level are required to document their own findings. (*Id.* ¶ 25.) Based upon the position description for a GS-13 auditor, Dey's responsibilities as AIC in the PHAS audit included reviewing the findings of staff auditors and assimilating them into a final report. (*Id.* ¶ 26.) The PHAS audit was completed more than six months after its target date. (*Id.* ¶ 27.)

Plaintiff was promoted to GS-12 in October 2002. (*Id.* ¶ 69.) Temme said that he decided to promote plaintiff because she had made some improvement over the year, it appeared that the audit she was working on was on track, and he felt it would motivate her to perform at a higher level. (*Id.* ¶ 70.)

On September 16, 2003, Begola spoke with plaintiff as part of plaintiff's mid-year review. (*Id.* ¶ 101.) Plaintiff was

informed in writing in December 2003 that she would not be promoted to GS-13. (*Id.* ¶ 102.) In the December 2003 memorandum, Temme stated that plaintiff was not going to be promoted because her work over the past year had not demonstrated that she had the ability to perform at the GS-13 level. (*Id.* ¶ 103.) Temme also stated in the December 2003 memorandum that plaintiff's work continued to be untimely and the documentation required to support her work was deficient. (*Id.* ¶ 104.)

In an End of Assignment Evaluation for the time period February 2004 through December 2004, Begola, plaintiff's supervisor, noted that, "Ms. Genevie needs to work in the area of time management to ensure assigned segment [sic] are completed within the established timeframe [sic]." (*Id.* ¶ 105.) Begola gave plaintiff a memorandum, dated December 3, 2004, discussing plaintiff's performance. (*Id.* ¶ 106.) The December 3, 2004 memorandum communicated Begola's concerns regarding plaintiff's performance, especially plaintiff's continual failure to meet deadlines. (*Id.* ¶ 107.) The December 3, 2004 memorandum to plaintiff stated in part:

> **\*4** A successful GS-12 Auditor must demonstrate the ability to timely execute an audit, be cognizant of milestone dates and complete assigned work within the established timeframe [sic]. However, you continually fail to meet deadlines for various assignments. Throughout the current review of the Baltimore Housing Authority, the AIC continually provided you with deadlines .... Throughout the audit, established deadlines were continually missed, even after you provided input as to the specific date the work would be completed .... Good management of time and resources is at the core of every successful auditor, and you must improve your performance in these areas.

(*Id.* ¶ 108.)

The memorandum gave specific examples of situations where important deadlines were missed, and urged plaintiff to improve her performance in the area of time management and resource management. (*Id.* ¶ 109.) The memorandum suggested six steps that Begola believed were ways that plaintiff could improve her performance, including, among others, such things as forecasting work to be performed in a given week, reviewing work completed at the end of each week to insure tasks have been accomplished, and eliminating non-work related distractions. (*Id.* ¶ 110.) The memorandum further warned that if the deficiencies in plaintiff's performance were not corrected, Begola would have to initiate more formal corrective action in the form of an Opportunity to Improve period, which if not successfully completed could result in plaintiff's demotion or removal. (*Id.* ¶ 111.) For the rating period February 2004 to January 2005, Begola again noted that, "Ms. Genevie needs to remain cognizant of properly referencing her work papers," and "[t]ime management is a continual challenge for Ms. Genevie and has been discussed with her on several occasions." (*Id.* ¶ 112.) Since the year 2000, the Agency consistently documented plaintiff's performance problems. (*Id.* ¶ 114.)

Plaintiff disagrees with the statements concerning untimely work and supporting documentation for audit findings contained in her evaluations and performance appraisals. (*Id.* ¶ 95.) Plaintiff contends that the perceived deficiencies in her work performance resulted from being assigned more work and being held to a higher standard for documenting work than the rest of the staff. (Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 58.)

### B. *Temme and Begola-Record of Promotions*

Both Temme and Begola have a record of promoting employees under their supervision. (J.S. ¶ 71.) Temme selected Begola, a female, to be an Assistant Regional Inspector General for Audit, a GS-14 position. (*Id.* ¶ 72.) Temme stated that as of December 2003, he had been in his position of Regional Inspector General for Audit for about four years. (*Id.* ¶ 76.) Temme has denied a male auditor, John Morris ("Morris"), promotion to the GS-12 level several times. (*Id.* ¶ 77.) Temme stated that Morris had been denied promotion to the GS-12 level for more than ten years. (*Id.* ¶ 78.) Temme denied Morris a promotion to GS-12 for several years, both before plaintiff was denied her promotion and after she was given her promotion. (*Id.* ¶ 79.) At the time of Temme's departure from the Agency, he was denying career-ladder promotions to three individuals, two females

(one being the plaintiff) and one male. (*Id.* ¶ 80.) Kimberly Harrison, a female auditor under Begola's supervision, was promoted from GS-9 to GS-11 in February 2003, and then to GS-12 in April 2004. (*Id.* ¶ 81.) Begola also promoted another female, Debra Braun, to GS-12 in March 2003. (*Id.* ¶ 82.) Begola did not recommend the promotion of any male to GS-13 during her tenure as the Assistant Regional Inspector General for Audit. (*Id.* ¶ 83.)

### C. *Career Ladder Progression for Auditors*
**\*5** The career ladder progression for auditors, like plaintiff, in the OIG is from a GS-7 auditor (entry-level) to a GS-13 senior auditor. (*Id.* ¶ 28.) The responsibilities at each grade become progressively more demanding and accountable. (*Id.* ¶ 29 .) Both Begola and Temme reference the written standards for the GS-11, GS-12, and GS-13 auditor positions in evaluating the performance of auditors on their staff. (*Id.* ¶ 30.) Auditors are expected to demonstrate the elements contained in the standards for their position. (*Id.* ¶ 31.) The distinctions between the grade levels are mainly related to knowledge, skill and responsibility. (*Id.* ¶¶ 32-44.) Generally, a GS-13 auditor is expected to be able to lead and manage an audit with minimal supervision, while a GS-12 requires more supervision, and a GS-11 auditor requires even more supervision. (*Id.* ¶ 47.) When asked about the expectations for a GS-13 auditor, Temme stated:

> We expect more from them. They're supposed to control the audit. They're supposed to divvy out things, keep the ARIGA posted. They're the front person.

(*Id.* ¶ 50.)

Under 5 C.F.R. Part 300, Subpart F § 300.604(a), "Time-in-Grade Restrictions," an Office of Personnel Management regulation governing the promotion of Federal employees, an employee must spend one year at the lower grade level in order to become eligible for a promotion to the next grade level. (*Id.* ¶ 51.)

### D. *Discrimination Claim*
On August 22, 2002, plaintiff initiated contact with an EEO counselor. (*Id.* ¶ 10.) As the basis for her EEO complaint,

plaintiff stated: "On August 9, 2002, I learned that my promotion was being denied again. I felt that I have been treated different [sic] than male staff as it relates to the career ladder promotion procedures." (*Id.* ¶ 11.) On the EEO complaint form, plaintiff stated that she sought corrective action in the form of "Retroactive promotion to GS-12 as of eligibility date, 7/01/01." *Id.* ¶ 12. Plaintiff filed a formal complaint with the EEO on October 17, 2002, alleging discrimination on the basis of sex and violation of the Equal Pay Act. (Compl. ¶ 8; Pl.'s Ex. U.) Although plaintiff was a GS-11 in July 2002, plaintiff sought a retroactive promotion as of July 2002 to the GS-13 level, because if she had been promoted to the GS-12 level in July 2001, when she was first eligible, she would have been eligible for promotion to the GS-13 level in 2002. (J.S. ¶ 68.)

### E. *Retaliation Claims*
In August 2002 plaintiff initiated contact with an EEO counselor. (*Id.* ¶ 10.) In October 2002, two months after she contacted the counselor and the same month she filed her EEO complaint, Temme promoted plaintiff to GS-12 because she appeared to be progressing well and he hoped the promotion would motivate her to continue to improve. (*Id.* ¶ 117.) On December 3, 2004, plaintiff's supervisor issued a memorandum to plaintiff, noting deficiencies in plaintiff's performance and urging plaintiff to improve her performance. (*Id.* ¶ 118.) The December 3, 2004 memorandum gave specific examples of situations where important deadlines were missed, and urged plaintiff to improve her performance in the areas of time management and resource management. (*Id.* ¶ 119.) While the memorandum brought performance deficiencies to plaintiff's attention, and offered a method by which she could improve, it had no impact on plaintiff's compensation or any other terms, conditions or privileges of employment. (*Id.* ¶ 120.) Temme testified: "our whole goal is to try to get staff fully trained and operational, competence [sic] so they can be our front line 13s. And the quicker I do that, the easier it is for me to do my job ... and our production is going to be up." (*Id.* ¶ 121.) In February 2004 plaintiff amended her EEOC complaint to claim retaliation and discrimination for the December 3, 2004 memorandum regarding her performance. (*Id.* ¶ 122.)

**\*6** In March 2005, plaintiff received both her Annual Performance Appraisal for the 2004 year and an End of Assignment Evaluation for a project that she worked on in 2004. (*Id.* ¶ 124.) Both the Annual Performance Appraisal and the End of Assignment Evaluation gave plaintiff a passing rating, but the evaluations also stated that plaintiff

had difficulties producing work products that were timely and properly documented. (*Id.* ¶ 125.) While the comments in the Annual Performance Appraisal state that plaintiff has trouble with time management, since 2000 the Agency has consistently documented plaintiff's difficulties in completing work assignments in a timely manner. (*Id.* ¶ 129.) In plaintiff's March 2005 End of Assignment Evaluation, plaintiff received a "pass" rating in all elements. (*Id.* ¶ 130.) The comments on this rating, however, also noted plaintiff's difficulties in producing a timely, well-documented work product. (*Id.* ¶ 131.) On March 25, 2005, plaintiff amended her administrative complaint to allege retaliation for the Annual Performance Appraisal and End of Assignment Evaluation. (*Id.* ¶ 126.)

## II. Procedural History

On July 26, 2005, an administrative law judge conducted a hearing concerning plaintiff's claims. (*Id.* ¶ 84.) In a decision issued on August 18, 2005, the administrative judge found that plaintiff failed to establish a prima facie case of sex discrimination under Title VII, (*id.* ¶ 92), and that plaintiff failed to establish a prima facie case of sex discrimination under the Equal Pay Act. (Compl.¶ 14.) With respect to plaintiff's retaliation claims, the administrative judge found that plaintiff failed to establish a prima facie case. (J.S. ¶ 134.) On September 14, 2005, the Agency accepted the administrative judge's decision. (Compl.¶ 16.) On September 19, 2005, plaintiff received the Agency's notice of acceptance of the administrative judge's decision. (*Id.* ¶ 17.) Having exhausted her administrative remedies, plaintiff timely filed her complaint in the instant action. Plaintiff's complaint reiterates her claims of discrimination on the basis of sex, violation of the Equal Pay Act, and retaliation claims, which were included in February 2004 as amendments to her EEOC complaint. Defendant moved for summary judgment and plaintiff opposed the motion.[1]

[1] After defendant filed a reply to plaintiff's response, plaintiff filed a document entitled: Plaintiff's Response to the Defendant's Additional Evidence Provided in Response to the Plaintiff's Response to the Agency's Motion for Summary Judgment (Docket No. 36), along with a slew of exhibits, asserting that defendant's evidence was false and misleading. Plaintiff, however, did not obtain leave of court to file this document. The court denied the motion and instructed plaintiff that for the court to consider the issues she raised, i.e., that the

defendant presented false and misleading evidence, she would need to file a motion to strike and reminded plaintiff that, despite the fact that she is *pro se,* she is subject to Rule 11 of the Federal Rules of Civil Procedure. As of the date of this opinion, plaintiff has not filed a motion to strike or a motion for reconsideration. Consequently, "Plaintiff's Response to the Defendant's Additional Evidence Provided in Response to the Plaintiff's Response to the Agency's Motion for Summary Judgment" will not be considered for purposes of this decision.

## III. *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Southeastern Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir.2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").

**\*7** The Supreme Court held in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and *Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings* and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions

on file," designate "specific facts showing that there is a genuine issue for trial."

*Id.* at 324 (emphasis added). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

### IV. *Discussion*

In defendant's pending motion for summary judgment, four issues are presented for disposition: A) whether plaintiff's original contact with an EEO counselor regarding her sex discrimination claim for the Agency's failure to promote her to GS-12 level auditor in July 2001 was timely made pursuant to 29 C.F.R. § 1614.105(a)(1); B) whether plaintiff established a prima facie case under the Equal Pay Act; C) whether plaintiff met her burden of adducing sufficient evidence of record for a reasonable jury to find that the proffered reason for the Agency's failure to promote her to GS-13 level auditor in August, 2002 was pretext; and D) whether plaintiff established a prima facie case of retaliation under Title VII. The court will address each issue in turn.

### A. Timeliness of Plaintiff's Sex Discrimination Claim for the Agency's Failure to Promote Her to GS-12 Level Auditor in July 2001

A threshold question before the court is the timeliness of plaintiff's initial contact with an EEO counselor. 29 C.F.R. § 1614 .105(a)(1) requires:

> An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory, or, in the case of a personnel action, *within 45 days* of the effective date of the action.

29 C.F.R. § 1614.105(a)(1) (emphasis added). On July 24, 2001, plaintiff became aware of the act alleged to be discriminatory, her non-promotion to GS-12 level auditor. Plaintiff's initial contact with an EEO counselor was more than one year later-August 22, 2002.

Plaintiff, who is acting pro se, asserts that her claim is timely under one or both of the twin doctrines of continuing violation

or equitable tolling, although plaintiff's memorandum does not couch her position in those exact terms. The gist of plaintiff's argument is that although she was aware that she was not promoted to GS-12 auditor on July 24, 2001, defendant's denial to promote her continued until October 6, 2002, when the plaintiff was promoted to GS-12. Plaintiff also argues that, although she was aware that she was not promoted to GS-12 auditor on July 24, 2001, she did not know the reasons why until August 2002, and appears to rely on equitable tolling principles.

#### 1. *Continuing Violation*

**\*8** The continuing violation doctrine is an equitable remedy that is applicable when a defendant's conduct is part of a continuing practice. *Cowell v. Palmer Twp.,* 263 F.3d 286, 292 (3d Cir.2001). The application of the doctrine operates to make "an action ... timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.,* 927 F.2d 1283, 1295 (3d Cir.1991) (citing *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1129 (3d Cir.1988)). The continuing violation doctrine does not apply when a plaintiff is aware of the injury at the time it occurs. *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.,* 331 F.3d 406, 417 n. 6 (3d Cir.2003). The Supreme Court has made clear that a failure to promote is a discrete act that "occurred" on the day that it "happened," and therefore the continuing violation doctrine in a Title VII case is inapplicable to such a claim. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (Title VII case).

While it is true, as plaintiff argues, that defendant continued to deny her a promotion to GS-12 from July 24, 2001 until October 6, 2002, when plaintiff was promoted to GS-12, the discriminatory act giving rise to her claim "occurred" on the day that it first "happened," thereby commencing the 45-day period for her to contact an EEO counselor. To find otherwise would make the 45-day time limit contained in 29 C.F.R. § 1614.105 meaningless. By way of example, under plaintiff's theory of the case, plaintiff's co-worker John Morris, a male auditor, who had been denied promotion to the GS-12 level for more than ten years, would still have a viable claim if discrimination played a part in the decision not to promote him ten years earlier. Even the most liberal reading of the regulation proscribes the result urged by plaintiff.

2. *Knowledge of Reason for Failure to Promote*

Plaintiff's other argument-that her claim is timely because, although she knew she was not promoted to GS-12 in July 2001, she did not know the reasons why until August 2002-must also be rejected. In employment discrimination cases, the United States Court of Appeals for the Third Circuit has recognized that "a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong." *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1386 (3d Cir.1994); *see Good v. Federal Reserve Bank of Cleveland,* No. 05-cv-383, 2007 WL 2955615, at *4 (W.D.Pa. Oct.9, 2007). "Indeed, once the adverse employment act occurs, such as termination or failure to promote, the employee becomes obligated to make further inquiry into the circumstances surrounding the adverse action." *Good,* 05-cv-383, 2007 WL 2955615, at *5 (citing *Bouker v. CIGNA Corp.,* No. 94-cv-39, 1994 WL 594273, at *2 (E.D.Pa. Oct.24, 1994)). Here, plaintiff knew she was not promoted and did not make further inquiry.

3. *Equitable Tolling*

**\*9** Plaintiff also relies on the doctrine of equitable tolling, in substance though not in name, to support the timeliness of her failure to promote claim. As its name suggests, equitable tolling is designed to prevent statutes of limitation from working unfair results. The United States Court of Appeals for the Third Circuit has identified three principal situations in which equitable tolling is particularly appropriate:

(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action;

(2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or

(3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.

*Robinson v. Dalton,* 107 F.3d 1018, 1022 (3d Cir.1997).

There is no evidence that the first or third scenarios are applicable to this claim. Furthermore, there are no facts of record to support a finding by a finder of fact that plaintiff's assertion of her rights was thwarted by any extraordinary means. In order for a plaintiff to be entitled to equitable tolling on an otherwise time-barred claim, a plaintiff must "exercise due diligence in preserving [her] claim." *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). Equitable tolling is an extraordinary

remedy which should be only sparingly extended. *Id.* Plaintiff failed to produce evidence sufficient to justify the application of equitable tolling to her retroactive promotion to GS-12 claim.

On July 24, 2001, plaintiff knew she was denied her promotion to GS-12. Plaintiff, however, did not initiate contact with an EEO counselor until over a year later, well beyond the 45-day period required by statute. Under those circumstances, plaintiff's sex discrimination claims for failure to promote her to GS-12 auditor in July 2001 is untimely and summary judgment must be granted in favor of defendant on this claim.

**B. Plaintiff's Equal Pay Act Claim**

Plaintiff asserts a claim under the Equal Pay Act. The basis for this claim is plaintiff's contention that from January 2001 through May 2002 she was performing equal work to Dey, the GS-13 AIC of the PHAS audit. Additionally, plaintiff claims that at some point, she performed work equal to or exceeding that of work of three similarly situated males: Ramiro, Dey, and David Kasperowicz ("Kasperowicz"), an independent verifier on the McKeesport Housing Authority Maintenance Audit who was promoted to ARIGA during the course of that audit.

To establish a prima facie case under the Equal Pay Act, a plaintiff must adduce evidence that employees of the opposite sex were paid differently for performing "equal work." *Stanziale v. Jargowsky,* 200 F.3d 101, 107 (3d Cir.2000). "Equal work" is defined as "work of substantially equal skill, effort and responsibility, under similar working conditions." *Id.* (citing *EEOC v. Del. Dep't of Health and Soc. Services,* 865 F.2d 1408, 1413-14 (3d Cir.1989)).

**\*10** In determining what constitutes "equal work," the courts have looked beyond job titles to distinguish whether the jobs are substantially equal. *See Brobst v. Columbus Services International,* 761 F.2d 148 (3d Cir.1985); *Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 265-66 (3d Cir.1970), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). In *Welde v. Tetley, Inc.,* 864 F.Supp. 440, 442 (M.D.Pa.1994), the court elaborated on the elements of the "equal work" test, noting:

"Skill" includes an assessment of such factors as experience, training, education and ability. 29 C.F.R. § 1620.15. "Effort" refers to the physical or mental exertion needed to perform the job. 29 C.F.R. § 1620.16.

"Responsibility" concerns the degree of accountability required in performing a job, with emphasis on the importance of the job obligation. 29 C.F.R. § 1620.17. These three terms-skill, effort, responsibility-"constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14(a).

*Id.*

Additionally, in *Brobst,* the court of appeals held:

> The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e. whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different.

761 F.2d at 156, (citations omitted). In *Brobst,* the court also commented:

> The interpretive regulation issued by the Department of Labor makes clear that, "In applying the various tests of equality to the requirements for the performance of such jobs, it will generally be necessary to scrutinize the job as a whole and to look at the characteristics of the jobs being compared *over a full work cycle."* 29 C.F.R. § 800.119 (1984).

*Id.* at 158 (citations omitted) (emphasis in original).

While it is recognized that Dey being a GS-13 and that plaintiff being a GS-11 during the relevant time period are not determinative on the equal pay issue, it is also not a distinction without a difference. To support her claim plaintiff would need to show that Dey and she were performing substantially the same work. Plaintiff's allegations, however, suggest at most that during the relevant time period she performed some of the same functions as Dey, not that the two were performing "substantially the same work over a full work cycle." *Brobst,* 761 F.2d at 158. Plaintiff also pointed to Ramiro and Kasperowicz as comparators. There, however, is insufficient evidence for a reasonable finder of fact to conclude that plaintiff was performing equal work to Ramiro or Kasperowicz other than plaintiff's bare assertion. Plaintiff's Equal Pay Act claim rests solely on conclusory allegations

and references to exhibits that appear to be either some kind of staffing chart or documents that relate to the proper documentation of work papers, but do nothing to bolster her claim. For these reasons, plaintiff failed to adduce sufficient evidence to establish a prima facie case. If undisputed facts of record, after resolving all disputed facts in favor of plaintiff and drawing all reasonable inferences in favor of plaintiff, compel the conclusion that no reasonable finder of fact could find that plaintiff can establish a prima facie case for her Equal Pay Act claim, it is not necessary to conduct the further analysis that involves burden-shifting or affirmative defenses. On the record before the court, no reasonable finder of fact could render a verdict in her favor on her Equal Pay Act claim. Summary judgment will be granted in favor of defendant on this claim.

### C. Plaintiff's Sex Discrimination Claim for the Agency's Failure to Promote Her to GS-13 Level Auditor in August 2002

**\*11** Plaintiff also asserts a claim of sex discrimination under Title VII based upon the failure of the Agency to promote her in August 2002. [2] Title VII makes it unlawful for an employer to discriminate against any person with respect to compensation, terms, conditions, or privileges of employment on the basis of sex. 42 U.S .C. § 2000e-2(a)(1). Since 1972 Title VII has required that personnel actions affecting federal employees "shall be made free from any discrimination based on race, color religion, sex or national origin. 42 U.S.C. § 2000(e)-16(a). The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

2
> In addition to plaintiff's sex discrimination claim for the Agency's failure to promote her to GS-12 auditor on July 24, 2001, which the court found was untimely, plaintiff also asserts a claim of sex discrimination based on the failure to promote her to GS-13 on August 9, 2002, a claim that was timely made. The premise of this claim is that had plaintiff been promoted to GS-12 in July 2001 she would then have been eligible for promotion to

GS-13 in August 2002, and the fact that she was not is what gives rise to the claim. Although the court can not accept this logic, for it presupposes that plaintiff would have performed satisfactorily at the GS-12 level for an entire year when, for aught that appears, she was unable to perform at least satisfactorily enough to obtain that position, noting again that plaintiff is before the court pro se, rather than dismiss the claim because of the more technical deficiencies inherent in it, it will be analyzed on its merits.

In *McDonnell Douglas,* the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims. The *McDonnell Douglas* framework requires a plaintiff alleging a violation of Title VII to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 254; *see also Id.* at n. 6. In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " *Id.*

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 644 n. 5 (3d Cir.1998). The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true,* would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision...." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994) (emphasis added) (citations omitted).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, " 'the *McDonnell Douglas* framework-with its presumptions and burdens'-disappear[s], ... and the sole remaining issue [is] 'discrimination *vel non,*' ...." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citations omitted). The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.

*Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999).

**\*12** To state a claim for discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position for which she applied; (3) she was subject to adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's qualifications to fill the position. *McDonnell Douglas,* 411 U.S. at 802; *Burdine,* 450 U.S. at 253; *Sarullo v. United States Postal Service,* 352 F.3d 789, 797 (3d Cir.2003).

The first three elements of a prima facie case are met here: plaintiff is a member of a protected class (female); she was qualified for the promotion (as that element is taken to mean that she was eligible for the promotion); and she was not promoted.

The fourth element of a prima facie case in issue here is whether there is evidence of record that males were more favorably treated than plaintiff. More specifically, whether males with qualifications similar to plaintiff were promoted to GS-13 while she was not. The United States Court of Appeals for the Third Circuit in *Scheidemantle v. Slippery Rock Univ. State System of Higher Education,* 470 F.3d 535 (3d Cir.2006), set forth two guiding principles with respect to considering when to determine whether a prima facie case under Title VII has been established. *Id.* at 538. First, Title VII is a remedial statute, so it must be interpreted broadly in order to effectuate its purpose. *Id.* at 538-39. Second, there is a low bar for establishing a prima facie case of employment discrimination. *Id.* at 539.

> In Title VII cases involving a dispute over "subjective" qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the *McDonnell Douglas* ... analysis, to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case .... Because the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement.

*Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir.1993) (internal citations omitted) (quoted in *Scheidemantle,* 470 F.3d at 539). In consideration of the broad statutory interpretation and the low bar for the Title VII prima facie case contemplated by the United States Court of Appeals for the Third Circuit, the court will assume for purposes of summary judgment that plaintiff has met her initial burden of establishing a prima facie case of employment discrimination. Under the *McDonnel Douglas* framework, the court must now consider whether defendant proffered a legitimate, nondiscriminatory reason for not promoting plaintiff.

Defendant offered two reasons for not promoting plaintiff: plaintiff's inability to perform at her existing level and not demonstrating that she had the ability to perform at a higher level. The record before the court is replete with documentation evidencing plaintiff's performance problems relating to the timeliness of her work and the improper documentation of her work papers. Def.'s Exs. C, D, F, G, K, L, M, P. Therefore, the court is satisfied that defendant set forth a legitimate, non-discriminatory reasons for not promoting plaintiff and met its burden of production.

**\*13** Plaintiff now must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'..." *Id.* at 765 (citing *Ezold,* 983 F.2d at 531; emphasis in *Fuentes* ). Furthermore, plaintiff needs to show more than that the employer's decision was "wrong or mistaken," but that the decision was actually motivated by discriminatory animus. *Id.*

Plaintiff argues she should have been promoted, but her evidence consists of pointing to other arguably equally undeserving employees, male (i.e.Dey) and female (i.e.Braun), who were nevertheless promoted, as well as a number of ways in which her supervisors failed to assess adequately her performance. Plaintiff provided no evidence that any of the adverse employment decisions plaintiff suffered were motivated by discriminatory animus towards her based upon her sex. Even read generously, plaintiff's only proof that she has been the victim of employment

discrimination based upon her sex appears to be her belief. Reviewing the evidence proffered by plaintiff, the court must conclude that she failed to present sufficient evidence for a reasonable finder of fact to find that defendant's reasons were not worthy of credence. Just to be perfectly clear, the court is not concerned with whether or not plaintiff deserved to be promoted; rather, the court is only concerned with whether or not the Agency's failure to promote her was because of impermissible and illegal discrimination. A reasonable finder of fact could not render a verdict in her favor on this claim. Therefore, summary judgment is granted in defendant's favor with respect to plaintiff's sex discrimination claim for failure to promote her in August 2002.

**D. Plaintiff's Retaliation Claim**

Plaintiff asserts a retaliation claim against the Agency alleging that a December 2004 memorandum critical of her performance and her Annual Appraisal and an End of Assignment Evaluation in March 2005, both of which contained critical comments, were issued in retaliation for plaintiff having filed her discrimination complaint in October 2002 [3].

3
> In plaintiff's affidavit plaintiff states that she believed her "current assignment" and an incident when she was required to travel to Baltimore, Maryland to document her work papers from the Allegheny Housing Authority's Drug Elimination Grant audit were also instances of retaliation. Pl.'s Ex. A at 9-10. Because plaintiff has adduced no evidence of record to support her contention that these incidents were adverse, they will not be considered as part of her retaliation claim for purposes of this opinion.

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse;" and (4) there was a causal connection between her participation in the protected activity and the adverse employment action. *LeBoon v. Lancaster Jewish Cmty. Center Ass'n,* 503 F.3d 217, 231-32 (3d Cir.2007) (citing *Moore v. City of Philadelphia,* 461 F.3d 331, 341-42 (3d Cir.2006)); *see Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). In *Burlington Northern* the Supreme Court held that under the anti-retaliation provision of Title VII employer

actions are materially adverse if the actions are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2409.

**\*14** Plaintiff's opposition to summary judgment on this claim consists, *in toto,* of identifying the elements of a prima facie case, more or less as the court has done above, and simply stating that all of the elements are met. Plaintiff points to the first three elements and argues that management's knowledge of her protected activity resulted in negative comments on her performance evaluations and the "continuous" failure to promote her. she also argues without pointing to any evidence, that she can prove a direct link between the protected activity and the adverse employment actions. Simply arguing that there is a direct link, however, does not make it so. "Although courts are to resolve any doubts as to the existence of genuine issues of fact against the parties moving for summary judgment, Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982).

The first step in embarking on a Title VII retaliation claim analysis is determining whether or not plaintiff has established a prima facie case.

The Agency concedes that plaintiff satisfied the first element of a prima facie case, that she engaged in conduct protected by Title VII. The second element of the prima facie case, whether or not plaintiff was subjected to an adverse employment action, and the third element, whether or not the adverse action was "materially adverse" as disputed by the parties. Defendant's argument is predicated on three district court cases, *Holliday v. Comcast Cable Communications, LLC,* No. 05-cv-2554, 2007 WL 551514 (E.D.Pa. Feb.16, 2007) (plaintiff placed on performance improvement plan, but successfully completed it), *Sykes v. Pa. State Police,* No. 05-cv-1349, 2007 WL 141064 (W.D.Pa. Jan.17, 2007) (plaintiff's actions belied the argument that the employer's actions would deter reasonable person from engaging in protected activity), and *Meyer v. Nicholson,* 441 F.Supp.2d 735 (W.D.Pa.2006) (memorandum in issue never placed in the plaintiff's personnel file and a report authored by a fellow employee had not been received by the decision maker), all of which were decided after the new standard announced in *Burlington Northern,* and recognize that not all employer conduct believed by an employee to be

adverse constitute an adverse employment action. Negative performance evaluations and written reprimands, however, may constitute adverse employment actions. *See Hempfling v. United Refining Co. of Pa.,* No. 06-cv-335, 2008 WL 201900 (W.D.Pa. Jan.23, 2008) ("write-ups" was adverse employment action under identical standard of the Age Discrimination in Employment Act), *EEOC v. Novartis Pharmaceuticals Corp.,* No. 05-cv-404, 2007 WL 2905892 (W.D.Pa. Sept.28, 2007) ("conduct memorandum" and "Territory Coaching Plan" considered adverse employment action), *Cooper v. City of Philadelphia,* No. 06-cv-576, 2007 WL 1825399 (E.D.Pa. June 21, 2007) ("negative performance evaluation" considered adverse employment action). Whether the writings in issue are so critical of plaintiff's performance that they were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington Northern,* 126 S.Ct. at 2409, is a close question and the court will assume, *arguendo,* and without deciding, that plaintiff could establish that the December 2004 memorandum and the March 2005 Annual Performance Appraisal and End of Assignment Evaluation satisfied the materially adverse employer conduct elements of the prima facie case.

**\*15** The dispute with respect to plaintiff's retaliation claim, thus, turns on whether plaintiff can demonstrate a causal nexus between her protected activity and the adverse action taken by defendant. With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. *Abramson v. Wm. Patterson College of N.J.,* 260 F.3d 265, 288 (3d Cir.2001) ("Temporal proximity ... is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920-21 (3d Cir.1997) ("Temporal proximity is sufficient to establish the causal link."); *Jalil v. Avdel Corp.,* 873 F.2d 701 (3d Cir.1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); *but c .f. Quiroga v. Hasbro, Inc.,* 934 F.2d 497 (3d Cir.1991) (affirming lower court's determination that the timing of the plaintiff's discharge

2008 WL 793885

alone did not raise an inference of retaliation); *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997) (causation prong not established on timing alone where nineteen months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing, however, in connection with other types of suggestive evidence, is sufficient to demonstrate the causal links. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir.2000). For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. *Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir.1986); *Abramson,* 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see also EEOC v. L.B. Foster Co.,* 123 F.3d 746, 753-54 (3d Cir.1997), *cert. denied,* 522 U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998).

In this case the alleged retaliatory adverse action occurred more than two years after the protected activity engaged in by plaintiff, i.e., contacting an EEO counselor on August 22, 2002 and filing an EEO complaint in October 2002 asserting discrimination based on sex for the Agency's failure to promote her. Generally, as is the case here, an intervening period of more than two years between the protected activity and the allegedly adverse act will not be "unusually suggestive" of retaliatory animus. *See, e.g., Krouse v. American Sterilizer Co.,* 126 F.3d 494 (3d Cir.1997) (intervening period of 19 months). In order to establish the requisite causal nexus, plaintiff must, therefore, adduce probative evidence of ongoing antagonism or implausibilities in defendant's reasons for not promoting her. "[W]e have indicated that the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." *Shaner v. Synthes,* 204 F.3d 494, 505 (3d Cir.2000) (citing *Krouse,* 126 F.3d at 503-04 ("Absent evidence of intervening antagonism or retaliatory animus, we conclude that the passage of time [between the filing of plaintiff's charge and the alleged retaliatory action] in this case is conclusive and that [plaintiff] failed to establish a causal link as a matter of law."); *Woodson,* 109 F.3d at 920-21).

*16 Plaintiff, has produced no evidence of intervening antagonism or retaliatory animus, or any other evidence that establishes a causal connection between the protected activity and the adverse acts. What is exceptionally noteworthy in this case is that plaintiff was promoted in the period between her protected activity and the alleged retaliatory actions. Likewise, plaintiff has offered no evidence to support a finding that defendant's reasons for the adverse employment actions were vague or inconsistent. "Revealing discrepancies in the proffered reasons can also constitute evidence of the causal link." *Abramson,* 260 F.3d at 289. The record in this case, however, is rife with evidence documenting defendant's consistent position that plaintiff's work performance was unsatisfactory with respect to timeliness and documentation of work product, both before and after plaintiff engaged in protected activity. Based upon the evidence of record, viewing disputed facts in favor of plaintiff, and drawing all reasonable inferences in plaintiff's favor, the court concludes that a reasonable finder of fact could not conclude that a causal link exists between plaintiff's protected activities and the adverse actions. Summary judgment will be granted in favor of defendant with respect to plaintiff's claims for retaliation.

In the interest of completing the analysis, the court notes that even if plaintiff had been able to establish a prima facie case, summary judgment on this claim would still be appropriate because plaintiff did not address the Agency's legitimate, non-discriminatory reasons for the adverse employment actions, nor produce any evidence or even argue that these reasons were pretext and that discrimination, more likely than not, was the real reason for the critical comments contained in the memorandum and evaluations. *See, e.g., Shaner,* 204 F.3d at 501; *Sheridan v. E.I. Dupont de Nemours & Co.,* 100 F.3d 1061, 1067 (3d Cir.1996) (*en banc* ).

## V. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted, and the case is dismissed with prejudice. The clerk shall mark this case closed.

An appropriate order shall issue.

## All Citations

Not Reported in F.Supp.2d, 2008 WL 793885

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 3780078
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Mary A. GRIFFIN, Appellant

v.

STATE OF NEW JERSEY DEPT. OF HUMAN
SERVICES; Lisa Markowitz Green; Virginia Carlson;
Christina Mongon; Jean Divitto; Lauri Woodward

No. 19-2751
|
Submitted Pursuant to Third
Circuit LAR 34.1(a) June 23, 2021
|
(Opinion filed: August 26, 2021)

On Appeal from the United States District Court for
the District of New Jersey (D.C. Civil Action No. 3-18-
cv-14697), District Judge: Honorable Freda L. Wolfson

**Attorneys and Law Firms**

Mary A. Griffin, Willingboro, NJ, Pro Se.

Kathryn M. Hansen, Esq., Office of Attorney General of New
Jersey, Agnes I. Rymer, Esq., Office of Attorney General of
New Jersey, Division of Law, Trenton, NJ, for Defendants -
Appellees.

Before: MCKEE, SHWARTZ, and RESTREPO, Circuit
Judges

OPINION [*]

[*]    This disposition is not an opinion of the full Court
and pursuant to I.O.P. 5.7 does not constitute
binding precedent.

PER CURIAM

**\*1**  Appellant Mary Griffin appeals the District Court's order
dismissing her complaint. For the reasons set forth below, we
will affirm.

Griffin, presently a 60-year-old African American female,
was hired by the New Jersey Department of Human Services
("DHS") in 2001 as a Technical Assistant III ("TA3"). A
second TA3, a white female, was hired one year later, but
was given the more favorable title of Senior Clerk Typist.
Because they performed the same work, DHS agreed to
change Griffin's job title to Senior Clerk Typist as well.
However, a year later, Griffin was demoted back to her
original title because she had not completed a required typing
exam or desk audit. Griffin allegedly requested a desk audit
but never received one, an action that Griffin contended was
an effort to block her from career advancement.

Nearly a decade later, in 2012, Griffin claimed that she was
subject to disciplinary actions based on false accusations.
She alleged that other DHS employees publicly demeaned
her, made comments about her religion, circulated emails
about her, and prevented her from moving to a different
internal job. After Griffin filed a discrimination grievance that
same year, her coworkers allegedly continued to levy false
accusations against her in retaliation. She continued to inquire
to supervisors about her promotion until 2014.

In 2018, Griffin filed a complaint in federal court alleging
violations of the New Jersey Law Against Discrimination
("NJLAD"), N.J. Stat. Ann. § 10:5-12; Title VII of the Civil
Rights Act of 1964; the Age Discrimination in Employment
Act ("ADEA"); the Fair Labor Standards Act ("FLSA");
and the Fourteenth Amendment. The District Court granted
defendants' motion to dismiss, determining that Griffin's
claims were untimely. This timely pro se appeal followed. [1]

[1]      This appeal was originally administratively closed
after Griffin failed to file an opening brief.
However, Griffin filed a motion for relief under
Rule 60(b) in the District Court, which we
construed as a motion to reopen her appeal. We
granted the requested relief and reopened this
appeal. Griffin v. State of N.J. Dep't of Human
Srvcs., No. 20-2000 (3d Cir. July 13, 2020).

We have jurisdiction under 28 U.S.C. § 1291 and exercise
plenary review over the District Court's dismissal under Rule
12(b)(6). See W. Penn Allegheny Health Sys., Inc. v. UPMC,
627 F.3d 85, 97 (3d Cir. 2010). To state a claim, a civil

complaint must set out "sufficient factual matter" to show that its claims are facially plausible. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We construe Griffin's pro se complaint liberally. See Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam).

On appeal, Griffin challenges only the District Court's determination that the continuing violations doctrine did not apply to her NJLAD claim. [2] She argues in her brief that her supervisors refused to include her "out-of-title" work in her yearly performance evaluations from 2016 to 2018. She states that she was promoted in 2018 only after other defendants retired from their positions. However, those factual allegations were not included in Griffin's original complaint or amended complaint and we therefore cannot consider them on appeal. See Tri-M Grp., LLC v. Sharp, 638 F.3d 406, 416 (3d Cir. 2011) (noting that arguments not raised in the district court will not be considered for the first time on appeal).

[2]     In her opening brief, Griffin did not contest the District Court's dismissal of her Title VII, ADEA, FLSA, and Fourteenth Amendment claims, and she has thus forfeited these claims. See M.S. by & through Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 124 n.2 (3d Cir. 2020).

*2 We agree that Griffin's claims, as alleged in her complaint, were untimely. Claims under the NJLAD are subject to a two-year statute of limitations. See Montells v. Haynes, 133 N.J. 282, 627 A.2d 654, 655 (1993). Under the continuing violations doctrine, "[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." Wilson v. Wal-Mart Stores, 158 N.J. 263, 729 A.2d 1006, 1010 (1999). However, discrete acts—such as demotions, transfers, and failures to promote—do not fall under the continuing violations doctrine and are subject to the NJLAD's two-year statute of limitations. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); Roa v. Roa, 200 N.J. 555, 985 A.2d 1225, 1232-33 (2010).

Here, Griffin alleged only discrete acts such that the continuing violations doctrine does not apply. She complained that she was demoted in 2003 and was denied the tests required for a promotion. She was again passed over for a promotion in 2011. Then, in 2012, she was subject to disciplinary action based on allegedly false accusations. [3]  A demotion, a failure to promote, and a single disciplinary action are discrete acts of discrimination that do not justify application of the continuing violations doctrine. See O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006) (holding that "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation" were discrete acts not subject to the continuing violations doctrine); Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 803 A.2d 611, 622 (2002). Thus, because the last discrete act that Griffin alleged in the District Court (in her response to the defendants' motion to dismiss) occurred in 2014 at the latest, the District Court correctly concluded that the 2018 complaint was untimely.

[3]     Griffin sometimes characterizes her claim as one of hostile work environment. However, as detailed in the text above, she complains of discrete acts, and "individually actionable allegations cannot be aggregated." Roa, 985 A.2d at 1232 (quoting O'Connor, 440 F.3d at 127). In any event, however characterized, these acts all occurred well more than two years before Griffin filed her complaint. In her complaint, Griffin also included a list of undated actions allegedly taken by various coworkers. See Compl. at 5-6. However, nothing in the list indicates that the actions were discriminatory in nature or that they continued into the limitations period. Griffin did not mention these allegations in her brief at all, let alone clarify when they occurred.

Accordingly, we will affirm the judgment of the District Court.

**All Citations**

--- Fed.Appx. ----, 2021 WL 3780078

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 672262, 2015 Fair Empl.Prac.Cas. (BNA) 182,770

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Quick v. GEO Group, Inc.,  W.D.Pa.,  February 3, 2020

2015 WL 672262
United States District Court,
W.D. Pennsylvania.

Ruby HELVY, Plaintiff,
v.
ALLEGHENY COUNTY and Allegheny County Department of Emergency Services, Defendants.

No. 2:14–cv–01686–TFM.
|
Filed Feb. 17, 2015.

**Attorneys and Law Firms**

Joseph Pometto, Michael L. Kraemer, Kraemer, Manes & Associates LLC, Pittsburgh, PA, for Plaintiff.

Virginia Spencer Scott, Pittsburgh, PA, for Defendants.

***MEMORANDUM OPINION***

TERRENCE F. McVERRY, Senior District Judge.

**\*1** Pending before the Court is DEFENDANTS' MOTION TO DISMISS (ECF No. 8) filed by Allegheny County and Allegheny County Department of Emergency Services [1] ("Defendant"), along with a BRIEF IN SUPPORT (ECF No. 11). Ruby Helvy ("Plaintiff") has filed a BRIEF IN OPPOSITION TO DEFENDANTS' MOTION (ECF No. 12). Accordingly, the motion is ripe for disposition. For the following reasons, the Court will grant the motion in part, and deny it in part.

[1]   The Allegheny County Department of Emergency Services is a subunit of the County, not an independent legal entity. Thus, the Department is not subject to suit in its own right, and the County, itself, is the proper Defendant in this action. See *Neil v. Allegheny Cnty.,* No. CIV.A. 120348, 2012 WL 3779182, at \*1 (W.D.Pa. Aug.31, 2012) (citations omitted). ("In a section 1983 action, police departments and other departments of a municipality are not separate legal entities from

the municipality and cannot, therefore, be sued separately."). The Department will, therefore, be dismissed from this action.

**I. Background**

Plaintiff, an African–American woman, was employed by Defendant as a 9–1–1 dispatcher from 2005 until 2014, taking 9–1–1 calls and relaying them to emergency workers in the field. On December 5, 2012, Plaintiff's supervisors, Rebecca Frazier and Stephanie Ware, suspended Plaintiff for one day without pay, allegedly because she was not at her desk during a call. Late the next month, on January 26, 2013, Plaintiff was suspended for three days without pay, allegedly because she asked officers to repeat themselves too many times during calls.

On February 15, 2013, Plaintiff submitted an intake questionnaire to the Equal Employment Opportunity Commission ("EEOC"), alleging that she was suspended because of her race. [2] Two days later, Plaintiff was suspended for two days without pay for her "general attitude, neglect of duty and politeness." The next month, Plaintiff was suspended from March 11–17, 2013, without pay, for displaying insufficient effort and inattention to detail. On May 16, 2013, Plaintiff filed a formal EEOC charge, which referenced all of the allegedly discriminatory conduct occurring from December 2012 to May 2013.

[2]

In her complaint, Plaintiff alleges that she "filed her initial, formal charge with the [EEOC]" on February 15, 2013, and she refers to Exhibit 1 as the "formal charge." Am. Compl. P. 20. Exhibit 1 is not, however, an EEOC charge form; it is an intake questionnaire. These are distinct forms that "serve different purposes." *Barzanty v. Verizon PA, Inc.,* 361 F. App'x 411, 415 (3d Cir.2010). "An Intake Questionnaire facilitates 'pre-charge filing counseling' and allows the Commission to determine whether it has jurisdiction to pursue a charge." *Id.* (quoting *Federal Express Corp. v. Holowecki,* 552 U.S. 389, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008)). It "is not shared with the employer during the pendency of the EEOC investigation." *Id.* In contrast, a formal charge delineates the scope of the EEOC's investigation and notifies the defendant of the charges filed against it. *Id.* (citations omitted). It appears as though Plaintiff's formal charge was not filed until May 16, 2013. *See* Ex. 2. Thus, this charge, as

supplemented in December 2013 and April 2014, defined the scope of the EEOC investigation and, in turn, the scope of this lawsuit.

Plaintiff was again suspended in November 2013. Around that same time, Defendant suspended a white, female co-worker; however, unlike Plaintiff, the white, female co-worker was suspended for a shorter period of time than Plaintiff and was given "split time." On December 5, 2013, Plaintiff filed a supplement to her EEOC charge, reflecting the new instance of alleged discrimination.

On March 23, 2014, Ware reprimanded Plaintiff for cancelling a call, allegedly while others who engaged in similar conduct were not so reprimanded. On April 3, 2014, Plaintiff again supplemented her EEOC charge to include this allegedly discriminatory act.

Plaintiff was issued a right-to-sue letter on September 8, 2014. On October 24, 2014, she was suspended without pay indefinitely, pending a termination hearing, allegedly as a result of a neglect of duty.

Plaintiff filed suit in the Allegheny County Court of Common Pleas on November 19, 2014. Defendant then timely removed the action to this Court. On December 22, 2014, Defendant filed a motion to dismiss. Plaintiff responded by filing an amended complaint, alleging claims for disparate treatment, hostile work environment, and retaliation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"). This motion then followed.

## II. Legal Standard

**\*2** A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. The Court must accept as true all well-pleaded facts and allegations and must draw all reasonable inferences therefrom in favor of the plaintiff. However, as the Supreme Court made clear in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007), the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* The Supreme Court has subsequently broadened the scope of this requirement, stating that only a complaint that states a plausible claim for relief survives a motion to dismiss. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

A district court must conduct a two-part analysis when presented with a motion to dismiss for failure to state a claim.

First, the Court must separate the factual and legal elements of the claim. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). Although the Court "must accept all of the complaint's well-pleaded facts as true, [it] may disregard any legal conclusions ." *Id.* at 210–211. Second, the Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Id.* at 211 (citing *Iqbal,* 556 U.S. at 679). Determining "plausibility" is " 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* at 211 (quoting *Iqbal,* 556 U.S. at 679).

## III. Discussion

Defendant seeks to dismiss three aspects of Plaintiff's amended complaint. First, Defendant argues that all claims arising out of Plaintiff's October 24, 2014, suspension pending termination should be dismissed because Plaintiff failed to exhaust her administrative remedies with respect to that action. Second, Defendant argues that Plaintiff's reprimand on March 23, 2014, does not rise to the level of an "adverse employment action" and consequently all claims related to that incident should be dismissed. Third, Defendant argues that Plaintiff cannot recover punitive damages under either Title VII or the PHRA. These issues will be addressed *seriatim.*

### A. October 24, 2014, Suspension

Defendant first contends that Plaintiff failed to exhaust her administrative remedies as to her October 24, 2014, suspension pending termination. Plaintiff counters that she was not required to file another charge with the EEOC for this claim because it was within the scope of her prior complaints.

A plaintiff must exhaust her administrative remedies before filing a Title VII suit in federal court. *Spence v. Straw,* 54 F.3d 196, 200 (3d Cir.1995). The exhaustion requirement may not be applicable, however, where a plaintiff has already filed an EEOC charge and the subsequent acts "are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Waiters v. Parsons,* 729 F.2d 233, 237 (3d Cir.1984). Accordingly, the Court must "examine carefully the prior pending EEOC complaint[s] and the unexhausted claim ... before determining that [another EEOC] complaint need not have been filed." *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir.1997).

**\*3** Plaintiff filed her formal charge of discrimination on May 16, 2013. In the charge form, she specifically referenced the December 2012 and January, February, and March 2013 suspensions and claimed that Defendant's actions amounted to racial discrimination and retaliation and also created a hostile work environment. On December 4, 2013, Plaintiff supplemented her EEOC charge to include the November 2013 suspension, again alleging discrimination and retaliation. On April 3, 2014, Plaintiff filed an additional supplement, which described the March 2014 reprimand and, as with the other incidents, alleged that it was discriminatory and retaliatory.

The Court concludes that Plaintiff's claim related to her October 24, 2014, suspension is fairly encompassed within the scope of her prior EEOC charges. Plaintiff alleges that her suspension and eventual termination "was the product of th[e] same [discriminatory and] retaliatory intent" that animated Defendant's earlier actions. *See Waiters,* 729 F.3d at 238. This incident was, in essence, a continuation of the prior discrimination and retaliation. Thus, Plaintiff was not required to file an additional charge with the EEOC as to this incident.

### 2. March 23, 2014, Reprimand

Defendant next argues that any claims related to Ware's reprimand of Plaintiff in March 2014 should be dismissed because Ware's conduct did not amount to an adverse employment action. In order for a reprimand to be individually actionable under Title VII, it must have affected the terms and conditions of the plaintiff's employment. *See Weston v. Pennsylvania,* 251 F.3d 420, 430–31 (3d Cir.2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345, (2006).* As the Court of Appeals has explained, "[f]ormal reprimands that result in a notation in an employee's personnel file could be sufficiently concrete" to amount to an adverse employment action, "but harsh words that lack real consequences are not." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1298 (3d Cir.1997), *overruled in part on other grounds by Burlington,* 548 U.S. at 53).

The amended complaint contains just one paragraph regarding this incident. Namely, Plaintiff alleges, "Ware reprimanded [her] for cancelling a call." Am. Compl. ¶ 33. She says nothing, however, about whether this reprimand had an effect on her employment status or the terms and conditions of her employment. She does not even describe what form the

reprimand took. Thus, the Court agrees with Defendant that this incident is not individually actionable, and Defendant's motion is granted to the extent Plaintiff seeks to base her disparate treatment claim on this incident.

Although Plaintiff seems to concede that this incident is not individually actionable, she suggests that it can still be considered as part of her hostile work environment claim.[3] It is true, as Plaintiff argues, that hostile work environment claims can be "based on the cumulative effect of individual acts," which, on their own, may not be actionable under Title VII. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The trouble with Plaintiff's argument, however, is that she cannot simply "cobbl[e] together a number of distinct, disparate acts"—the same acts that make up her disparate treatment claim—and label it "a hostile work environment." *Brantley v. Kempthorne,* No. CIV.A. 06–1137ESH, 2008 WL 2073913, at \*8 (D.D.C. May 13, 2008). So, "[f]or example, if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate disparate treatment claims under Title VII, but it would not create a hostile work environment claim...." *Id.* Something more is required to adequately state a hostile work environment claim: allegations of a pervasive pattern of behavior that makes going to work virtually unbearable. Otherwise, "the distinctions between both the elements that underpin" disparate treatment claims and hostile work environment claims "and the kinds of harm each cause of action was designed to address" would be significantly blurred. *Parker v. State Dep't of Pub. Safety,* 11 F.Supp.2d 467, 475 (D.Del.1998).

3    In her brief, Plaintiff spends almost an entire page discussing the continuing violation doctrine, but the Court fails to see how that doctrine is implicated in this case. The continuing violation doctrine allows a plaintiff to base a hostile work environment claim, in part, on non-discrete acts of discrimination that fall outside the of the limitations period so long " 'as they are linked in a pattern of actions which continues into the applicable limitations period.' " *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir.2013) (quoting *O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir.2006)). But in this case, all of the allegedly discriminatory acts occurred well within the limitations period, so Plaintiff has no need

Case 4:21-cv-00872-MWB   Document 24-2   Filed 09/15/21   Page 43 of 101

to attempt to revive otherwise stale allegations by alleging that they were part of a continuing violation.

**\*4** Plaintiff ignores this principle. As she acknowledges in her brief in response to Defendant's motion, her hostile work environment claim, though separately pled, is premised on the very same factual allegations underlying her disparate treatment claims. *See* Pl.'s Br. at 7, ECF No. 11 (referring to the four suspensions and arguing that "these acts formed the basis of a hostile environment complaint"). She has not alleged any additional facts. Thus, the Court is quite skeptical of whether Plaintiff has pleaded enough to proceed to discovery. Fortunately for Plaintiff, Defendant has not moved to dismiss her hostile work environment claim on this, or any other, basis, so the Court is constrained to allow this claim to survive—at least at this stage. But a word of caution is in order: summary judgment will be granted in favor of Defendant on this claim unless Plaintiff can come forward with evidence of "severe or pervasive conduct" that altered the terms and conditions of her employment. *Mandel,* 706 F.3d at 167. She will not be "permitted to 'bootstrap' her alleged discrete acts of discrimination and retaliation into a broader hostile work environment claim." *Brantley,* 2008 WL 2073913, at \*8.

### C. Punitive Damages

Finally, Defendant moves to dismiss Plaintiff's claim for punitive damages. The Court agrees that dismissal is warranted. It is clear that "[p]unitive damages are not available under Title VII" where, as here, "the defendant is a 'government,' a 'government agency,' or a 'political subdivision.'" *Phillips v. Donahoe,* No. CIV.A. 12–410, 2013 WL 5963121, at \*23 n. 37 (W.D.Pa. Nov.7, 2013) (quoting 42 U.S.C. § 1981a(b)(1)). Likewise, as Defendant correctly observes, punitive damages are also not available under the PHRA. *See Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 749 (Pa.1998)). Accordingly, no matter what Plaintiff uncovers in discovery, she will not, as a matter of law, be able to recover

punitive damages, and this aspect of Defendant's motion is granted.

### IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss will be granted in part, and denied in part. An appropriate order follows.

---

### *ORDER*

**AND NOW,** this 17th day of February, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, and DECREED** that DEFENDANTS' MOTION TO DISMISS (ECF No. 8) is **GRANTED IN PART,** and **DENIED IN PART.** The motion is **DENIED** insofar as it seeks to dismiss any claims based on Plaintiff's October 24, 2014, suspension; **GRANTED** insofar as the March 23, 2014, reprimand is not individually actionable; and **GRANTED** insofar as it seeks to dismiss Plaintiff's request for punitive damages.

It is **FURTHER ORDERED** that the Allegheny County Department of Emergency Services is **DISMISSED** as a Defendant, and the caption of this action is amended is hereby **AMENDED** as follows:

Defendant shall file an answer to Plaintiff's amended complaint **on or before March 3, 2015.** The parties shall confer as necessary and shall file with the Court the Stipulation Selecting ADR Process and the Rule 26(f) Report **on or before March 10, 2015.** The Initial Case Management Conference is hereby **SCHEDULED** on **March 17, 2015, at 8:30 a.m.** in Courtroom 6C.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 672262, 2015 Fair Empl.Prac.Cas. (BNA) 182,770

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4394274

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   Kutty v. SAP America, Inc.,   E.D.Pa.,   February 10, 2020

2015 WL 4394274
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Donna INGRAM, et al., Plaintiffs,

v.

The VANGUARD GROUP, INC., et al., Defendants.

Civil Action No. 14–3674.
|
Filed July 17, 2015.

**Attorneys and Law Firms**

Bacardi L. Jackson, Joe H. Tucker, Jr., Leslie Miller Greenspan, The Tucker Law Group, Philadelphia, PA, for Plaintiffs.

Grace E. Speights, Morgan, Lewis & Bockius LLP, Washington, DC, Joseph J. Costello, Wonho John Lee, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Defendants.

## OPINION

SLOMSKY, District Judge.

## I. INTRODUCTION

**\*1** Plaintiffs Donna Ingram, Jo DiGiovanni, and Wendy Kenworthy bring this lawsuit against the Vanguard Group, Inc. ("Vanguard") and several individuals who supervised them during their tenure at Vanguard. They allege that during their employment at Vanguard they were subjected to employment discrimination, retaliation, and a hostile work environment in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., ("Title VII"), the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, et seq., (the "PHRA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., (the "ADEA").

In the Amended Complaint (Doc. No. 24), Plaintiffs assert the following claims:

- Count I: Plaintiff Ingram against Defendants Vanguard, Christopher Hammond, Martin Schamis, Tracy Richards, and Christopher Schmidt for race discrimination based on disparate treatment,[1] a hostile work environment,[2] and disparate impact[3] in violation of Section 1981.

[1]    A disparate treatment claim is based on allegations that the employer "simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics]." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Proof of discriminatory motive is needed to support this type of claim. *Id.*

[2]    A hostile work environment claim is based on allegations that "the workplace is permeated with discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "[T]he 'hostile work environment' theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by defendant." *O'Connor v. City of Newark,* 440 F.3d 125, 128 (3d Cir.2006).

[3]    A disparate impact claim involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). "Proof of discriminatory motive ... is not required under a disparate impact theory." *Id.*

- Count II: Plaintiff Ingram against Defendants Vanguard, Hammond, Schamis, Richards, and Schmidt for retaliation[4] in violation of Section 1981.

[4]    A retaliation claim is based on allegations that an employer has retaliated against an employee for either opposing unlawful discrimination or participating in an administrative or judicial proceeding regarding alleged unlawful

discrimination. *Moore v. City of Phila.,* 461 F.3d 331, 341 (3d Cir.2006).

• Count III: Plaintiff Ingram against Defendant Vanguard for race discrimination based on disparate treatment, a hostile work environment, and disparate impact in violation of Title VII.

    • Count IV: Plaintiffs Ingram and DiGiovanni against Defendant Vanguard for retaliation for their complaints of race discrimination in violation of Title VII.

    • Count V: All Plaintiffs against Defendant Vanguard for gender discrimination based on disparate treatment and a hostile work environment, as well as retaliation, in violation of Title VII.

    • Count VI: Plaintiff Ingram against Defendant Vanguard for race discrimination based on disparate treatment and a hostile work environment, as well as retaliation, in violation of the PHRA.

    • Count VII: Plaintiffs Ingram and DiGiovanni against Defendant Vanguard for retaliation for their complaints of race discrimination in violation of the PHRA.

    • Count VIII: All Plaintiffs against Defendant Vanguard for gender discrimination based on disparate treatment and a hostile work environment, as well as retaliation, in violation of the PHRA.

    • Count IX: Plaintiff DiGiovanni against Defendant Vanguard for age discrimination [5] and retaliation in violation of the ADEA.

[5]    In Count IX, DiGiovanni does not specify the theory, or theories, of discrimination on which she bases her claim. Count IX simply reads, in relevant part, "By committing the foregoing acts of discrimination and retaliation against Plaintiff DiGiovanni, Defendant has violated the ADEA." (Doc. No. 24 ¶ 301.) Plaintiffs will be required to file a notice within twenty days of the date of this Opinion specifying the theory, or theories, of discrimination on which DiGiovanni bases her claim in Count IX.

• Count X: Plaintiff DiGiovanni against Defendant Vanguard for age discrimination [6] and retaliation in violation of the PHRA.

[6]    In Count X, as in Count IX, DiGiovanni does not specify the theory, or theories, of discrimination on which she bases her claim. Count X simply reads, in relevant part, "By committing the foregoing acts of discrimination and retaliation against Plaintiff DiGiovanni, Defendant has violated the PHRA." (Doc. No. 24 ¶ 307.) Plaintiffs will be required to file a notice within twenty days of the date of this Opinion specifying the theory, or theories, of discrimination on which DiGiovanni bases her claim in Count X.

• Count XI: All Plaintiffs against Defendants Hammond, Richards, Schamis, and Schmidt, and additional Defendants Brian Hamilton, Bob Smith, and Bob Arata for aiding and abetting liability under the PHRA.

(Doc. No. 24 ¶¶ 243–315.)

Defendants have filed a Motion to Dismiss Partially the Amended Complaint. (Doc. No. 26.) In the Motion, they seek to dismiss: (1) Plaintiffs' claims asserted in paragraphs 48–58, 75, 134–53, and 192–208 of the Amended Complaint because they are time barred; (2) Plaintiffs' hostile work environment claims; and (3) Plaintiffs' disparate impact claims. [7] Defendants' Motion is now ripe for a decision. [8] For reasons that follow, Defendants' Motion (Doc. No. 26) will be granted in part and denied in part.

[7]    In the Motion to Dismiss Partially the Amended Complaint, Defendants also sought to dismiss the following: (1) Plaintiffs Ingram and DiGiovanni's claims against Defendant Arata for aiding and abetting liability under the PHRA (Count XI); (2) Plaintiffs Ingram and Kenworthy's claims against Defendant Hammond for aiding and abetting liability under the PHRA (Count XI); (3) Plaintiffs DiGiovanni and Kenworthy's claims against Defendant Richards for aiding and abetting liability under the PHRA (Count XI); and (4) Plaintiff Ingram's disparate impact claim under Section 1981 (Count I). (Doc. No. 26–2 at 18–23.) In Plaintiffs' Response in Opposition to the Motion, Plaintiffs indicated that they are withdrawing these claims. (Doc. No. 28 at 4 n. 1.) Accordingly, these claims will be dismissed.

2015 WL 4394274

Defendants' Motion also states that they are seeking to dismiss all the claims against Defendant Hammond. (Doc. No. 26–1 ¶ 5; Doc. No. 26–2 at 21, 29.) However, Defendants' Memorandum in support of their Motion only addresses Plaintiffs' PHRA aiding and abetting claims against Hammond asserted in Count XI, and Plaintiff Ingram's Section 1981 disparate impact claim against Hammond asserted in Count I. (*See* Doc. No. 26–2 at 18–22, 29.) As noted above, Plaintiffs have agreed to dismiss both of these claims. (*See* Doc. No. 28 at 4 n. 1.) Defendants' Motion does not address Plaintiff Ingram's Section 1981 disparate treatment, hostile work environment, and retaliation claims against Hammond asserted in Counts I and II. Therefore, Plaintiff Ingram's remaining Section 1981 claims against Hammond will not be dismissed.

[8]    Plaintiffs filed their original Complaint on June 13, 2014. (Doc. No. 1.) On September 16, 2014, following a hearing on Defendants' Motion to Dismiss Partially the Complaint, the Court granted Plaintiffs leave to amend their Complaint. On November 3, 2014, Plaintiffs filed the Amended Complaint. (Doc. No. 24.) On November 17, 2014, Defendants filed another Motion to Dismiss seeking to partially dismiss the Amended Complaint. (Doc. No. 26.) On December 19, 2014, Plaintiffs filed a Memorandum of Law in Opposition to Defendants' Motion. (Doc. No. 28.) On January 9, 2015, Defendants filed a Reply. (Doc. No. 29.)

## II. BACKGROUND

### A. The Parties

### 1. Plaintiff Donna Ingram
**\*2**  Plaintiff Donna Ingram is an African American woman. (Doc. No. 24 ¶ 8.) She began working at Vanguard in November 2000 and, at the time the Amended Complaint was filed, was on leave from her position as Team Leader in Vanguard's Retail Client Account Services Department. (*Id.*)

### 2. Plaintiff Jo DiGiovanni
Plaintiff Jo DiGiovanni is a Caucasian woman. (*Id.* ¶ 9.) She began working at Vanguard in 2004 and, at the time

the Amended Complaint was filed, was on leave from her position as Team Leader in Vanguard's Retail Client Account Services Department. (*Id.*)

### 3. Plaintiff Wendy Kenworthy
Plaintiff Wendy Kenworthy is also a Caucasian woman. (*Id.* ¶ 10.) She began working at Vanguard in November 1997 and was fired from her job at Vanguard as Team Leader on October 20, 2013. (*Id.*)

### 4. Defendant Vanguard Group, Inc.
Defendant Vanguard Group, Inc. ("Vanguard") is an investment management company. (*Id.* ¶ 11.) It offers mutual funds and other financial products and services to individual and institutional investors in the United States and abroad. (*Id.*) It has an office in Malvern, Pennsylvania. (*Id.*)

### 5. Defendant Christopher Hammond
Defendant Christopher Hammond was a Manager in the Retail Processing Group at Vanguard. (*Id.* ¶ 22.) Hammond directly supervised Plaintiffs Ingram and Kenworthy. (*Id.*)

### 6. Defendant Martin Schamis
Defendant Martin Schamis was a Senior Manager in Retail Client Account Services and was the "skip-level" supervisor [9] of all three Plaintiffs. (*Id.* ¶ 23.)

[9]    In the Amended Complaint, Plaintiffs use the term "skip-level supervisor" to refer to a person who supervised the direct supervisors of Plaintiffs.

### 7. Defendant Tracy Richards
Defendant Tracy Richards was a Manager in the Retail Processing Group at Vanguard. (*Id.* ¶ 24.) Richards was the supervisor of all three Plaintiffs. (*Id.*)

### 8. Defendant Bob Arata
Defendant Bob Arata was a Senior Manager in the Retail Processing Group at Vanguard. (*Id.* ¶ 25.) Arata was also the "skip-level" supervisor of all three Plaintiffs. (*Id.*)

### 9. Defendant Christopher Schmidt

Defendant Christopher Schmidt was a Manager in Retail Client Account Services at Vanguard. (*Id.* ¶ 26.) Schmidt also supervised Plaintiffs Ingram and Kenworthy. (*Id.*)

### 10. Defendant Brian Hamilton

Defendant Brian Hamilton was a Manager in Retail Client Account Services at Vanguard. (*Id.* ¶ 27.) Hamilton directly supervised Plaintiff DiGiovanni. (*Id.*)

### 11. Defendant Bob Smith

Defendant Bob Smith was a Manager in the Retail Processing Group and Retail Client Account Services at Vanguard. (*Id.* ¶ 28.) Smith directly supervised Plaintiff Kenworthy. (*Id.*)

### B. Plaintiffs' Allegations

In the Amended Complaint, Plaintiffs allege that Vanguard has "fostered a continuous pattern and practice of discrimination and retaliation against its employees who are not young, Caucasian males ." (*Id.* ¶ 12.) Plaintiffs claim that Vanguard routinely "manages out" employees who are either female, African American, or older, by subjecting them, for example, to unmerited write-ups and performance critiques, giving them assignments for which they have no training or experience, and loading their teams with underperformers in an effort to set them up for termination. (*Id.* ¶¶ 32(d), 37(c), 73–78; Doc. No. 28 at 4–6.) Moreover, Plaintiffs describe a working environment at Vanguard that is hostile to employees who are either female, African American, or older. (Doc. No. 24 ¶¶ 13–18, 21, 30, 33.) Plaintiffs additionally allege that the complaint process in Vanguard's human resources department, known as "Crew Relations," is not only ineffective, but facilitates retaliation against employees who file complaints. (*Id.* ¶¶ 19, 32(a), 34–35.) In addition to these general allegations, each Plaintiff sets forth claims in the Amended Complaint pertinent to their own employment at Vanguard. These claims are as follows:

### 1. Plaintiff Ingram's Individual Claims

**\*3** Donna Ingram began her career at Vanguard in 2000 as a Service Associate in Personal Financial Planning at Vanguard's Malvern, Pennsylvania office. (*Id.* ¶ 45.) In 2008, she transferred to the Retail Processing Group as a Supervisor and began reporting to Jeff Fafara, who was the manager of that group. (*Id.* ¶ 46.) Almost immediately, Fafara instructed Ingram to "manage out" two older African American women, which Ingram refused to do in the absence

of a meritorious reason to support such action. (*Id.* ¶ 47.) In 2010, when Ingram informed Fafara that she was pregnant, he responded by saying, "I need more boys on my team, transition your process and transition your team." (*Id.* ¶ 48.) Ingram alleges that she received unwarranted negative evaluations because of her pregnancy and also had an extra fifteen-hour-a-week commitment added to her workload. (*Id.* ¶ 49.) She alleges that Fafara treated men more favorably than he treated women, and that he applied inconsistent performance standards for men and women. (*Id.* ¶¶ 49– 54.) When Ingram informed Fafara's supervisor, Bob Arata, about Fafara's inconsistent treatment of men and women, he responded by saying, "Well, Donna, we all have our biases." (*Id.* ¶ 55.)

In May 2011, Fafara was promoted and Ingram began reporting to Tracy Richards. (*Id.* ¶ 58.) Ingram alleges that Richards was immediately hostile toward her. (*Id.* ¶ 60.) Richards asked Ingram if she "needed a hug" when Ingram told her about Fafara's discrimination. (*Id.* ¶ 62.) At some point, Richards disbanded Ingram's team. (*Id.* ¶ 63.) After the team was disbanded, Richards transferred the lowest-performing employees to Ingram's new team (*id.* ¶ 86), and Richards instructed Ingram to "manage out" and terminate African American employees (*id.* ¶¶ 91–98).

In October 2011, Ingram began reporting to Christopher Hammond. (Doc. No. 24 ¶ 66.) Ingram alleges that Hammond overrode Ingram's assessments of her team members in order to drive out and terminate the non-Caucasian employees who outperformed their Caucasian colleagues. (*Id.*) When Ingram advocated for a more consistent rating process, Hammond yelled at her in front of her team members, saying, "Well, if you need everything spelled out for you, then maybe this isn't the job for you." (*Id.* ¶ 68.) When Ingram asked Hammond to continue their conversation in private, Hammond responded by saying, "You need to get off the back of the bus." (*Id.* ¶ 69.) Ingram also alleges that Hammond asked her to "manage out" African American employees. (*Id.* ¶ 76.) When she refused to do so, it was reflected in her 2011 evaluation, which stated that she should be "ensuring that the performance management process is driving poor performance out of the organization" and that she should "balance [her] ability to be the voice of the crew with the understanding of the needs of the business." (*Id.*) In addition, Ingram alleges that when she was pregnant in 2010, Hammond told her that "they were going to make her have her baby early." (*Id.* ¶ 70.)

**\*4** Ingram informed Vanguard's senior management and Crew Relations about the discriminatory behavior that she witnessed and was subjected to, but they were unresponsive. (*Id.* ¶¶ 77–79.) Ingram claims that, because of her complaints, she was shunned and excluded from meetings and received negative performance evaluations. (*Id.* ¶¶ 81–83.)

On April 10, 2012, Ingram dual-filed a Charge of Discrimination against Vanguard with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (*Id.* ¶ 87.) In August 2012, Ingram claims that in retaliation for these complaints Richards modified Ingram's workload and told her to "look for a new role." (*Id.* ¶ 89.)

In September 2012, Ingram's senior manager, Martin Schamis, asked her if she would be attending a company charity event for United Way. (*Id.* ¶ 100.) Ingram responded that she would be, and Schamis said, "Wait until you see my costume." (*Id.*) Schamis attended the event dressed as a giant monkey, even though the event did not call for costumes. (*Id.*) Ingram believes that this was intended as a racial insult. (*Id.* ¶ 102.) Ingram also claims that Schamis retaliated against her in her 2012 performance evaluation by including numerous inaccuracies and improperly using input from Richards, who was no longer Ingram's manager. (*Id.* ¶¶ 104–10.) Ingram alleges that this was in retaliation for her complaints of discrimination. (*Id.*)

On June 6, 2013, Ingram filed an Amended Charge of Discrimination against Vanguard. (*Id.* ¶ 113.) She alleges she continued to experience discriminatory and retaliatory treatment after this charge was filed. (*Id.* ¶ 114.) On July 15, 2013, Ingram claims that her manager at the time, Christopher Schmidt, unfairly gave her a written alert. (*Id.* ¶ 117.) In this alert, Schmidt claims that Ingram did not support her peers, despite overwhelming evidence to the contrary. (*Id.*) Schmidt also claims that Ingram failed to address performance issues with an African American member of her team. (*Id.* ¶¶ 118–19.) Ingram alleges that Schmidt was consistently disrespectful to her, while he was very respectful to his Caucasian male colleagues. (*Id.* ¶ 120.) In addition, Ingram claims that neither Schmidt nor Crew Relations did anything regarding offensive comments about her that a coworker posted on Facebook. (*Id.* ¶ 121–125.)

In October 2013, Ingram states that the discrimination and retaliation at Vanguard had become so unbearable that, at the suggestion of her doctor, she went out on leave. (*Id.* ¶ 126.)

She also claims that the extreme stress she experienced at Vanguard triggered and exacerbated an underlying medical condition. (*Id.*) Ingram's doctor has advised her that returning to Vanguard would be detrimental to her health. (*Id.* ¶ 129.)

### 2. Plaintiff DiGiovanni's Individual Claims

**\*5** Jo DiGiovanni began her career at Vanguard in 2004 as a Supervisor in the Bank Services Department. (Doc. No. 24 ¶ 133.) In October 2006, Christine Rogers–Raestch became DiGiovanni's manager. (*Id.* ¶ 135.) Rogers–Raestch and DiGiovanni's department head, Laura Marakowski, began to harass DiGiovanni for refusing to "manage out" an older, African American, female associate. (*Id.* ¶ 136–38.) Rogers–Raestch changed DiGiovanni's year-end performance rating from "Distinguished" to "Accomplished" in retaliation for DiGiovanni's refusal to "manage out" this associate. (*Id.* ¶ 139.) DiGiovanni alleges that her unwillingness to "manage out" this associate continued to negatively impact her performance reviews. (*Id.* ¶¶ 150, 155–56.)

Rogers–Raestch also discouraged DiGiovanni from applying for managerial positions. (*Id.* ¶ 141.) From mid–2007 through the end of 2008, DiGiovanni alleges that she applied for roughly eight positions, but was never hired—despite being more qualified than the other applicants. (*Id.* ¶ 142.) After DiGiovanni was declined for several positions, Rogers–Raestch told DiGiovanni that she was not involved with the selection process. (*Id.*) This conversation led DiGiovanni to believe that Rogers–Raestch had in fact interfered with her ability to obtain these positions. (*Id.*) After DiGiovanni was not selected for any position, she complained to her new manager, Pat Manley, who disregarded her concerns. (*Id.* ¶ 148.)

In March 2012, one of DiGiovanni's younger male colleagues, Lester Hawthorne, made an ageist and sexist comment to her while discussing the need for associates to pass the Series 7 examination.[10] (*Id.* ¶ 159.) He told DiGiovanni that, while the examination was challenging, she could pass if she studied. (*Id.*) He said, "Heck, I've even seen older women, like in their 50s, pass the test." (*Id.*)

[10]  The Series 7 examination is formally known as the General Securities Representative Examination. Individuals who pass the Series 7 examination are eligible to register to trade all securities products.

Also in March 2012, DiGiovanni contacted Crew Relations to complain about the hostile environment and discrimination

she experienced at Vanguard. (*Id.* ¶ 161.) In April 2012, DiGiovanni applied for three positions in other departments at Vanguard. (*Id.* ¶ 162.) She was turned down for all three positions due to low ratings on her performance evaluations given by Arata, who apparently was her "skip-level" supervisor at the time. (*Id.* ¶ 163.)

In May 2012, DiGiovanni again contacted Crew Relations about her continued mistreatment based on her age and gender. (*Id.* ¶ 165.) In July 2012, DiGiovanni received the lowest performance rating of her tenure at Vanguard. (*Id.* ¶ 166.) DiGiovanni alleges that the low rating was not warranted and was simply done in retaliation for her complaints of discrimination. (*Id.*)

On October 3, 2012, DiGiovanni dual-filed a Charge of Discrimination against Vanguard with the EEOC and PHRC. (*Id.* ¶ 167.) Shortly after filing the discrimination charge, DiGiovanni met with her manager at the time, Brian Hamilton, who told her she would receive a "really tough message" at the end of the year. (*Id.* ¶ 169.) During the meeting, Hamilton also attacked DiGiovanni's leadership ability and told her that she did not add value to Vanguard and that she should start looking for employment elsewhere. (*Id.*)

**\*6** After meeting with Hamilton, DiGiovanni became distraught and contacted Crew Relations again about the discriminatory and retaliatory treatment she experienced at Vanguard. (*Id.* ¶ 174.) She explained to a Crew Relations representative that Richards and Hamilton had begun referring to older employees as "low energy" and younger employees as "high energy." (*Id.* ¶ 175 .) Crew Relations did not remedy the situation. (*Id.* ¶¶ 176–77.)

In December 2012, in retaliation for the Charge of Discrimination DiGiovanni filed, she received her first ever "Further Development Needed" rating on her year-end review. (*Id.* ¶ 180.) This rating severely impacted her compensation. She did not receive a merit raise or bonus for the first time in her eight-year career at Vanguard. (*Id.*) In further retaliation for her complaints, DiGiovanni was rated poorly in her 2013 mid-year review. (*Id.* ¶ 181.)

DiGiovanni alleges that the environment at Vanguard became so toxic that it worsened her severe stress and depression. (*Id.* ¶ 185.) At the time the Amended Complaint was filed, DiGiovanni was on sick leave and under the treatment of a therapist and a psychiatrist. She is also on medication for stress and depression. (*Id.* ¶ 186.) She has been advised that

returning to Vanguard would be detrimental to her health. (*Id.* ¶ 187.)

### 3. Plaintiff Kenworthy's Individual Claims

Wendy Kenworthy began her career at Vanguard in November 1997. (*Id.* ¶ 191.) She became a Supervisor in the Small Business Services department in 2004. (*Id.*) In 2008, the Small Business Services group became Retail Operations and Kenworthy began reporting to Jeff Fafara. (*Id.* ¶ 192.)

Under Fafara, and then later under Christopher Hammond, Kenworthy was asked to "manage out" female employees who were either African American or older. (*Id.* ¶ 194.) Fafara and Hammond told her that her job was on the line if she refused. (*Id.*)

While working under Fafara, Kenworthy noticed that he treated women differently than men. (*Id.* ¶ 196.) Fafara would ignore poor performance by men, but would routinely chastise female employees for their performance. (*Id.* ¶ 198) Fafara also gave female supervisors far heavier workloads than male supervisors. (*Id.* ¶ 205.) Additionally, when Ingram announced in a meeting that she was going out on maternity leave, Fafara said he wished he had more men on his team. (*Id.* ¶ 196.) This made Kenworthy feel that having a child would have a negative impact on her career. (*Id.*)

In 2010, frustrated with Fafara's discriminatory treatment of women, Kenworthy, Ingram, and another woman who reported to Fafara met with Crew Relations. (*Id.* ¶ 199.) Crew Relations ignored their complaints. (*Id.*) After Crew Relations failed to take action, the women met with their senior manager, Arata. (*Id.* ¶ 199.) Arata also did nothing. (*Id.*)

**\*7** At the end of 2010, Fafara lowered the ratings of Kenworthy's female team members without first consulting her. (*Id.* ¶ 202.) Before the time that Kenworthy complained about Fafara to Crew Relations and Arata, Kenworthy always had been allowed to provide input on such ratings. (*Id.* ¶ 203.)

In early 2011, Kenworthy was asked to take over a Transfer of Assets team. (*Id.* ¶ 207.) She never had performed in this role before. (*Id.*) No other male manager was moved to a role in which they had no previous experience. (*Id.*)

In November 2011, Kenworthy began reporting to Christopher Hammond. (*Id.* ¶ 208.) Under Hammond, Kenworthy was given a rating lower than "Fully Successful"

2015 WL 4394274

for the first time in fourteen years. (*Id.* ¶ 209.) Kenworthy alleges that she was given this rating in retaliation for her complaints about Fafara. (*Id.*) Moreover, Kenworthy alleges that she was given insufficient opportunity to correct any deficiencies in her performance. (*Id.* ¶ 210–12.)

During a meeting with Hammond, Kenworthy informed him that she learned in June 2011 that she may have breast cancer. (*Id.* ¶ 213.) Hammond responded by saying, "Oh, that is what is wrong with you. That's what happened to you." (*Id.*) Kenworthy believes that Hammond was insinuating that her performance declined because of this potential illness. (*Id.*)

Additionally, under Hammond, Kenworthy continued to receive far more work than her male colleagues. (*Id.* ¶ 214.) Kenworthy claims that no matter how hard she worked, she never received recognition. (*Id.* ¶ 216.) For instance, her Caucasian male colleagues would often receive $250 "spot bonuses," while Kenworthy did not receive such bonuses. (*Id.*) Kenworthy also claims that Tracy Richards, a female manager in her department, contributed to the discrimination against her. (*Id.* ¶¶ 217–20.) For instance, Richards would often take projects away from Kenworthy's male colleagues and give them to her without the support needed for the projects to succeed. (*Id.*)

In March 2012, Kenworthy began reporting to a new manager, Bob Smith. (*Id.* ¶ 222.) In August 2012, Smith informed Kenworthy that she might be trending toward a rating of "Further Development Needed" because she did not complete her projects "fast enough." (*Id.* ¶ 224.)

On September 26, 2012, Kenworthy dual-filed a Charge of Discrimination against Vanguard with the EEOC and PHRC. (*Id.* ¶ 225.) Roughly three months after filing this charge, Kenworthy received her lowest rating as an employee at Vanguard. (*Id.* ¶ 227.) In a February 2013 meeting with Smith, she was given a written warning. (*Id.* ¶ 228.) Kenworthy claims that the timing of this warning was "extremely odd" because such alerts generally are given closer in time to a poor end-of-year rating. (*Id.*)

In May 2013, Kenworthy received her mid-year evaluation. (*Id.* ¶ 230.) Despite improving her performance, Smith extended her warning for another sixty days. (*Id.*) Shortly after receiving this warning, Kenworthy began reporting to Chris Schmidt. (*Id.* ¶ 231.) Keworthy informed Schmidt that she had not received a copy of the extended warning. (*Id.* ¶ 232.) Schmidt told her that it was written with the same

wording as the initial warning. (*Id.*) Kenworthy claims that, since the warning was not updated, she was unaware of any additional deficiencies in her performance. (*Id.* ¶ 233.)

**\*8** On August 21, 2013, Kenworthy met with Schmidt. (*Id.* ¶ 234 .) At this meeting, Schmidt gave her a formal warning. (*Id.*) The warning addressed issues with Kenworthy's performance that were never previously raised. (*Id.*)

On October 20, 2013, Kenworthy was called into a meeting with Crew Relations. (*Id.* ¶ 235.) Crew Relations informed her that her employment with Vanguard was being terminated. (*Id.*) Kenworthy was shocked. No one had communicated with her about any failure to meet the objectives outlined in the August 21, 2013 warning. (*Id.*)

Kenworthy alleges that, as a result of the hostile and discriminatory environment at Vanguard, she has "suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, and depression, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her and have caused a great damage to her career and professional standing." (*Id.* ¶ 239.)

### III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). After *Iqbal* it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 663; *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ethypharm S.A. France v. Abbott Labs.,* 707 F.3d 223, 231 n. 14 (3d Cir.2013) (citing *Sheridan v. NGK Metals Corp.,* 609 F.3d 239, 262 n. 27 (3d Cir.2010)). "A claim has facial plausibility when the court pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Applying the principles of *Iqbal* and *Twombly,* the Third Circuit in *Santiago v. Warminster Twp.,* 629 F.3d 121 (3d Cir.2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Id.* at 130 (quoting *Iqbal,* 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George,* 641 F.3d 560, 563 (3d Cir.2011).

**\*9** A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (citing *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 234–35 (3d Cir.2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. ANALYSIS

As noted above, Defendants seek to dismiss (1) Plaintiffs' claims asserted in paragraphs 48–58, 75, 134–53, and 192–208 of the Amended Complaint because they are time barred; (2) Plaintiffs' hostile work environment claims; and (3) Plaintiffs' disparate impact claims. For reasons that follow, the Court will dismiss as time barred paragraphs 142–45 and 147–48 of the Amended Complaint, which allege that Vanguard discriminated or retaliated against Plaintiff DiGiovanni when she failed to obtain certain positions she applied to from 2007 to 2009. Plaintiffs' disparate impact claims will also be dismissed. Plaintiffs' hostile work environment claims will not be dismissed.

### A. Defendants' Motion to Dismiss Certain Allegations as Time Barred Will Be Granted in Part and Denied in Part

Defendants move to dismiss the allegations set forth in paragraphs 46–58, 75, 134–53, and 192–208 of the Amended Complaint, arguing that they are time barred because they concern events that occurred more than 300 days before Plaintiffs filed their administrative charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (Doc. No. 26–2 at 12–18.) In their Brief in Opposition to Defendants' Motion to Dismiss, Plaintiffs argue that even if these allegations do not by themselves support claims because they are time barred, they can still be considered as (1) relevant background evidence in support of Plaintiffs' timely discrimination claims, and support for Plaintiffs' hostile work environment claims. (Doc. No. 28 at 14–18.) For reasons that follow, Defendants' Motion to Dismiss these allegations will be granted in part and denied in part.

Before bringing a lawsuit under Title VII, the ADEA, or the PHRA, plaintiffs must first exhaust their administrative remedies. To bring claims under Title VII or the ADEA, plaintiffs must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. § 626(d)(1). To bring claims under the PHRA, plaintiffs must file a charge of discrimination with the PHRC within 180 days of the alleged unlawful employment practice. 43 Pa. Stat. Ann. § 959(h).

In the Motion to Dismiss, Defendants argue that the allegations set forth in paragraphs 46–58, 75, 134–53, and 192–208 only concern Plaintiffs' claims under Title VII, the ADEA, and the PHRA, and relate to acts that occurred over 300 days before Plaintiffs dual-filed their administrative charges with the PHRC and EEOC. [11] (Doc. No. 26–2 at 12.) Since the 300–day statute of limitations under Title VII and the ADEA is the longest statute of limitations relevant to these allegations, Defendants contend that these allegations should be dismissed as time barred. [12]

[11]    Defendants argue that none of the allegations set forth in paragraphs 46–58, 75, 134–53, and 192–208 of the Amended Complaint relate to Plaintiff Ingram's Section 1981 claims. (Doc. No. 26–2 at 14.) Section 1981 only protects against race discrimination and does not require exhaustion of administrative remedies. *See Johnson v. Ry. Exp. Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (noting that "the filing

Ingram v. Vanguard Group, Inc., Not Reported in F.Supp.3d (2015)

2015 WL 4394274

of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites to the institution of a Section 1981 action"); *Anjelino v. N.Y. Times Co.,* 200 F.3d 73, 98 (3d Cir.1999) ("[Section 1981], on its face, is limited to issues of racial discrimination in the making and enforcing of contracts."). Defendants argue that Section 1981 cannot save Ingram's untimely allegations because her allegations in the challenged paragraphs are based on gender, not race, discrimination. (Doc. No. 26–2 at 14.) The Court does not have to decide this question because, as explained below, none of Ingram's allegations will be dismissed as untimely at this stage of the proceeding.

12     Plaintiff Ingram filed her administrative complaint with the EEOC and the PHRC on April 10, 2012. (Doc. No. 24 ¶ 2, Ex. A.) Therefore, her Title VII claims are limited to acts that occurred on or after June 15, 2011, and her PHRA claims are limited to acts that occurred on or after October 13, 2011. Plaintiff DiGiovanni filed her administrative complaint with the EEOC and PHRC on October 3, 2012. (*Id.* ¶ 167, Ex. C.) Her Title VII and ADEA claims therefore are limited to acts that occurred on or after December 8, 2011, and her PHRA claims are limited to acts that occurred on or after April 6, 2012. Plaintiff Kenworthy filed her administrative complaint with the EEOC and PHRC on September 26, 2012. (*Id.* ¶ 225, Ex. D.) Her Title VII claims therefore are limited to acts that occurred on or after December 1, 2011, and her PHRA claims are limited to acts that occurred on or after March 30, 2012.

**\*10** In support of their argument, Defendants rely on the U.S. Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and decisions by courts in the Third Circuit interpreting *Morgan.* In *Morgan,* the Court addressed the question of whether an act that falls outside the statute of limitations for filing an administrative charge can support a lawsuit under Title VII.[13] 536 U.S. at 108. The Court held that the answer differs depending on whether the plaintiff is seeking to recover for a discrete discriminatory act or a hostile work environment. *Id.* at 110.

13     Although the U.S. Supreme Court in *Morgan* only addressed Title VII, its analysis regarding the statute of limitations for filing an administrative

charge is also applicable to the PHRA and the ADEA. Courts generally apply the same analysis to claims under parallel provisions of Title VII, the ADEA, and the PHRA. *See Gomez v. Allegheny Health Servs., Inc.,* 71 F.3d 1079, 1084 (3d Cir.1995) (noting that the PHRA "is construed consistently with interpretations of Title VII"); *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 330 (3d Cir.1995) ("Because the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to that contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under ADEA .").

The Court stated that a discrete discriminatory act is a separately actionable unlawful employment practice. *Id.* at 114. A plaintiff seeking to recover for a discrete discriminatory act must file an administrative charge within the statute of limitations, or else that discrete discriminatory act cannot support a lawsuit. *Id.* at 113. However, a plaintiff may use acts that occurred outside the statute of limitations period as background evidence in support of a timely claim. *Id.* The Court explained as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [relevant statute of limitations time period] after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id. See also McCann v. Astrue,* 293 F. App'x 848, 850 & n. 3 (3d Cir.2008) ("The law makes clear that discrete

discriminatory acts that are actionable on their own may not be aggregated under a continuing violation theory.... They may, however, be used as background evidence in support of timely claims.").

"Hostile work environment claims," the Court reasoned, "are different in kind from discrete acts." *Morgan,* 536 U.S. at 115. A hostile work environment claim exists " '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Id.* at 116 (quoting *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A hostile work environment "cannot be said to occur on any particular day." *Id.* Rather, "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Thus, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' " *Id.* at 117.

**\*11** With regard to whether an act that falls outside the statute of limitations period can be part of a hostile work environment claim, the Court stated the following:

> Given, therefore, that incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within [the statute of limitations period] of any act that is part of the hostile work environment.

*Id.* at 118. According to the Court in *Morgan,* a hostile work environment is a continuing violation such that an act that occurred before the statute of limitations period may be considered part of a claim. *Id.* at 117–18. It is only necessary that at least one act contributing to the claim falls within the statute of limitations period. *Id.*

In *O'Connor v. City of Newark,* the Court of Appeals for the Third Circuit interpreted the holding in *Morgan* to mean that plaintiffs cannot use a continuing violation theory to aggregate discrete discriminatory acts that fall outside the

statute of limitations period into a hostile work environment claim. 440 F.3d 125, 127 (3d Cir.2006). The court held that the continuing violation theory is only applicable to acts that are not individually actionable but can be combined to support a hostile work environment claim:

> *Morgan* established a bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim. The former must be raised within the applicable limitations period or they will not support a lawsuit. The latter can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.

*Id.* (citations omitted).

Therefore, a discrete discriminatory act that occurred outside the statute of limitations period cannot support a lawsuit, either individually or as part of a hostile work environment claim.[14] *Id.; see also McCann,* 293 F. App'x at 850 & n. 3. Based on *Morgan,* the Third Circuit in *O'Connor* developed "the following non-exhaustive list of discrete acts for which the limitations period runs from the act: termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation." 440 F.3d at 127.

[14]     As noted, discrete discriminatory acts that cannot support a lawsuit because they are time barred still can be used as background evidence to support a timely claim. *See Morgan,* 536 U.S. at 113; *McCann,* 293 F. App'x at 850 & n. 3.

In the present case, Defendants contend that, based on the precedent discussed above, any discrete discriminatory act that occurred more than 300 days before Plaintiffs filed their administrative charges cannot support a claim under Title VII, the ADEA, or the PHRA. This is because, as noted above, under Title VII and the ADEA Plaintiffs had 300 days from the date the discrete discriminatory act occurred to file an administrative charge. Under the PHRA, Plaintiffs had 180

days from the date of the discrete discriminatory act to file an administrative charge.

**\*12** Defendants argue that the allegations in paragraphs 46–58, 75, 134–53, and 192–208 of the Amended Complaint involve discrete acts that occurred over 300 days before Plaintiffs filed their administrative charges. As such, they argue that these allegations should be dismissed as time barred. The Court does not agree that all the allegations in these paragraphs are time barred. Accordingly, Defendants' Motion to Dismiss these allegations will be granted in part and denied in part.

### 1. Ingram's allegations in paragraphs 46–58 and 75 of the Amended Complaint will not be dismissed

As noted, Plaintiff Ingram dual-filed her administrative charge with the EEOC and PHRC on April 10, 2012. (Doc. No. 24, Ex. A.) Therefore, her Title VII claims are limited to acts that occurred on or after June 15, 2011. Defendants seek to dismiss Ingram's allegations in paragraphs 46–58 and 75 of the Amended Complaint, arguing that they relate to discrete acts that occurred before June 15, 2011. These allegations read as follows:

46. In 2008, Ingram transferred to the Retail Processing Group as a Supervisor and began reporting to Jeff Fafara, Manager in the Retail Processing Group at Vanguard.

47. Almost immediately Fafara instructed Ingram to manage out two older African American women, which Ingram refused to do without merit.

48. In 2010, after Ingram informed Fafara that she was pregnant and would need to take a leave approximately nine months later, Fafara responded by saying, "I need more boys on my team. Transition your process and transition your team."

49. During that year, Ingram was negatively evaluated on projects, which she no longer owned because she had been forced to transition them solely because she was pregnant. Such negative evaluations impacted both her professional standing within Vanguard's organization and her compensation. Moreover, Fafara added an extra fifteen hour a week commitment to Ingram's workload without first consulting her. This commitment was not imposed upon any of Ingram's white, male colleagues.

50. Under Fafara, Ingram witnessed firsthand how he regularly applied inconsistent performance standards for men and women and for Caucasians and non-Caucasians.

51. For example, Fafara would overturn performance ratings that Ingram and her fellow female supervisors, Kenworthy and Corie McDevitt ("McDevitt") had objectively determined based on performance.

52. Fafara would then instruct Ingram, Kenworthy and McDevitt to award ratings so that male Processing Associates would receive higher ratings than female Processing Associates irrespective of performance.

53. Fafara interacted very differently with men and women. While he was frequently sterile and cold to his female subordinates and socially shunned them, he was cordial and inviting to his male subordinates.

54. Ingram, Kenworthy and McDevitt informed Fafara's supervisor, Defendant Bob Arata, of the preferential treatment that Fafara was displaying towards men and his discriminatory treatment of pregnant women and women generally.

**\*13** 55. Arata responded to Ingram by saying, "Well, Donna, we all have our biases." Upon information and belief, Arata took no steps to remedy the hostile and discriminatory environment that Fafara created for Ingram, Kenworthy and other women.

56. Upon returning from maternity leave in January 2011 and through Fafara's promotion in May 2011, Ingram continued to suffer the discriminatory conduct of Fafara and retaliation for her complaints about his discriminatory behavior.

57. Shortly after returning from maternity leave, Fafara assigned three additional projects to Ingram knowing that she did not have adequate assistance to handle these projects.

58. Fafara's discriminatory and retaliatory conduct continued until he was promoted in approximately May 2011. His decision not to elevate Ingram to a process owner impacted Ingram's compensation into 2012 and beyond.

\* \* \*

75. When Ingram first joined the Retail Operations group, Fafara advocated for two of Ingram's African American employees to be "managed out" of the organization.
(Doc. No. 24 ¶¶ 46–58, 75.)

None of Ingram's allegations in these paragraphs relate to a termination, failure to promote, denial of transfer, refusal to hire, or wrongful suspension—which are the discrete discriminatory acts identified by the Third Circuit in *O'Connor.* Therefore, at this stage of the proceeding, the Court will not dismiss these allegations as time-barred discrete acts.

### 2. DiGiovanni's allegations in paragraphs 134–53 of the Amended Complaint will be dismissed in part

Plaintiff DiGiovanni filed her administrative complaint with the EEOC and PHRC on October 3, 2012. (Doc. No. 24, Ex. C.) Her Title VII and ADEA [15] claims therefore are limited to acts that occurred on or after December 8, 2011. Her allegations that Defendants seek to dismiss as time-barred discrete acts are in paragraphs 134–53. These paragraphs read as follows:

[15]    Plaintiff DiGiovanni is the only Plaintiff who asserts an age discrimination claim under the ADEA.

134. Roughly eighteen months after joining Vanguard, in August 2006, DiGiovanni's then-manager Bill Greco ("Greco") approached her about taking over two merged teams in the Bank Services group. The role Greco wanted DiGiovanni to take over was the most critical role in the department at the time. Although DiGiovanni was considering a position in another area, she agreed to take the role after significant coaxing by Greco. Greco told DiGiovanni that she was chosen for this assignment because she was the strongest supervisor in the Bank Services department. Greco told DiGiovanni that she was on track to receive a "Distinguished" rating and that, if she continued to do a good job in her then-current role and take on the new role, he would rate her "Distinguished" at year's end.

135. In October 2006, Greco went out on sick leave and Christine Rogers–Raestch ("Rogers–Raestch") became DiGiovanni's manager.

136. In October 2006, Rogers–Raestch and DiGiovanni's department head, Laura Marakowski ("Marakowski"), began to harass DiGiovanni for supporting one of her older, African American female associates. Rogers–Raestch wanted DiGiovanni to "manage out" the associate based on her alleged performance deficiencies.

**\*14** 137. As the immediate supervisor, DiGiovanni did not think her performance warranted termination. Instead, DiGiovanni worked with the associate to strengthen her performance. By the end of the year, the associate had earned an "Accomplished" rating.

138. Rather than laud the marked improvement that was made possible by setting the associate up for success, Rogers–Raestch and Marakowski chastised DiGiovanni's decision to assign the associate the "Accomplished" rating, with Marakowski at one point asking, "If someone was holding a gun to your head, would you say she is 'Accomplished'?", [sic] in a very threatening demeanor.

139. At the end of the year, Rogers–Raestch changed DiGiovanni's end of the year rating from "Distinguished" to "Accomplished" in retaliation for her refusal to "manage out" the older, African American female associate on her team.

140. Soon after receiving her end of the year rating, DiGiovanni began to experience severe signs of stress, including dizzy spells and palpitations. Eventually, DiGiovanni was hospitalized for severe stress induced vertigo. As a result, she was out of work and incapacitated for one month.

141. In 2007, DiGiovanni approached Rogers–Raestch about posting for other positions. Rogers–Raestch strongly discouraged DiGiovanni from posting for several positions of interest. In fact, when DiGiovanni shared with Rogers–Raestch her interest in a managerial position, Rogers–Raestch laughed loudly and stated that just because other supervisors were ready to become a manager, didn't mean that DiGiovanni was ready. The supervisors Rogers–Raestch was referring to were both young, Caucasian males that had been promoted as soon as their time-in-job requirement of 18 months was met.

142. In 2007, DiGiovanni began to apply for lateral positions in different areas. From mid–2007 through the end of 2008, DiGiovanni applied for roughly eight positions, but was never hired for any of the positions despite being more qualified than the people who were ultimately selected. Rogers–Raestch made it a point to approach DiGiovanni after she was declined for a few

of these positions and explain that Rogers–Raestch had "nothing to do with [DiGiovanni] not getting the job." Such a comment was odd and led DiGiovanni to believe that Rogers–Raestch, in fact, interfered with her ability to successfully post for another position.

143. The fact that DiGiovanni was never given any of the positions for which she applied was shocking because of her proven performance at Vanguard. Although DiGiovanni's supervisors trusted the quality of her work enough to constantly assign the most challenging tasks to her, DiGiovanni was not deemed deserving of an opportunity to advance at Vanguard. At interviews, DiGiovanni received no negative feedback or opportunity areas. Instead, DiGiovanni was told that she was "just beat out" for the positions for which she applied.

144. By way of example, in April 2008, DiGiovanni applied for an Accounts Payable Position. DiGiovanni interviewed with the Principal and was confident she would be hired based on her experience and qualifications for that position. At Vanguard, an interview with the Principal generally signals that the interviewee is the finalist. That position, however, was given to a less qualified Vanguard employee who was younger and had far less experience that DiGiovanni did.

 **\*15** 145. After learning that the Accounts Payable position went to a less qualified younger employee, DiGiovanni investigated which applicants were hired for all of the previous positions for which she applied. All of those positions were given to less qualified, younger employees with less experience, demonstrating a pattern and practice of age discrimination.

146. In 2008, DiGiovanni was assigned a new manager, Pat Manley ("Manley").

147. Soon thereafter, in 2009, DiGiovanni applied for another Accounts Payable position for which a recruiter contacted her and suggested she apply. DiGiovanni interviewed with a manager who remembered her from previous interviews. During the interview, they engaged in small talk and the manager all but assured DiGiovanni the position was hers. DiGiovanni was well qualified as indicated by the recruiter who requested that she apply and the interviewer. Once again, however, DiGiovanni did not get that position. The position was given to a less qualified and significantly younger female with no supervisory experience.

148. After being turned down for all of the jobs for which she applied, DiGiovanni complained to Manley that she felt she was being discriminated against on the basis of age. Consistent with the Vanguard culture of ignoring and dismissing complaints of unlawful discrimination, Manley disregarded her concerns.

149. In 2009, DiGiovanni was asked to spearhead a pilot quality assurance program with a new team. DiGiovanni was responsible for building the program from the ground up—a task that proved very challenging. Despite the inherent difficulty in developing this program, DiGiovanni was often lauded by her peers and supervisors with respect to her successful performance. DiGiovanni's end of the year performance appraisal did not reflect her performance. Instead of receiving the "Distinguished" rating she had earned, DiGiovanni was rated overall "Fully Successful." This rating negatively impacted her bonus, her potential to receive raises and her reputation for purposes of applying for new positions.

150. DiGiovanni spoke to her manager, Alan Copeland ("Copeland"), to ask him why she had not been rated "Distinguished" and asked how she could improve for the upcoming year. Mr. Copeland told her that although people noticed how well she performed, she should be more outspoken. Specifically, Copeland informed DiGiovanni that the perception of DiGiovanni amongst the managers was that DiGiovanni was too soft on the crew. Upon information and belief, that opinion was circulated amongst managers following DiGiovanni's refusal to terminate an older African–American female.

151. Despite the inaccurate perception of DiGiovanni, in 2010, DiGiovanni took proactive steps to be more outspoken and maintained her performance level.

152. Despite following Mr. Copeland's suggestion, in 2010, DiGiovanni received the same rating. DiGiovanni approached Mr. Copeland again about how to receive a "Distinguished" rating. Mr. Copeland responded that she needed to become a process owner.

 **\*16** 153. In 2011, DiGiovanni was asked by her principal John Haines ("Haines") to become a process owner on his team. Haines asked her to join his team because he heard positive feedback on how well DiGiovanni was handling the process owner position in the department.

(Doc. No. 24 ¶¶ 134–53.)

Paragraphs 142–45 and 147–48 contain allegations that DiGiovanni was not hired for various positions that she applied to from 2007 to 2009 on account of her sex, age, or both. These acts took place well before December 8, 2011, which is the earliest date in DiGiovanni's statute of limitations period under Title VII and the ADEA. Refusal to hire is a discrete discriminatory act identified in *O'Connor* that cannot be aggregated with timely claims under a continuing violation theory. Accordingly, these allegations are time barred and cannot be a basis for Defendants' liability under Title VII, the ADEA, or the PHRA. The allegations in paragraphs 142–45 and 147–48 will therefore be dismissed. The remaining allegations in paragraphs 134–41, 146, and 149–53 will not be dismissed at this stage of the proceeding.

### 3. Kenworthy's allegations in paragraphs 192–208 of the Amended Complaint will not be dismissed

Plaintiff Kenworthy filed her administrative complaint with the EEOC and PHRC on September 26, 2012. (Doc. No. 24, Ex. D.) Her Title VII claims therefore are limited to acts that occurred on or after December 1, 2011. Her allegations that Defendants seek to dismiss as time barred are in paragraphs 192–208 of the Amended Complaint. These allegations read as follows:

192. In 2008, the Small Business Services group merged to become Retail Operations and Kenworthy began reporting to Jeff Fafara, Manager.

193. Ingram also reported to Fafara during this time period.

194. As was the case with Ingram, Kenworthy was also often sought to "manage out" the female, African American or older employees under Fafara and Defendant Christopher Hammond. If Kenworthy refused to put someone on performance management or fire them, she was told by Fafara and Hammond that her job would be on the line and that she was "too soft" on her crew.

195. In 2010, Ingram, McDevitt and Kenworthy were the only three female supervisors reporting to Fafara. There was a noticeable difference in the way Fafara treated the three of them as compared to the male supervisors he managed; the latter were treated more favorably.

196. In a staff meeting, after McDevitt returned from maternity leave and Ingram announced that she would be leaving for maternity leave in a few months, Fafara inappropriately commented that he wished he had more males on his team. Fafara's comment made Kenworthy feel that, as a woman, if she chose to have a child, that decision would be detrimental to her career and she would be treated differently and lose the respect of her manager.

197. In contrast, male employees were not demeaned or treated in such a hostile manner if they chose to become parents.

 *17  198. While working under Fafara, Kenworthy witnessed him treat her male and female crew members differently. Specifically, on Kenworthy's team, there were two lower performing crew members-one male, one female. While the male crew member's poor performance and productivity issues were ignored by Fafara, he would routinely chastise the female crew member for her performance, despite knowing that her performance was affected by her well-known health issues.

199. Frustrated with the discriminatory treatment of women in their department, McDevitt, Ingram and Kenworthy met with Crew Relations in 2010 to discuss their issues with Fafara. In this meeting, they reported the inappropriate comment Fafara made in the staff meeting. Despite the overwhelming evidence of discrimination and the corroboration of the incidents that had occurred, Crew Relations did not take any proactive steps to address Ingram, McDevitt and Kenworthy's concerns or remedy the discrimination against women in the Retail Services Department. Instead, Crew Relations ignored their complaints.

200. After meeting with Crew Relations, McDevitt, Ingram and Kenworthy met with their senior manager, Defendant Bob Arata and discussed the differential treatment of women and men by Fafara. Like Crew Relations, Arata dismissed their concerns.

201. Upon information and belief, neither Crew Relations nor Arata conducted an investigation into the concerns McDevitt, Ingram and Kenworthy raised in their meetings.

202. At the end of 2010, Fafara lowered Kenworthy's female crew members' performance rating without first consulting Kenworthy.

203. Prior to the complaints of McDevitt, Ingram and Kenworthy, Kenworthy was allowed to give input into such decisions. Furthermore, Fafara did not exclude any of

her male peers in decisions regarding their crew members' performance.

204. Fafara's actions made Kenworthy feel that because she was a woman and had complained of disparate treatment, she was powerless within Vanguard's pervasive discriminatory and retaliatory culture and not trusted to make the right decisions with respect to her crew.

205. Under Fafara, the female supervisors were given a far heavier workload than the male supervisors. Fafara would often alleviate Kenworthy's male colleagues' workloads by giving their projects to Kenworthy. Fafara did so without concern for Kenworthy's increased workload.

206. Despite Fafara's discriminatory and retaliatory actions and Vanguard's knowledge of his conduct, he was promoted in mid–2011.

207. In early–2011, Kenworthy was asked to take over a Transfer of Assets ("TOA") team, a function she had never previously performed or managed. No other white or male manager was moved to a role in which they had no previous experience.

208. In November 2011, Kenworthy began reporting to Defendant Christopher Hammond. Ingram also reported to Hammond during approximately the same time frame. Hammond was very good friends with Kenworthy's previous manager, Fafara.

**\*18** As with Ingram's allegations above, none of Kenworthy's allegations in these paragraphs are the kind of discrete discriminatory acts identified in *O'Connor.* Accordingly, they will not be dismissed as time barred at this stage of the proceeding.

### B. Plaintiffs Allege Plausible Hostile Work Environment Claims

In *Andrews v. City of Philadelphia,* the Third Circuit Court of Appeals held that a plaintiff must show the following to prevail on a hostile work environment claim: (1) the plaintiff suffered intentional discrimination because of a protected characteristic; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same characteristics in like circumstances; and (5) a basis for employer liability exists.[16] *Andrews v. City of Phila.,* 895 F.2d 1469, 1482 (3d Cir.1990).

16   Ingram claims that she suffered a hostile work environment based on race and gender discrimination in violation of Title VII, Section 1981, and the PHRA. (Doc. No. 24 ¶¶ 244, 256, 270, 279, 293.) DiGiovanni's hostile work environment claim is based on allegations of gender discrimination in violation of Title VII and the PHRA. (*Id.* ¶¶ 270, 293.) Kenworthy alleges that she was subjected to a hostile work environment based on gender discrimination in violation of Title VII and the PHRA. (*Id.* ¶¶ 270, 293.) The analysis of whether a plaintiff has stated a hostile work environment claim is the same under Title VII, Section 1981, and the PHRA. *See Sherrod v. Phila. Gas Works,* 57 F. App'x 68, 75 (3d Cir.2003).

In the present case, Defendants argue that Plaintiffs cannot state hostile work environment claims because they have not plausibly shown that the alleged harassment was severe or pervasive, as required by the second prong of the *Andrews* test. (Doc. No. 26–2 at 23–27.) Plaintiffs counter that they have alleged enough facts to survive a motion to dismiss. (Doc. No. 28 at 19–27.) They contend that the question of whether the conduct was sufficiently severe or pervasive should be reserved for summary judgment or trial. (*Id.*)

For reasons that follow, the Court finds that each Plaintiff has plausibly alleged that she faced discriminatory conduct that was sufficiently severe or pervasive to state a hostile work environment claim. Accordingly, Defendant's Motion to Dismiss Plaintiffs' hostile work environment claims will be denied.

### 1. The standards for determining whether alleged conduct is sufficiently "severe or pervasive" to state a hostile work environment claim

To satisfy the second prong of the *Andrews* test, each Plaintiff must show that the alleged harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To determine whether each Plaintiff has done so, the Court must consider a variety of factors, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.,* 510

U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Any other relevant factors, like the employee's psychological well-being, may be taken into account, and no single factor is required. *Id.* The Court's analysis "must concentrate not on individual incidents, but on the overall scenario ." *Abramson v. William Patterson Coll. of New Jersey,* 260 F.3d 265, 276 (3d Cir.2001) (quoting *Andrews,* 895 F.2d at 1484). Because the conduct must be severe or pervasive enough to alter the conditions of employment, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotations omitted).

**\*19** Determining whether harassing conduct is sufficiently severe or pervasive is a highly fact-intensive inquiry, and "does not lend itself to a 'mathematically precise test.' " *Long v. Pizza Hut (Store # 635008),* No 03–0738, 2003 WL 23019186, at \*4 (W.D.Pa. Nov.5, 2003) (quoting *Harris,* 510 U.S. at 23). Therefore, courts have "shown a reluctance to dismiss a complaint at the [motion to dismiss] stage when the primary challenge to the hostile work environment claim is whether or not the conduct in question is severe and/or pervasive." *Grasty v. World Flavors, Inc.,* Civ. No. 11–1778, 2011 WL 3515864, at \*9 n. 2 (E.D.Pa. Aug.11, 2011). Because the inquiry is fact-intensive, "summary judgment provides a more appropriate vehicle to resolve [this issue], as the parties at that stage have had an opportunity to conduct discovery and develop their claims." *Long,* 2003 WL 23019186, at \*4.

**2. Plaintiffs have plausibly alleged that they were subjected to "severe or pervasive" harassment**

As noted above, Defendants argue that Plaintiffs have failed to allege that the conduct they faced was sufficiently severe or pervasive to state hostile work environment claims. In support of their argument, Defendants primarily rely upon two cases from the United States District Court for the District of New Jersey in which defendants' motions to dismiss hostile work environment claims were granted because the alleged conduct was not sufficiently severe or pervasive.¹⁷ (*See* Doc. No. 26–2 at 25–26.) These cases are distinguishable from the present case, and therefore do not persuade the Court that Plaintiffs' hostile work environment claims should be dismissed at this stage of the litigation.

17   In a footnote to its Memorandum in Support of the Motion to Dismiss Partially the Amended Complaint (Doc. No. 26–2 at 25 n. 9), Defendants list additional cases in which plaintiffs' hostile work environment claims were dismissed because the alleged conduct was not sufficiently severe or pervasive. *See Wadhwa v. Sec'y, Dep't of Vet. Affs.,* 505 F. App'x 209, 213–14 (3d Cir.2012); *Davis v. City of Newark,* 285 F. App'x 899, 901–03 (3d Cir.2008); *Pittman v. Bob,* No. 11–0842, 2012 WL 3580157, at \*7 (W.D.Pa. Aug.17, 2012); *King v. City of Phila.,* 66 F. App'x 300, 305 (3d Cir.2003); *Matteo v. Bumble Bee Foods, LLC,* No. 14–435, 2014 4094281, at \*1, \*4–5 (D.N.J. Aug. 18, 2014); *Bell v. Waste Mgmt., Inc.,* No. 03–992, 2004 WL 2451416, at \*6 (D.Del. Oct.29, 2004); *Burgess–Walls v. Brown,* No. 11–275, 2011 WL 3702458, at \*9 (E.D.Pa. Aug.22, 2011); *Nerosa v. Storecast Merch. Corp.,* No. 02–440, 2002 WL 1998181, at \*4 (E.D.Pa. Aug.28, 2002). The Court has reviewed each of these cases and is satisfied that they are factually distinguishable and that Plaintiffs in the present case have plausibly alleged that the discriminatory conduct was sufficiently severe or pervasive to state a hostile work environment claim.

In *Wise v. Estes,* five plaintiffs sued their employer alleging, among other claims, that they were subjected to a hostile work environment on account of their race in violation of Section 1981. Civ. No. 10–481, 2010 WL 2757273, \*5–6 (D.N.J. July 6, 2010). In dismissing plaintiffs' claims, the court explained that plaintiffs "provide no details of the frequency and duration of the alleged harassing conduct." *Id.* at \*6. Moreover, the court noted, only one plaintiff made allegations of specific comments directed at him personally. Most plaintiffs made "only general allegations of belittling conduct." *Id.* Accordingly, the court dismissed plaintiffs' hostile work environment claims without prejudice and gave them leave to amend their complaint to correct the deficiencies. *Id.* at 7.

Likewise, in *Feeney v. Jefferies,* the court dismissed plaintiff's hostile work environment claim because it consisted only of "vague allegations" that gave "no information as to the frequency" of the alleged discriminatory conduct. Civ. No. 09–2708, 2010 WL 2629065, at \*5 (D.N.J. June 28, 2010). In his complaint, plaintiff claimed that his supervisor "repeatedly" made derogatory comments, but only recounted two occasions on which such comments were made. *Id.* In

Case 4:21-cv-00872-MWB Document 24-2 Filed 09/15/21 Page 60 of 101
Ingram v. Vanguard Group, Inc., Not Reported in F.Supp.3d (2015)
2015 WL 4394274

dismissing plaintiff's hostile work environment claim, the
court refused to grant him leave to amend the complaint
because he had already amended it three times. *Id.* at *7. The
court found that "allowing further amendments would unduly
protract [the] proceedings." *Id.*

**\*20** In the present case, Plaintiffs' allegations are substantial
enough to state a plausible hostile work environment claim.
Unlike the plaintiffs in *Wise* and *Feeney,* each Plaintiff in this
case provides myriad examples of conduct that they allege
created a hostile work environment at Vanguard. Moreover,
each Plaintiff alleges that the hostile work environment at
Vanguard damaged her psychological well-being. (Doc. No.
24 ¶¶ 126–29, 186–87, 239.)

Plaintiff Ingram's allegations include, for instance, Fafara's
comment of "I need more boys on my team" when she
told him she was pregnant (*id.* ¶ 48); Hammond's racially
charged statement to her that she needed to "get off the back
of the bus" (*id.* ¶ 69); and Schamis's monkey costume at
the United Way Challenge, which she believes was intended
as a racial insult (*id.* ¶¶ 101–02). Ingram also claims that
she was pressured to "manage out" employees who were
either female, African American, or older, and that she
received a negative performance review because she refused
to do so. (*Id.* ¶¶ 72–76.) Ingram states that the hostile work
environment at Vanguard became so unbearable that, at the
suggestion of her doctor, she "went out on leave in October
2013 for extreme stress, which also triggered and exacerbated
an underlying medical condition." (*Id.* ¶ 126.)

Plaintiff DiGiovanni's allegations include harassing conduct
from her supervisor, Rogers–Raestch, for refusing to "manage
out" employees who were either female, African American,
or older. (*Id* . ¶¶ 135–38.) DiGiovanni claims that Rogers–
Raestch lowered her performance review and interfered with
her ability to transfer to other positions within Vanguard
because she refused to "manage out" these employees. (*Id.*
¶¶ 134, 139, 141–42, 150.) DiGiovanni also alleges that
when she was speaking with a younger male manager, Lester
Hawthorne, about the need to obtain a Series 7 license,
Hawthorne said "Heck, I've seen older women, like in their
50s, pass the test." (*Id.* ¶ 159.) She states that the environment
at Vanguard became "so toxic that it worsened her severe
stress and depression." (*Id.* ¶ 185.) At the time the Amended
Complaint was filed, she was on sick leave from Vanguard
and under the treatment of both a therapist and a psychiatrist.
(*Id.* ¶ 186.)

Plaintiff Kenworthy, like Ingram and DiGiovanni, alleges
that she was instructed to "manage out" employees who
were either older, female, or African American. (*Id.* ¶ 194.)
She also states that Fafara's comment to Ingram that he
needed "more boys on his team" made her feel that her
career would be negatively affected if she chose to have
a child. (*Id.* ¶ 196.) Kenworthy claims that her complaints
about discriminatory treatment were not only ignored, but
made her a target to be "managed out." (*Id.* ¶¶ 199–201,
223.) In February 2013, she began to receive unwarranted
formal performance warnings from her managers, which
culminated in her termination from employment on October
20, 2013. (*Id.* ¶¶ 228–35.) Because of the hostile environment
at Vanguard, Kenworthy alleges that she "suffered mental,
physical and emotional distress, including, but not limited
to, sleeplessness, nervousness, headaches, and depression,
as well as humiliation, ridicule, loss of self-respect and
confidence, physical injury and damage, all of which have
negatively affected her and have caused great damage to her
career and professional standing." (*Id.* ¶ 239.)

**\*21** Considering the totality of the claims, each Plaintiff has
plausibly alleged that she faced discriminatory conduct that
was sufficiently severe or pervasive to constitute a hostile
work environment. Their allegations are sufficient to survive
Defendants' Motion to Dismiss. Accordingly, Defendants'
Motion to Dismiss Plaintiffs' hostile work environment
claims will be denied.

### C. Plaintiffs' Disparate Impact Claims Will Be Dismissed

Defendants seek to dismiss Plaintiffs' disparate impact
claims. [18] (Doc. No. 26–2 at 28.) They argue that Plaintiffs
have failed to administratively exhaust these claims because
the Charges of Discrimination that they dual-filed with the
EEOC and PHRC "do not reference or describe disparate
impact claims, nor do they identify any neutral employment
practices that can form the basis for a disparate impact
claim." (*Id.*) Plaintiffs counter that their Charges should be
"read liberally." (Doc. No. 28 at 27–28.) Plaintiffs, however,
do not address the argument that their Charges fail to identify
any neutral employment practice that can support a disparate
impact claim. (*See id.*) For reasons that follow, Plaintiffs'
disparate impact claims will be dismissed.

[18]    As Defendants note in their Memorandum in
Support of their Motion to Dismiss Partially the
Amended Complaint, the Amended Complaint has

several references to "impact" (*see* Doc. No. 24 ¶¶ 14, 21, 31–32, 79), but it appears that only Ingram asserts a disparate impact claim in Counts I and III. (*Id.* ¶¶ 244, 256 .) For reasons discussed below, none of the Plaintiffs' administrative charges present disparate impact allegations. Therefore, even assuming all Plaintiffs have asserted disparate impact claims in the Amended Complaint, the claims would be dismissed for failure to exhaust administrative remedies.

"Disparate impact discrimination is a brand of 'unintentional discrimination,' whereby an employer adopts certain practices that are 'facially neutral in their treatment of different groups' but 'in fact fall more harshly on one group than another and cannot be justified by business necessity.' " *Byrd v. City of Phila.,* Civ. No. 12–4520, 2013 WL 5728669, at *3 (E.D.Pa. Oct.22, 2013) (quoting *Raytheon Co. v. Hernandez,* 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003)). "In the case of disparate impact discrimination, employers act without a deliberately discriminatory motive, but their actions are functionally equivalent to intentional discrimination." *Id.* (citing *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)).

For a plaintiff to fulfill her administrative exhaustion requirement with regard to a disparate impact claim, her charge of discrimination "must identify or describe the neutral employment practice which is alleged to disproportionately affect protected employees in order to exhaust disparate impact claims." *Brown v. Ameriprise Fin. Servs., Inc.,* 707 F.Supp.2d 971, 976 (D.Minn.2010). "Otherwise, every assertion of intentional discrimination could be read to imply unintentional discrimination, and all claims of disparate treatment would exhaust claims of disparate impact." *Id.* at 976–77.

In this case, Plaintiffs' Charges of Discrimination do not identify any neutral employment practice that they allege had a disparate impact on them. The only employment practices that Plaintiffs identify in their Charges are Vanguard's alleged practice of "managing out" employees who are either female, African American, or older, and Vanguard's allegedly ineffective and retaliatory complaint process. (*See* Doc. No. 24 at Ex. A. ¶¶ 22–23, 25, 27–29; Ex. C. ¶¶ 6, 24; Ex. D. ¶ 4.) However, these acts are not neutral employment practices that have the unintentional effect of negatively impacting protected classes of employees. Rather, claims of "managing out" and retaliation are based on theories of intentional discrimination. *See, e.g., Krouse v. Am. Sterilizer Co.,* 126

F.3d 494, 504 (3d Cir.1997) (holding that a "retaliatory animus" is required to sustain a retaliation claim); *Lafate v. Vanguard Grp., Inc.,* No. 13–5555, 2014 WL 4384510, at *8 (E.D.Pa. Sept.5, 2014) (holding that Vanguard's practice of "managing out" minorities "does not appear to be a 'facially-neutral' practice"); *Welch v. Eli Lilly & Co.,* No. 06–0641, 2009 WL 734711, at *2–3 (S.D.Ind. Mar.18, 2009) (holding that allegations that defendant "coached out" African Americans constituted a disparate treatment claim, not a disparate impact claim). Therefore, Plaintiffs' Charges of Discrimination fail to identify any facially neutral employment practices that disparately impact a protected class of employees. Accordingly, Plaintiffs' disparate impact claims will be dismissed because they have failed to exhaust their administrative remedies with respect to them.

## V. CONCLUSION

**\*22** For reasons stated above, Defendants' Motion to Dismiss Partially the Amended Complaint (Doc. No. 26) will be granted in part and denied in part. Defendants' Motion to Dismiss the allegations in certain paragraphs in the Amended Complaint as time barred will be granted only with regard to paragraphs 142–45 and 147–48, which allege that Vanguard discriminated or retaliated against Plaintiff DiGiovanni when she failed to obtain certain positions she applied to from 2007 to 2009. Defendants' Motion to Dismiss Plaintiffs' hostile work environment claims will be denied. Defendants' Motion to Dismiss Plaintiffs' disparate impact claims will be granted. An appropriate Order follows.

## ORDER

**AND NOW,** this 17th day of July 2015, upon consideration of Defendants' Motion to Dismiss Partially the Amended Complaint (Doc. No. 26), Plaintiffs' Response in Opposition to the Motion (Doc. No. 28), and Defendants' Reply in Further Support of the Motion (Doc. No. 29), and for reasons stated in the Opinion of the Court issued this day, it is **ORDERED** as follows:

1. Defendants' Motion to Dismiss the allegations set forth in paragraphs 46–58, 75, 134–53, and 192–208 of the Amended Complaint (Doc. No. 26) will be granted in part and denied in part. The allegations set forth in paragraphs 142–45 and 147–48 of the Amended Complaint (Doc. No. 24) are dismissed as time barred because they involve events that occurred more than 300 days before Plaintiff Jo DiGiovanni filed her

Charge of Discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. The allegations set forth in paragraphs 4658, 75, 134–41, 146, 149–53, and 192–208 of the Amended Complaint (Doc. No. 24) will not be dismissed.

2.  Defendants' Motion to Dismiss Count XI of the Amended Complaint against Defendant Bob Arata only (Doc. No. 26) is granted. Bob Arata is no longer a defendant in this case.

3.  Defendants' Motion to Dismiss Counts I, II, and XI of the Amended Complaint against Defendant Christopher Hammond only (Doc. No. 26) is granted in part and denied in part. Count XI of the Amended Complaint against Defendant Hammond is dismissed. Counts I and II of the Amended Complaint against Defendant Hammond will not be dismissed.

4.  Defendants' Motion to Dismiss Count XI of the Amended Complaint against Defendant Tracy Richards only (Doc. No. 26) is granted.

5.  Defendants' Motion to Dismiss the hostile work environment claims, which are set forth in Counts I, III, V, VI, and VIII of the Amended Complaint (Doc. No. 26), is denied.

6.  Defendants' Motion to Dismiss the disparate impact claims, which are set forth in Counts I and III of the Amended Complaint (Doc. No. 26), is granted.

It is **FURTHER ORDERED** that Plaintiffs shall file a notice by **August 6, 2015** specifying the theory, or theories, of discrimination on which Plaintiff Jo DiGiovanni bases her claims in Counts IX and X of the Amended Complaint.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4394274

---

**End of Document**                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 462344
United States District Court, W.D. Pennsylvania.

Shelby KRAMER, Plaintiff,
v.
FRANKLIN COVEY CO, Defendant.

Civil Action No. 2:18-cv-1599
|
Signed 02/09/2021

**Attorneys and Law Firms**

John Stember, Maureen Davidson-Welling, Stember Cohn & Davidson-Welling, LLC, Pittsburgh, PA, for Plaintiff.

Kathleen J. Goldman, Erin J. McLaughlin, Ryan Wilk, Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, for Defendant.

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, District Judge

**\*1** Defendant, Franklin Covey Co., filed its Motion for Summary Judgment (ECF No. 34), together with an accompanying Brief in Support (ECF No. 35), requesting that the Court grant summary judgment against Plaintiff, Shelby Kramer, on all counts. After consideration of the parties' pleadings and their positions at oral argument, the Court grants in part and denies in part Defendant's Motion for Summary Judgment (ECF No. 34).

**I. FACTUAL BACKGROUND**

Defendant is an organizational improvement company. Defendant's clients often engage it to improve several aspects of their operational schemes, including improving the effectiveness of employees, leadership capabilities, execution of strategy, and overall company culture. Defendant employed Plaintiff, Shelby Kramer, from 2007 to 2014 as an Associate Client Partner (ECF No. 36, ¶¶ 1–2); (ECF No. 43, ¶¶ 1–2). Client Partners are commission-based and usually earned commissions of 8% on account revenue generated and could earn up to 12% if they achieved all quarterly bonuses. (ECF No. 45, ¶ 64); (ECF No. 52, ¶ 64). Plaintiff gave birth to her first child while employed by Defendant.[1] In 2014, Plaintiff resigned from her employment with Defendant to

pursue employment with SkillSoft. (ECF No. 36, ¶¶ 3–4); (ECF No. 43; ¶¶ 3–4).

1   Defendant did not discriminate against her on account of her pregnancy, nor did it retaliate against her for taking leave under the Family Medical Leave Act ("FMLA"). (ECF No. 36, ¶ 3); (ECF No. 43, ¶ 3).

In 2015, Defendant rehired Plaintiff as a Sales Manager for its northeast region. Her duties as a Sales Manager included managing a group of Associate Client Partners, coaching and teaching them, holding them accountable to sales goals, attending client visits, and creating strategy for penetrating accounts. Plaintiff's supervisor at the time was General Manager Elise Roma ("GM Roma"). That same year, Defendant consolidated its sales regions, and Plaintiff's title transitioned from Sales Manager to Managing Director. (ECF No. 36, ¶¶ 6–10); (ECF No. 43, ¶¶ 6–10). As a Managing Director, Plaintiff had a total target annual compensation of $240,000. (ECF No. 46-18, p. 2); (ECF No. 52, ¶ 65). At the same time, Defendant appointed General Manager Mark Josie ("GM Josie") as a new supervisor for Plaintiff. (ECF No. 36, ¶ 9); (ECF No. 43, ¶ 9).

Plaintiff was generally known as a diligent worker and strong performer who routinely fulfilled her job responsibilities in a satisfactory manner. (ECF No. 45, ¶ 6); (ECF No. 52, ¶ 6). Plaintiff did not have performance issues, and her superiors believed her to be a hard worker and a good manager. (ECF No. 45, ¶¶ 6, 8, 50–53); (ECF No. 52, ¶¶ 6, 8, 50–53). GM Josie told Plaintiff that he planned to expand Plaintiff's team to include twelve to thirteen Client Partners. (ECF No. 45, ¶ 9); (ECF No. 52, ¶ 9).

In October of 2016, Plaintiff informed GM Josie that she was pregnant and planned to take an eight-week maternity leave beginning in April of 2017.[2] (ECF No. 37-1, p. 14); (ECF No. 52, ¶ 10). According to Plaintiff, GM Josie's treatment of her changed after she revealed her pregnancy and planned leave. (ECF No. 45, ¶ 11); (ECF No. 52, ¶ 11). She claims that the following events and circumstances adversely affected her employment: (1) GM Josie began to generally ignore Plaintiff after revealing her pregnancy, and specifically, he ignored emails, requests to join meetings remotely, and stopped having scheduled meetings with her to discuss her team[3] (ECF No. 45, ¶ 12); (ECF No. 52, ¶ 12); (2) although GM Josie previously promised to "scramble" the Client Partner teams (i.e., put seasoned Client Partners

2021 WL 462344, 2021 Fair Empl.Prac.Cas. (BNA) 45,155...

on each Managing Director's team) to give each team a fair chance to produce revenue, GM Josie "scrambled" all teams except for Plaintiff's (ECF No. 37-1, p. 14); (ECF No. 45, ¶ 13); (ECF No. 52, ¶ 13); (3) although the company's operating guidelines prohibited doing so, GM Josie permitted other teams to take account targets from Client Partners on her team (ECF No. 45, ¶ 15); (ECF No. 52, ¶ 15); (4) GM Josie did not provide Plaintiff's team with gift cards for achieving substantial growth in the prior fiscal year, despite awarding other teams gift cards (ECF No. 45, ¶ 17); (ECF No. 52, ¶ 17); and (5) GM Josie cancelled hiring on Plaintiff's team because he believed it would not be a good idea to hire employees shortly before Plaintiff began her leave (ECF No. 53-3, pp. 3–6); (ECF No. 52, ¶ 18).

2    Defendant's Response to Plaintiff's Concise Statement of Additional Material Facts provides that Defendant "does not dispute that [Plaintiff], at some point, informed [GM] Josie that she was pregnant. However, the exhibit that Plaintiff cites in support of this statement ... does not support the assertion that [Plaintiff] did so on October 10, 2016." (ECF No. 52, ¶ 10). While the Court was unable to locate an exact date as to when Plaintiff notified GM Josie that she was pregnant, Plaintiff testified that she had notified him sometime in October of 2016.

3    Defendant disputes that GM Josie was routinely cancelling meetings with Plaintiff on the grounds that "Plaintiff could only identify one 'one-on-one' that [GM] Josie postponed" (ECF No. 52, ¶ 12), and that there is only one circumstance wherein GM Josie ignored Plaintiff's request to join a meeting remotely (ECF No. 52, ¶ 12). Plaintiff's testimony was given in response to questioning by defense counsel, and she was not asked to identify additional instances of cancelled meetings. She also stated unambiguously that "the one-on-ones always occurred, and all of a sudden they were not happening and [GM Josie] was cancelling them or he was too busy to have them with me." (ECF No. 46-2, p. 15).

*2    Some of these circumstances prompted Plaintiff to have phone discussions with Chief People Officer, Todd Davis ("CPO Davis"). During Plaintiff's first conversation with CPO Davis, she complained of GM Josie allowing other teams to take accounts and alleged that there was "favoritism" at play. (ECF No. 45, ¶ 16); (ECF No. 52, ¶ 16). In Plaintiff's

second conversation with CPO Davis, she told CPO Davis that she was not comfortable with GM Josie's cancelling of the hiring on her team because of her pregnancy. (ECF No. 45, ¶ 22); (ECF No. 52, ¶ 22). During the same conversation, Plaintiff also informed CPO Davis of the instance in which GM Josie refused to provide her team with gift cards, and she further noted that she was "getting scared" because GM Josie "was starting to ignore [her] emails and cancel [her] one-on-ones." [4]  (ECF No. 36, ¶ 90); (ECF No. 43, ¶ 90). Neither GM Josie nor Executive Vice President of Global Sales and Delivery, Paul Walker ("EVP Walker") were informed of these discussions. (ECF No. 37-2, p. 6); (ECF No. 36, ¶¶ 91, 93); (ECF No. 43, ¶¶ 91, 93).

4    Plaintiff testified that CPO Davis specifically stated in reply to the hiring freeze that the company had a right to protect itself from her pregnancy. (ECF No. 46-1, p. 10); (ECF No. 46-2, p. 25). CPO Davis, however, testified that "those were never the words that [he] used." (ECF No. 46-1, p. 24).

Around the same time that Plaintiff disclosed her pregnancy, Defendant began introducing a subscription-based product labeled "All Access Pass," which allowed clients to obtain subscriptions to all of Defendant's content and solutions simultaneously. (ECF No.36, ¶ 11); (ECF No. 43 ¶ 11). Defendant began transitioning its business model to accommodate changes in its business strategy, including implementing changes in its hiring practices to suit different methods of selling. (ECF No. 36, ¶ 12); (ECF No. 43, ¶ 12). The new business model would include the use of more experienced senior sales employees, while the prior model generally utilized junior sales employees. (ECF No. 36, ¶¶ 13–14); (ECF No. 43, ¶¶ 13–14). The restructuring was planned and discussed by top-level management, including EVP Walker; Chief Executive Officer Robert Whitman ("CEO Whitman"); CPO Davis; and Chief Financial Officer Stephen Young ("CFO Young"). (ECF No. 36, ¶¶ 16–17); (ECF No. 43, ¶¶ 16–17). EVP Walker was ultimately the executive charged with implementing the restructuring. (ECF No. 37-2, p. 6); (ECF No. 43, ¶ 16).

Pursuant to the restructuring, Defendant consolidated its three sales regions (East, Central, and West) into two sales regions (Pacific and Atlantic). (ECF No. 36, ¶ 18); (ECF No. 43, ¶ 18). Prior to consolidating the regions, GM Josie managed the East Region, Mike Heinold managed the Central Region, and General Manager Jennifer Colisomo ("GM Colisomo") managed the West Region. (ECF No. 36, ¶ 19); (ECF No.

Case 4:21-cv-00872-MWB   Document 24-2   Filed 09/15/21   Page 65 of 101

Kramer v. Franklin Covey Co, Slip Copy (2021)
2021 WL 462344, 2021 Fair Empl.Prac.Cas. (BNA) 45,155...

43, ¶ 19). Going forward, each sales region was organized into pods, which functioned as the primary operating unit of the company. (ECF No. 37-2, p. 18); (ECF No. 43, ¶ 20). Although Managing Directors were typically charged with overseeing salespeople, under the new pod structure, Managing Directors were responsible for more revenue and functions because of the transition into a general-manager type role instead of a sales leader role. (ECF No. 37-2, p. 8); (ECF No. 43, ¶ 22). Managing Directors would have more employees reporting to them, including inside business partners, sales assistants, client service coordinators, regional practice leaders, and implementation specialists. (ECF No. 37-2, pp. 11, 12); (ECF No. 43, ¶ 23).

The restructuring also included the transition of employees into different roles because, according to EVP Walker, some employees then serving as Managing Directors did not have the leadership skills and experience necessary for the restructured role. (ECF No. 37-2, p. 12); (ECF No. 43, ¶ 25). EVP Walker, CEO Whitman, GM Colisomo, and GM Josie were responsible for deciding which employees would be affected by the restructuring. (ECF No. 37-2, p. 14); (ECF No. 43, ¶ 26). They met to discuss changes to the company's structure in connection with reorganization. (ECF No. 45, ¶ 28); (ECF No. 52, ¶ 28). During that meeting, they put together an initial list of individuals—Plaintiff, Andrew Jeppson, Adriana Coury, and Jessica Farnsworth [5]—that would be transitioned in the restructuring, which was subsequently revised and approved of by Defendant's Chairman and HR Department. (ECF No. 45, ¶ 29); (ECF No. 52, ¶ 29); (ECF No. 48-3, p. 2). According to GM Josie, each person charged with putting together the list had their own criteria for evaluating employees. (ECF No. 45, ¶ 34); (ECF No. 52, ¶ 34). For instance, GM Josie identified a number of criteria that he may have considered, including chemistry, personal situations, capacity to run a large organization, track record with the company, business acumen and educational level, the type of client partners managed, and the ability to work with different clients. (ECF No. 45, ¶ 35); (ECF No. 52, ¶ 35); (ECF No. 46-9, pp. 9–10). EVP Walker considered Plaintiff's transition because she had previously been managing a group of junior salespeople, and junior salespeople would be leaving the company as a result of the restructuring. (ECF No. 37-2, p. 9); (ECF No. 43, ¶ 28).

[5]    Plaintiff avers that Adriana Coury was not of "child-bearing age" in her Concise Statement of Additional Material Facts (ECF No. 45, ¶ 59). She does not, however, point to any record evidence

establishing that Adriana Coury was unable to have children at the time.

**\*3** As part of the restructuring, the company also considered hiring Coral Rice [6] and John Harding as Managing Directors. (ECF No. 37-2, pp. 10, 12); (ECF No. 43, ¶ 31). Coral Rice was ultimately hired as a Managing Director while John Harding was not. (ECF No. 36, ¶ 37); (ECF No. 43, ¶ 37). CEO Whitman and GM Josie evaluated the remaining Managing Directors serving in the East Region and decided on Andrew Jeppson. (ECF No. 37-6, p. 3); (ECF No. 43, ¶ 38); (ECF No. 37-3, p. 6); (ECF No. 43, ¶ 38).

[6]    EVP Walker had been talking to Coral Rice about becoming a Managing Director. (ECF No. 37-2, p. 10); (ECF No. 43, ¶ 34). Coral Rice has a master's degree in educational administration and began her employment with Defendant in 1992. (ECF No.36, ¶¶ 32–33); (ECF No.43, ¶¶ 32–33). She served in various capacities during her employment with Defendant, including roles as a Client Partner and consultant. (ECF No.36, ¶ 33); (ECF No.43, ¶ 33). Coral Rice was an affiliate of Defendant's predecessor, Covey Leadership Center (ECF No. 37-5, p. 4); (ECF No. 43, ¶ 33), previously served as a Client Partner, managed other Client Partners (ECF No. 37-5, p. 5); (ECF No. 43, ¶ 33), and worked as a consultant for Defendant (ECF No. 37-5, p. 7); (ECF No. 43, ¶ 7). Coral Rice was not of "child-bearing age." (ECF No. 45, ¶ 60); (ECF No. 52, ¶ 60).

Defendant's restructuring was formally announced on March 1, 2017. (ECF No. 36, ¶ 39); (ECF No. 43, ¶ 39). The company announced that Plaintiff and Jessica Farnsworth would be transitioned from their Managing Director roles into Client Partner roles (ECF No. 37-2, p. 16); (ECF No. 43, ¶ 40), while Adriana Coury [7] would be made Director of Operations (similar in level to a Managing Director). (ECF No. 45, ¶ 59); (ECF No. 52, ¶ 59). Three male Managing Directors were retained. (ECF No. 45, ¶ 59); (ECF No. 52, ¶ 59). All of the Client Partners previously working under Plaintiff were transferred to Andrew Jeppson to manage. (ECF No. 45, ¶ 55); (ECF No. 52, ¶ 55). Mike Heinold was also transitioned from General Manager to Managing Director. (ECF No. 37-2, p. 17); (ECF No. 43, ¶ 41).

[7]    Adriana Coury was not pregnant at the time, and Plaintiff acknowledged that there were other

employees affected by the restructuring that were not pregnant. (ECF No. 36, ¶¶ 42–43); (ECF No. 43, ¶¶ 42–43).

On March 1, 2017, EVP Walker and GM Josie notified Plaintiff by phone that the company was undergoing restructuring and explained the new pod structure. (ECF No. 36, ¶ 48); (ECF No. 43, ¶ 48). EVP Walker informed Plaintiff that they did not see her operating at the new level of pod leader, but that the company wished to retain her because she was a great contributor. (ECF No. 37-2, p. 16); (ECF No. 43, ¶ 49). Plaintiff was accordingly moved to a Client Partner position, and she was to report to Coral Rice, who in turn reported to GM Josie. (ECF No. 45, ¶ 61); (ECF No. 52, ¶ 61). Plaintiff was advised that she would no longer be charged with supervising employees. (ECF No. 45, ¶ 63); (ECF No. 52, ¶ 63). EVP Walker informed Plaintiff that she had the option of covering a large geography, with accounts near her home as well as along the east coast, including some larger accounts, or covering a territory closer to home. (ECF No. 37-2, p. 17); (ECF No. 43, ¶ 50).

Bridge compensation was provided to employees affected by the restructuring so that those individuals could earn the same compensation that they earned in their former role. (ECF No. 37-2, p. 17); (ECF No. 43, ¶ 51). CPO Davis informed Plaintiff via email that she was poised to receive the same compensation that she received as a Managing Director for the remainder of that fiscal year, and for the duration of the next fiscal year. (ECF No. 36, ¶ 55); (ECF No. 43, ¶ 55). GM Josie and CPO Davis later called Plaintiff to discuss compensation options. (ECF No. 36, ¶ 57); (ECF No. 43, ¶ 57). GM Josie outlined two compensation plans for Plaintiff during the call: a no-risk plan and a variable risk plan. (ECF No. 36, ¶ 59); (ECF No. 43, ¶ 59). Under the no-risk plan, Defendant would review Plaintiff's compensation for the past three years and continue to pay her the highest amount she earned during that period. (ECF No. 36, ¶ 59); (ECF No. 43, ¶ 59). According to Plaintiff, during that phone discussion, she brought up the eighteen-month bridge compensation plan that CPO Davis discussed via email, and upon doing so, GM Josie immediately conferred with CPO Davis to reduce the bridge compensation to six months. (ECF No. 46-2, pp. 5, 9). GM Josie, however, explained that he and Plaintiff could talk about bridge compensation in the next fiscal year, and that he did not want Plaintiff's compensation to be affected. [8] (ECF No. 37-3, p. 12). After the conversation, GM Josie sent a follow-up email confirming that bridge pay would be offered for six months. (ECF No. 46-20, p. 2). Plaintiff also acknowledged that the compensation of her co-worker did not change even though "he had been given some accounts ... [that] weren't doing well." (ECF No. 36, ¶ 72); (ECF No. 43, ¶ 72). Adriana Coury's compensation also remained the same approximately three years after the restructuring, and Rob Ogle's bridge pay just recently ended. (ECF No. 45, ¶ 111); (ECF No. 52, ¶ 111).

[8]     Plaintiff disputes that GM Josie stated that they could talk about the same arrangement in the next fiscal year but does so by pointing to her own testimony wherein she described how GM Josie conferred with CPO Davis to remove the eighteen-month bridge pay. (ECF No. 36, ¶ 59); (ECF No. 43, ¶ 59).

**\*4** After the move to Client Partner, Plaintiff asserts that she was promised certain accounts by the company. She believed that the company would be providing her "a list of accounts, and in [her] initial discussions with [EVP] Walker and [GM Josie], they ... said that [she] would be inheriting accounts from Elise Cannon, Tod Taylor, Andrew Jeppson, and Mike Groll ...." (ECF No. 46-2, p. 8). [9] Both GM Josie and EVP Walker, however, told Plaintiff that she would only be receiving some of those accounts. [10] (ECF No. 52, ¶ 67). Towards the end of the call, GM Josie told Plaintiff that he would provide her with a written list of accounts and pay plan for her to evaluate the following day. (ECF No. 45, ¶ 69); (ECF No. 52, ¶ 69). In a follow-up call, Plaintiff was told that she would not be inheriting Elise Cannon's accounts. (ECF No. 45, ¶ 75); (ECF No. 52, ¶ 75). Plaintiff was provided a list of potential accounts that belonged to Tod Taylor, Andrew Jeppson, and Mike Groll, and GM Josie recommended that Plaintiff meet with Andrew Jeppson, Mike Groll, and Tod Taylor to discuss the accounts. (ECF No. 46-20, pp. 2, 6–9). According to Plaintiff, she met with those individuals, and Andrew Jeppson told her that GM Josie allowed him to keep his accounts (ECF No. 45, ¶ 80); (ECF No. 52, ¶ 80), while Tod Taylor informed Plaintiff that he had "passed on all but a few accounts." (ECF No. 48-8, p. 2). Plaintiff did not inquire into which accounts she would receive upon her return (ECF No. 37-1, p. 24), nor did she know which accounts she would receive upon return. (ECF No. 37-1, p. 24). Subsequently, Plaintiff discussed the accounts with GM Josie, and upon doing so, he became angry with her and stated that, regardless of the status of the accounts, "they were what they were, and if [she] didn't like it, [she] could leave." (ECF No. 46-2, pp. 3, 42). Plaintiff asked him if the company wanted her to leave, and GM Josie "just paused and ... told [her] that he would talk to [her] ... the next week." (ECF No. 46-2, p. 4). [11]

2021 WL 462344, 2021 Fair Empl.Prac.Cas. (BNA) 45,155...

9

*See also* (ECF No. 46-2, p. 31) ("They talked about giving me accounts that were in closer proximity to my home in the New England area, it was Elise Cannon's book of business, and then they also talked about giving me accounts from Mike Groll, Tod Taylor[,] and Andrew Jeppson."); (ECF No. 46-2, p. 32) ("The discussion was about the individuals that I outlined, Cannon, Groll, Jeppson, and Taylor accounts, .... The way that that came up was that they said that they felt like I would be a good candidate to take on some of the region's most, you know, important accounts, key accounts ....").

10

GM Josie stated that the company was "going to look at Mike Groll's [accounts], Tod Taylor's [accounts], Andy Jeppson's [accounts] ...." (ECF No. 37-3, p. 8). He did not "know if every single account on those lists [was] going to be given to [Plaintiff], but she was going to have a nice book of business ...." (ECF No. 37-3, p. 8). According to GM Josie, no promises were made as to any accounts and nothing was finalized. (ECF No. 37-3, p. 9).

11

GM Josie stated that he could not recall having the conversation and that he did not remember the contents of the conversation. (ECF No. 53-3, p. 12). "Testimony that one does not recall certain events is not equivalent to testimony that it did not happen." *See EEOC v. Bob Evans Farms, LLC*, 725 F. Supp. 3d 635, 642, 642 n.6 (2017) (collecting cases).

On March 16, 2016, Plaintiff's counsel contacted CPO Davis and left a voicemail claiming that Plaintiff was being harassed by an individual in leadership. (ECF No. 45, ¶ 90); (ECF No. 52, ¶ 90). [12] Plaintiff subsequently took an early maternity leave because her doctors recommended doing so due to stress and complications from her prior pregnancy. (ECF No. 45, ¶¶ 94–95); (ECF No. 52, ¶¶ 94–95). CPO Davis was charged with handling the investigation into Plaintiff's complaints. (ECF No. 45, ¶ 97); (ECF No. 52, ¶ 97). Plaintiff's counsel attempted to determine whether Plaintiff could return to work after maternity leave under different leadership, but that was not an option. (ECF No. 45, ¶ 100); (ECF No. 52, ¶ 100). Plaintiff resigned on June 14, 2017 (ECF No. 37-1, p. 3), approximately three months before her bridge compensation was scheduled to end. (ECF No. 45, ¶ 102); (ECF No. 52, ¶ 102). In doing so, she acknowledged that upon her return her compensation would have been the same as it was when she left. (ECF No. 36, ¶ 81); (ECF No. 43, ¶ 81).

12

The parties dispute whether pregnancy discrimination was mentioned. (ECF No. 45, ¶ 90); (ECF No. 52, ¶ 90). CPO Davis, however, understood that Plaintiff was complaining of pregnancy discrimination. (ECF No. 45, ¶ 91); (ECF No. 52, ¶ 91).

### III. STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided in order to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof," will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

### IV. ANALYSIS

**\*5** Defendant requests that the Court grant summary judgment on Plaintiff's hostile work environment, discrimination, and retaliation claims. [13] Plaintiff's hostile work environment, discrimination, and retaliation claims brought under both Title VII and the PHRA are addressed simultaneously because "[c]laims arising under the PHRA are governed by the same legal standard as that applied to Title VII[,]" *Lepore v. Lanvision Sys., Inc.*, 113 F. App'x 449, 452 (3d Cir. 2004), [14] and the parties likewise address each claim under the same legal standards. After careful consideration of the arguments set forth by the parties, the Court grants summary judgment in favor of Defendant on Plaintiff's hostile work environment claims and constructive discharge claims and denies summary judgment on Plaintiff's discrimination and retaliation claims.

13  Plaintiff has withdrawn her FMLA interference claim. (ECF No. 42, p. 9 n.2). That claim is dismissed with prejudice. *See Gyda v. Temple Univ.*, 2000 WL 675722, at \*4 (E.D. Pa. May 23, 2000) (dismissing claims with prejudice that were withdrawn on a motion for summary judgment).

14  *See also Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 318–19 (3d Cir. 2002) (reviewing claims brought pursuant to PHRA and Title VII under same standards); *Fogleman v. Mercy Hospital Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) ("PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."); *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083–84 (3d Cir. 1995) (stating PHRA is "construed consistently with interpretations of Title VII."); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 791, 791 n.8 (3d Cir. 2016) (same).

**A. Hostile Work Environment Claims**

Defendant requests that the Court grant summary judgment on Plaintiff's pregnancy-based hostile work environment claims on the ground that Plaintiff cannot establish that she was subject to severe or pervasive discrimination on account of her sex. (ECF No. 35, pp. 11–15). Plaintiff counters that Defendant does not properly consider the circumstances in their totality. (ECF No. 42, 16–18).

To show a *prima facie* case of hostile work environment, a plaintiff must establish that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination suffered was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person under similar circumstances; and (5) the existence of *respondeat superior* liability. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (citation omitted).

To show the conduct at issue is severe or pervasive, the conduct generally must be seen as altering the conditions of employment and creating an abusive working environment. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986). In other words, conduct is severe or pervasive "when the workplace is permeated with discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment." *Peace-Wickham v.*

*Walls*, 409 F. App'x 512, 519 (3d Cir. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). Harassment is measured both objectively and subjectively, *Hatch v. Franklin County*, 755 F. App'x 194, 202 (3d Cir. 2018) (citation omitted), and courts are instructed to consider the totality of the circumstances, including the frequency of the discriminatory conduct, the severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

**\*6** "The threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). Title VII is not a general civility code and it does not guarantee an ideal workplace, *Fichter v. AMG Resources Corp.*, 528 F. App'x 225, 231 (3d Cir. 2013), nor does it encompass the ordinary trials and tribulations of the workplace. *Stucke v. City of Philadelphia*, 685 F. App'x 150, 154 (3d Cir. 2017). "Offensive conduct that renders an employee's work[-]life unpleasant or uncomfortable is insufficient." *Williams v. Pa. Human Relations Comm.*, No. 14-1290, 2016 WL 6834612, at \*21 (W.D. Pa. Nov. 21, 2016) (citation omitted). Allegations properly described as petty slights, minor annoyances, and simple lack of good manners do not suffice to establish an actionable hostile work environment. *Yarnall v. Phila. School Dist.*, 57 F. Supp. 3d 410, 433 (E.D. Pa. 2014) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

To show that the conduct she endured was sufficiently severe or pervasive, Plaintiff points to a series of events and circumstances that began occurring after her superiors were allegedly aware of her pregnancy. (ECF No. 42, p. 16–18). Those circumstances include: (1) GM Josie stopped scheduling meetings with her (ECF No. 37-1, pp. 13–14); (2) GM Josie let other teams take accounts from her team (ECF No. 37-1, pp. 12–13); (3) GM Josie humiliated her and her team by refusing to provide them gift cards at an award ceremony (ECF No. 46-2, pp. 29–31); (4) GM Josie refused to allow her to hire new members for her team (ECF No. 37-1, p. 13); (5) although GM Josie allegedly promised to "scramble" Plaintiff's team (i.e., switch up members of teams to adjust revenue accrued by each team)—as he allegedly did with other teams—he did not "scramble" her team (ECF No 46-2, pp. 16–17, 22–23); (6) GM Josie and others demoted her; and (7) although GM Josie allegedly promised certain accounts to Plaintiff, he gave many of those accounts to others, and

2021 WL 462344, 2021 Fair Empl.Prac.Cas. (BNA) 45,155...

allegedly told Plaintiff to leave if she did not like it (ECF No. 46-2, p. 42).

As an initial matter, Defendant maintains that the Court should not consider acts of discriminatory disparate treatment —namely the demotion—in adjudicating a hostile work environment claim. (ECF No. 51, p. 8). This argument is premised on a body of law distinguishing otherwise individual acts of disparate treatment from hostile work environments. Our Court of Appeals, however, has not adopted or had the occasion to address the doctrine. The Court agrees that consideration of Plaintiff's demotion in analyzing her hostile work environment claim is inappropriate because it would "blur the distinctions between ... the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address." [15] *Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 315, 329 (D. Del. 2019). Plaintiff's demotion is properly considered an individual act of disparate treatment because it is a tangible adverse employment action. The same is also true of Plaintiff's allegation that GM Josie allegedly gave away promised accounts, resulting in a reduction in her compensation. [16] *See Griffin v. Dep't of Human Services*, No. 18-14697, 2019 WL 3369783, at *3 (D.N.J. Jul. 26, 2019) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)) ("Demotions, reductions in pay, failures to promote, office moves to undesirable locations, undesirable assignments, transfers to dead-end jobs, transfers with reduction in pay, and compensation decisions are all discrete acts."). These circumstances are appropriately analyzed as separate instances of discrimination, and the Court therefore will not consider her demotion or reduction in compensation in adjudicating her hostile work environment claim.

[15]    *See Helvy v. Allegheny Cty.*, No. 14-01686, 2015 WL 672262, at *3 (W.D. Pa. Feb. 17, 2015) (declining to consider individual acts of disparate treatment in analyzing hostile work environment because a plaintiff is not permitted to "cobble together a number of distinct, disparate acts—the same acts that make up her disparate treatment claim—and label it a hostile work environment."); *Busch v. Oswayo Valley School Dist.*, No. 15-239, 2016 WL 5394085, at *9 (W.D. Pa. 2016) (same); *Stucke v. City of Phila.*, No. 12-6216, 2015 WL 2231849, at *7 (E.D. Pa. May 12, 2015) (same); *Parker v. State Dep't of Pub. Safety*, 11 F. Supp.

2d 467, 475–77 (D. Del. 1998) (same). *See also Haqq v. Pa. Dept. of Public Welfare*, No. 09-0042, 2010 WL 1253452, at *9 n.9 (E.D. Pa. Mar. 23, 2010) (noting that the concerns of district courts regarding allowing individual acts of disparate treatment to form the basis of a hostile work environment are well-reasoned). *Cf. Quick v. GEO Group, Inc.*, No. 18-93, 2020 WL 532343, at *14 (W.D. Pa. Feb. 3, 2020) (discussing the doctrine and distinguishing *Helvy* and *Lampkins* on the grounds that the plaintiff did not bring a disparate treatment claim).

[16]    Indeed, Plaintiff acknowledges that this circumstance is an individual act of disparate treatment. *See* (ECF No. 42, p. 14) (discussing Defendant's reason for discrimination does not explain "Josie's post-March 1, 2017 acts stripping [Plaintiff] of assigned accounts .... As [Defendant] has offered no reason for that disparate treatment ...."). Moreover, the record does not support that Plaintiff was promised certain accounts by GM Josie, nor can it reasonably be inferred that she was promised certain accounts upon her return from maternity leave. The statements of GM Josie (ECF No. 36, ¶ 59); (ECF No. 36, ¶ 68); (ECF No. 43, ¶ 59), CPO Davis (ECF No. 46-19), and EVP Walker (ECF No. 36, ¶ 51); (ECF No. 43, ¶ 51), and Plaintiff illustrate nothing more than preliminary negotiations concerning the scope of Plaintiff's responsibility upon her return. Furthermore, to the extent that Plaintiff is using the alleged promise of accounts to show a reduction in her compensation, her contention is highly speculative. Although there is some dispute of the duration of bridge compensation, the fact remains that Plaintiff received bridge compensation during her maternity leave (ECF No. 36, ¶ 78); (ECF No. 43, ¶ 78), and she acknowledged that, upon her return, her compensation would have been exactly the same as it was when she left. (ECF No. 36, ¶ 81); (ECF No. 43, ¶ 81). Plaintiff resigned approximately three months before her bridge compensation was allegedly going to terminate. The testimony of other employees on bridge compensation does not bolster her cause because Adriana Coury's compensation remained the same approximately three years after the restructuring, and Rob Ogle's bridge pay just recently ended. (ECF No. 45, ¶ 111); (ECF No. 52, ¶ 111). On the

same note, GM Josie, EVP Walker, and CPO Davis indicated that they intended for Plaintiff to receive bridge pay for as long as necessary. The record, therefore, does not support Plaintiff's allegation that GM Josie promised any accounts to her—by all measures, it appears that the conversations between Plaintiff and GM Josie were at most preliminary discussions for the future—and any resulting reduction in pay does not extend beyond speculation.

 **\*7** Plaintiff's remaining circumstances (i.e., GM Josie cancelling meetings, allowing other teams to take accounts, refusing gift cards, freezing hiring, failing to "scramble," and telling Plaintiff to leave during a conversation), while they may have created a contentious working environment, are insufficient to allow a factfinder to reasonably conclude that the conduct at issue was either severe or pervasive because they consist of isolated and otherwise neutral managerial functions, which amount to no more than "petty slights, minor annoyances, and simple lack of good manners." *Yarnall*, 57 F. Supp. 3d at 433 (quoting *Burlington*, 548 U.S. at 68) (internal quotation marks omitted). *See Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006), *overruled in part on other grounds*, *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (discussing how "[a] cold shoulder can be hurtful, but it is not harassment."); *Williams v. Pa. Human Relations Comm.*, No. 14-1290, 2016 WL 6834612, at \*20 (W.D. Pa. Nov. 21, 2016) (discussing that the perceived discourtesy or bad manners of a superior is insufficient to show harassment); *Baugh v. Robert Morris Univ.*, No. 16-430, 2018 WL 1400063, at \*24 (W.D. Pa. Mar. 20, 2018) (collecting cases discussing pervasiveness).

Because it would be improper for the Court to consider Plaintiff's demotion and reduction in pay in its analysis of her hostile work environment claims, and because the remaining circumstances, considered in their totality, are insufficient to allow a factfinder to reasonably conclude that the conduct at issue was either severe or pervasive, the Court grants summary judgment on Plaintiff's hostile work environment claims.

## B. Discrimination Claims

Defendant next contends that Plaintiff cannot establish *prima facie* cases of discrimination on the basis of sex, either pursuant to her gender or pregnancy, because Plaintiff did not experience an adverse employment action, and even if she did, the evidence does not support an inference of gender or pregnancy discrimination. (ECF No. 35, p. 15).

A *prima facie* case of pregnancy discrimination requires a showing of the following: "(1) the employer had knowledge of the pregnancy; (2) the plaintiff was qualified for the job; (3) the plaintiff suffered an adverse employment action; and (4) there is a nexus between the plaintiff's pregnancy and the adverse employment action that raises an inference of discrimination." *Fritz v. Uwchlan Ambulance Corps, Inc.*, No. 18-3181, 2020 WL 1042420, at \*3 (E.D. Pa. Mar. 4, 2020) (citation omitted). A *prima facie* case of gender discrimination requires a showing of the following: "(1) she was a member of a protected class; (2) ... she was qualified for the position; (3) ... she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination." *Id.* (citation omitted).

"Disparate treatment discrimination is proven by either using direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008). If indirect evidence is the chosen avenue, the burden-shifting framework is applied. *Id. See also Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 553 (W.D. Pa. 2019) (applying burden shifting framework to sex discrimination claims); *Fritz*, 2020 WL 1042420, at \*3 (applying burden shifting framework to pregnancy discrimination claims). The employee must first establish a *prima facie* case. If she does so, then the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its adverse employment decision. If the employer does so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination. *Doe*, 527 F.3d at 364.

 **\*8** Defendant first argues that Plaintiff has failed to show that she was subject to an adverse employment action. (ECF No. 35, 16–19). An adverse employment action is one that brings about serious and tangible consequences resulting in the alteration of an employee's compensation, terms, conditions, or privileges of employment. *Fritz*, 2020 WL 1042420, at \*4 (citation omitted). Modest changes in the duties or conditions of employment that do not result in a material disadvantage are not properly considered adverse. *Id.* (citation omitted). Typical examples of adverse employment actions include, *inter alia*, hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Id.* (citation omitted). Plaintiff contends that there were three adverse employment actions: (1) her demotion (ECF No. 42, 9–10); (2) the stripping away of accounts (ECF No. 42, pp. 14, 20 n.12); and (3) her constructive discharge (ECF No. 42, p. 11).

The Court finds that Plaintiff cannot show that she was constructively discharged, nor could a factfinder reasonably conclude that she was constructively discharged because she failed to demonstrate that she was subjected to a hostile work environment. *See Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 174 n.7 (3d Cir. 2014) (finding no constructive discharge where plaintiff failed to establish a hostile work environment). Additionally, although Plaintiff argues that she suffered an adverse employment action when GM Josie allegedly gave away promised accounts (ECF No. 42, pp. 14, 20 n.12), a factfinder could not reasonably find that this is an adverse employment action because, for the same reasons set forth *supra* at pages 15–16 n.16, the record does not show that she was ever promised accounts. The record merely shows that she and others were engaged in preliminary negotiations, and similarly, that she received, and would continue to receive, the same compensation during and after her maternity leave.

The Court grants summary judgment on Plaintiff's constructive discharge claims because she failed to establish her hostile work environment claims. The Court also grants summary judgment on Plaintiff's circumstance involving the promise of certain accounts because no factfinder could reasonably conclude that she was promised accounts, nor could a factfinder reasonably conclude that she received a reduction in pay.

Plaintiff's demotion, however, is an adverse employment action. "Employment decisions such as transfers and demotions may suffice to establish the third element of a plaintiff's *prima facie* case." *Jones v. School Dist. Of Phila.*, 198 F.3d 403, 411–12 (3d Cir. 1999) (citing *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994)). *See also Torre*, 42 F.3d at 831 n.7 ("It is clear ... that a transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action."). She was recruited as a Managing Director, a role that required her to coach Client Partners, assist them with learning content, hold them accountable to sales goals, attend client visits with them, and create strategy for developing accounts. (ECF No. 36, ¶ 7); (ECF No. 43, ¶ 7). Her transfer to Client Partner meant that she

would no longer be charged with supervising Client Partners, and as a result, regardless of the parties' characterizations, Plaintiff was demoted to a lower–level position with less responsibility, a move that a factfinder could reasonably conclude was an adverse employment action.

Plaintiff's demotion was also accompanied by circumstances from which a factfinder could reasonably find that she was demoted because of her pregnancy or sex. Typically, to show an inference of discrimination, a plaintiff points to others outside of her protected class who were treated more favorably than her. *Parish v. UPMC University Health Center of Pittsburgh*, 373 F. Supp. 3d 608, 628–30 (W.D. Pa. 2019). In cases involving a reduction in force, however, the standard is more relaxed. *Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 553–55 (W.D. Pa. 2019). A plaintiff in a reduction-in-force case need only show that the company retained employees outside of her protected class. *Id.* (citation omitted).

**\*9** Plaintiff has shown the required inference because Defendant retained employees outside of Plaintiff's protected class, and her demotion was preceded by several aggravating circumstances used to describe her hostile work environment claims. As a result, viewing the circumstances in the light most favorable to Plaintiff, a factfinder could reasonably find that she was discriminated against because of her sex or pregnancy.

Because Plaintiff has established a *prima facie* case of discrimination concerning her demotion, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Sabo*, 386 F. Supp. 3d at 554. Defendant contends that Plaintiff's demotion was the result of a nationwide restructuring of the company's sales business (ECF No. 35, p. 24), and the burden therefore shifts back to Plaintiff to establish pretext. *Sabo*, 386 F. Supp. 3d at 546. There are two methods that can be employed by a plaintiff to show that a defendant's reason for the discrimination is pretextual. *Sabo*, 386 F. Supp. 3d at 546. First, a plaintiff can produce evidence showing that the proffered reason is so weak that it is "unworthy of credence." *Id.* (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647–48 (3d Cir. 2015)). Second, a plaintiff can produce evidence of pretext by pointing to any of the following: "(1) that defendant previously discriminated against the plaintiff; (2) that defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated individuals outside the protected class more favorably." *Id.* (citation omitted).

During the restructuring, Defendant hired Coral Rice as a Managing Director, transitioned Jessica Farnsworth into a Director of Operations, and demoted Adriana Coury into a Client Partner role. Defendant also retained Andrew Jeppson, Mike Groll, and Tod Taylor in Managing Director roles. The circumstances are accompanied by the aggravating conduct of GM Josie after he learned of Plaintiff's pregnancy and planned leave. Viewing these circumstances aggregately in the light most favorable to Plaintiff, and drawing all reasonable inferences therefrom, a factfinder could reasonably find that the national restructuring of Defendant's business was used as a pretext to conceal its actionable conduct related to Plaintiff's demotion. These circumstances that occurred during and prior to the demotion amount to a close call—one that should be resolved by the factfinder at trial.

Therefore, the Court denies summary judgment on Plaintiff's demotion-based discrimination claims because she has established *prima facie* cases of discrimination under Title VII and the PHRA, and a factfinder could reasonably find that the sex and pregnancy discrimination suffered by Plaintiff was obscured under the veil of Defendant's national restructuring.

#### C. Retaliation Claims

Defendant contends that Plaintiff has not established *prima facie* cases of Title VII/PHRA retaliation because she cannot show: (1) that she suffered an adverse employment action, (2) that she engaged in protected activity, or (3) causation.[17] (ECF No. 35, pp. 21–24). Defendant also contends that Plaintiff cannot establish a *prima facie* case of FMLA retaliation because she cannot show an adverse employment action or causation. (ECF No. 35, p. 28).

[17]    Plaintiff ambiguously argues that because CPO Davis "admitted that it was [Plaintiff's] assertion of her rights through counsel that deterred [Defendant] from taking any action to remedy the discrimination[,]" Defendant is liable for retaliation. (ECF No. 42, p. 20). To the extent Plaintiff claims that GM Josie retaliated after her counsel complained on her behalf by removing accounts from her (ECF No. 20, p. 20, n.12), that is not an actionable retaliation claim because "failing to remedy discrimination" is not an adverse employment action, *Ashton v. SCI-Fayette, Pa. Dept. of Corrections*, No. 16-1795, 2018 WL

2966849 (W.D. Pa. Jun. 13, 2018), nor for the reasons already stated, does the record establish that Plaintiff was promised certain accounts.

**\*10**  To establish *prima facie* cases of retaliation under Title VII and the PHRA, a plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Sabo*, 386 F. Supp. 3d at 555. To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 301–02 (3d Cir. 2012). Where a plaintiff proceeds on indirect evidence, the *McDonnell Douglas* burden-shifting framework applies to each of these claims. *See id.* at 302 (stating framework applies in FMLA retaliation cases supported by indirect evidence); *Carvalho-Grevious, v. Delaware State University*, 851 F.3d 249, 257 (3d Cir. 2017) (applying *McDonnell Douglas* burden-shifting framework to Title VII retaliation case).

To show protected activity, a plaintiff can point to informal protests of discriminatory employment practices, which include complaints made to upper management. *Moore v. City of Phila.*, 461 F.3d331, 343 (3d Cir. 2006) (citation omitted). The message rather than the means of conveyance is crucial to a finding of protected activity. *Id.* (citation omitted). To that extent, protected activity occurs where a plaintiff complains to management about alleged discrimination in a manner where it is possible to discern from the context of the statement that the employee is opposing unlawful conduct. *Sabo*, 386 F. Supp. 3d at 555.

To show causation, a plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). A plaintiff may point to a broad array of evidence to establish causation, including inconsistent explanations, patterns of antagonism, or temporal proximity suggestive of retaliatory motive. *Carvalho-Grevious*, 851 F.3d at 260. The overall inquiry is focused on the totality of the circumstances, which tends to show the required inference. *Id.*

For the reasons already set forth *supra* at pages 19–20, Plaintiff suffered an adverse employment action when she

was demoted. She also engaged in protected activities by phoning CPO Davis to discuss GM Josie's treatment of her,[18] and by notifying GM Josie of her planned leave. Moreover, she has sufficiently shown causation because, as both parties acknowledge, the decision to move Plaintiff was made by consensus of the leadership group, including CPO Davis, EVP Walker, GM Josie and CEO Whitman (ECF No. 45, ¶ 42); (ECF No. 52, ¶ 42); *see also* (ECF No. 36, ¶ 17); (ECF No. 43, ¶ 17) (stating that EVP Walker, CEO Whitman, CPO Davis, and CFO Young were involved in discussions about restructuring). And as both CPO Davis and GM Josie were each aware of protected activity—and were charged to some extent with Plaintiff's move from Managing Director to Client Partner—a factfinder could reasonably find that her demotion is causally connected to her protected activities. That causal connection is further strengthened by the presence of the aggravating circumstances endured by Plaintiff after she notified GM Josie of her planned leave.

[18]     Plaintiff points out that during a phone conversation with CPO Davis, she conveyed that "[she] felt very uncomfortable with the hiring strategy being put on hold because of [her] pregnancy." (ECF No. 36, ¶ 90); (ECF No. 43, ¶ 90). On the same call, Plaintiff went on to identify the instance in which GM Josie refused to provide her team with gift cards, and she further noted that she was "getting scared" because GM Josie "was starting to ignore [her] emails and cancel [her] one-on-ones." (ECF No. 36, ¶ 90); (ECF No. 43, ¶ 90).

**\*11** Because Plaintiff has established *prima facie* cases of retaliation concerning her demotion, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Defendant again contends that Plaintiff's demotion was the result of a nationwide restructuring of the company's sales business (ECF No. 35, p. 24), and the burden therefore shifts back to Plaintiff to establish pretext.

To show that a legitimate, non-discriminatory reason is pretextual, a plaintiff must point to evidence from which a factfinder could reasonably disbelieve the reason or believe that an invidious discriminatory reason was more likely than not the motivating cause of the action. *Michniewicz v. Metasource, LLC*, 756 F. Supp. 2d 657, 668 (E.D. Pa. 2010) (citation omitted). A plaintiff usually does so by: "(1) discredit[ing] [the defendant's] reason, by coming forward with such weaknesses, implausibilities,

incoherencies, inconsistencies, or contradictions in the proffered reason to allow a rational factfinder to find the reason unworthy of credence, or (2) adduc[ing] evidence that discrimination was more likely than not a motivating or determinative cause." *Id.* (citation omitted).

For the reasons set forth *supra* at pages 21–22, whether the circumstances surrounding Defendant's national restructuring were used to hide what was, in fact, retaliation is a decision best resolved by the factfinder. Therefore, the Court denies summary judgment on Plaintiff's retaliation claims brought under Title VII, the PHRA, and the FMLA because she established *prima facie* cases of retaliation, and a factfinder could reasonably find that the reason offered by Defendant for her demotion was pretextual.

## V. CONCLUSION

For the reasons set forth herein, the Court grants in part and denies in part Defendant's Motion for Summary Judgment (ECF No. 34). The Court grants summary judgment in favor of Defendant on Plaintiff's hostile work environment claims brought under Title VII and the PHRA, and included at Counts I and II of the Complaint because, without considering Plaintiff's demotion, the totality of the circumstances endured by Plaintiff are insufficient to allow a factfinder to reasonably conclude that the conduct at issue was either severe or pervasive. The Court grants summary judgment in favor of Defendant on Plaintiff's constructive discharge claims brought under Title VII and the PHRA, and included at Counts I and II of the Complaint because Plaintiff failed to establish the lesser severity or pervasiveness required for hostile work environment claims, and as a result, no factfinder could reasonably conclude that Plaintiff was constructively discharged. The Court also grants summary judgment in favor of Defendant on Plaintiff's discrimination claims involving the alleged promise of certain accounts brought under Title VII and the PHRA, and included at Counts I and II because the record does not reflect that she was promised accounts, nor could the same be considered an adverse employment action.

The Court denies summary judgment on Plaintiff's demotion-based discrimination claims brought under Title VII and the PHRA, and included at Counts I and II because she has sufficiently established *prima facie* cases of discrimination, and although Defendant has offered its national restructuring as a legitimate, non-discriminatory reason for her demotion, she has provided circumstances that would allow a factfinder to reasonably conclude that the proffered reason was pretextual. The Court also denies summary judgment on

**Kramer v. Franklin Covey Co, Slip Copy (2021)**

2021 WL 462344, 2021 Fair Empl.Prac.Cas. (BNA) 45,155...

Plaintiff's demotion-based retaliation claims brought under Title VII, the PHRA, and the FMLA, and included at Counts I, II, and III because she established *prima facie* cases of retaliation, and because Defendant proffered the same legitimate, non-discriminatory reason above, a factfinder could reasonably find that the proffered reason was

pretextual. These claims will proceed to trial. An Order of Court will follow.

**All Citations**

Slip Copy, 2021 WL 462344, 2021 Fair Empl.Prac.Cas. (BNA) 45,155, 105 Empl. Prac. Dec. P 46,697

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

2014 WL 1371594
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Patricia McSPARRAN, Plaintiff

v.

Commonwealth of PENNSYLVANIA, Pennsylvania
Department of Environmental Protection,
Kelly Heffner, and Jeffrey Logan, Defendants.

Civil No. 1:13–CV–1932.
|
Signed April 8, 2014.

**Attorneys and Law Firms**

Nina B. Shapiro, Law Office of Nina B. Shapiro, Esquire,
Lancaster, PA, for Plaintiff.

David B. White, Laura E. Caravello, Patrick Sorek, Burns
White LLC, Pittsburgh, PA, for Defendants.

*MEMORANDUM*

WILLIAM W. CALDWELL, District Judge.

I. *Introduction and Procedural History*

**\*1** Plaintiff is Patricia McSparran. Defendants are the
Commonwealth of Pennsylvania (the Commonwealth); the
Pennsylvania Department of Environmental Protection (the
DEP); Kelly Heffner, the DEP's Deputy Secretary for Water
Management; and Jeffrey Logan, the DEP's Executive Deputy
Secretary for Management and Administration.

Plaintiff was formerly the DEP's Director of the Bureau of
Waterways Engineering and Wetlands. She brought this suit
alleging she was given unequal pay, subjected to harassment
and then fired from her job, all on the basis of her sex. She
made the following claims: (1) a 42 U.S.C. § 1983 claim based
on her federal right to equal protection; (2) a section 1983
claim based on her federal right to due process; (3) a claim
under Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§§ 2000e *et seq.;* (4) a claim under the Pennsylvania Human
Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951 *et seq.;* (5) a
state-law claim for defamation; and (6) a state-law claim for
intentional infliction of emotional distress.

Defendants filed a motion to dismiss under Fed.R.Civ.P.
12(b)(6). We granted that motion. We dismissed the due-
process claim and the state-law claim for intentional infliction
of emotional distress without leave to amend. We gave
Plaintiff an opportunity to amend her Complaint to set forth
her other claims with greater factual support. *McSparran v.
Pennsylvania,* 2013 WL 6631654, at \*10 (M.D.Pa. Dec.17,
2013).

Plaintiff has filed an Amended Complaint, reiterating her
equal-protection claim, her Title VII claim, her PHRA claim
and her defamation claim. We are considering Defendants'
motion to dismiss that pleading.

II. *Standard of Review*

On a Rule 12(b)(6) motion, "[w]e 'accept all factual
allegations as true, construe the complaint in the light most
favorable to the plaintiff, and determine whether, under any
reasonable reading of the complaint, the plaintiff may be
entitled to relief.' " *Byers v. Intuit, Inc.,* 600 F.3d 286, 291 (3d
Cir.2010) (quoted case omitted).

A complaint need only contain "a short and plain statement
of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual
allegations are not required. *Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929
(2007). Nonetheless, a complaint has to plead "enough facts
to state a claim to relief that is plausible on its face." *Id.* at 570,
127 S.Ct. at 1974. "The plausibility standard is not akin to a
'probability requirement,' but it asks for more than a sheer
possibility that a defendant has acted unlawfully." *Ashcroft v.
Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d
868 (2009) (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. at
1965). "[L]abels and conclusions" are not enough, *Twombly,*
550 U.S. at 555, 127 S.Ct. at 1964–65, and a court " 'is not
bound to accept as true a legal conclusion couched as a factual
allegation.' " *Id.,* 127 S.Ct. at 1965 (quoted case omitted).

**\*2** The court is not limited to evaluating the complaint
alone; it can also consider documents attached to the
complaint, matters of public record, and indisputably
authentic documents. *Delaware Nation v. Pennsylvania,* 446
F.3d 410, 413 n. 2 (3d Cir.2006).

The Third Circuit has described the Rule 12(b)(6) inquiry as
a three-part process:

Case 4:21-cv-00872-MWB Document 24-2 Filed 09/15/21 Page 76 of 101

McSparran v. Pennsylvania, Not Reported in F.Supp.3d (2014)

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.,* 706 F.3d 209, 212 (3d Cir.2013) (quoted cases omitted). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679, 127 S.Ct. at 1950.

With this standard in mind, we set forth the background to this litigation, as Plaintiff alleges it in her Amended Complaint.[1]

[1] Parenthetically, we note that the Third Circuit has stated that the *Twombly* plausibility standard applies to employment-discrimination cases. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009).

III. *Background*
Plaintiff is a member of a protected class based on her gender. (Doc. 18, Am.Compl.¶ 11). She is "highly educated, experienced and accomplished in the field of environmental protection" with a Bachelor of Science in Civil Engineering and a Master of Science in Civil Engineering. (*Id.* ¶ 12). Before she worked for the Commonwealth, Plaintiff was a Water Resources Engineer for the Delaware River Basin Commission and an engineer for a private company doing environmental consulting. (*Id.*).

"On or about March 15, 2004, Plaintiff was hired as an Executive Assistant for the DEP in the Office of Water Management." (*Id.* ¶ 13). As an executive assistant, "Plaintiff performed all duties related to operations, oversight, policy, legislation and management of the Water Management Deputate including acting as the Deputy Secretary's alternate

when she was unavailable." (*Id.* and Am. Compl. Ex. A, Job Description).

Almost two years later, on June 9, 2006, she "was promoted through the competitive process to Director of the Bureau of Waterways Engineering "[a]s a result of a national search and committee decision." (*Id.* ¶ 14 and Am. Compl., Ex. B). At that time, the then Deputy Secretary of Water Management and Plaintiff's immediate supervisor, Cathleen Curran Myers, wrote: "With a strong background in engineering and water management programs, Ms. McSparran is well qualified to assume the responsibilities of this position." (*Id.* and Am. Compl., Ex. B). "Except for her final weeks of employment, Plaintiff was the sole female Bureau Director in Water Management of DEP." (*Id.* ¶ 15).

During her employment Plaintiff was subjected to "disparate treatment on the basis of her gender/sex." (Doc. 18, Am.Compl.¶ 16). "Plaintiff was treated differently than the other male bureau directors who were similarly situated and had similar responsibilities and/or authority within the department and [who] reported to the same supervisor...." (*Id.* ¶ 17).

**\*3** Plaintiff complained to her supervisor, Cathleen Curran Myers, then the Deputy Secretary of Water Management, "that her salary was less than her male counterparts," at that time "John Hines, Stuart Gansell, and Fred Marrocco." (*Id.* ¶¶ 14 and 18). "Plaintiff was similarly situated at the same pay grade as John Hines and Stuart Gansell." (*Id.* ¶ 18). "The Bureau Directors similar to Plaintiff had comparable authority and likewise reported to Cathleen Myers." (*Id.*).

"To minimize the disparity in salary compared to her male counterparts," and to recognize "her exemplary performance with increased responsibilities" on July 3, 2007, Myers awarded Plaintiff "an exceptional pay increase of two (2) steps." (*Id.* ¶ 20, Am. Compl., Ex. D, exceptional pay increase request).[2]

[2] We note that in the exceptional pay increase request, Myers does not list as a reason for the request that Myers wanted to minimize the salary disparity with Plaintiff's male counterparts. It also appears from the request that it was granted on January 3, 2007, not July 3, 2007.

In recommending Plaintiff for the pay increase, Myers wrote: Plaintiff's "problem solving experience and leadership

McSparran v. Pennsylvania, Not Reported in F.Supp.3d (2014)

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

abilities ... greatly served the Bureau"; Plaintiff "enhanced existing as well as implemented new initiatives"; Plaintiff "demonstrated excellence in communicating with the public in response issues in the Delaware River Basin related to the new York reservoirs"; and Plaintiff's efforts in that regard "helped to spawn an integrated study related to the flooding and reservoirs." (*Id.* ¶ 19 and Am. Compl., Ex. D).

Nonetheless, the "exceptional pay increase did not equalize the pay disparity." (*Id.* ¶ 21). "Plaintiff was denied equal wages earned by similarly situated male directors," at the time, "John Hines and Stuart Gansell." (*Id.*). Hines "supervised a smaller office than the Plaintiff," and Gansell "had about the same size bureau as Plaintiff." (*Id.*). When Gansell was replaced by Cedric Karper, Karper "earned more than the Plaintiff despite less seniority in the position of Bureau Director." (Doc. 18, Am.Compl.¶ 21(a)). When Karper retired and was replaced by Hines as acting bureau director, Hines "earned more than the Plaintiff performing the comparable bureau director duties for Watershed Management." (*Id.,* ¶ 21(b)). When Glenn Rider was bureau director, Rider "earned more than Plaintiff when Rider "had less seniority as a bureau director compared to Plaintiff." (*Id.* ¶ 21(c)).

In 2009, John Hines was promoted, replacing Myers as Deputy Secretary of Water Management. (*Id.* ¶ 22). Hines supervised Plaintiff from 2009 through January 2011. (*Id.* ¶ 23). During this time, Plaintiff complained to Hines that "he favored the male bureau directors." (*Id.*). Under Hines, male bureau directors Glenn Rider and Dana Aunkst "received higher wages for performing comparable director duties." (*Id.*). Hines "repeatedly placed the male directors in charge of the Deputate in his absence despite Plaintiff was the most senior Bureau Director," and Hines "would put his male executive assistant in charge if the male bureau directors were unavailable, deliberately excluding the plaintiff despite her availability." (*Id.*). Hines "refused to act on her complaints of disparate treatment," responding, 'Do not go there.' " (*Id.* ¶ 24).

**\*4** Further, "Hines subjected Plaintiff to sexual harassment including unwelcome touching, leering and sexual advances and innuendos that Plaintiff repeatedly rejected." (*Id.* ¶ 25).

In January 2011, Hines was "again promoted," (*id.,* ¶ 26), and Michael L. Krancer was appointed Acting Secretary. (*Id.* ¶ 27). In an e-mail, dated February 16, 2011, Krancer thanked Plaintiff and another employee for their "terrific briefing

paper on the H20 program and the two Montco projects" and said he appreciated their "workmanlike efforts." (*Id.* ¶ 27, and Am. Compl., Ex. E). In an e-mail, dated February 18, 2011, Krancer thanked Plaintiff for information she supplied about a particular project, saying "it [was] exactly what I was looking for." (*Id.*).

In June 2011, defendant Kelly Heffner, a female, was promoted to the position of Deputy Secretary of Water Management, and became Plaintiff's direct supervisor. (Am.Compl.¶ 28). "Plaintiff complained on multiple occasions to Defendant Heffner that Plaintiff was denied equal wages and unequal work conditions compared to the preferential treatment accorded Glenn Rider, then a similarly situated male director with comparable job duties, authority and same supervisor." (*Id.* ¶ 29).

In response, and unlike the treatment given to Rider, "Defendant Heffner shunned the female plaintiff and precluded her from business communication, information and meetings." (*Id.,* ¶ 30). More specifically, Heffner "regularly cancelled one-on-one meetings, failed to respond to Plaintiff's email inquiries for business information, clarification and instruction, and failed to communicate with Plaintiff by phone or in-person instead communicating with the Male Bureau Director Glenn Rider and other male staff." (*Id.*). Also, "Heffner approved Glenn Rider's request for an extension of time to complete a two (2) year strategic plan BUT refused to approve Plaintiff's exact request for an extension for the same reasons provided by Glenn Rider." (*Id.*) (emphasis in original). Additionally, Heffner "deliberately overlooked the female plaintiff Bureau Director and placed the males as her alternate when Defendant Heffner was out of the office. Defendant Heffner placed Glenn Rider as her alternate and otherwise placed her lesser male Executive Assistant Duke Adams in charge despite Plaintiff's availability." (*Id.* ¶ 31, and Am. Compl., Ex. F).

Heffner "published falsehoods to Director of State Employment and staff of Water Management Deputate and staff of Field Operations Deputate and Executive Staff about the plaintiff alleging that she was not adhering to Heffner's supervisory directives and unwilling to comply with Administrative goals." (*Id.* ¶ 32).

Additionally, Defendant Heffner "circumvented the 'chain of command' and deliberately communicated with her subordinate staff to keep the plaintiff out of the loop and in the dark on policy changes and implementations." (*Id.* ¶ 33). "On

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

occasion she invited male Jeffrey Means, then not associated with Water Management, instead of the plaintiff to internal meetings that he had no business or reason" to attend. (*Id.*).

 **\*5** Heffner "invited Plaintiff's subordinate male section chiefs to meetings on high level capital budget issues and addressed questions and discussions with them instead of directing the questions and discussion to the Plaintiff" when "[t]he subordinate male section chiefs had NO business necessity to be at the meeting, NO involvement in the budget, NO knowledge of the budgetary process, and NO authority on the subject." (Doc. 18, Am.Compl.¶ 33(a)) (emphasis in original). "They were unable to answer the questions yet Defendant Heffner refused to acknowledge the Plaintiff's presence, authority and ability to provide the information and necessity to discuss the issues relevant to her management of her Bureau. Defendant Heffner publicly humiliated the plaintiff and disgraced her in front of her subordinate staff." (*Id.*).

"Heffner precluded the plaintiff from critical business meetings with Secretary of DEP, executive staff, and Governor's office relative to Plaintiff's programs." (*Id.,* ¶ 33(b)). "Plaintiff's absence from critical meetings with other agencies related to Plaintiff's programs was noticed by outside federal agencies including Natural Resources Conservation Service and by the executive staff of Pennsylvania Department of General Services that falsely implied Plaintiff's lack of competency and diminished professional reputation and expertise." (*Id.* ¶ 34).

During the time Heffner was Plaintiff's supervisor, Heffner did not prepare and present a performance review of Plaintiff. (*Id.* ¶ 36). It was Hines who did her last performance evaluation, dated January 14, 2011. (*Id.* ¶ 35). Hines rated Plaintiff as exceeding expectations on her management skills and described her as a "dedicated manager who is astute in understanding key details on issues as well as having the ability to shift out key issues for decisions." (*Id.,* and Am. Compl., Ex. G).

"Heffner deliberately precluded Plaintiff from the internal post-recovery task force following the flood of 2011 despite her experience and demonstrated expertise in flood recovery through the flood protection program in her Bureau." (*Id.* ¶ 39).

Plaintiff avers that she continued with her excellent work, as evidenced by e-mails. (*Id.* ¶ 38). On January 10, 2012, an official with a state senator e-mailed to thank her for help she was giving on a certain project. (*Id.,* and Am. Compl., Ex. I). On March 20, 2012, a DEP official e-mailed to thank her for her participation in a meeting. (*Id.*). On April 3, 2012, a federal official thanked Plaintiff for her "assistance on granting emergency permit clearance for the EWP projects," related to post-flood recovery. (Doc. 18, Am.Compl.¶ 39(a), and Am. Compl., Ex. J).

However, two days later, on April 5, 2013, "without notice or warning, HR Director Aimee Brough presented the termination letter to Plaintiff stating and notifying her that she was involuntarily separated because her services 'were no longer required.' " (*Id.* ¶ 40, and Am. Compl., Ex. K). Plaintiff asked if she was being fired for cause, and Ms. Brough "responded 'no' and she reread the termination letter emphasizing 'services no longer required.' " (*Id.* ¶ 41, and Am. Compl., Ex. L). "The termination decision was made by Defendant Heffner and Defendant Logan." (*Id.* ¶ 48, and Am. Compl., Ex. M). Plaintiff had not been warned about any performance issues while she was employed. (*Id.* ¶ 56). Hines participated in the decision to fire Plaintiff and acted to harm her to retaliate against her for rejecting his advances. (*Id.* ¶ 71).

 **\*6** Plaintiff was replaced by "a less qualified male," Jeffrey Means. (*Id.* ¶¶ 42 and 50). Means had previously been demoted from the position of bureau director at another deputate which was much smaller in size and responsibility than the Bureau of Waterways Engineering. (Doc. 18, Am.Compl.63(a)). "Means does not have a master's degree or equal education to Plaintiff." (*Id.* ¶ 63(b)). "Means did not have the proven experience and knowledge in flood protection, stream improvement and dam safety programs." (*Id.* ¶ 63(c)). And "Means did not have the background and work experience in [the] Water Management Deputate" when he replaced Plaintiff. (*Id.* ¶ 63(d)).

"Defendant Heffner admitted her sexual favoritism towards male employees including Male Jeffrey Means." (*Id.* ¶ 53, and Am. Compl., Ex. Q). Heffner "engaged in a pattern and practice of preferential treatment and sexual favoritism towards male employees laced with solicitation and sexual interest based on their male gender." (*Id.* ¶ 57). Heffner's sexual favoritism toward Means is supported by the fact that Means did not have to compete for the position he took from Plaintiff; the position was not posted "and a search was not performed contrary to usual practice and procedure." (*Id.* ¶ 52, and Am. Compl., Ex. P). Additionally, Heffner had previously

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

twice promoted Means to positions that were not advertised nor subject to typical Commonwealth hiring and promotion practices and procedures. (*Id.* ¶ 58). In these promotions, Heffner gave him "significantly higher raises and resulting salaries than the compensation guidelines provided [for] in stark contrast to the female plaintiff." (*Id.*).

Heffner exhibited sexual favoritism toward another male, Duke Adams. (*Id.* ¶ 59). Heffner promoted him to executive assistant and gave him preferential treatment by letting him assume control of the office in Heffner's absence rather than Plaintiff. (*Id.*) Heffner exhibited sexual favoritism toward another male, Tom Bold. (*Id.* ¶ 60). Bold was two levels below Plaintiff and was her subordinate, but Heffner "invited Tom Bold to significant internal meetings with the Secretary of DEP and executive staff of DEP[,] excluding" Plaintiff. (*Id.*). Heffner gave Glenn Rider preferential treatment "as described above." (*Id.* ¶ 61).

"Defendant Heffner deliberate[ly] orchestrated Plaintiff's separation [,] falsely accusing her of poor performance" so that she could be replaced by a male, Jeffrey Means. (*Id.* ¶ 54, and Am. Compl., Ex. Q).

Beginning in November 2011, Heffner "acted to harm and defame" Plaintiff. (*Id.* ¶ 54). "Heffner published falsehoods about Plaintiff's work performance to tarnish her reputation and discharge her from employment." (*Id.* ¶ 55, and Am. Compl., Exs. P, Q). Specifically, Heffner "accused her of being insubordinate, not a team player, failing to support the Administration and Agency staff, objectives and programs, fail[ing] to demonstrate leadership qualities, and 'go[ing] beyond accepted advocacy and staff.' " (*Id.*). Both Heffner and Logan published these falsehoods. (*Id.* ¶ 103).

**\*7** "Defendant Logan admittedly relied [on] and accepted the falsehoods" and he "republished the falsehoods." (*Id.* ¶ 67). These falsehoods "were published to individuals that had no right to know," (*id.* ¶ 68 and 110), including "Field Operations Deputate, staff within the Water Management Deputate, Executive Staff of DEP, Governor's Office, Bureau of State Employment including but not limited to Melanie DePalma, colleagues through the Susquehanna River Basin Commission and other commissions, former colleagues including John Hines and attorneys that Plaintiff had worked with at DEP and outside of the department on environmental, Water Planning Office and staff at National Resources and Conservation Service and other federal agencies in contact with DEP." (*Id.* ¶¶ 68 and 110). The falsehoods

caused Plaintiff "to lose her job, tarnish her reputation, and suffer harm and losses" including the foreclosure of other opportunities. (*Id.* ¶¶ 70, 77, and 112).

## IV. *Discussion*

### A. The Equal Protection Claim, the Title VII Claim and the PHRA Claim

The equal-protection claim, the Title VII claim and the PHRA claim are all decided using the same analysis. *Wood v. University of Pittsburgh,* 395 F. App'x 810, 816 (3d Cir.2010) (non prece ntial) ("The showing required to prove a § 1983 gender discrimination claim is identical to that required by Title VII."). *Id.* at 813 n. 1 ("Our analysis of gender discrimination claims under the Pennsylvania Human Relations Act ("PHRA") is identical to our analysis under Title VII.").

In reviewing Defendant's motion to dismiss these claims, we thus need to analyze them only under the law that applies to one of these claims. We will use Title VII law, even though we used equal-protection law in analyzing the legal sufficiency of the original complaint. As we see it, the Amended Complaint makes five gender-discrimination claims under Title VII: (1) an equal pay claim; (2) a discharge claim; (3) a hostile work environment claim based on conduct of John Hines, who was once a supervisor of Plaintiff; (4) a hostile work environment based on the conduct of defendant Heffner; and (5) a retaliation claim based on Plaintiff's complaints about disparate treatment.

To establish a prima facie case of sex discrimination under Title VII, "[a] plaintiff must show that '1) s/he is a member of a protected class, 2) s/he was qualified for the position s/he sought to attain or retain, 3) s/he suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.' " *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 169 (3d Cir.2013) (quoted case omitted).[3]

> [3]
>
> > Title VII provides:
> >
> > > it shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

McSparran v. Pennsylvania, Not Reported in F.Supp.3d (2014)

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1).

We look to the prima facie case because we must decide the motion to dismiss keeping the elements of the claim in mind. *Connelly, supra,* 706 F.3d at 212. At the same time, however, we must recognize that Plaintiff need not establish the prima facie case at the pleading stage, only make " 'allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].' " *Groeber v. Friedman & Schuman, P.C.,* ––– F. App'x ––––, ––––, 2014 WL 542386 at *2 (3d Cir.2014) (non precede nti al) (quoted case omitted).

**\*8** In moving to dismiss the employment-discrimination claims, Defendants argue that Plaintiff's Amended Complaint fails to provide sufficient factual allegations to raise the inference that the conduct of Defendants was motivated by gender discrimination. They begin by noting that Kelly Heffner, Plaintiff's supervisor, against whom Plaintiff made numerous allegations of sex discrimination, and the person who made the decision to fire her, is herself a female. Defendants recognize that Heffner's gender is not dispositive but argue that it is relevant when considered with other factors. Second, since Plaintiff alleges that except for the final weeks of her employment, she was the sole female Bureau Director in Water Management, there was another woman at her level, which is inconsistent with her claim she was fired because of her sex. Third, the allegation that she was the "sole" female Bureau Director is not probative of sex discrimination when there are only three Bureau Director positions. Fourth, she does not make sufficient allegations regarding the male comparators she alleges are similarly situated. Specifically, her allegations indicate she considers seniority important for pay, but she does not allege whether the higher-paid males had more seniority than she. Fifth, Plaintiff was given a two-step pay raise, accompanied by praise for her abilities, which is inconsistent with gender discrimination. Defendants also argue the claims based on Hines's conduct are time-barred and that many of the actions alleged against Heffner do not constitute adverse action.

*1. The Equal Pay Claim*

We will begin with the equal pay claim. Defendants do not contest that Plaintiff has made sufficient allegations concerning the first three elements of the claim. They do challenge whether Plaintiff has satisfied the fourth element, that she was paid less than the other bureau directors because of her gender.

To support this fourth element, Plaintiff made allegations concerning comparators, an accepted way of supporting an inference of discrimination in a Title VII disparate treatment claim. *See Golod v. Bank of America Corp.,* 403 F. App'x 699, 702 n. 2 (3d Cir.2010) (nonprecedential). Comparators are similarly situated employees who are not members of the plaintiff's protected class who were treated more favorably under similar circumstances. *Greene v. Virgin Islands Water & Power Auth.,* ––– F. App'x ––––, ––––, 2014 WL 523363 at *4 (3d Cir.2014) (nonprecedential).

The following allegations are pertinent to that claim. On June 9, 2006, Plaintiff was promoted to Director of the Bureau of Waterways Engineering by the then Deputy Secretary of Water Management and Plaintiff's immediate supervisor, Cathleen Curran Myers. (Am. Compl. ¶ 14 and Am. Compl., Ex. B). "Except for her final weeks of employment, Plaintiff was the sole female Bureau Director in Water Management of DEP." (*Id.* ¶ 15). Plaintiff complained to Myers "that her salary was less than her male counterparts," at that time "John Hines, Stuart Gansell, and Fred Marrocco." (*Id.* ¶¶ 14 and 18). "Plaintiff was similarly situated at the same pay grade as John Hines and Stuart Gansell." (*Id.* ¶ 18). "The Bureau Directors similar to Plaintiff had comparable authority and likewise reported to Cathleen Myers." (*Id.*).

**\*9** To recognize "her exemplary performance with increased responsibilities" on July 3, 2007, Myers awarded Plaintiff "an exceptional pay increase of two (2) steps." (*Id.* ¶ 20, Am. Compl., Ex. D, exceptional pay increase request).[4] In recommending Plaintiff for the pay increase, Myers praised Plaintiff's work. (*Id.* ¶ 19 and Am. Compl., Ex. D).

[4]    Paragraph 20 also alleges that Myers wanted to minimize the salary disparity with Plaintiff's male counterparts. However, the exceptional pay increase request does not list that as a reason for the request. It also appears from the request that it was granted on January 3, 2007, not July 3, 2007.

Nonetheless, the "exceptional pay increase did not equalize the pay disparity." (*Id.* ¶ 21). "Plaintiff was denied equal wages earned by similarly situated male directors," at the time, "John Hines and Stuart Gansell." (*Id.*). Hines "supervised a smaller office than the Plaintiff," and Gansell "had about the same size bureau as Plaintiff." (*Id.*). When Gansell was replaced by Cedric Karper, Karper "earned more than the Plaintiff despite less seniority in

Case 4:21-cv-00872-MWB Document 24-2 Filed 09/15/21 Page 81 of 101

McSparran v. Pennsylvania, Not Reported in F.Supp.3d (2014)

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

the position of Bureau Director." (Doc. 18, Am.Compl.¶ 21(a)). When Karper retired and was replaced by Hines as acting bureau director, Hines "earned more than the Plaintiff performing the comparable bureau director duties for Watershed Management." (*Id.,* ¶ 21(b)). When Glenn Rider was a bureau director, Rider "earned more than Plaintiff when Rider "had less seniority as a bureau director compared to Plaintiff." (*Id.* ¶ 21(c)).

In 2009, John Hines was promoted, replacing Myers as Deputy Secretary of Water Management. (*Id.* ¶ 22). Hines supervised Plaintiff from 2009 through January 2011. (*Id.* ¶ 23). Under Hines, male bureau directors Glenn Rider and Dana Aunkst "received higher wages for performing comparable director duties." (*Id.*).

In June 2011, defendant Heffner, became Deputy Secretary of Water Management and was Plaintiff's direct supervisor. (Am.Compl.¶ 28). "Plaintiff complained on multiple occasions to Defendant Heffner that Plaintiff was denied equal wages and unequal work conditions compared to the preferential treatment accorded Glenn Rider, then a similarly situated male director with comparable job duties, authority and same supervisor." (*Id.* ¶ 29).

We believe these allegations are sufficient to state a claim of unequal pay based on gender. Essentially, they assert the following. There are three bureau director positions underneath the DEP's deputy secretary for water management. The other bureau directors had comparable authority to Plaintiff. Plaintiff did receive an exceptional pay increase, but it did not equalize the pay disparity. Two male bureau directors, John Hines and Stuart Gansell, were in the same pay scale as Plaintiff but were paid more, even though Hines supervised a smaller office than the Plaintiff, and Gansell had about the same size bureau as Plaintiff. When Gansell was replaced by the male Karper, Karper still earned more than Plaintiff although he had less seniority. When Rider was a bureau director, he also earned more than Plaintiff although he had less seniority but was performing comparable director duties. Dana Aunkst was another male who was paid more than Plaintiff for being a bureau director with comparable duties.

**\*10** Defendants argue that Plaintiff does not make sufficient allegations concerning the male comparators, specifically that while she considers seniority relevant to her pay claim, she does not allege whether the higher-paid males had more seniority than she, an allegation that would explain

the disparity on a non-gender basis. We disagree. We think the other comparator allegations are sufficient to state a plausible claim. It could be argued that Plaintiff has made her comparator allegations in conclusory form, alleging only that the comparators had "comparable duties" or "comparable authority." However, the standard of review is context-based, and we think that in a case dealing with a limited number of supervisory employees such allegations are sufficient, especially when combined with allegations that the comparators were all outside her protected class and at least two of them were in the same pay scale. Plaintiff has pled more than just a threadbare recital of the elements of her claim, *see Golod, supra,* 403 F. App'x at 702; she has supported the fourth element with comparator allegations. Additionally, to require more would come too close to obligating a plaintiff to plead evidence, which a plaintiff does not have to do at the pleading stage. *In re Insurance Brokerage Antitrust Litig.,* 618 F.3d 300, 325 n. 25 (3d Cir.2010).

Defendants also argue that the two-step pay raise Plaintiff received shows that there was no sexual discrimination in her salary. We reject this position since Plaintiff alleges that even with the pay increase, her salary was less than her male counterparts.

### 2. *The Discharge Claim*

Defendants assert that Plaintiff fails to state a claim that she was discharged because of her gender. The allegations pertinent to the discharge claim are as follows. "Except for her final weeks of employment, Plaintiff was the sole female Bureau Director in Water Management of DEP." (Doc. 18, Am.Compl.¶ 15). After Plaintiff was fired, she was replaced by "a less qualified male," Jeffrey Means. (*Id.* ¶¶ 42 and 50). Means had previously been demoted from the position of bureau director at another deputate which was much smaller in size and responsibility than the Bureau of Waterways Engineering. (*Id.* ¶ 63(a)). "Means does not have a master's degree or equal education to Plaintiff." (*Id.* ¶ 63(b)). "Means did not have the proven experience and knowledge in flood protection, stream improvement and dam safety programs." (*Id.* ¶ 63(c)). And "Means did not have the background and work experience in [the] Water Management Deputate" when he replaced Plaintiff. (*Id.* ¶ 63(d)).

Heffner exhibited "sexual favoritism towards male employees...." (*Id.* ¶ 53, and Am. Compl., Ex. Q). She "engaged in a pattern and practice of preferential treatment and sexual favoritism towards male employees laced with solicitation and sexual interest based on their male

McSparran v. Pennsylvania, Not Reported in F.Supp.3d (2014)

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

gender." (*Id.* ¶ 57). More specifically, Heffner exhibited sexual favoritism toward Jeffrey Means because Means did not have to compete for the position he took from Plaintiff; the position was not posted "and a search was not performed contrary to usual practice and procedure." (*Id* . ¶ 52, and Am. Compl., Ex. P). Additionally, Heffner had previously twice promoted Means to positions that were not advertised nor subject to typical Commonwealth hiring and promotion practices and procedures. (*Id.* ¶ 58). In these promotions, Heffner gave him "significantly higher raises and resulting salaries than the compensation guidelines provided [for] in stark contrast to the female plaintiff." (*Id.*).

 **\*11** Heffner's sexual favoritism toward males is also supported by her treatment of another male, Duke Adams. (*Id.* ¶ 59). Heffner promoted him to her executive assistant and gave him preferential treatment by letting him assume control of the office in Heffner's absence rather than Plaintiff. (*Id.*) Heffner exhibited sexual favoritism toward another male, Tom Bold. (*Id.* ¶ 60). Bold was two levels below Plaintiff and her subordinate, but Heffner "invited Tom Bold to significant internal meetings with the Secretary of DEP and executive staff of DEP[,] excluding" Plaintiff. (*Id.*).

Heffner also gave Glenn Rider preferential treatment "as described above." (*Id.* ¶ 61). This apparently refers to Rider's earning more as a bureau director than Plaintiff even though he had less seniority in that position, (*id.* ¶ 21(c)), Heffner's approval of Rider's request for an extension of time to complete a two-year strategic plan but refusing Plaintiff's same request even though she gave the same reasons Rider did, (*id.),* and Heffner's choice to name Rider (and other males) as her alternate instead of Plaintiff when Heffner was out of the office. (*Id.* ¶ 31).

It appears the foregoing allegations would support a claim that Heffner fired Plaintiff because of her gender on the following reasoning. Plaintiff alleges (more than just conclusionally but with specific examples) that Heffner exhibits favoritism to males. Additionally, Plaintiff alleges she was replaced by a less qualified male, again with specific reasons why he was less qualified. Although Heffner was female and in the same class as Plaintiff, members of the same protected class can discriminate against others in that class, *see Vereen v. Woodland Hills School Dist.,* No. 06–CV–462, 2008 WL 794451, at *21 n. 9 (W.D.Pa. Mar. 24, 2008) (citing *Oncale v. Sundower Offshore Services, Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998)).

In moving to dismiss, Defendants argue Plaintiff's allegations fail to show a gender-based discharge claim. They point to the allegation that except for the final weeks of her employment, Plaintiff was the sole female bureau director in the Water Management deputate. As they argue, a fair inference from this language is that another woman was hired at Plaintiff's level at about the same time Plaintiff was terminated, thereby negating her claim she was discharged because of her sex. They also note that Heffner is herself female and that although it is not dispositive in itself that the decision maker is in the same class as the plaintiff, *see Oncale, supra,* 523 U.S. at 78, 118 S.Ct. at 1001 (" 'Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.' ") (quoted case omitted), it supports their position that Plaintiff has not made a plausible claim that she was discharged because of her sex.

 **\*12** In opposition, Plaintiff opens with a procedural point. She argue that Fed.R.Civ.P. 12(g)(2) bars Defendants from relying on the allegation that there was another female bureau director in the few weeks before Plaintiff was fired as that allegation was in the original complaint and Defendant did not cite it in its Rule 12(b) (6) motion to dismiss that pleading.

In pertinent part, Rule 12(g)(2) prohibits a party from "raising a defense or objection that was available to the party but omitted from its earlier motion." Rule 12(g)(2) does not apply here because Plaintiff's Amended Complaint contains new factual averments that Defendants are entitled to challenge by another Rule 12(b)(6) motion. *Negron v. School Dist. of Philadelphia,* No. 13–CV–169, 2014 WL 144720, at *3 (E.D.Pa. Jan. 15, 2014) ("because Negron's amended complaint supplements the factual allegations regarding the CHRIA claim, the School District is not barred from raising new defenses and objections to that claim"). Additionally, Defendants' reliance on the allegation is just a single strand of their argument.

We therefore consider Defendants' argument based on the existence of another female bureau director, hired at almost the same time Heffner, a female, was supposedly terminating Plaintiff on the basis of gender. Plaintiff contends that we should ignore the new female bureau director because "the recently hired female was not similarly situated nor a like comparator...." (Doc. 22, Opp'n Br ., ECF p. 15). As Defendants note, this is contrary to Plaintiff's reliance on male bureau directors as similarly situated comparators. We

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

can also consider Defendants' other point, that the decision-maker Heffner is in the same class as Plaintiff. We may not see this as being dispositive, but can consider it among other factors. *Vereen, supra,* 2008 WL 794451, at *21 n. 9 (when the decision maker is a member of the same protected class as the plaintiff, it tends to undermine the contention that race or sex was a factor in the hiring decision).

We will nonetheless allow the discharge claim to proceed. Plaintiff has alleged more than conclusorily that Heffner prefers men and that she was replaced by a less qualified male, with allegations supporting why the male is less qualified. Defendants' points can be renewed at a later stage of the case. [5]

[5]    Since we are allowing the discharge claim to proceed, we will also allow the quid pro quo discharge claim based on Hine's involvement to proceed as well.

### 3. *The Hostile Work Environment Claim Based on Hines's Conduct Is Time–Barred*

Plaintiff makes a claim for a hostile work environment, *see Mandel, supra,* 706 F.3d at 167, based on the following allegations involving Hines. In 2009, Hines was promoted to Deputy Secretary of Water Management, (Doc. 18, Am.Compl. ¶ 22), and served in that job through January 2011. (*Id.* ¶ 23). During this time, "Hines subjected Plaintiff to sexual harassment including unwelcome touching, leering and sexual advances and innuendos that Plaintiff repeatedly rejected." (*Id.* ¶ 25).

Defendants argue that any claim based on this conduct is barred by the statute of limitations for Title VII actions, which requires a claim to be filed with the Equal Opportunity Employment Commission (EEOC) within 300 days of the unlawful employment practice. *See Mikula v. Allegheny Cnty.,* 583 F.3d 181, 183 (3d Cir.2009). Plaintiff filed her charge with the EEOC on July 19, 2012, (Doc. 22–1), well beyond the 300–day deadline for events that occurred at the latest by January 2011. In opposition, Plaintiff argues the claim is timely since Hines's conduct forms the basis of her quid pro quo discharge claim, which *was* timely filed as her discharge occurred on April 6, 2012.

**\*13**   Plaintiff misconstrues Defendant's argument. They move to dismiss a hostile work environment claim separate from the claim base on her discharge. As we noted above, Plaintiff can pursue her quid pro quo discharge claim. The

hostile work environment claim based on Hines's conduct is time-barred. This applies to the PHRA claim as well, *see Mandel, supra,* 706 F.3d at 164–65 (180–day limitations period for filing a PHRA claim), and the section 1983 equal-protection claim. *Giles v. City of Philadelphia,* 542 F. App'x 121, 122 (3d Cir.2013) (nonprecedential) (in Pennsylvania, the statute of limitations for a section 1983 action is two years). We will dismiss this claim as time-barred.

### 4. *The Hostile Work Environment Claim Based on Heffner's Conduct*

Plaintiff has made a hostile work environment claim based on Heffner's alleged conduct. Defendants argue that the conduct alleged does not rise to the level of a hostile work environment, citing *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1297 (3d Cir.1997) (observing in the context of a quid pro quo claim that "not every insult, slight, or unpleasantness gives rise to a valid Title VII claim").

The pertinent allegations are as follows. "Plaintiff complained on multiple occasions to Defendant Heffner that Plaintiff was denied equal wages and unequal work conditions compared to the preferential treatment accorded Glenn Rider, then a similarly situated male director with comparable job duties, authority and same supervisor." (Doc. 18, Am.Compl.¶ 29).

In response, and unlike the treatment given to Rider, "Defendant Heffner shunned the female plaintiff and precluded her from business communication, information and meetings." (*Id.,* ¶ 30). More specifically, Heffner "regularly cancelled one-on-one meetings, failed to respond to Plaintiff's email inquiries for business information, clarification and instruction, and failed to communicate with Plaintiff by phone or in-person instead communicating with the Male Bureau Director Glenn Rider and other male staff." (*Id.*). Also, "Heffner approved Glenn Rider's request for an extension of time to complete a two (2) year strategic plan BUT refused to approve Plaintiff's exact request for an extension for the same reasons provided by Glenn Rider." (*Id.*) (emphasis in original). Additionally, Heffner "deliberately overlooked the female plaintiff Bureau Director and placed the males as her alternate when Defendant Heffner was out of the office. Defendant Heffner placed Glenn Rider as her alternate and otherwise placed her lesser male Executive Assistant Duke Adams in charge despite Plaintiff's availability." (*Id.* ¶ 31, and Am. Compl., Ex. F).

Further, Defendant Heffner "circumvented the 'chain of command' and deliberately communicated with her

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

subordinate staff to keep the plaintiff out of the loop and in the dark on policy changes and implementations." (*Id.* ¶ 33). "On occasion she invited male Jeffrey Means, then not associated with Water Management, instead of the plaintiff to internal meetings that he had no business or reason" to attend. (*Id.*).

**\*14** Heffner "invited Plaintiff's subordinate male section chiefs to meetings on high level capital budget issues and addressed questions and discussions with them instead of directing the questions and discussion to the Plaintiff" when "[t]he subordinate male section chiefs had NO business necessity to be at the meeting, NO involvement in the budget, NO knowledge of the budgetary process, and NO authority on the subject." (Doc. 18, Am.Compl.¶ 33(a)) (emphasis in original). "They were unable to answer the questions yet Defendant Heffner refused to acknowledge the Plaintiff's presence, authority and ability to provide the information and necessity to discuss the issues relevant to her management of her Bureau." (*Id.*).

"Heffner precluded the plaintiff from critical business meetings with Secretary of DEP, executive staff, and Governor's office relative to Plaintiff's programs." (*Id.,* ¶ 33(b)). "Heffner deliberately precluded Plaintiff from the internal post-recovery task force following the flood of 2011 despite her experience and demonstrated expertise in flood recovery through the flood protection program in her Bureau." (*Id.,* ¶ 39).

"To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel, supra,* 706 F.3d at 167. "The hostility of a work environment must be determined by the totality of the circumstances." *Fichter v. AMG Resources Corp.,* 528 F. App'x 225, 230 (3d Cir.2013) (nonprecedential) (quoted case omitted). "Such circumstances may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoted case omitted). The workplace must have been "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her]

employment and create an abusive working environment...." *Id.* (quoted case omitted) (brackets in original).

We agree with Defendants that Plaintiff's allegations do not meet this standard. Plaintiff was kept out of the line of communication with Heffner speaking to her subordinates instead, excluded from meetings, not given an extension one time, prevented from working on one flood project, and not placed in charge of the office at certain times. These actions were not pervasive or severe. Moreover, they were decisions about how Heffner would manage the office. "Title VII does not 'guarantee a Utopian workplace.' " *Id.* at 231 (quoted case omitted). We will dismiss the hostile work environment claim based on Heffner's conduct.

### B. *Plaintiff's Defamation Claim Survives the Motion to Dismiss*

**\*15** Plaintiff's defamation claim is against defendants Heffner and Logan. Defendants move to dismiss this claim on the following grounds. First, the statements are not capable of a defamatory meaning since they were made only to a select group of people and thus could not have harmed Plaintiff's reputation in the community. Second, the statements were about Plaintiff's actual job performance and such statements made in the employer-employee context do not support a defamation claim. Third, Plaintiff still fails to allege sufficient facts showing that the statements were published to those with no valid interest in the subject matter or that either Heffner or Logan made the statements to these people. Fourth, the statements were privileged as they were made only to those with a legitimate interest in the subject matter.

We will take the first, third and fourth arguments together. We reject them because the Amended Complaint does adequately allege that Heffner and Logan published the statements and did so to third parties with no interest in the communication. Plaintiff alleges "Heffner published falsehoods about Plaintiff's work performance to tarnish her reputation and discharge her from employment." (Doc. 18, Am. Compl. ¶ 55, and Am. Compl., Exs. P, Q). "Defendant Logan ... "republished the falsehoods." (*Id.* ¶ 67). Further, these falsehoods "were published to individuals that had no right to know," (*id.* ¶¶ 68 and 110), including "Field Operations Deputate, staff within the Water Management Deputate, Executive Staff of DEP, Governor's Office, Bureau of State Employment including but not limited to Melanie DePalma, colleagues through the Susquehanna River Basin Commission and other commissions, former colleagues including John Hines and attorneys that Plaintiff had worked

2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

with at DEP and outside of the department on environmental, Water Planning Office and staff at National Resources and Conservation Service and other federal agencies in contact with DEP." (*Id.* ¶¶ 68 and 110). These allegations show that Plaintiff avers both defendants published the statements and that the statements were published beyond a limited audience and to persons who had no need for the information. It also defeats a claim of privilege as privilege only applies when a publication is "to those with a legitimate interest in the subject matter." *See Doe v. Kohn, Nast & Graf, P.C.,* 862 F.Supp. 1310, 1327 (E.D.Pa.1994). [6]

[6]     Publication beyond a limited audience also relates to the lowering of the plaintiff's reputation in the community. *See Maier v. Maretti,* 448 Pa.Super. Ct. 276, 282, 284, 671 A.2d 701, 704, 706 (1995).

Defendant's remaining argument is that the statements were about Plaintiff's actual job performance and such statements made in the employer-employee context do not support a defamation claim. In part, Defendants cite in support *Kia v. Imaging Sciences Int'l, Inc.,* 735 F.Supp.2d 256, 273–74 (E.D.Pa.2010); *Sheehan v. Anderson,* 2000 WL 288116, *2 (E.D.Pa. Mar.17, 2000); and *Wendler v. DePaul,* 346 Pa. Super Ct. 479, 483, 499 A.2d 1101, 1103 (1985). We disagree. These cases are distinguishable. The courts did rule that statements about job performance were not defamatory, but it was also important that the statements had only been made to other employees who would have had an interest in the statements. In the instant case, on the other hand, Plaintiff alleges Defendants published the statements to more than just coworkers or to workplace supervisors. [7]

[7]     *Wendler* provides some support for Defendants' argument. There, citing *Beckman v. Dunn,* 276 Pa.Super. Ct. 527, 533, 419 A.2d 583, 586 (1980), the court likened the statements to mere opinion and stated that opinion was not actionable. However, this was dictum as immediately afterward the court noted that the statement had been made by the defendant as the plaintiff's supervisor and had been given only to a manager. *Id.* The court then stated: "Given this factual context and the intended audience, we agree that the alleged statements were not capable of defamatory meaning." *Id.* (footnote omitted).

V. *Conclusion*

 **16** Based on the foregoing, we will dismiss the following claims: (1) the hostile work environment claim based on Hines's conduct; and (2) the hostile work environment claim based on Heffner's conduct. These claims are dismissed without further leave to amend as amendment would be futile. The following claims will proceed: (1) the equal pay claim; (2) the discharge claim; (3) a retaliation claim based on Plaintiff's complaints about disparate treatment; (4) the quid pro quo discharge claim; and (5) the state-law defamation claim.

We will issue an appropriate order.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1371594, 97 Empl. Prac. Dec. P 45,051

---

**End of Document**                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 900946
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Daryl V. RELEFORD, Jr., and
Darcius B. Releford, Plaintiffs,
v.
PENNSYLVANIA STATE
UNIVERSITY, et al., Defendants.

No. 10–cv–1621.
|
March 14, 2011.

**Attorneys and Law Firms**

Derek W. Cummings, Larry A. Weisberg, McCarthy
Weisberg Cummings, P.C., Harrisburg, PA, for Plaintiffs.

Ryan M. Tira, Robin A. Read, McNerney, Page, Vanderlin
and Hall, Williamsport, PA, for Defendants.

***MEMORANDUM & ORDER***

JOHN E. JONES III, District Judge.

**I. INTRODUCTION**

**\*1** Before the Court in this illegal discrimination action are
three Motions to Dismiss the Amended Complaint. (Docs.22,
23, 38.) For the reasons articulated below, the Court will grant
in part and deny in part each Motion.

**II. STANDARDS OF REVIEW**

**A. 12(b)(6)**

In considering a motion to dismiss pursuant to Rule 12(b)
(6), courts "accept all factual allegations as true, construe
the complaint in the light most favorable to the plaintiff,
and determine whether, under any reasonable reading of the
complaint, the plaintiff may be entitled to relief." *Phillips
v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008)
(quoting *Pinker v. Roche Holdings, Ltd.,* 292 F.3d 361, 374
n. 7 (3d Cir.2002)). In resolving a motion to dismiss pursuant
to Rule 12(b)(6), a court generally should consider only
the allegations in the complaint, as well as "documents that
are attached to or submitted with the complaint, ... and any
matters incorporated by reference or integral to the claim,

items subject to judicial notice, matters of public record,
orders, [and] items appearing in the record of the case." *Buck
v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir.2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint
against the pleading requirements of Rule 8(a). Rule 8(a)(2)
requires that a complaint contain a short and plain statement
of the claim showing that the pleader is entitled to relief,
"in order to give the defendant fair notice of what the claim
is and the grounds upon which it rests." *Bell Atl. Corp. v.
Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d
929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78
S.Ct. 99, 2 L.Ed.2d 80 (1957)). While a complaint attacked by
a Rule 12(b)(6) motion to dismiss need not contain detailed
factual allegations, it must contain "sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on
its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct.
1937, 1949, 173 L.Ed.2d 868 (2009). To survive a motion
to dismiss, a civil plaintiff must allege facts that 'raise a
right to relief above the speculative level ....' *Victaulic Co. v.
Tieman,* 499 F.3d 227, 235 (3d Cir.2007) (quoting *Twombly,*
550 U.S. at 555). Accordingly, to satisfy the plausibility
standard, the complaint must indicate that defendant's liability
is more than "a sheer possibility." *Iqbal,* 129 S.Ct. At 1949.
"Where a complaint pleads facts that are 'merely consistent
with' a defendant's liability, it 'stops short of the line between
possibility and plausibility of entitlement to relief.' " *Id.*
(quoting *Twombly,* 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and
later formalized in *Iqbal,* a district court must first identify
all factual allegations that constitute nothing more than "legal
conclusions" or "naked assertions." *Twombly,* 550 U.S. at
555, 557. Such allegations are "not entitled to the assumption
of truth" and must be disregarded for purposes of resolving a
12(b) (6) motion to dismiss. *Iqbal,* 129 S.Ct. at 1950. Next,
the district court must identify "the 'nub' of the ... complaint
—the well-pleaded, nonconclusory factual allegation[s]." *Id.*
Taking these allegations as true, the district judge must then
determine whether the complaint states a plausible claim for
relief. *See id.*

**\*2** However, "a complaint may not be dismissed merely
because it appears unlikely that the plaintiff can prove those
facts or will ultimately prevail on the merits." *Phillips,* 515
F.3d at 231 (citing *Twombly,* 127 S.Ct. 1964–65, 1969 n.
8). Rule 8 "does not impose a probability requirement at
the pleading stage, but instead simply calls for enough facts

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

**B. 12(b)(1)**

When considering a motion to dismiss pursuant to Rule 12(b)(1), a court is not limited to considering only the allegations on the face of the complaint if the defendant is challenging subject matter jurisdiction in fact. *Carpet Group Int'l v. Oriental Rug Importers Ass'n,* 227 F.3d 62, 69 (3d Cir.2000). In a challenge to subject matter jurisdiction, "no presumptive truthfulness attaches to a plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). Thus, the court is "free to weigh the evidence and satisfy itself whether it has the power to hear the case." *Carpet Group Int'l,* 227 F.3d at 69. A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction should be granted if the plaintiff does not carry the burden of persuasion to show that jurisdiction does in fact exist. *Id.*

**III. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs Daryl ("Daryl") and Daricus ("Daricus") (collectively, "Plaintiffs") are twin brothers who attended the Pennsylvania College of Technology ("Penn College"). Defendant Penn College is a technical college located in Lycoming County, Pennsylvania. It is a special mission affiliate college of the Pennsylvania State University ("Penn State"). Penn College is a "college, university, or other postsecondary institution" that receives "federal financial assistance" as described by Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d–2000d–7 ("Title VI") and is an "educational institution" as set out in the Pennsylvania Fair Educational Opportunities Act of 1961, 24 P.S. §§ 5001–5010 ("PFEOA"). The Penn College Police Department ("Penn College Police") is a department of Penn College. (The above-named Defendants will be collectively referred to as "Institutional Defendants".)

Defendant Tim Mallery ("Assistant Director Mallery") was, at all relevant times, the Assistant Director of Resident Life/Coordinator of Housing Operations for Penn College. William Goddard ("Professor Goddard"), Gary Pandolfi ("Professor Pandolfi"), Wayne Gebhart ("Professor Gebhart"), Stephen Manbeck ("Professor Manbeck"), Garret Graff ("Professor Graff"), Robert Gresko ("Professor Gresko"), Richard Taylor ("Professor Taylor"), Peter

Kruppenbacher ("Professor Kruppenbacher"), Dale Kissinger ("Professor Kissinger"), and Thomas Ask ("Professor Ask") are or were at all relevant times employed as professors at Penn College. Marc Bridgens ("Dean Bridgens") was, at all relevant times, Dean or Assistant Dean of Construction and Design Technologies for Penn College. Ward Caldwell ("Special Assistant Caldwell") was employed as the Special Assistant to the President for Student Affairs during all times relevant to the action. Carolyn Strickland ("Assistant Vice President Strickland") was, at all relevant times, the Assistant Vice President for Academic Services at Penn College. Norman Hager ("Officer Hager") was employed as a police officer for Penn College Police and James Bies ("Assistant Chief Bies") was the Assistant Chief of Police for the Penn College Police at all relevant times. (Collectively the above-named Defendants will be referred to as "Individual Defendants". All Individual Defendants and Institutional Defendants shall be referred to collectively as "Defendants".)

**\*3** Plaintiffs initiated this action alleging illegal discrimination on the basis of their African American race by Penn State and Penn College on August 4, 2010 (Doc. 1). Plaintiffs thereafter filed the instant, twenty-two count Amended Complaint, naming all Defendants on October 19, 2010. (Doc. 16.) Based upon the following allegations, Daryl asserts the following counts: Contract Discrimination in violation of 42 U.S.C. § 1981 against the Individual Defendants (Count I); a violation of Due Process against the Individual Defendants pursuant to 42 U.S.C. § 1983 (Count II); Retaliation in violation of § 1983 against the Individual Defendants (Count III); a deprivation of Equal Protection under § 1983 against all Defendants (Count IV); Title VI violations regarding Discrimination, Hostile Environment, and Retaliation against all Defendants (Counts V, VI, and VII, respectively); Pennsylvania Human Relations Act violations for Discrimination, Hostile Environment, and Retaliation against all Defendants (Counts VIII, IX, and X, respectively); violations of the PFEOA for Discrimination, Hostile Environment, and Retaliation against all Defendants (Counts XI, XII, and XIII, respectively); a claim of negligence against Defendants (Count XIV); and a claim for intentional infliction of emotional distress against all Defendants (Count XV). Daricus asserts the following, similar claims: Contract Discrimination in violation of § 1981 against the Individual Defendants (Count XVI); a deprivation of Equal Protection in violation of § 1983 against the Individual Defendants (Count XVII); Title VI violations related to Discrimination, Hostile Environment, and Retaliation against all Defendants (Counts XVIII, XIX, and XX, respectively); a claim for

negligence against all Defendants (Count XXI); and a claim for intentional infliction of emotional distress against all Defendants (Count XXII).

During the spring of 2006, Daryl and Daricus both enrolled in the Heating, Ventilating, Air Conditioning, and Plumbing ("HVAC/Plumbing") program at Penn College. Plaintiffs allege a litany of racial discrimination from that point in time until the present, beginning with Daryl arriving at his dormitory room to find a confederate flag on display and later being covered by the flag and a capirote while he slept, and continuing with regular derogatory remarks by students and, at times, professors, harassment by the Penn College Police, regular accusations of misconduct, and other conduct suggestive of racial animus. Plaintiffs allege that, despite reporting these instances, nothing was done by the administration to prevent or rectify the discrimination. Daryl was eventually suspended because his grade point average fell below a 2.0 for consecutive semesters, and thus was not allowed to return for the fall semester of 2010 or the spring semester of 2011. Daricus is still enrolled at Penn College. Plaintiffs seek declaratory and injunctive relief, compensatory damages, punitive damages related to certain claims, and attorneys' fees and costs.

 **\*4** Defendants Penn College and Penn College Police filed their Motion to Dismiss (Doc. 22) on November 1, 2010, and Penn State filed its own Motion to Dismiss on that same date (Doc. 23). As detailed below, the two Motions raise, essentially, the same arguments in support of dismissal with Penn State's Motion adding one argument relevant to their status. Thus, we will address the Motions raised by the Institutional Defendants in conjunction. The Individual Defendants filed their Motion to Dismiss on December 20, 2010 (Doc. 38), and we shall analyze that Motion separately.

## IV. DISCUSSION

### A. The Institutional Defendants' Motions to Dismiss (Docs.22–23)

The Institutional Defendants raise the following eight core arguments in support of dismissal of certain claims, and Penn State raises one additional argument: A) Counts V, VI, VII, XVIII, XIX, and XX must be dismissed against the Institutional Defendants because Plaintiffs fail to allege the requisite *prima facie* cases for each count; B) Counts VIII, IX, X, XI, XII, and XIII must be dismissed because of Daryl's alleged failure to exhaust administrative remedies; C) Counts VIII, IX, X, XI, XII, and XIII must be dismissed because

Daryl fails to state causes of action upon which relief may be granted. Further, Defendants argue that the punitive damages claims in these counts must be dismissed because they are not permitted to be recovered under a PHRA or PFEOA claim; D) Count XIV must be dismissed because common law negligence claims are preempted by the PHRA; E) Count XV must be dismissed because the claim for intentional infliction of emotional distress is not independent of the discrimination claim and is preempted. Further, the Institutional Defendants maintain that punitive damages cannot be maintained against them as instrumentalities of the state; F) Count XXI must be dismissed because negligence is preempted; G) Count XXII must be dismissed because the relevant circumstances render a claim for intentional infliction of emotional distress is preempted; H) The Defendants request a more definite statement regarding compensatory damages; and I) Penn State must be dismissed as a Defendant because Plaintiffs do not allege a single action taken by or on behalf of Penn State.

After filing the Motions, the Institutional Defendants withdrew their request for a more definite statement. Plaintiffs have withdrawn their negligence claims found in Count XIV and XXI, and have withdrawn their requests for punitive damages for the claims brought under the PHRA and the PFEOA. We will thus address each of the remaining arguments in turn.

### 1. Counts V, VI, VII, XVIII, XIX, and XX

Defendants claim that neither Daryl nor Daricus sufficiently alleged facts to establish a *prima facie* case for racial discrimination, hostile environment, or retaliation. Defendants further assert that punitive damages are inapplicable, and Plaintiffs have withdrawn their prayer for punitive damages with respect to these claims.

### a. Discrimination (Counts v. and XVII)

 **\*5** The *McDonnell Douglas* burden-shifting analysis applied to allegations of discrimination in employment has been adapted to address claims regarding discrimination in education. Thus, to prevail on a Title VI racial discrimination claim, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse action by the defendants in his education; (3) despite being otherwise qualified; and (4) he was treated differently than similarly situated students who were not members of the protected class. *See Manning v. Temple Univ.,* 2004 U.S. Dist. LEXIS 26129, \*5, 2004 WL 3019230 (E.D.Pa. Dec. 30, 2004)

(Bartle, J.) All parties agree that Plaintiffs are members of a protected class.

The Institutional Defendants first argue that Daricus fails to plead any adverse action that was taken against him related to his education, noting that he remains an active student at Penn College. The Institutional Defendants further assert that Daricus fails to satisfy the final element and identify how individuals who are not a member of his protected class were treated differently by the Institutional Defendants. Defendants likewise argue that Daryl has failed to satisfy these two elements. Defendants maintain that the "only identifiable alleged adverse action in the Amended Complaint is Plaintiff Daryl Releford's academic dismissal...." And that he failed to allege facts to demonstrate that he was in fact qualified to continue his education. (Doc. 31 p. 6.) Finally, Defendants assert that Daryl has not alleged facts to support that similarly situated students who were not members of his protected class were treated differently.

In response, Plaintiffs cite a litany of allegations from the Amended Complaint which they claim sufficiently support each of their claims for Title VI discrimination. We find that the following allegations are sufficient to put the Institutional Defendants on notice of the potential facts that support the claims and to potentially demonstrate the requisite elements of a Title VI claim.

Though the allegations in support of Daricus' claim are more numerous with respect to the harassing behavior, he does allege that he was wrongfully accused of cheating and given a failing grade (Doc. 16 ¶¶ 49–54), was denied a position as an RA because he presented a greater risk that he would "drink, smoke, and not follow the rules" (*Id.* ¶¶ 55–58), and was denied classroom assistance when Caucasian students were granted said assistance (*Id.* ¶ 106–112), among other things. Notably, our task at this juncture is not to evaluate whether Plaintiffs can ultimately prove their claims, but rather whether they have stated a plausible claim for relief. We thus find that, at this stage, the Amended Complaint sufficiently alleges some adverse actions taken against Daricus as the result of his race.

Daryl likewise has alleged facts to support a discrimination claim under Title VI sufficient to overcome Defendants' Motions to Dismiss. In addition to the harassing behavior, Daryl alleges that he was not permitted to take an exam that he missed due to a death in his family (Doc. 16 ¶¶ 72–76), his grades were adversely adjusted for behavior when

Caucasian students' grades were not for the same conduct (Doc. 16 ¶¶ 91–92), he was erroneously advised that he could not pursue a second associate's degree necessary to receive a bachelor's degree despite other students having this opportunity (*id.* ¶¶ 124–127), was denied the opportunity to improve his grades when those opportunities were available to a Caucasian student (*id.* ¶¶ 166–177) and, ultimately, invokes his suspension from Penn College. As noted above, we are evaluating whether the Plaintiffs have stated a *prima facie* case-not whether they will ultimately survive the burden-shifting analysis required to prove their case. Thus, Daryl has likewise stated a claim for discrimination in violation of Title VI upon which relief could be granted.

*b. Hostile Environment (Counts VI and XIX)*
**\*6** Defendants aptly identify the following elements necessary to demonstrate a *prima facie* case for hostile environment:

> (1) [the plaintiff] is a member of a protected class; (2) [plaintiff was harassed because of] race, color or national origin; (3) defendant had actual knowledge of and was deliberately indifferent to the harassment; and (4) the harassment was so severe and objectively offensive that it deprived plaintiff of access to the educational benefits or opportunities provided by the school.

(Doc. 31 p. 7.) Defendants maintain that Plaintiffs each fail to allege a deprivation of educational benefits or opportunities, and assert that, despite his dismissal, Daryl "cannot base a hostile environment claim ... upon ... a single act of alleged discrimination." (*Id.* (citing *Rivera v. County of Monroe*, 2010 U.S. Dist. LEXIS 115418, 2010 WL 4386473 (M.D.Pa. Oct. 29, 2010) (Munley, J)).) The Institutional Defendants apparently misconstrue our colleague Judge Munley's point and erroneously cite *Rivera* for the proposition that one deprivation of access to opportunities via a dismissal would be insufficient to make out a claim. However, the cited passage refers to a single act of discriminatory behavior rather than its effect. We thus do not view *Rivera* as a case providing support for the Institutional Defendants' Motions.

We find that each Plaintiff has adequately alleged facts to support a claim for hostile environment in violation of Title VI. The Amended Complaint identifies, and Defendants do not deny, a pattern of harassing, hostile behavior that was reported to administrators and staff at Penn College, and further alleges that nothing was done to attempt to rectify that discrimination. Further, as noted in the preceding subsection, Plaintiffs have each identified several alleged deprivations of educational opportunities or benefits.

### c. Retaliation

In order to state a claim for retaliation under Title VI, a plaintiff must allege facts sufficient to demonstrate three factors: (1) the plaintiff engaged in protected activity, (2) the defendants responded with "retaliation", *see Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997) and (3) the protected activity was a substantial or motivating factor of the alleged retaliation. *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001). *See also Moore v. City of Philadelphia,* 461 F.3d 331, 341– 42 (3d Cir.2006).

Defendants maintain that Daryl has failed to allege a cause of action for retaliation because he fails to allege that his dismissal from Penn College was related to his complaints submitted about Penn College to the Pennsylvania Human Relations Commission ("PHRC"). Defendants argue that the two cannot be related because the complaints were submitted too long before his dismissal and did not concern his academic performance. (Doc. 31 p. 8.) Further, Defendants assert that Daricus cannot maintain a retaliation action because he fails to identify any protected activity he engaged in and cannot demonstrate any adverse action taken as a result.

**\*7** We find that Daryl has sufficiently stated a claim upon which relief can be granted for retaliation. Daryl's allegations suggest that the adverse actions he encountered subsequent to his complaint with the PHRC could have been retaliation for his protected activity. Daricus, however, has not sufficiently alleged a claim of retaliation. The Amended Complaint identifies no protected activity that Daricus engaged in. Further, Plaintiffs do not even attempt to argue in opposition that Daricus engaged in any specific protected activity, and merely rely on the allegations regarding racial discrimination and hostility. Therefore, Daricus fails to state a claim upon which relief could be granted.

### 2. Counts VIII, IX, X, XI, XII, and XI

### a. Failure to Exhaust

The Institutional Defendants argue that Daryl has failed to exhaust his administrative remedies before asserting claims under the PHRA and PFEOA. To bring a claim under the PHRA, a plaintiff must first file a complaint with the PHRC. 43 P.S. § 959(h). The procedure for processing a complaint and any available remedies under the PFEOA is in accordance with the PHRA, 24 P.S. § 5007, and, thus requires a complainant to first file a complaint with the PHRC.

In support of the Motion, Defendants note that Daryl filed one complaint with the PHRC in September of 2008 and alleged only harassment by Defendant Pandolfi. Defendants maintain that because Daryl did not include all of the claims or incidents that he now alleges and because he did not file subsequent complaints with the PHRC related to the other conduct, he has not exhausted his administrative remedies and thus is barred from now asserting the claims in a private action. Plaintiffs respond that Defendants are arguing that a plaintiff should be required to repeatedly file claims with respect to ongoing discrimination, a position that has been considered and rejected. Further, Plaintiffs assert that Daryl's claims should not be limited to one count of discrimination because of his failure to "check off" the retaliation box or the hostile environment box because it is inappropriate to penalize a person with no legal background in this manner.

For purposes of exhaustion, the scope of a complaint in a subsequent private action is not limited to the exact allegations of the administrative complaint, but rather "defined by the scope of the [ ] investigation which can reasonably be expected to grow out of the charge of discrimination...." *Hicks v. ABT Associates, Inc.,* 572 F.2d 960, 965 (3d Cir.1978); *see also Lesko v. Clark Publisher Services,* 904 F.Supp. 415, 418 (M.D.Pa. Sept.21, 1995) (Rambo, J.). As noted by the United States District Court for the Eastern District, "[c]ourts have held that a plaintiff needs to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; 'the district court has ancillary jurisdiction such a claim when it grows out of an administrative charge that is properly before the court.' " *Smith–Cook v. AMTRAK,* 2005 U.S. Dist. LEXIS 27297, \*6, 2005 WL 3021101 (E.D.Pa. Nov. 10, 2005) (Yohn, Jr., J.) (quoting *Gupta v. East Texas State Univ.,* 654 F.2d 411, 414 (5th Cir.1981)).

**\*8** We find that Daryl has exhausted his administrative remedies sufficiently to bring a private cause of action. Though in his original administrative complaint he describes

discrimination related to the harassment by one named Defendant, the allegations of subsequent harrasment and hostile conduct included in Daryl's discrimination and hostile environment claims were reasonably included within the scope of the original investigation. Similarly, we will not penalize Daryl for failing to check the appropriate box for a claim for hostile environment; the claims and underlying conduct are so related that they are easily encompassed within the original investigation, and it would be unfair to penalize an individual without legal training to recognize all potential causes of action. We do not believe this reasoning necessarily extends to a claim for retaliation because the basis of the claim —retaliation for protected activity—is not the same as the harassment that was asserted. Nonetheless, Daryl's claim for retaliation grows out of the original administrative charge, and therefore is properly within the ancillary jurisdiction of the Court. *See Smith–Cook, infra.*

### b. Failure to State a Claim

The Institutional Defendants alternatively argue that Daryl's claims under the PHRA and PFEOA must be dismissed because he fails to state a claim upon which relief can be granted. The requisite elements to assert a claim for racial discrimination under Title VI, § 1981, or the PHRA are the same. *See Pryor v. NCAA,* 288 F.3d 548, 569 (3d Cir.2002) (elements for Title VI and § 1981 are "identical"). Logically, the analysis under the PFEOA would likewise be the same. Therefore, we incorporate our analysis articulated in Section IV.A.1, above, regarding Daryl's claims under Title VI and find that he has sufficiently stated claims upon which relief can be granted. Further, Plaintiffs have withdrawn their requests for punitive damages under the PHRA and PFEOA claims.

### 3. Counts XV and XXI a. Preemption

The Institutional Defendants seek dismissal of each Plaintiff's intentional infliction of emotional distress claim, asserting that the common-law claim is preempted by the PHRA. In addressing this preemption argument we observe that our colleague the Honorable Sylvia Rambo has noted, "[t]he general rule that has emerged, albeit tortuously, is simply that if all or part of the facts that would give rise to a discrimination claim would also independently support a common law claim, the common law claim is not preempted by the PHRA...." *Keck v. Comm. Union Ins. Co.,* 758 F.Supp. 1034 (M.D.Pa.1991). Thus, accepting *Keck,* the Institutional Defendants argue that the underlying discrimination is the entire basis of both Daryl and Daricus' intentional infliction

of emotional distress claims, and that neither claim would be viable without the alleged discrimination. The Defendants do not, however, address the viability of the claims beyond asserting their preemption.

 **\*9** We find that Plaintiffs' intentional infliction of emotional distress claims are not preempted by the PHRA. We again note that we are not addressing the merits of Plaintiffs' claims at this stage, but recognize that both Daryl and Daricus allege a pattern of harassing behavior. That behavior could, conceivably, amount to the outrageous behavior necessary to support a claim for intentional infliction of emotional distress even in the absence of any duty by the Defendants to avoid discrimination on the basis of race. Therefore, the intentional infliction of emotional distress claims can have a factual basis independent of the discrimination claims, and thus are not preempted.

### b. Punitive Damages

Defendants argue that, even if Plaintiffs may proceed with their intentional infliction of emotional distress claims they may not recover punitive damages against Defendants. In support, Defendants maintain that Penn State and Penn College are instrumentalities of the Commonwealth of Pennsylvania. Defendants contend that because punitive damages are not recoverable against the Commonwealth and its agents, *see* 42 Pa.C.S. § 8528(c); *Feingold v. Southeastern Pa. Transp. Auth.,* 512 Pa. 567, 517 A.2d 1270 (Pa.1986), Plaintiffs may not recover punitive damages from the named Defendants. Plaintiffs respond that Defendants are misguided in their application of Penn State's and Penn College's status as an instrumentality of the state for punitive damages purposes. Defendants retort that this assertion is inconsistent with Plaintiffs' allegations of § 1983 violations because, to pursue a § 1983 claim, a plaintiff must assert that the defendant is a state actor.

Title 24, § 2510–504 of the Pennsylvania Statutes decrees that, like the Pennsylvania State University, Penn College is a state-related institution and is generally an instrumentality of the Commonwealth of Pennsylvania. The statute further identifies that Penn State shall have all rights, powers, privileges and immunities, and duties of a nonprofit corporation. 24 P.S. § 2510–504. Nonetheless, the application of Penn State's status as an instrumentality of the state has been limited for certain purposes. In *The Pennsylvania State University v. Derry Township School District,* the Supreme Court of Pennsylvania addressed whether the University is an instrumentality of the Commonwealth for

purposes of exemptions from real-estate taxation. 557 Pa. 91, 731 A.2d 1272 (Pa.1999). The Supreme Court noted that the characteristics of Penn State changed greatly over the passage of time, and concluded that Penn State is not an agency of the Commonwealth. The Court recognized that Penn State is funded in great part by appropriations from the Commonwealth, but nonetheless noted that the "mere funding of an institution does not ... make it an instrumentality of the state." Id. at 1274. The Court likewise recognized other characteristics of the University that are plainly governmental (for example, Penn State employees are included within the definition of "state employees" under the State Employees' Retirement Code, 71 Pa.C.S. § 5102); yet in other respects it has non-governmental characteristics (such as the inapplicability of the Right to Know Act, 65 P.S. §§ 66.1–66.4, which opens public records of state agencies to inspection by the public). Ultimately, the Supreme Court concluded that, with respect to real-estate taxes, Penn State was not an instrumentality of the state because of the composition of its Board of Trustees, who have the authority to control and dispose of Penn State property. Penn College, like Penn State, is likewise denied agency or instrumentality status in certain realms. See, e.g., In the Matter of James Stephens v. Pennsylvania College of Technology, 2010 PA O.O.R.D. LEXIS 163, *1, 2010 WL 2128830 (Pa. Office of Open Records, March 12, 2010) (Penn College "is not an agency subject to the [Right to Know Law], but rather a non-profit part of a state-related institution.").

**\*10** As demonstrated above, there is no settled law on the issue of whether Penn State and Penn College are instrumentalities of the state with respect to punitive damages. We find that the record at this juncture is likewise insufficiently developed for the Court to fully evaluate the parties' arguments regarding the applicability of punitive damages. We will therefore dismiss each Motion without prejudice as it relates to punitive damages, and give the parties the opportunity to more fully develop their arguments, and relevant factual bases, before raising the issue again in a subsequent motion for summary judgment or at trial.[1]

[1] Resolution of this issue will only be necessary, however, if Plaintiffs are able to satisfy their burden of demonstrating reckless or wanton behavior that would warrant punitive damages on the merits.

#### 4. Penn State as a Defendant

Penn state offers one argument in addition to those offered by both Institutional Defendants: that Plaintiffs are unable to maintain an action against it because they fail to allege a single action that was taken by or on behalf of Penn State. Further, Penn State maintains that Plaintiffs fail to allege that Penn State operates, controls, or is otherwise legally responsible for Penn College. In support, Defendants argue that Penn College is a statutory creation and, because a State Senator and a State Representative are the two required members of an eleven-member Board, "Penn College is not controlled in any manner by Penn State." (Doc. 30 p. 19.) Notably however, Defendants neglect to mention that Penn College "is a nonprofit corporation organized and existing under the laws of the Commonwealth and is a wholly controlled affiliate of the Corporation for Penn State", and "The Corporation for Penn State is a wholly controlled affiliate of the Board of Trustees of the Pennsylvania State University...." 24 P.S. § 2510–503.

Again, we find that deciding this somewhat novel issue in the present Motion to Dismiss would be inapt because of a largely non-existent record in that respect. For the present purposes, we find that Plaintiffs have sufficiently alleged claims against Penn State. Similar to the issues regarding Penn State and Penn Tech's instrumentality status, our denial of the Motions is without prejudice. It may well be that after the record is further developed Penn State will elect to revisit this argument at the summary judgment stage, and nothing herein is intended to preclude it from doing so.

#### B. Individual Defendants' Motion to Dismiss (Doc. 38)

The Individual Defendants assert the following nine arguments in support of their Motion to Dismiss (Doc. 38): A) Counts I and XVI must be dismissed because Plaintiffs fail to state a § 1981 discrimination claim that is plausible on its face; B) Counts II, III, IV, and XVII must be dismissed because Plaintiffs fail to properly allege any § 1983 claim for due process, equal protection, or retaliation against the Individual Defendants; C) Counts V, VI, VII, XVIII, XIX, and XX must be dismissed because of Plaintiffs' failure to state claims upon which relief can be granted; D) Counts VIII, IX, X, XI, XII, and XIII must be dismissed because of Daryl's failure to exhaust administrative remedies pursuant to Pennsylvania law; E) Counts VIII, IX, X, XI, XII, and XIII must be dismissed for failure to state a claim upon which relief can be granted against the Individual Defendants; F) Count XIV must be dismissed because the negligence claim is preempted by the PHRA claims; G) Count XV must be dismissed because Daryl's intentional infliction of emotional distress claim is preempted by the PHRA; H) Count XXI must be dismissed because Daricus' negligence claim is

preempted by the PHRA; I) Count XXII must be dismissed because Daricus' intentional infliction of emotional harm claim is likewise preempted. Plaintiffs have withdrawn their claims for negligence, and thus we will address the Individual Defendants' arguments *ad seriatim* below.

### *1. Counts I and XVI*

**\*11** The Individual Defendants argue that Plaintiffs fail to state a claim for racial discrimination under § 1981 because Plaintiffs have failed to identify any contract or any Defendant's authority to mandate the reinstatement of Daryl. In response, Plaintiffs highlight the contractual relationship between a student and a university, whereby the student agrees to pay tuition in exchange for an education, and further argue that the Individual Defendants' authority to reinstate is inherent.

Section 1981 provides, in pertinent part, "all persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981. The right to "make and enforce contracts" encompasses the ability to enjoy all benefits and privileges of the contract. *Id.* As noted above, the requisite elements to assert a claim for racial discrimination under Title VI, § 1981, or the PHRA are the same. *See Pryor v. NCAA*, 288 F.3d 548, 569 (3d Cir.2002) (elements for Title VI and § 1981 are "identical"). Therefore, we incorporate our analysis from Section IV.A.1, *infra*, and find that Plaintiffs have sufficiently alleged a § 1981 claim upon which relief could be granted.

### *2. Counts II, III, IV, and XVII*

Defendants maintain that Plaintiffs' claims asserted under 42 U.S.C. § 1983, Daryl's claims relating to due process, retaliation, and equal protection and Daricus' claim relating to equal protection, must be dismissed for failure to state a claim upon which relief could be granted. We will address these arguments in turn.

### *a. Due Process*

Defendants argue that Daryl's claim for a violation of due process should be dismissed because he received all of the process to which he was entitled before he was suspended from Penn College. Daryl argues that he had a property right in his "continued enrollment" and thus his dismissal without a hearing was in violation of his due process rights.

While we accept Defendants' argument that "a due process hearing is not required every time a student is terminated for poor scholarship" (Doc. 42 p. 7 (citing *Ross v. Penn. State University,* 445 F.Supp. 147 (M.D.Pa.1978))), we believe the record is insufficiently developed to effectively evaluate the amount of process that was due to Daryl and whether he was deprived of it. Therefore, we will dismiss Defendants' Motion in that respect.

### *b. Retaliation*

Defendants next maintain that Daryl's claim for retaliation under § 1983 must be dismissed because he fails to specify the protected activity he engaged in that triggered Defendants' retaliation. Defendants assert that "[t]he Plaintiffs' [*sic* ] alleged complaints did not involve allegations that Plaintiff Daryl Releford's federal rights were violated" and, therefore, he apparently was not participating in a protected activity by complaining. (Doc. 42 p. 8.) The Amended Complaint, however, clearly states that Daryl felt that he was being discriminated against on the basis of his race, and that he complained of that discrimination. The alleged harassment and allegedly related suspension therefore clearly implicate federally protected rights to be free from discrimination and to pursue avenues to vindicate discrimination through process of law.

**\*12** Further, Defendants claim that Daryl fails to plead that any individual Defendant was responsible for his removal from Penn College, and therefore his claims of retaliation against the Individual Defendants should fail. Defendants fail to limit this sweeping argument to any one particular Defendant who was not responsible, but rather argue that none of the sixteen named Defendants were responsible. Further, Defendants fail to support their arguments by any controlling or even persuasive law. Based upon the allegations against the Individual Defendants and our analysis with respect to retaliation found elsewhere in this Memorandum, we find that Daryl has pleaded a claim upon which relief could be granted and will deny the Motion in that respect.

### *c. Equal Protection*

Finally, with respect to Plaintiffs' § 1983 claims, Defendants argue that neither Daryl nor Daricus can sustain claims for equal protection under § 1983. An equal protection analysis utilizes the familiar *McDonnell Douglas* burden—shifting framework as articulated in Section IV.A. 1.a. We will, therefore, incorporate that analysis and find that both Daryl and Daricus have alleged equal protection claims.

*3. Counts V, VI, VII, XVIII, XIX, and XX*

The Individual Defendants incorporate the same arguments as articulated by the Institutional Defendants in support of their assertion that Plaintiffs' Title VI claims must be dismissed. Because the arguments and controlling legal principles are identical, we shall incorporate our analysis articulated in Section IV.A.1. We thus find that Daryl has properly alleged claims for discrimination, hostile environment, and retaliation. We further find that Daricus has stated claims for discrimination and hostile environment, but fails to state a claim upon which relief could be granted for retaliation.

*4. Counts VIII, IX, X, XI, XII, and XIII*

The Individual Defendants argue that Daryl's claims under the PHRA and the PFEOA must be dismissed because his failure to exhaust his administrative remedies is a jurisdictional bar to asserting the claims and, alternatively, because he fails to state a claim upon which relief can be granted. We incorporate our analysis from Section IV.A.2, *infra*, and find that Daryl exhausted his administrative remedies and thus may assert his claims under Pennsylvania law.

*5. Counts XV and XXI*

The Individual Defendants assert that both Plaintiffs' intentional infliction of emotional distress claims must be dismissed because each is preempted by the discrimination actions. Individual Defendants further argue that punitive damages are prohibited because each individual Defendant was a state actor. Because our analysis is the same, we will incorporate Section IV.A.3. and find that Plaintiffs' intentional infliction of emotional distress claims, and related prayers for punitive damages, are actionable.

## V. CONCLUSION

For the reasons articulated at length above, we will grant Defendants Penn College and Penn College Police's Motion to Dismiss (Doc. 22) and Penn State's Motion to Dismiss

(Doc. 23), and the Individual Defendants' Motion to Dismiss (Doc. 38) in part and deny each in part. In sum, all claims asserted by Daryl and Daricus, except for Daricus' Title VI Retaliation Claim, may proceed to discovery as stated. Considerate of the leniency afforded to civil rights plaintiffs, however, we will grant Plaintiffs the opportunity to amend the Amended Complaint with respect to Daricus' retaliation claim to cure the noted deficiencies if such amendment warranted. Further, as indicated above, we deny without prejudice Defendants' Motions regarding the applicability of punitive damages against Penn State, Penn College, and its agents, and regarding whether Penn State may be held legally responsible for Penn College's actions. Defendants may again raise these arguments, if warranted, when the record is more developed.

**\*13  NOW, THEREFORE, IT IS HEREBY ORDERED:**
1. Defendants the Pennsylvania College of Technology and the Pennsylvania College of Technology Police Department's Motion to Dismiss (Doc. 22) is **GRANTED IN PART and DENIED IN PART** to the extent indicated in this Memorandum;

2. Defendants the Pennsylvania State University (Doc. 23) is **GRANTED IN PART and DENIED IN PART** to the extent indicated in this Memorandum;

3. The Individual Defendants' Motion to Dismiss (Doc. 38) is **GRANTED IN PART and DENIED IN PART** to the extent indicated in this Memorandum;

4. If warranted with bases in fact or law, Plaintiffs **MAY FILE** a Second Amended Complaint within fourteen (14) days of the date of this Order to properly plead a Title VI Retaliation Claim by Daricus Releford.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 900946

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  9

2021 WL 1174498
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Marlana VOSS, Plaintiff,
v.
MANITOWOC CRANES, LLC, Defendant.

Civil No. 1:20-CV-00754
|
Signed 03/29/2021

**Attorneys and Law Firms**

Mary Elizabeth LeMieux-Fillery, Brian M. Doyle, The Law
Offices of Eric A. Shore, Philadelphia, PA, for Plaintiff.

Katelynn Mary Williams, Pro Hac Vice, Foley & Lardner
LLP, Madison, WI, Mark Neuberger, Pro Hac Vice, Foley &
Lardner LLP, Miami, FL, Kathy Speaker MacNett, Skaralatos
& Zonarich, LLP, Harrisburg, PA, for Defendant.

### MEMORANDUM

JENNIFER P. WILSON, United States District Court Judge

 **\*1** This is an employment discrimination case brought
by Plaintiff, Marlana Voss ("Voss"), a former employee of
Defendant, Manitowoc Cranes, LLC ("Manitowoc"). This
action is brought pursuant to Title VII of the Civil Rights Act,
the Americans with Disabilities Act ("ADA"), the Family and
Medical Leave Act ("FMLA"), and the Pennsylvania Human
Relations Act ("PHRA"). Before the court is Manitowoc's
motion to dismiss all claims in Voss's complaint. (Doc. 6.) For
the reasons that follow, the motion will be granted in part and
denied in part.

### FACTUAL BACKGROUND
### AND PROCEDURAL HISTORY

Voss first filed suit in this case on May 8, 2020. (Doc.
1.) According to the allegations in the complaint, Voss
began working at Manitowoc on April 25, 2005. (*Id.* ¶
12.) In July 2015, Voss started working as the first-shift
materials supervisor in Manitowoc's R&D building. (*Id.* ¶
14.) Voss shared an office with a fellow employee named
Dana Cunningham ("Cunningham"), a male engineer. (*Id.*)

In the following weeks, Cunningham directed lewd and
inappropriate comments toward Voss and made unwelcomed
sexual advances. (*Id.* ¶ 15.) On March 14, 2016, Voss was laid
off due to a company-wide work force reduction. (*Id.* ¶ 16.)

On approximately April 6, 2016, Cunningham visited Voss's
home because he allegedly had information about her
employment at Manitowoc and assured her that he would
do what he could to get her rehired. (*Id.* ¶ 17.) While
Cunningham was in Voss's home, Voss went to her basement
to get Cunningham something to drink and Cunningham
followed Voss and sexually assaulted her. (*Id.*) After this
incident, Cunningham, using his Manitowoc-issued phone,
sent Voss numerous sexually explicit text messages and nude
photographs over the following weeks. (*Id.* ¶ 18.)

In May 2017, Voss was rehired by Manitowoc as a buyer/
supply chain analyst. (*Id.* ¶ 19.) In this new position, Voss
worked in the main administrative office and not the R&D
building where Cunningham worked. (*Id.*) In July 2017, Voss
received an anonymous letter at her home, the contents of
which accused Voss of having a sexual relationship with a
coworker at Manitowoc. (*Id.* ¶ 20.)

During August 2017, Voss was asked to return to her materials
supervisor position in the R&D building by managers Jon
Eberhardt ("Eberhardt") and Rick Shank ("Shank"). (*Id.* ¶
21.) Voss explained that a coworker had sexually harassed
her while she worked in the R&D building and declined the
request. (*Id.*) Shank asked if the coworker she was referring
to was Cunningham and Voss confirmed that it was. (*Id.*)
Shank acknowledged that he was aware that Cunningham had
harassed and assaulted another employee. (*Id.*)

The day after meeting with Eberhardt and Shank, Voss met
with Brian Smith ("Smith"), the human resources director
at Manitowoc. (*Id.* ¶ 22.) After Voss told Smith about her
dealings with Cunningham, Smith said that no action could
be taken against Cunningham because all of the alleged
conduct occurred off the premises of Manitowoc. (*Id.*)
In addition, Voss informed Smith that another Manitowoc
employee was sexually harassed by Cunningham and made
complaints about his behavior. Smith stated he was unaware
of any previous sexual harassment complaints involving
Cunningham but would check his file. (*Id.*)

 **\*2** In September 2017, Tom McMurdy ("McMurdy"),
the vice president of purchasing at Manitowoc, started
sending emails criticizing Voss's work performance. Prior to

these emails Voss had a positive working relationship with McMurdy. (*Id.* ¶ 23.) In October 2017, Voss received another anonymous letter at her house. (*Id.* ¶ 24.) The author of the anonymous letter asserted that he/she was in a sexual relationship with Voss. (*Id.*) Also in October 2017, Voss learned while speaking with a former Manitowoc employee that Cunningham had sexually harassed and assaulted at least two other female employees. (*Id.* ¶ 25.)

Cunningham was promoted to the position of building manager in November 2017. (*Id.* ¶ 26.) Following his promotion, Cunningham began telling Voss he would have her transferred to the material supervisor position in the R&D building. (*Id.*) Cunningham was the direct supervisor of the material supervisor position. (*Id.*)

On November 14, 2017, Voss was in the R&D building conducting inventory when Cunningham asked her to come to his office. (*Id.* ¶ 27.) Once in the office, Cunningham made sexually suggestive comments to Voss, asked about her marriage, and stated he wanted to run away with her. (*Id.*) Cunningham repeatedly asked Voss to close his office door. Voss said "no" several times. Cunningham then proceeded to shut the door, positioning himself between Voss and the door. (*Id.* ¶ 28.) Voss stood up to leave his office when Cunningham made physical contact with Voss using his hand to hit her buttocks and seize her shoulders with both hands. (*Id.*) Cunningham said that he wanted to "explore [her] body" and "play with [her] all over." (*Id.*) Voss responded "you don't need to be doing all that crazy stuff." (*Id.*) Cunningham then followed with an apology for his actions and agreed to comply with the "ground rules" after which Voss left the office. (*Id.*)

In January 2018, Voss heard a rumor that she had been placed on a performance improvement plan ("PIP"). (*Id.* ¶ 29.) Voss met with Smith, the Human Resources director, on January 24, 2018. (*Id.*) Smith informed Voss that Manitowoc's Human Resources department had to approve any PIP or poor review. Smith stated he was unaware of any impending poor performance review or forthcoming decision to place Voss on PIP. (*Id.*)

Several days after this meeting with Smith, Voss met with Smith again as well as her direct supervisor, Mike Ward ("Ward"). At the meeting Ward presented Voss her first substandard performance review since the commencement of her employment. (*Id.* ¶ 30.) The performance review included unwarranted criticisms of Voss's attendance and cellphone use. (*Id.*) Following Ward's negative evaluation Voss began

copying him on all her work-related emails. After viewing her work-related emails, Ward told Voss that he could defend her work performance when questioned by McMurdy. (*Id.* ¶ 31.)

Voss received another anonymous letter at her home on March 26, 2018. In the letter, the author expressed a plan to move into Voss's house after she divorced her husband. (*Id.* ¶ 32.) Voss's neighbors saw a man, fitting Cunningham's physical description, stop at Voss's mailbox the previous day. (*Id.*)

After receiving this letter, Voss, accompanied by her husband, met with Smith to discuss Cunningham's actions. (*Id.* ¶ 33.) Voss presented Smith copies of the anonymous letters she had received. (*Id.*) Upon looking at the letters, Smith told Voss there was no proof that Cunningham was the author of the letters. (*Id.*) In addition to showing Smith the letters, Voss described to Smith the incident that occurred in Cunningham's office on November 14, 2017. Smith told Voss she was not firm enough in rejecting Cunningham's advances. (*Id.*) Voss's husband also expressed his concern, explaining that Voss had been experiencing symptoms of anxiety and depression due to her work situation at Manitowoc. (*Id.*) Finally, Voss stated her belief that she had received the negative performance evaluation to harass her in retaliation for having made a complaint about Cunningham. (*Id.*)

**\*3** On April 3, 2018, Voss and her husband met with Smith and Sharon Bair ("Bair"), a Human Resources representative. (*Id.* ¶ 34.) At the meeting, Smith criticized Voss for not coming forward earlier about the November 14, 2017 incident. Smith stated the timing of her allegations was not "fair" to Cunningham. (*Id.*) Around this time, Voss began suffering from significant shoulder and neck pain. (*Id.* ¶ 35.) She additionally received treatment for work-related depression and anxiety. Voss missed work on April 4 and April 5, 2018 because of her medical condition. (*Id.*)

On April 5, 2018, Smith called Voss to inform her that Cunningham had been placed on administrative leave pending further investigation. (*Id.* ¶ 36.) On April 9, 2018, Smith told Voss that Manitowoc had decided to terminate Cunningham. (*Id.* ¶ 37.) Smith once again told Voss he believed she was a willing participant in Cunningham's inappropriate actions because Voss was not firm enough in rejecting his behavior. (*Id.*) Smith proceeded to tell Voss she would be disciplined which could mean termination for any other misconduct. (*Id.*)

Voss missed work on April 11, 2018, April 24, 2018, and April 25, 2018 because of a combination of symptoms such as "sleep attacks" that caused Voss to suddenly fall asleep, which she believes were brought on by her work environment. (*Id.* ¶ 38.) Voss requested that Ward provide her with an adjustable desk to help remedy her pain in her neck, shoulder, and limbs, but Ward declined this request. (*Id.*)

On May 3, 2018 Voss applied for short-term disability ("STD") and Family and Medical Leave Act ("FMLA") leave. (*Id.* ¶ 39.) Voss's application was approved by a third-party company that manages Manitowoc's leave. (*Id.*) On May 4, 2018, Voss advised Ward by email that her leave had started and that she would work from home during her leave. (*Id.* ¶ 40.) Ward responded via email and confirmed her status. (*Id.*)

On May 7, 2018 at 1:30 a.m., Voss emailed Ward to inform him that although she would be working from home on that date, she had plans to attend a funeral in the morning followed by a doctor's appointment. (*Id.* ¶ 41.) Voss also informed Ward that she would not be monitoring her emails until after her doctor's appointment. (*Id.*)

After Voss's doctor appointment she received an email from Smith stating that Ward had reported her absent without leave from May 4 to May 7. (*Id.* ¶ 42.) Ward also relayed to Smith that Voss had been unresponsive to emails. (*Id.*) Voss then forwarded Smith her email correspondence with Ward. (*Id.*) On May 11, 2018, Smith informed Voss that she would not be permitted to work from home during her leave because of the severity of her symptoms but would be paid during her absence. (*Id.* ¶ 43.)

Approximately 3 months later, on August 8, 2018, Smith emailed Voss requesting that she provide detailed medical documentation as to her current condition, prognosis, and plan of treatment. (*Id.* ¶ 44.) Smith stated the information was necessary in order for Manitowoc to determine whether Voss had a disability and if reasonable accommodation was necessary and available to enable Voss to perform her job duties. (*Id.* ¶ 44.) Smith informed Voss that if she did not provide this information she would be terminated. (*Id.*)

Voss responded to Smith's email on August 13, 2018 with the information requested. (*Id.* ¶ 45.) Voss provided an in-depth description of her diagnosis and symptoms including medical records from her primary care physician. (*Id.*) She explained that her symptoms developed as a result of the sexual harassment by Cunningham and Manitowoc's handling of the matter including its retaliatory behavior. (*Id.*) Voss never received a response from Manitowoc. (*Id.*)

**\*4** On February 4, 2019 Voss was informed she was being terminated because Manitowoc had eliminated her buyer position. (*Id.* ¶ 46.) In the months prior to Voss's termination, however, Manitowoc had hired two individuals for buyer positions. (*Id.*)

Voss's complaint raises seven claims. In Count I, she alleges disparate treatment in violation of Title VII of the Civil Rights Act. (*Id.* at 11–12.) [1] In Count II, she alleges harassment in violation of Title VII. (*Id.*) In Count III, she alleges retaliation in violation of Title VII. (*Id.* at 12–13.) In Count IV, she alleges discrimination and wrongful discharge on the basis of disability in violation of the ADA. (*Id.* at 13.) In Count V, she alleges that Defendant interfered with her ability to take FMLA leave in violation of the FMLA. (*Id.* at 14–15.) In Count VI, she alleges retaliation in violation of the PHRA. (*Id.* at 15–16.) In Count VII, she alleges retaliation and discrimination under the PHRA. (*Id.* at 16–17.) Voss seeks prospective injunctive relief in the form of reinstatement as well as various forms of monetary relief. (*Id.* at 17–18.)

[1]    For ease of reference, the court utilizes the page numbers from the CM/ECF header.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1367, which gives district courts supplemental jurisdiction over state law claims that are so closely related to federal claims as to be part of the same case or controversy.

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health, 938 F.3d 69, 92 (3d Cir. 2019)* (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012).*

## DISCUSSION

### A. Voss's ADA Claim Is Dismissed for Failure to Exhaust Administrative Remedies

The court will first address Manitowoc's argument that Voss failed to exhaust administrative remedies with regard to her ADA claim. (Doc. 7, pp. 12–14.) Before filing suit in federal court, a plaintiff alleging employment discrimination must exhaust administrative remedies. *Mandel v. M & Q Packaging Corp., 706 F.3d 157, 163 (3d Cir. 2013).* The exhaustion requirements under the ADA mirror those under Title VII. *Churchill v. Star Enters., 183 F.3d 184, 190 (3d Cir. 1999).* Thus, a plaintiff must bring a timely charge of discrimination before the Equal Employment Opportunity Commission ("EEOC") and obtain notice of her right to sue in order to exhaust her administrative remedies. *Mandel, 706 F.3d at 163.*

**\*5** Once a plaintiff has filed a claim before the EEOC and has obtained notice of her right to sue, the scope of the subsequent federal litigation is defined by the scope of proceedings before the EEOC. *Id.* Thus, any claim that the plaintiff brings in federal court must be "within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Id.* (quoting *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)*).

In this case, Defendants argue that Voss failed to exhaust administrative remedies for her ADA claim because she did not allege discrimination on the basis of disability in her EEOC charge. [2] (Doc. 7, pp. 15–17.) Defendants note that Voss did not check a box on her EEOC charge indicating that she was discriminated against on the basis of a disability and argue that she did not otherwise assert disability discrimination in the EEOC charge. (*Id.*)

[2] A district court considering a motion to dismiss generally may only consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).* The court may also consider, however, "a document integral to or explicitly relied upon in the complaint." *Doe v. Univ. of Scis., 961 F.3d 203, 208 (3d Cir. 2020)* (quoting *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)*). Accordingly, the court may consider Voss's EEOC charge despite the fact that it was not attached to her complaint because it is integral to the complaint. *See, e.g., Thompson v. Keystone Human Servs. Corp., No. 1:09-CV-02558, 2012 WL 398619, at \*5 n.5 (M.D. Pa. Feb. 7, 2012)* (concluding that court could consider EEOC charge in resolving motion to dismiss in employment discrimination case).

Voss concedes that she did not check the appropriate box for disability discrimination on her EEOC charge, but argues that the failure to check the appropriate box "is not necessarily indicative of a failure to exhaust the mandatory administrative remedies." (Doc. 15-1, pp. 20–21.) Voss argues that a claim should be considered administratively exhausted where there is a close nexus between the allegations raised in the EEOC charge and the allegations subsequently raised in federal court. (*Id.* at 21.) She argues that such a close nexus is present here because her EEOC charge clearly discussed the conditions that gave rise to her ADA claim before this court. (*Id.* at 21–22.)

A district court considering whether a plaintiff has administratively exhausted an employment discrimination claim must liberally construe the plaintiff's EEOC charge, and "the failure to check a particular box on an EEOC charge is not necessarily indicative of a failure to exhaust the mandatory administrative remedies." *Lowenstein v. Catholic High East, 820 F. Supp. 2d 639, 644 (E.D. Pa. 2011)* (internal alterations omitted) (quoting *Schouten v. CSX Transp., Inc., 58 F. Supp. 2d 614, 616 (E.D. Pa. 1999)*). Thus, a plaintiff's failure to check the appropriate box "does not preclude a plaintiff from bringing a claim for that type of discrimination as long as the plaintiff has alleged sufficient facts to put the EEOC on notice of the claim." *Seiple v. Two Farms, LLC, No. 20-CV-05650, 2021 WL 601171, at \*4 (E.D. Pa. Feb. 16, 2021).* Where, however, an EEOC charge neither checks the appropriate box for a claim nor alleges sufficient facts to put the EEOC on notice of the claim, the district court must dismiss the claim

with prejudice for failure to exhaust. *Savage v. Temple Univ. – of Commw. Sys. of Higher Educ.*, No. 19-CV-06026, 2020 WL 3469039, at *3 (E.D. Pa. June 25, 2020) (citing *Titus-Williams v. Schirg*, No. 19-CV-04743, 2020 WL 424950, at *1 (E.D. Pa. Jan. 24, 2020)).

**\*6** The United States District Court for the Eastern District of Pennsylvania considered a case with facts similar to the present case in *McIntosh v. White Horse Village, Inc.*, 176 F. Supp. 3d 480, 482–83 (E.D. Pa. 2016). In *McIntosh*, the plaintiff failed to check the "disability" box and made no mention of disability discrimination in the attached document to the EEOC charge. (*Id.*) In explaining that the claim was not within the scope of the plaintiff's EEOC charge, the *McIntosh* court stated "[p]laintiff does not describe the reason for her medical leave of absence, nor does she describe any disability she suffers or is perceived as having, and she does not at any point indicate she is asserting a violation of rights under the ADA." (*Id.* at 482.)

This court finds the *McIntosh* court's reasoning instructive. Like the plaintiff in *McIntosh*, Voss failed to check the box indicating that she was bringing a claim for disability discrimination in her EEOC charge, *see* Doc. 6-1, p. 6, and the text of her EEOC charge also did not indicate that she was discriminated against on the basis of disability. (*See id.* at 7.) The court will accordingly reach the same conclusion as that reached by the *McIntosh* court and dismiss Voss's ADA claim for failure to exhaust administrative remedies.

**B. Timeliness of Voss's Title VII Disparate Treatment and Hostile Work Environment Claims**

The court will next address Manitowoc's argument that Voss's disparate treatment and harassment claims are untimely to the extent that they are based on conduct predating October 2, 2018. (Doc. 7, pp. 6–9.) A plaintiff alleging discrimination under Title VII in Pennsylvania must bring an EEOC charge within 300 days after the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1); *Mikula v. Allegheny Cty. of Pa.*, 583 F.3d 181, 183 (3d Cir. 2009); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000). An EEOC charge is considered filed when it is received by the EEOC. *E.g.*, *Valentin v. Manpower Grp. Sols.*, 792 F. App'x 208, 210 (3d Cir. 2019).

In this case, Voss filed her EEOC charge on July 29, 2019. (*See* Doc. 6-1, p. 6.) Thus, her claims under Title VII must be based on events that occurred on or after October 2, 2018.

Voss's termination, however, is the only event that allegedly occurred during that limitations period. (*See* Doc. 1.)

Voss nevertheless argues that the events occurring prior to the limitations period should be considered timely for purposes of her hostile work environment claim under the continuing violation doctrine. (Doc. 15-1, pp. 17–20.) The continuing violation doctrine serves as an equitable exception to the time bar under Title VII, allowing courts to consider "discriminatory acts that are not individually actionable ... so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Mandel*, 706 F.3d at 165 (citing *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). Therefore, a plaintiff must prove that at least one discriminatory act occurred within the limitations period and that this alleged wrong "is more than the occurrence of isolated or sporadic acts." *Kimes Univ. of Scranton*, 126 F. Supp. 3d 477, 492 (M.D. Pa. 2015). To make this determination, courts may consider subject matter, i.e., "whether the violations constitute the same type of discrimination," *Mandel*, 706 F.3d at 166 n.2, and frequency, i.e., "whether the acts are recurring or more in the nature of isolated incidents." *Kimes*, 126 F. Supp. 3d at 492.

**\*7** Discrete acts, such as "termination, failure to promote, denial of transfer, or refusal to hire" cannot be the basis for a plaintiff to invoke the continuing violation doctrine, because each discrete act "constitutes a separate actionable 'unlawful employment practice.' " *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also, e.g.*, *Zankel v. Temple Univ.*, 245 F. App'x 196, 199 (3d Cir. 2007) (holding that plaintiff's termination was discrete act that could not form the basis for invocation of continuing violation doctrine). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 114.

Here, as noted above, the only timely event Voss alleges under Title VII is her employment termination. As a discrete discriminatory act, however, her termination cannot be the basis to invoke the continuing violation doctrine. *Id.* Accordingly, the continuing violation doctrine does not apply here. Voss's Title VII hostile work environment claim will therefore be dismissed as untimely and her Title VII disparate treatment claim will be dismissed as untimely except to the extent that it is based on her termination.

**C. Voss's Claims Against Manitowoc Under the FMLA**

In the complaint, Voss alleges both interference and retaliation under the FMLA. (Doc. 1, pp. 14–16.) To state a claim for interference with benefits under the FMLA, a plaintiff must plead that "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014)). To state a claim for retaliation under the FMLA, a plaintiff must plead that she (1) invoked her right to FMLA-qualifying leave, (2) suffered an adverse employment action, and (3) the adverse action was causally related to her invocation of rights. *Id.* at 152 n.6 (citing *Ross*, 755 F.3d at 193).

An employee is an eligible employee under the FMLA if she has been employed by her employer for at least twelve months and has worked at least 1,250 hours for the employer in the last twelve months. 29 U.S.C. § 2611(2)(A). An employer is subject to the FMLA if it "employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar years." *Id.* § 2611(3)(A)(i).

Here, Voss fails to state a claim under the FMLA because she has failed to allege that she worked at least 1,250 hours in the twelve months proceeding her termination or that her employer employed at least 50 employees during the relevant period. *See, e.g.*, *Sinico v. Berry*, No. 1:18-CV-01259, 2020 WL 528765, at *8 (M.D. Pa. Feb. 3, 2020); *Kiniropoulos v. Northampton Cty. Child Welfare Serv.*, 917 F. Supp. 2d 377, 391–92 (E.D. Pa. 2013). Accordingly, Voss's FMLA claims are dismissed without prejudice.

### D. The Complaint States a Disparate Treatment Claim Based on Voss's Termination

The court will next address Manitowoc's argument that the complaint fails to state a disparate treatment claim upon which relief may be granted. Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." [3] 42 U.S.C. § 2000e2(a)(1). Considering that

Plaintiff's termination is the only disparate treatment alleged in the complaint that is within the limitations period, the court's discussion will only proceed with respect to Voss's termination.

[3]   The substantive standards for discrimination and retaliation are generally the same under Title VII and the PHRA. *See, e.g.*, *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007); *Woodson v. Scott Paper Co.*, 109 F.3d 918, 932 n.20 (3d Cir. 1997). The court will accordingly consider Voss's Title VII and PHRA claims together.

**8** In order for a plaintiff to successfully plead a disparate treatment claim in violation of Title VII, the plaintiff must allege: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

The parties do not dispute the first three elements. (Doc. 7, p. 9–10; Doc. 15, p. 10.) Manitowoc's sole argument is that Voss has failed to allege facts that give rise to an inference of intentional discrimination. A plaintiff may successfully plead facts giving rise to an inference of discrimination by alleging either that similarly situated employees who were not members of the employee's protected class "were treated more favorably under similar circumstances" or that there was a "causal nexus" between the plaintiff's membership in a protected class and the adverse employment action taken against her. *Greene v. Virgin Islands Water & Power Authority*, 557 F. App'x. 189, 195 (3d Cir. 2014) (citing *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 n.7 (3d Cir. 2003)).

Manitowoc argues that the complaint has failed to do either. (Doc. 7, p. 10.) Although Voss alleges that she was subjected to burdens that similarly situated male employees did not face, *see* Doc. 1, ¶ 50, Manitowoc asserts that such an allegation is conclusory and fails to meet the pleading burden. (Doc. 7, p. 13.) In support of its argument, Manitowoc points to Voss's failure to allege who was responsible for terminating her employment. (*Id.*)

This court does not find Manitowoc's argument persuasive. Voss makes allegations from which sex discrimination could be reasonably inferred. On several occasions Smith, the

2021 WL 1174498

Human Resources director at Manitowoc, criticized Voss for not being firm enough in rejecting Cunningham's advances. (Doc. 1, ¶ 37.) Smith also threatened Voss with disciplinary action for future misconduct. (*Id.*) These alleged facts are sufficient to give rise to an inference that Voss was terminated because of her sex. Thus, the motion to dismiss the disparate treatment claim with respect to Voss's termination is denied.

### E. The Complaint States a Retaliation Claim Upon Which Relief May Be Granted

The court will next address whether the complaint states a claim for retaliation upon which relief may be granted. To state a claim for retaliation under Title VII, a plaintiff must allege that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia,* 461 F.3d 331, 340–41 (3d Cir. 2006) (citing *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995)).

The parties agree the first two elements are met: Voss's complaints about sexual harassment and discrimination constituted protected activity, and her termination constituted an adverse employment action. (Doc. 15, p. 12; Doc. 20, p. 4.) Manitowoc argues Voss's retaliation claim must be dismissed because Voss fails to allege a causal connection between her protected activity and the allegedly retaliatory conduct. (Doc. 7, p. 14.)

 **\*9** A complaint may adequately allege a causal connection between a plaintiff's protected activity and a defendant's allegedly retaliatory conduct by alleging (1) that the defendant gave an "inconsistent explanation for taking an adverse employment action" against the plaintiff, (2) "a pattern of antagonism" against the plaintiff, or (3) an unusually suggestive temporal proximity between the protected activity and the defendant's conduct. *Carvalho-Grevious v. Del. State Univ.,* 851 F.3d 249, 260 (3d Cir. 2017). The alleged circumstances as a whole may also be sufficient to infer retaliation. *Id.*

The court finds that the complaint adequately pleads a pattern of antagonism necessary to support an inference of retaliation. Voss alleges several incidents in which Voss complained about Cunningham's behavior and was met with responses that could be viewed by a reasonable finder of fact as antagonistic. First, Voss alleges that she told Smith about Cunningham's behavior and Smith told her she was not "firm enough" in rejecting Cunningham's advances. (Doc. 1, ¶ 33.) Second, Smith allegedly criticized Voss for not approaching management earlier about the November 14, 2017 incident with Cunningham and stated that the timing of her decision to come forward about the incident was not "fair" to Cunningham. (*Id.* ¶ 34.) Third, Smith, upon informing Voss of Cunningham's termination, criticized Voss for numerous "failures" and stated again that Voss was not firm enough in rejecting Cunningham's behavior and that he believed Voss was a willing participant. (*Id.* ¶ 37.) In that same conversation, Smith informed Voss that any future misconduct may result in discipline not limited to termination. (*Id.*)

Other allegations also support an inference of retaliation. Voss alleges that while she was on FMLA/STD leave Ward reported her as absent despite Voss notifying him that she would be working from home and had to attend a funeral and a doctor's appointment. (*Id.* ¶ 41.) Ward also allegedly marked Voss as absent during her leave and reported that Voss was not responding to emails, despite Voss having sent an email to him stating that she would be on leave starting that day. (*Id.* ¶ 42.) Taken together, these allegations are sufficient to allege a pattern of antagonism. Accordingly, Voss's retaliation claim survives Manitowoc's motion to dismiss.

### CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss (Doc. 6) is granted in part and denied in part. An appropriate order follows.

### All Citations

Slip Copy, 2021 WL 1174498

---

**End of Document**                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.