# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERROL A. HENDERSON, | No. 4:21-CV-00872 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| PENNSYLVANIA STATE UNIVERSITY, | |
| Defendant. | |

## MEMORANDUM OPINION

### MARCH 21, 2022

Presently before the Court is Pennsylvania State University's ("Penn State") motion to dismiss[1] Errol A. Henderson, Ph.D.'s amended complaint.[2] This motion, having been fully briefed,[3] is ripe for disposition. For the following reasons, the Court will grant in part and deny in part Penn State's motion.

## I.    BACKGROUND[4]

Henderson, an African American male, was hired in 2002 as a tenured associate professor in Penn State's Political Science and Africana Studies

---

[1]   Doc. 20.

[2]   Doc. 14.

[3]   Docs. 21, 23, 24.

[4]   For purposes of this motion, the Court accepts as true all allegations contained in Henderson's amended complaint. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 351 (3d Cir. 2020) (in evaluating motion to dismiss court "must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief" (internal quotation marks omitted)), *cert. denied sub nom. AbbVie Inc. v. Fed. Trade Comm'n*, 141 S. Ct. 2838 (2021).

departments.[5] Henderson was the first and, until the autumn of 2019, only African American tenured professor in Penn State's political science department.[6] On May 12, 2021, Henderson filed this complaint, which he later amended, alleging claims under Title VII of the Civil Rights Act of 1964 ("Title VII"),[7] the Pennsylvania Human Relations Act ("PHRA"),[8] and 42 U.S.C. § 1981 for discrimination, hostile work environment, and retaliation on the basis of Henderson's race and his complaints of discriminatory conduct.[9]

The facts giving rise to this action stem from Henderson's employment at Penn State and the allegedly hostile environment created by its leaders and employees.[10] During his tenure at Penn State, Henderson has received broad recognition for his work, having served on the editorial boards of several publications, been a frequent keynote speaker at events and community programs, and been awarded fellowships and grants while at Penn State, including a nearly $2,000,000 grant funded by the John Templeton Foundation.[11] He also received a faculty recognition award from the Multicultural Resource Center at Penn State and, in 2015, he published a book entitled *African Realism? International Relations*

---

[5]   *Id.* ¶¶ 17, 19.
[6]   *Id.* at 1.
[7]   42 U.S.C. § 2000e, *et seq.*
[8]   43 Pa. Stat. & Cons. Stat. Ann. § 951, *et seq.*
[9]   Doc. 14.
[10]  *Id.*
[11]  *Id.* ¶¶ 23, 25.

*Theory and Africa's Wars in the Postcolonial Era*, for which he received an award and positive reviews.[12]

"Notwithstanding the success he achieved both in and out of the classroom, [] Henderson was vocal about a series of comments and actions that he witnessed being committed by senior faculty members and administrators that reflected systemic and institutional biases."[13] These complaints began as early as 2010, and included issues involving Penn State's failure to successfully recruit African American students and faculty members and its failure to engage with individuals who raised concerns about diversity, inclusion, and discrimination.[14]

Among these issues was an incident that occurred at an unidentified time when Donna Bahry, a white woman and the former head of the political science department, made unsolicited comments to Henderson about "Black rapists" and discussed having "been stalked by Black men while she taught at another university."[15] In 2014, Henderson began reporting to Kee Ann Banaszak, the head of Penn State's political science department, who in turn reported to Susan Welch, then the dean of the college of liberal arts; both individuals are white women.[16]

Henderson complained to Banaszak about unprofessional and biased behavior among his colleagues, including an incident where a white faculty member used "the

---

[12]  *Id.* ¶¶ 22, 39-40.
[13]  *Id.* ¶ 26.
[14]  *Id.* ¶¶ 27-28.
[15]  *Id.* ¶ 29.
[16]  *Id.* ¶¶ 30-31.

word 'bitch' during a tenure committee meeting while discussing a potential candidate" and an incident in 2015 where "the Provost made an offensive and stereotypical remark regarding an individual's ethnicity during an address to many faculty members."[17] Although Henderson's complaints were allegedly investigated, no action was taken, and Banaszak eventually accused Henderson of harassing her by consistently raising with Banaszak complaints of biased behavior among Penn State's staff.[18] Henderson eventually escalated his complaints to Penn State president Eric J. Barron—who is white—complaining of a racially hostile climate within Penn State's political science department, including long-standing discriminatory treatment by Welch and Bahry.[19] Those complaints were "ignored and dismissed."[20]

At some point after Henderson's book was published in 2015, he "sought [] Banaszak's guidance in formally applying for a promotion to Full Professor" which is a leadership position that could lead to further promotions, greater compensation, and additional control over committee and departmental assignments.[21] Henderson was informed that such an application would only move forward with Banaszak's or Welch's recommendation, and that Banaszak would not recommend Henderson for

---

[17] *Id.* ¶¶ 33-34.
[18] *Id.* ¶¶ 35-36.
[19] *Id.* ¶ 37.
[20] *Id.* ¶ 38.
[21] *Id.* ¶¶ 40-41.

such a promotion due to his allegedly deficient classroom skills and performance.[22] Henderson's attempts to be promoted to full professor "continue to be denied."[23]

In December 2017, Henderson complained to Suzanne Adair—Associate Vice President of Affirmative Action—about Banaszak's refusal to consider Henderson for a promotion, "among other discriminatory actions taken by Penn State's Political Science department against him."[24] In October 2018, Adair informed Henderson that the investigation into his allegations had concluded, and his claim of race discrimination was found to be unsubstantiated.[25] Banaszak thereafter retaliated against Henderson by refusing to provide funds for Henderson's two newest books.[26]

In January 2019, Henderson published an op-ed in Penn State's student newspaper that "recounted various discriminatory experiences he had endured in his nearly twenty-years at Penn State, and he called on Penn State to reckon with its institutional racism that had resulted in a dearth of Black faculty members and students."[27] Henderson urged Penn State to seriously consider issues of racial bias and employ additional oversight and intervention to combat racism on Penn State's campus.[28]

---

[22]  *Id.* ¶ 42.
[23]  *Id.* ¶ 58.
[24]  *Id.* ¶ 43.
[25]  *Id.* ¶ 44.
[26]  *Id.* ¶ 45.
[27]  *Id.* ¶¶ 46-47.
[28]  *Id.* ¶ 48.

A few weeks after that article was published, Adair informed Henderson that some of his white colleagues complained that he had created a racially hostile work environment for them; these complaints arose from Henderson's "efforts to combat racism" at Penn State and within the political science department specifically.[29] On May 16, 2019, Henderson received a formal letter of discipline that charged him with violating Penn State's Policy AD91—related to discrimination, harassment, and related inappropriate conduct—and alleged that "Henderson did 'repeatedly refer to, and/or name, specific members of the department during faculty meetings and other forums when he is raising issues regarding perceived racist actions or practices,' and such conduct rose to the level of harassment and the creation of a hostile work environment."[30]

On May 23, 2019, Welch provided Henderson with a letter formally stating that Henderson's behavior and "public denunciations of colleagues have created a hostile work environment impeding the department from carrying out its normal business."[31] The sanctions imposed on Henderson included a two-year ban from participation on departmental committees, a ban from all departmental meetings and events, a prohibition on teaching during the 2019-2020 school year, and a

---

[29]  *Id.* ¶¶ 49-50.
[30]  *Id.* ¶¶ 51-52 (brackets omitted).
[31]  *Id.* ¶ 53.

requirement that Henderson take remedial teaching courses to improve his classroom performance.[32]

## II.    LAW

Under Federal Rule of Civil Procedure 12(b)(6), courts will dismiss a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." A motion to dismiss "tests the legal sufficiency of a pleading"[33] and "streamlines litigation by dispensing with needless discovery and factfinding."[34] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[35] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[36]

Following the Roberts Court's "civil procedure revival," the landmark decisions of *Bell Atlantic Corporation v. Twombly*[37] and *Ashcroft v. Iqbal*[38] tightened the standard that district courts must apply to 12(b)(6) motions.[39] These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[40]

---

[32]   *Id.* ¶¶ 54-55.
[33]   *Richardson v. Bledsoe*, 829 F.3d 273, 289 n.13 (3d Cir. 2016).
[34]   *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989).
[35]   *Id.* at 326 (*citing Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).
[36]   *Id.* at 327.
[37]   550 U.S. 544 (2007).
[38]   556 U.S. 662, 678 (2009).
[39]   *Iqbal*, 556 U.S. at 670 (*citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)) ("[a]cknowledging that *Twombly* retired the *Conley* no-set-of-facts test").
[40]   *Id.*

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[41] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[43] Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[44]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[45] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[46]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the

---

[41] *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

[42] *Id.*

[43] *Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) (internal quotations and citations omitted).

[44] *Twombly*, 550 U.S. at 556.

[45] *Iqbal*, 556 U.S. at 679.

[46] *Id.* at 678 (*quoting Twombly*, 550 U.S. at 557 (internal quotations omitted)).

light most favorable to [the plaintiff]."[47] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[48] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[49]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[50]

## III.  ANALYSIS

Penn State raises three issues in its motion to dismiss. First, Penn State asserts that Henderson's 42 U.S.C. § 1981 claim must be dismissed because Penn State is a state actor and, accordingly, 42 U.S.C. § 1983 provides Henderson's exclusive remedy.[51] Second, Penn State contends that Henderson's failure-to-promote claim should be dismissed because it is time-barred.[52] Finally, Penn State argues that

---

[47]  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[48]  *Iqbal*, 556 U.S. at 678 (internal citations omitted); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

[49]  *Iqbal*, 556 U.S. at 678.

[50]  *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

[51]  Doc. 21 at 15-16.

[52]  *Id.* at 16-22.

Henderson's hostile work environment claim must be dismissed because there are no timely incidents demonstrating that he was subject to a hostile work environment due to his race and, in any event, he has failed to state a claim for relief.[53] Penn State further asserts that Henderson should not be given leave to amend his complaint, as amendment would be futile.[54] The Court will address each argument in turn.

### A.    42 U.S.C. § 1981 Claim

First, Penn State argues that Henderson's 42 U.S.C. § 1981 claim must be dismissed, as the exclusive remedy for a claim against a state actor lies with 42 U.S.C. § 1983.[55] Henderson responds that Penn State is not a state actor and, therefore, a § 1981 claim may proceed against it or, in the alternative, he should be given leave to amend his complaint to assert a § 1983 claim against Penn State.[56] As both parties acknowledge, it is well established that "Congress, in promulgating § 1983 over a century ago, established that section as the exclusive remedy for violations of § 1981 by state actors."[57] Consequently, the only question is whether Penn State is a state actor, such that any suit against it must proceed under § 1983, rather than § 1981.

---

[53]   *Id.* at 22-29.

[54]   *Id.* at 30-31.

[55]   Doc. 21 at 9-10.

[56]   Doc. 23 at 9-11.

[57]   *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009). *See also Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 735 (1989) (holding that § 1983 "provides the exclusive federal remedy for violation of the rights guaranteed in Section 1981").

The Court need not examine whether Penn State is a state actor under any of the "three broad tests generated by Supreme Court jurisprudence to determine whether state action exists,"[58] as the United States Court of Appeals for the Third Circuit has already determined that Penn State is a state actor.[59] In *American Future Systems, Inc. v. Pennsylvania State University*, the Third Circuit held that, in light of its prior decisions holding that Temple University and the University of Pittsburg are state actors, and given Penn State's "far closer relationship with the state than" those institutions, it was "clearly establishe[d] that Penn State is a state actor."[60] And, although Penn State's status as a state actor was not directly discussed in *Nicholas v. Pennsylvania State University*, there the Third Circuit analyzed claims against Penn State arising under § 1983.[61] Finally, in *Yan Yan v. Pennsylvania State University*, an unpublished decision, the Third Circuit determined that the chair of a graduate program at Penn State was a state actor, as he worked for Penn State and had supervisory authority over the plaintiff.[62]

It is therefore clear that Penn State is a state actor within the meaning of § 1983, and Henderson's exclusive remedy for racial discrimination rests in a § 1983

---

[58]  *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (discussing tests).

[59]  Several district courts have similarly concluded that Penn State is a state actor for § 1983 purposes. *E.g., Bradshaw v. Pa. State Univ.*, No. CIV.A. 10-4839, 2011 WL 1288681, at *1 (E.D. Pa. Apr. 5, 2011).

[60]  752 F.2d 854, 861 n.24 (3d Cir. 1984).

[61]  227 F.3d 133 (3d Cir. 2000).

[62]  *Yan Yan v. Pa. State Univ.*, 529 F. App'x. 167, 172-73 (3d Cir. 2013).

claim, not in a § 1981 claim.[63] Consequently, Henderson's § 1981 claim will be dismissed. This flaw in Henderson's pleading is, however, easily remedied. Consequently, the Court will provide Henderson leave to amend his complaint to raise this claim under § 1983.

### B. Failure-to-Promote Claim

Penn State next argues that Henderson's failure-to-promote claim must be dismissed based upon the applicable statutes of limitations, as no discriminatory act occurred within the limitations period.[64] Henderson in turn argues that his failure-to-promote claim is not time-barred, as he continues to seek (and be denied) a promotion to this day.[65]

Although Penn State focuses on Henderson's failure to plead with specificity when certain acts occurred and whether they occurred within the limitations period, this is the wrong inquiry to engage in at this stage in the litigation.[66] Rather, the Third Circuit has noted that "[t]echnically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss."[67] The Third Circuit, however, "permit[s] a limitations defense to be raised by a motion under Rule 12(b)(6) only if the time

---

[63]   *McGovern*, 554 F.3d at 121.
[64]   Doc. 21 at 16-22.
[65]   Doc. 23 at 12-16.
[66]   *See, e.g.*, Doc. 24 at 9 ("Tellingly, [Henderson] does not dispute that his Amended Complaint lacks any specific allegation identifying a timely instance in which he was denied a promotion").
[67]   *Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 604 (3d Cir. 2017) (internal quotation marks omitted).

alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."[68] "Since the applicability of the statute of limitations usually involves questions of fact for the jury, if the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)."[69] The relevant question therefore is not whether Henderson has adequately pled that his claim is within the statute of limitations, but whether is it plain from the pleadings that his claim falls outside the statute of limitations.

Henderson's failure-to-promote claims are subject to varying limitations periods. "To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice"[70] while, under the PHRA, "an administrative complaint must first be filed with the PHRC within 180 days of the alleged act of discrimination."[71] Claims under 42 U.S.C. § 1983 are subject to, at a minimum, a two-year statute of limitations.[72] Henderson filed his charges of discrimination on

---

[68]   *Id.* (internal quotation marks omitted).

[69]   *Id.* (internal citations and quotation marks omitted).

[70]   *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013).

[71]   *Id.* at 164.

[72]   *E.g. Opoku v. Educ. Comm'n for Foreign Med. Graduates*, 574 F. App'x 197, 202 (3d Cir. 2014). The parties dispute whether a two-year or a four-year limitations applies here, as some courts have determined that, when a plaintiff must bring a § 1981 claim under § 1983—as is the case here—§ 1981's four-year limitations period applies. *Douglas v. Nesbit*, No. 1:16-CV-01836, 2017 WL 1021680, at *5 (M.D. Pa. Mar. 16, 2017) (collecting cases). The Court will not resolve this dispute here because, even under a two-year limitations period, Henderson's claim is not facially untimely based upon the allegations contained in the amended complaint.

November 12, 2019, and therefore the limitations period began on January 16, 2019 for his Title VII claim, and on May 16, 2019 for his PHRA claim.[73] Henderson filed his complaint with this Court on May 12, 2021 and, accordingly, the limitations period for his § 1983 claim began—at the latest—on May 12, 2019.

Henderson alleges in his amended complaint that, at some unspecified time in 2017, he was informed by Banaszak that she would not recommend Henderson for promotion to full professor, and his application would not proceed without her or Welch's recommendation.[74] Penn State argues that this constitutes a discrete act, thereby triggering the relevant statutes of limitations, and discrete acts are not subject to the continuing violation doctrine.[75]

Penn State is correct that, as a general matter, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire . . . constitute[] a separate actionable 'unlawful employment practice'" and may not form the basis for a continuing violation.[76] However, that rule is based upon the proposition that discrete acts are "easy to identify" and occur independent of any other acts.[77] In

---

[73] Doc. 14 at 18.

[74] *Id.* ¶ 42.

[75] Doc. 21 at 21-22. "Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Mandel*, 706 F.3d at 165 (internal quotation marks omitted). "To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 165-66.

[76] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

[77] *Id.*

contrast, where an action is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" "cannot be said to occur on any particular day," and "involve repeated conduct," those acts may form a continuing violation such that, if any act occurred within the limitations period, all prior acts are also timely.[78]

While it is generally the case that the failure to promote is a discrete act, not all cases of failure to promote are discrete. The Third Circuit has determined that, where a plaintiff "did not seek to fill a specific vacancy, but [instead] sought a promotion in job title that could have been granted at any time," the continual failure to promote that individual "constitutes a continuing violation" such that, if one act of failure to promote occurred within the limitations period, all prior acts are likewise timely.[79]

Here, the role of full professor is not a specific vacancy and, instead, it appears that Henderson could have been promoted to that role at any time. Given that Henderson was never definitively informed that, under no circumstances would he

---

[78] *Id.* at 115-17.

[79] *Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 844 (3d Cir. 1992). Although *Miller* analyzed a failure-to-promote claim under the Equal Pay Act, the Third Circuit later noted that the "application of the continuing violations doctrine is not dependent on which statute gives rise to the plaintiff's claim" and applied *Miller* to a Title VII claim. *Cardenas v. Massey*, 269 F.3d 251, 258 (3d Cir. 2001). Furthermore, Penn State argues that *Morgan* abrogates *Miller*. Doc. 24 at 15. However, *Miller* involves a unique set of facts not present or addressed in *Morgan*. Under the unique circumstances where a promotion may occur at any time, a failure to promote "cannot be said to occur on any particular day" but, instead, "involve[s] repeated conduct," *Morgan*, 536 U.S. at 115, such that it is not a discrete event, and *Miller* therefore remains good law.

be promoted to full professor,[80] he continues to be eligible for a promotion to full professor at this time. Moreover, Henderson alleges that "[h]is attempts to be promoted to Full Professor continue to be denied," indicating that he made attempts to be promoted within the limitations period and until at least the date that the amended complaint was filed.[81] Because it may reasonably be inferred that Henderson has sought, and been denied, a promotion to full professor within the limitations period, his failure-to-promote claim is not facially untimely,[82] and the motion to dismiss this claim based on the statutes of limitations will be denied.[83]

---

[80]  Henderson was informed by Banaszak that she would not recommend him for promotion, allegedly due to Henderson's teaching deficiencies, although Henderson alleges that this refusal was due to his race. Doc. 14 ¶ 42. However, this statement from Banaszak did not effectively foreclose any further attempts to receive a promotion for two reasons. First, the reason that Banaszak provided for her refusal to recommend Henderson for full professor is conditional; she would not recommend promotion based on Henderson's purported teaching deficiencies, leaving open the possibility that she would recommend promotion if Henderson improved his teaching. Second, it does not appear on the face of the complaint that Welch—who also had the power to recommend Henderson for a promotion—ever unequivocally informed Henderson that she would not recommend him for promotion.

[81]  Doc. 14 ¶ 58.

[82]  *Cf. Cooper v. Children's Behav. Health, Inc.*, No. 3:18-CV-120, 2021 WL 4481093, at *12 (W.D. Pa. Sept. 30, 2021) (finding failure-to-promote claim timely as plaintiff "could have been promoted at any time, and her promotion was not based on specific vacancies at Children's, [and therefore] Children's repeated failure to promote Cooper following her demotion constitute continuing violations").

[83]  The Court notes that although Henderson's claims are not facially untimely, the amended complaint is unusually lacking in detail regarding Henderson's continued attempts to seek a promotion and fails to detail how he sought such a promotion—whether formally or informally, and with whom he discussed the matter. The lack of detail regarding those efforts, and when exactly those efforts occurred, make it difficult for Penn State to defend against Henderson's claims. Should Henderson file a second amended complaint, he may wish to shore up these deficiencies in his pleading.

### C.      Hostile Work Environment Claim

Finally, Penn State argues that Henderson's hostile work environment claim should be dismissed for two reasons. First, it contends that Henderson's claim is time-barred, as none of the acts that he identifies in support of his claim occurred within the limitations period.[84] Second, Penn State asserts that Henderson has failed to allege a sufficiently severe or pervasive hostile work environment.[85]

### 1.      Whether Hostile Work Environment Claim is Facially Untimely

First, Penn State argues that no incident of discrimination occurred within the relevant limitations period, as three incidents are undated, and one incident occurred in 2015.[86] Although Henderson was disciplined within the limitations period, Penn State argues that his discipline constitutes a discrete event that cannot render timely otherwise untimely acts.[87] Henderson responds that, although no non-discrete acts occurred within the limitations period, three discrete acts occurred within the period that render timely his hostile work environment—those acts being an investigation against Henderson for allegedly creating a hostile work environment, a formal letter of discipline written on May 16, 2019, and the imposition of sanctions against Henderson on May 23, 2019.[88]

---

[84]   Doc. 21 at 23-26.
[85]   *Id.* at 26-29.
[86]   Doc. 21 at 24-26.
[87]   *Id.* at 25.
[88]   Doc. 23 at 16-19.

Based upon these arguments, the only genuine dispute here is whether the timely discrete acts that Henderson references may form the basis of a hostile work environment claim, such that the continuing violation doctrine would permit the Court to consider earlier hostile acts that fall outside of the limitations period.[89] As discussed previously, in *National Railroad Passenger Corporation v. Morgan*, the United States Supreme Court held that untimely "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire . . . constitute[] a separate actionable 'unlawful employment practice'" and may not form the basis for a continuing violation.[90] However, the holding in *Morgan* was limited, by its plain language, to circumstances in which the "discrete discriminatory acts are . . . time barred."[91] In such circumstances, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."[92]

The United States Court of Appeals for the Fourth Circuit has determined that, in light of the Supreme Court's language in *Morgan*, where a plaintiff "does not rely on the continuing-violation doctrine to revive time-barred discrete acts" but, instead, relies on "non-time-barred discrete acts" as "part of the series of separate acts that collectively create a hostile work environment," such discrete acts are sufficient for

---

[89]   Penn State does not argue that Henderson has failed to allege that the discrete acts that occurred in 2019 are not part of the same racial discrimination that forms the core of his hostile work environment claim, and the Court therefore will not analyze that element of the continuing violation doctrine here. *See* Doc. 24 at 16-19.

[90]   536 U.S. at 114.

[91]   *Id.* at 113.

[92]   *Id.*

purposes of the continuing violation doctrine, and any untimely non-discrete acts may be considered in determining whether a plaintiff was subject to a hostile work environment.[93] The Fourth Circuit observed that "[t]he Supreme Court has recently explained that in a constructive-discharge case, the employee's resignation is the culmination of the intolerable discriminatory conduct of the employer, such that the relevant limitation period starts with the employee's resignation, not the last act of the employer" and concluded that "[i]f a constructive discharge can be part and parcel of a discriminatory pattern of conduct, we see no reason that a discrete act cannot."[94]

The Fourth Circuit further noted that the Supreme Court has "clarified the holding in *Morgan* to be that a hostile-environment claim 'includes every act composing that claim, whether those acts are independently actionable or not'"[95] and "that 'even if a claim of discrimination based on a single discriminatory act is time barred, that same act could still be used as part of the basis for a hostile-work-environment claim, so long as one other act that was part of that same hostile-work-environment claim occurred within the limitations period.'"[96] The sum of the Supreme Court's decisions convinced the Fourth Circuit that "[s]o long as the act is part of the pattern of discriminatory treatment against the employee, then that act

---

[93]  *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 222-23 (4th Cir. 2016) (internal quotation marks omitted).

[94]  *Id.* at 223 (citing *Green v. Brennan*, 578 U.S. 547, 556-57 (2016)).

[95]  *Id.* (quoting *Green*, 578 U.S. at 557).

[96]  *Id.* (quoting *Green*, 578 U.S. at 562 n.7).

should be sufficient for purposes of the continuing-violation doctrine, even if the act would otherwise qualify as a discrete act that is independently actionable."[97] Two other Courts of Appeals that have considered this issue are in accord with the Fourth Circuit's ruling.[98]

In contrast to this well-reasoned authority from those three circuit courts stands an unpublished—and conclusory—opinion from the Third Circuit, *Zankel v. Temple University*, holding that discrete acts such as termination are "not a continuation of any earlier" discrimination and cannot render prior acts of discrimination timely under the continuing violation doctrine.[99] Unpublished opinions are "not binding precedent" and should therefore be followed only to the extent that they are "persuasive."[100]

This Court finds *Zankel* unpersuasive and declines to follow it here. The opinion is bereft of any genuine reasoning or analysis, and that court does not appear to have grappled with the intent of *Morgan* or the specific language that limits its holding only to *untimely* discrete acts. Rather, the court in *Zankel* seems to have

---

[97] *Id.*

[98] *See Baird v. Gotbaum*, 662 F.3d 1246, 1251-52 (D.C. Cir. 2011) (holding that the district court erred by failing to employ the *Morgan* analysis to time-barred acts and concluding, on "a closely related argument," that courts may not "dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own"); *Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) ("Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim").

[99] 245 F. App'x 196, 198-99 (3d Cir. 2007).

[100] *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 290 (3d Cir. 2018).

simply assumed that the narrow language employed by the Supreme Court in *Morgan* applies broadly to all discrete acts.[101] To the contrary, as the Fourth Circuit, the United States Court of Appeals for the Eleventh Circuit, and the United States Court of Appeals for the District of Columbia have persuasively set forth, the holding in *Morgan* does not prevent a discrete act from rendering non-discrete acts timely under the continuing violation doctrine, so long as the discrete act is itself timely and constitutes a continuation or culmination of the defendants' discriminatory behavior.[102]

Here, Henderson was disciplined on May 23, 2019,[103] which is well within all of the relevant limitations periods and, therefore, it does not appear from the face of the amended complaint that Henderson's hostile work environment claim is untimely. Accordingly, Penn State's motion to dismiss that claim based on the applicable statutes of limitations will be denied. However, while Henderson's hostile work environment claim is timely, as discussed below, he has failed to sufficient plead such a claim.

---

[101]  *See Zankel*, 245 F. App'x at 199 (basing decision on the fact that "[t]he Supreme Court has declared, however, that the continuing violation doctrine has no applicability to discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire because each incident of discrimination and each retaliatory adverse employment action constitutes a separate actionable unlawful employment practice" (brackets and internal quotation marks omitted)).

[102]  *See Lee v. Mission Chevrolet, Ltd.*, No. EP-16-CV-00034-DCG, 2017 WL 4784368, at *8-9 (W.D. Tex. Oct. 23, 2017) (reaching same conclusion).

[103]  Doc. 14 ¶¶ 53-56.

## 2.    Whether Henderson has Stated a Viable Hostile Work Environment Claim

Next, Penn State contends that Henderson has failed to plead a viable hostile work environment claim for two reasons. First, many of the incidents to which Henderson cites do not involve his race and therefore cannot form the basis of a hostile work environment claim.[104] Second, Penn State argues that any alleged discrimination was not severe or pervasive enough to form a viable hostile work environment claim, and his claims of bias are too vague to support such a claim.[105]

"Title [VII] may be violated when an employee's racist behavior creates a hostile work environment for his colleagues."[106] "Under Title VII, a hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[107] "The Supreme Court has explained further that 'conditions' of employment cover not only economic or tangible discrimination, but 'the entire spectrum of disparate treatment of men and women.'"[108]

"To plead a hostile work environment claim, a plaintiff must allege: (1) She suffered intentional discrimination; (2) the discrimination was severe or pervasive;

---

[104] Doc. 21 at 26-27.

[105] *Id.* at 27-29.

[106] *Kengerski v. Harper*, 6 F.4th 531, 537 (3d Cir. 2021).

[107] *Starnes v. Butler Cty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (quoting *Morgan*, 536 U.S. at 116).

[108] *Id.* (quoting *Morgan*, 536 U.S. at 116).

(3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present."[109] "[A] claim of employment discrimination necessarily survives a motion to dismiss so long as the requisite *prima facie* elements have been established"[110] and, in those circumstances, whether such "allegations are true and whether they amount to 'pervasiveness' are questions to be answered after discovery."[111]

Under the pervasive standard, "[l]ess severe isolated incidents which would not themselves rise to the level of discrimination may, when taken together as part of the overall scenario, evidence discriminatory animus, and one severe incident may be enough to create a hostile work environment."[112] Under the severe standard, even a "single use of the 'n-word' is adequately 'severe'" if the plaintiff pleads "the incident to 'be extreme to amount to a change in the terms and conditions of employment.'"[113]

Penn State only contests whether Henderson has sufficiently pled that his workplace was severe or pervasive and does not challenge the other four elements

---

[109] *Id.* (ellipsis, brackets, and internal quotation marks omitted). The test for a hostile work environment is identical under § 1983, *id.*, and § 1981. *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).

[110] *Castleberry*, 863 F.3d at 266.

[111] *Id.* at 267.

[112] *Starnes*, 971 F.3d at 428 (brackets and internal quotation marks omitted).

[113] *Castleberry*, 863 F.3d at 264, 266 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

of a hostile work environment claim.[114] The Court agrees with Penn State that, even under the lenient standards applied to a motion to dismiss, the allegations, as currently constituted, are insufficient to demonstrate sufficiently pervasive or severe discrimination.

Henderson cites to three specific incidents that may reflect racial animus at Penn State. First, at an unidentified time, Bahry made entirely unsolicited and gratuitous comments about "Black rapists" and discussed having "been stalked by Black men while she taught at another university."[115] And in 2015 "the Provost made an offensive and stereotypical remark regarding an individual's ethnicity during an address to many faculty members."[116] Several years later, in response to Henderson's op-ed in the student newspaper and efforts to raise awareness about racism at Penn State, Henderson was investigated and disciplined for allegedly harassing his colleagues.[117]

None of these specific incidents are individually severe enough to support a claim for a hostile work environment; they do not involve the use of a loathsome racial slur, nor do they involve any form of inappropriate physical contact. Nor does the Court believe that three incidents—spread out over the course of more than half a decade—are sufficiently pervasive to support a hostile work environment claim.

---

[114] Doc. 21 at 27-29.
[115] Doc. 14 ¶ 29.
[116] *Id.* ¶¶ 33-34.
[117] *Id.* ¶¶ 46-56.

Henderson does, however, assert that he personally witnessed a number of comments and actions "by senior faculty members and administrators that reflected systemic and institutional biases."[118] Henderson began complaining of these incidents as early as 2010, and those incidents included issues involving Penn State's failures to successfully recruit African American students and faculty members and its failure to engage with individuals who raised concerns about diversity, inclusion, and discrimination.[119] Allegations that racism and systemic and institutional biases permeate Penn State may, if supported by reference to specific incidents, be sufficient to support Henderson's claim. However, as constituted, Henderson's allegations of racism and institutional biases are far too conclusory to support his claim—such assertions must be backed by some concrete examples[120] to pull them from the realm of conclusory allegations and provide some basis to conclude that racism and biases actually permeate Penn State.[121] In other words, Henderson must

---

[118] *Id.* ¶ 26.

[119] *Id.* ¶¶ 27-28.

[120] Such examples should not be difficult to gather or include in a second amended complaint, as Henderson wrote an op-ed wherein he "recounted various discriminatory experiences he had endured in his nearly twenty-years at Penn State." *Id.* ¶ 47.

[121] *See Holmes v. Gates*, 403 F. App'x 670, 673-74 (3d Cir. 2010) (dismissal was appropriate as plaintiff "failed to marshal anything but conclusory allegations to support her claim," and such "generalized grievances[] lack[] the requisite specificity to 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged'" (quoting *Iqbal*, 129 S.Ct. at 1949)); *Tamburello v. City of Allentown*, No. 5:20-CV-06153-JMG, 2021 WL 3367309, at *3-4 (E.D. Pa. Aug. 3, 2021) (although court was "sensitive that courts have been hesitant to dismiss hostile work environment claims under Rule 12(b)(6) because the proof of this claim is highly fact-specific . . . absent nonconclusory allegations concerning a subjective, detrimental effect on Plaintiff, we cannot let these claims proceed" (brackets and internal quotation marks omitted)); *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 898-99 (E.D. Pa. 2020) (conclusory assertions insufficient "to support a finding that Lockheed Martin

"put some meat on the bones"[122] of his allegations in order to support his claim that racism and racial biases permeate Penn State. For that reason, Penn State's motion to dismiss will be granted as to Henderson's claim of a hostile work environment, but he will be provided leave to further amend his complaint as to this claim.

### D.    Leave to Amend

Having carefully considered the claims set forth in the amended complaint, Henderson will be granted leave to file a second amended complaint. The Third Circuit has directed that, when a complaint is vulnerable to dismissal under Rule 12(b)(6), a court "must permit a curative amendment unless such an amendment would be inequitable or futile."[123] The Third Circuit has also stated that:

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.[124]

With respect to futility, the Third Circuit has sanctioned denial of leave to amend "if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted."[125] As detailed above, Henderson may plausibly state a claim for relief as to all counts that will be dismissed.

---

subjected Mr. Power to a hostile work environment, let alone that it did so in retaliation for Mr. Power's protected activities").

[122] *Nat'l ATM Council, Inc. v. Visa Inc.*, cc, 82 (D.D.C. 2013).

[123] *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[124] *Id.*

[125] *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000).

Henderson's deficient claims under § 1981 are easily remedied by refiling that claim pursuant to § 1983, and the factual deficiencies in his hostile work claim may be rectified by providing more concrete factual details in support of his claims of bias and racism at Penn State—details that appear to exist based upon indications in the complaint that Henderson fleshed out his experiences with racism at Penn State in an op-ed that he wrote for the student newspaper.[126]

## IV.   CONCLUSION

For the reasons stated herein, Penn State's motion to dismiss the amended complaint is granted in part. Henderson's 42 U.S.C. § 1981 and hostile work environment claims are dismissed without prejudice, and with leave to amend. The motion is denied in all other respects.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[126]  Doc. 14 ¶¶ 46-48.