**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ERROL A. HENDERSON,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>THE PENNSYLVANIA STATE UNIVERSITY,<br><br>　　　　　　　Defendant. | No. 4:21-cv-00872-MWB<br><br>Honorable Matthew W. Brann<br><br>*Electronically Filed* |

## DEFENDANT THE PENNSYLVANIA STATE UNIVERSITY'S ANSWER AND DEFENSES TO THE SECOND AMENDED COMPLAINT

Defendant The Pennsylvania State University ("Defendant" or "Penn State") hereby submits its Answer and Defenses to the Second Amended Complaint filed by Plaintiff Errol A. Henderson ("Plaintiff" or "Professor Henderson") in accordance with the numbered Paragraphs as follows:

## PRELIMINARY STATEMENT

Penn State is committed to building an inclusive, diverse, and respectful environment for the thousands of faculty, staff, and students in its community. Increasing diversity and sustaining an environment of inclusion and respect are key to Penn State's ability to deliver on its values and provide its community with the best educational and work environment possible. Understanding the importance of diversity and inclusion, Penn State encourages the members of its community,

including Plaintiff, to speak up and engage in productive discussions that help Penn State advance these priorities.  Plaintiff has been a valued member of his department for his research, publications, and scholarly accomplishments.  Penn State has made numerous efforts over the years to help Plaintiff improve and excel in his interactions with students and colleagues so he can achieve and sustain success in these important areas.  It is against this backdrop that Penn State responds to the allegations here.

### PARTIES[1]

1. Plaintiff is an African American individual and citizen of the Commonwealth of Pennsylvania.

**RESPONSE:**  Penn State admits that its personnel records reflect that Plaintiff identifies as African American and resides in the Commonwealth of Pennsylvania.

2. Defendant is a research university with campuses and facilities throughout Pennsylvania.

**RESPONSE:**  Admitted.

3. Defendant is engaged in an industry affecting interstate commerce and, at all relevant times, has regularly conducted business in the Commonwealth of Pennsylvania.

---

[1] For the Court's convenience, Penn State restates the headings used in the Second Amended Complaint but does not admit the substance of any of those headings.

**RESPONSE:**  Admitted.

4.     At all times material hereto, Defendant has acted as an "employer" within the meaning of the statutes which form the basis of this matter.

**RESPONSE:**  Penn State admits that Plaintiff has been employed by Penn State since 2002.  The remaining allegations in Paragraph 4 state conclusions of law to which no responsive pleading is required.

5.     At all times material hereto, Defendant employed more than fifteen (15) individuals.

**RESPONSE:**  Admitted.

6.     At all times material hereto, Plaintiff was an "employee" of Defendant within the meaning of the statutes which form the basis of this matter.

**RESPONSE:**  Penn State admits that Plaintiff has been employed by Penn State since 2002.  The remaining allegations in Paragraph 6 state conclusions of law to which no responsive pleading is required.

7.     At all times material hereto, Defendant acted by and through its authorized agents, servants, workmen and/or employees within the course and scope of their employment with Defendant, under color of state law, and in furtherance of Defendant's business.

**RESPONSE:** The allegations in Paragraph 7 state conclusions of law to which no responsive pleading is required.

8.     At all times material hereto, Defendant has acted under color of state law.

**RESPONSE:** The allegations in Paragraph 8 state conclusions of law to which no responsive pleading is required.

**JURISDICTION**

9.     The causes of action which form the basis of this matter arise under Title VII, Section 1983, and the PHRA.

**RESPONSE:**  Penn State admits that Plaintiff purports to assert claims under Title VII, Section 1983, and the PHRA.  Penn State denies that it subjected Plaintiff to discrimination, harassment, or retaliation under those statutes, and that Plaintiff is entitled to any form of relief.

10.     The District Court has jurisdiction over Count I (Title VII) pursuant to 28 U.S.C. §1331.

**RESPONSE:**  Admitted.

11.     The District Court has jurisdiction over Count II (Section 1983) pursuant to 28 U.S.C. §1331.

**RESPONSE:**  Admitted.

12.     The District Court has supplemental jurisdiction over Count III (PHRA) pursuant to 28 U.S.C. §1367.

**RESPONSE:**  Admitted.

13.     Venue is proper in the District Court under 28 U.S.C. § 1391(b).

**RESPONSE:**  Admitted.

14.     On or about November 8, 2019, Plaintiff filed a Complaint with the Pennsylvania Human Relations Commission ("PHRC"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"), complaining of the acts of discrimination and retaliation alleged herein.  Attached hereto, incorporated herein, and marked as Exhibit 1 is a true and correct copy of the PHRC Complaint.

**RESPONSE:**  Penn State admits that Plaintiff filed a complaint with the PHRC, which was cross-filed with the EEOC, that bears the date of November 8, 2019 and that it is attached to Plaintiff's Second Amended Complaint as Exhibit 1.  The remaining allegations in Paragraph 14 purport to characterize a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations to the extent inconsistent with those terms.

15.     On or about May 19, 2020, Plaintiff filed an Amended Complaint with the PHRC, which was cross-filed with the EEOC.  Attached hereto, incorporated herein, and marked as Exhibit 2 is a true and correct copy of the Amended PHRC Complaint.

**RESPONSE:**  Penn State admits that Plaintiff filed an amended complaint with the PHRC, which was cross-filed with the EEOC, that bears the date of May 19, 2020 and is attached to Plaintiff's Second Amended Complaint as

Exhibit 2.   The remaining allegations in Paragraph 15 purport to characterize a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations to the extent inconsistent with those statements.

16.   Plaintiff filed his original Complaint with this Court on or around May 12, 2021. See Doc. No. 1.

**RESPONSE:**  Admitted.

17.   On or about July 6, 2021, Plaintiff received a Notice of Right to Sue from the U.S. Department of Justice, Civil Rights Division.   Attached hereto, incorporated herein, and marked as Exhibit 3 is a true and correct copy of the Notice of Right to Sue.

**RESPONSE:**  Admitted.

18.   Consequently, Plaintiff filed a First Amended Complaint on or around July 19, 2021, incorporating his claims under Title VII.  See Doc. No. 14.

**RESPONSE:**  Admitted.

19.   On March 31, 2022, the Court granted, in part, Defendant's Motion to Dismiss and permitted Plaintiff to file a Second Amended Complaint on or before April 18, 2022.  See Doc. No. 26.

**RESPONSE:**  Admitted.

20.   Plaintiff has complied with all administrative prerequisites for the commencement of this action.

**RESPONSE:**  The allegations in Paragraph 20 state conclusions of law to which no responsive pleading is required.

## FACTUAL ALLEGATIONS

21.     Penn State was founded in 1855.

**RESPONSE:**  Admitted.

22.     Over forty years later, in 1899, Calvin Waller became the first Black student to be admitted to Penn State.

**RESPONSE:**  Admitted.

23.     In 1956, over 100 years after the founding of Penn State, Mary E. Godfrey became Penn State's first full-time Black professor.

**RESPONSE:**  Penn State admits that 1956 is over 100 years after Penn State's founding in 1855.  Penn State further admits that, in or around 1956, Penn State hired Mary E. Godfrey as an Assistant Professor of Art Education and that she was the first Black full-time faculty member hired by Penn State.

24.     In 1963, Charles T. Davis became the first Black professor promoted with tenure to Full Professor.

**RESPONSE:**  Penn State admits that, after joining the faculty at Penn State as an associate professor in English in 1961, Charles T. Davis was promoted to a Full Professor with tenure of English in 1963.  Penn State further admits that Mr.

Davis was the first Black faculty member to become tenured at Penn State.  Penn State denies any remaining allegations in Paragraph 24.

25.     Historically, Penn State has cultivated an abysmal record on hiring of Black faculty members and specifically Black professors.

**RESPONSE**:  Denied.

26.     In 1976, 35 Black individuals held faculty positions at Penn State, representing less than 1% of the entire faculty.

**RESPONSE**:   The allegations in Paragraph 26 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross:  A Report on the Status of African American Professors at Penn State University (UP)*, Part 1, published on January 20, 2020 ("*More Rivers to Cross*, Part 1").[2]  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

---

[2] Plaintiff's allegations in Paragraph 26 and Paragraphs 27-28 and 31-39 concern or relate to statistics in *More Rivers to Cross*, Part 1, which is not an official Penn State publication and was not issued by an office of the university charged with collecting, collating, and interpreting data on student and faculty composition to measure progress toward equity goals in hiring and retention.  Therefore, for purposes of its responses to Paragraph 26 and Paragraphs 27-28 and 31-39 (and otherwise in this Answer), Penn State denies that such statistics or statements concerning such statistics reflect all available data or are a comprehensive representation of Penn State's record.  Notwithstanding the denials of these allegations, Penn State values the perspectives and contributions of the authors and those who participated in the preparation of *More Rivers to Cross*, Part 1 and the important dialogues around diversity that this work has generated.

27.    By 1998, shortly before Dr. Henderson joined Penn State, fewer than 3 of every 100 full-time faculty members of Penn State identified as Black, i.e., 2.5%.

**RESPONSE:**  Penn State admits that 1998 is a few years before Plaintiff joined Penn State in 2002.  The remaining allegations in Paragraph 27 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

28.    In 2003, Dr. Henderson's first full year at Penn State, the number rose to 3%.

**RESPONSE:**  Penn State admits that Plaintiff joined Penn State in 2002 and, therefore, his first full calendar year employed by Penn State was 2003.  The remaining allegations in Paragraph 28 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

29.    The Black share of full-time faculty members at the main University Park campus – where Dr. Henderson resides – has not changed in 20 years.

**RESPONSE:**   Penn State admits that Plaintiff works at Penn State's University Park campus.  Penn State denies the remaining allegations in Paragraph 29.

30.    As recently as 2019, only 3.2% of full-time faculty members at University Park identified as Black, i.e., 94 out of 2,939.

**RESPONSE:**   The allegations in Paragraph 30 paraphrase, characterize, summarize, and/or quote statements and/or statistics from an article by Nick Anderson entitled "Black professors push a major university to diversify and confront racism," which was published in *The Washington Post* on June 16, 2021. This article is a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

31.    Notably, the number of Black professors at University Park who were either tenured or held a tenure-track position *decreased* from 83 in 2004 to 68 in 2018, resulting in a negative percentage change of -22% or loss of 15 tenured or tenured-track faculty positions.

**RESPONSE:**   The allegations in Paragraph 31 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

32.    At the same time, the total number of tenured or tenure-track positions among all University Park faculty *increased* by 6.9%.

**RESPONSE:**   The allegations in Paragraph 32 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*,

Part 1. *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

33.     In 2004, Black tenured or tenure-track professors represented 4.8% of all tenured or tenured-track University Park professors, compared to only 3.9% in 2018.

**RESPONSE:**   The allegations in Paragraph 33 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1. *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

34.     From 2004 to 2018, the number of Black associate professors at University Park had decreased by -18.9%, and the number of Black assistant professors at University Park had decreased by -36.7%.

**RESPONSE:**   The allegations in Paragraph 34 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1. *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

35.     The College of Liberal Arts – which houses the Political Science department – consists of the largest number of University Park faculty and represented 20.4% of all Penn State faculty in 2018.

**RESPONSE:**  Penn State admits that the Political Science Department is part of the College of Liberal Arts and that the College of Liberal Arts has the most faculty of all of Penn State's Colleges within the University Park campus.  The remaining allegations in Paragraph 35 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

36.    From 2004 to 2018, the number of non-Black faculty within the College of Liberal Arts rose by 63% in contrast to the pattern of Black faculty, which increased by only 12.5%.

**RESPONSE:**   The allegations in Paragraph 36 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

37.    In 2018, the percentage of Black professors in the College of Liberal Arts was only 4.7%, the vast majority of whom are members of the Department of African American Studies.

**RESPONSE:**   The allegations in Paragraph 37 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*,

Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

38.     In 2004, in contrast, the percentage of Black professors in the College of Liberal Arts was 6.6%.

**RESPONSE:**   The allegations in Paragraph 38 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

39.     The lack of diversity at Penn State extends beyond the faculty population.  In 2019, Black individuals represented 10.6% of the population in Pennsylvania.  However, Black individuals comprised only 4.1% of the total student body at University Park campus of 46,723 enrolled students.

**RESPONSE:**   The allegations in Paragraph 39 paraphrase, characterize, summarize, and/or quote statements and/or statistics from *More Rivers to Cross*, Part 1.  *More Rivers to Cross*, Part 1 is a written document, and the terms of such document speak for themselves.

40.     Dr. Henderson is an African American man who was born in Detroit in 1962.

**RESPONSE:**   Penn State admits that its personnel records reflect that Plaintiff identifies as an African American man and that Plaintiff was born in 1962.

Penn State lacks knowledge or information sufficient to form a belief as to Plaintiff's place of birth.

41.     He obtained his PhD in Political Science from University of Michigan in 1993.

**RESPONSE:**  Admitted.

42.     A former member of the U.S. Army and U.S. Army Reserve, Dr. Henderson's teaching and research focus on World Politics, the Analysis of War, and Africana/Black Studies, among other subjects.

**RESPONSE:**  Admitted.

43.     In 2002, Dr. Henderson joined Penn State as a tenured faculty member and Associate Professor in the Political Science and Africana Studies departments.

**RESPONSE:**   Penn State admits that on February 19, 2002, Penn State offered Plaintiff an appointment as Associate Professor of African and African American Studies and Political Science.   Plaintiff was granted tenure in the Department of African and African American Studies, effective July 2002, and in the Political Science Department, effective July 2003.   Penn State denies the remaining allegations in Paragraph 43.

44.     Since 2005, Dr. Henderson exclusively has been an Associate Professor of International Relations within the Political Science department.

**RESPONSE:**  Penn State admits that due to interpersonal issues Plaintiff had with many of his colleagues in the Department of African and African American Studies, leading to a number of complaints regarding Plaintiff's treatment of others, Plaintiff left the Department of African and African American Studies in 2006. Since January 1, 2006, Plaintiff has held an 100% appointment as Associate Professor in Penn State's Department of Political Science.  Penn State denies the remaining allegations in Paragraph 44.

45.    Dr. Henderson has taught thousands of students during his time at Penn State. In a typical academic year at Penn State, Dr. Henderson would teach four courses and approximately 140-300 undergraduate students. Approximately every two academic years, he would also typically teach one graduate course consisting of approximately 10-12 graduate students.

**RESPONSE:**  Penn State admits that Plaintiff's course load and number of students in his classes has varied because, over the past few years, Plaintiff was on sabbatical focusing on his research and then took a medical leave of absence, and he did not teach full-time during these intervals.  Penn State further admits that in a "typical" year, Plaintiff taught approximately four courses, comprised of either four undergraduate courses or three undergraduate courses and one graduate course. Penn State denies the remaining allegations in Paragraph 45.

46.     Dr. Henderson has been lauded as an active mentor to many students and student groups on campus. In 2014, for example, Dr. Henderson was given the Faculty Recognition Award from the Multicultural Resource Center at Penn State.

**RESPONSE:**  Penn State admits that, in 2014, Dr. Henderson was given the Faculty Recognition Award from the Multicultural Resource Center at Penn State. Penn State denies the remaining allegations in Paragraph 46.

47.     In his broader academic service, Dr. Henderson has served on the editorial boards of several publications and is a frequent keynote speaker at events and community programs.

**RESPONSE**:  Penn State admits that, in terms of broader academic service, Plaintiff has served on the editorial boards of publications and has been a keynote speaker at events and community programs.  Penn State denies the remaining allegations in Paragraph 47.

48.     Moreover, over the course of his employment with Penn State, Dr. Henderson has been a prolific publisher of scholarly works, including journal articles, chapters, and books, including an award-winning book in 2015.

**RESPONSE**:  Penn State admits that over the course of his employment with Penn State, Plaintiff has authored various scholarly works, including journal articles, book chapters, and books, including an award-winning book in 2015.  Penn State denies the remaining allegations in Paragraph 48.

49.     Dr. Henderson has also been awarded fellowships and grants while at Penn State, including a nearly $2,000,000 grant funded by the John Templeton Foundation.

**RESPONSE:**  Penn State admits that Plaintiff has received fellowships and grants during his employment with Penn State, and that Plaintiff was one of several individuals who benefitted from an approximately $2 million grant funded by the John Templeton Foundation.   Penn State denies the remaining allegations in Paragraph 49.

50.     In or around 2014, Dr. Henderson began reporting to Dr. Lee Ann Banaszak (white), who continues to serve as the Head of the Political Science department at Penn State.

**RESPONSE:**  Admitted.

51.     Dr. Banaszak initially reported to Dr. Susan Welch (white), who remained the Dean of the College of Liberal Arts until around 2019.

**RESPONSE:**  Admitted.

52.     Notwithstanding the success he has achieved both in and out of the classroom, Dr. Henderson has been vocal about a series of comments and actions that he witnessed being committed by senior faculty members and administrators that reflected systemic and institutional biases.

**RESPONSE:**  Penn State admits that Plaintiff has raised concerns on one or more occasions regarding his belief that certain senior faculty members and administrators have made comments or engaged in other conduct that Plaintiff considered inappropriate or biased.  Penn State denies the remaining allegations in Paragraph 52.

53.    In January 2019, Dr. Henderson published an Op-Ed in *The Daily Collegian*, Penn State's student newspaper, entitled, "Being Black at Penn State."

**RESPONSE:**  Admitted.

54.    In this article, Dr. Henderson recounted various discriminatory experiences he had endured in his nearly twenty years at Penn State, and he called on Penn State to reckon with its institutional racism that had resulted in a dearth of Black faculty members and students.

**RESPONSE:**  The allegations in Paragraph 54 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

55.    Dr. Henderson first highlighted that from the founding of Penn State in the 19th century, he was (at the time) the only tenured African American professor in the history of the Penn State Political Science department, noting that the

department has never had an African American Full Professor, which is still true, today.

**RESPONSE:**  Penn State admits that its Political Science department does not currently have an African American full professor.  Penn State further states that the allegations in Paragraph 55 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 55.

56.    Dr. Henderson further underscored the extreme absence of Black professors at Penn State generally, citing the above statistics that the number of Black professors at Penn State has hovered around 3% of the total faculty population for several decades.

**RESPONSE:**   The allegations in Paragraph 56 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

57.    When Provost Nick Jones (white) was asked about Penn State's failure to hire diverse candidates, Provost Jones merely replied, "We don't discriminate one way or another."

**RESPONSE:**   Penn State admits that Nick Jones is the Executive Vice President and Provost at Penn State and that he is white.  The remaining allegations in Paragraph 57 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, and the terms of such document speak for themselves.   Penn State denies that Provost Jones responded to a question "about Penn State's failure to hire diverse candidates" by "merely repl[ying] 'We don't discriminate one way or another,'" and denies the remaining allegations in Paragraph 57.

58.    Dr. Henderson wrote in his January 2019 Op-Ed that Provost Jones's "comments reflect, inform, and set the policy and tone for the university; and this is evident in the political science department where my treatment as the only tenured black professor in its history is much different – and negatively so – than that of white professors."

**RESPONSE:**  Penn State admits that Dr. Henderson wrote in his January 2019 Op-Ed the language quoted in Paragraph 58.  Penn State further states that the allegations in Paragraph 58 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 58.

59.    For several years prior to the publication of his January 2019 Op-Ed, Dr. Henderson had complained about the racially hostile work environment and Penn State's poor engagement with individuals, such as himself, who raise concerns about diversity, inclusion, and discrimination.

**RESPONSE:**  Penn State admits that, on one or more occasions prior to the publication of his January 2019 Op-Ed, Plaintiff raised concerns regarding diversity and inclusion as well as events that he perceived to reflect bias or discrimination. Penn State denies that Plaintiff has been subjected to discrimination or harassment based on his race and further denies the remaining allegations in Paragraph 59.

60.    For example, Dr. Henderson articulated his criticism over Penn State's failures to successfully recruit Black students and faculty members, which contributed to the unhealthy climate of the Political Science department and served to alienate individuals like himself, who sought to challenge the system that perpetuated these shortcomings.

**RESPONSE:**  Penn State admits that, on one or more occasions prior to the publication of his January 2019 Op-Ed, Plaintiff raised concerns regarding recruitment of Black students and faculty members.  Penn State denies the remaining allegations in Paragraph 60.

61.    Dr. Henderson gave an example that when he first joined Penn State in 2002, there were no Black PhD students in the Political Science department.  He

ultimately helped recruit three Black women who graduated from the program, with two of them landing significant placements at Big Ten universities.

**RESPONSE:**   The allegations in Paragraph 61 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

62.    In or around 2015, when Dr. Henderson asked Dr. Banaszak – then the Head of the Political Science department – to put these Black female graduates' pictures on the department website, to show Penn State's recent success in educating Black female PhDs, his request was denied.   Dr. Banaszak stonewalled on Dr. Henderson's requests, leaving only white individuals (and one Black student who, upon information and belief, was not even a student of Penn State) as the featured pictures on the website.

**RESPONSE:**   Penn State admits that Plaintiff asked about including the pictures of a few of the Political Science Department's graduate students, who are Black females, on the Political Science Department's website.   By way of further response, after receiving the students' permission, Penn State added the graduate students' pictures to the Political Science Department's website.   Penn State further states that the allegations in Paragraph 62 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, and

that the terms of such document speak for themselves.  Penn State denies the remaining allegations in Paragraph 62.

63.     Moreover, one of these Black female graduates posted on social media after Dr. Henderson published his January 2019 Op-Ed that she was advised to not work with Dr. Henderson formally because "we're both Black" and she was told, "that's what everyone was expecting."  The Black female graduate further stated that notwithstanding this "advice," she continued to work with Dr. Henderson.

**RESPONSE:**  Penn State lacks knowledge or information sufficient to form a belief regarding the existence and/or content of the referenced social media post by an unidentified individual, and, therefore, Penn State denies the allegations in Paragraph 63.  By way of further response, Penn State denies that Penn State instructed any Black (or other) graduate students not to work with Plaintiff because he or they are Black.

64.     Dr. Henderson further described in his January 2019 Op-Ed that Penn State's continued reliance on Student Rating of Teaching Effectiveness ("SRTE") evaluations reflected institutional bias to the detriment of Black professors like Dr. Henderson, considering the numerous academic studies showing that SRTEs are often infected with the racial and gender biases of the students and entities that complete the evaluations.

**RESPONSE:**   The allegations in Paragraph 64 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

65.    Racial bias permeated through the Political Science department faculty meetings. For example, in 2017 the Political Science faculty was discussing the candidacy of a Black male professor for a position within the department.  This scholar was a full professor at another institution, had published two books through Princeton University Press, published numerous journal articles, and had presentations televised on C-Span.  Nevertheless, during this meeting, a white male professor – Dr. Matthew Golder – repeatedly referred to this Black male candidate as "incompetent."

**RESPONSE:**  Penn State admits that during the 2015-2016 academic year, Penn State considered a Black male candidate for a position in its Political Science Department, and that there was discussion and debate about the candidate as part of the evaluation process.  Penn State denies the remaining allegations in Paragraph 65.

66.    Dr. Banaszak was present for this meeting and did not challenge Dr. Golder's ad hominem and slanderous mischaracterization of this Black male professor's intellect.

**RESPONSE:** Penn State admits that Dr. Banaszak attended a meeting during the 2015-2016 academic year concerning the consideration of a Black male professor. Penn State denies the remaining allegations in Paragraph 66.

67. Dr. Henderson has never heard a faculty member refer to a white candidate or colleague as "incompetent."

**RESPONSE:** Penn State lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 67 (including what Plaintiff may or may not have "heard"), and, therefore, Penn State denies those allegations.

68. By way of further example of the ongoing racial hostility that Dr. Henderson faced in the workplace, in or around 2016, Dr. Henderson was aggressively confronted by a white Political Science professor – Dr. Pete Hatemi – who alleged that *he* was the first Black tenured professor in the Political Science department of Penn State – not Dr. Henderson – because his ancestry allegedly included a Black relative several generations ago. Dr. Hatemi asserted that he took umbrage with Dr. Henderson's statement during a faculty meeting that Dr. Henderson held this honor.

**RESPONSE:** Denied.

69. Afterwards, Dr. Henderson asked Dr. Welch, who confirmed that Dr. Henderson was indeed the first and at the time the only African American tenured professor in the history of the Penn State Political Science department.

**RESPONSE:**  Penn State lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 69, and, therefore, Penn State denies those allegations.

70.    By way of further example of the hostility Dr. Henderson observed and experienced, in or around 2018, the white senior professor tasked with the recruitment of graduate students – Dr. Glenn Palmer – reported to the Political Science faculty on the incoming class.  During the question-and-answer session, Dr. Henderson inquired as to how many Black students were in the incoming class. Dr. Palmer responded, "zero."

**RESPONSE:**  Penn State lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 70, and, therefore, Penn State denies those allegations.

71.    When Dr. Henderson asked about the process that the committee tasked with graduate recruitment had employed to attempt to secure more Black students, Dr. Palmer had no answer.  At that point, Dr. Banaszak, who chaired the meeting, turned to Dr. Henderson and berated him for asking the question and for allegedly not doing more to recruit Black students himself – even though this was not Dr. Henderson's formal responsibility and he was not a member of the graduate student recruitment committee.

**RESPONSE:**   Penn State denies that Dr. Banaszak ever "berated" Dr. Henderson at any time.  Penn State admits that Dr. Henderson was not a member of the graduate student recruitment committee in 2018.  Penn State lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 71, and, therefore, Penn State denies those allegations.

72.    Dr. Henderson further recounted in his January 2019 Op-Ed that in or around 2008, he raised concerns about personal interactions he had with Dr. Donna Bahry (white), the former Head of the Political Science department, who arbitrarily commented to him about Black rapists and stated to him during a formal annual evaluation that she had been stalked by Black men while she taught at another university.

**RESPONSE:**   The allegations in Paragraph 72 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, and the terms of such document speak for themselves.  Penn State denies the alleged substance of Plaintiff's commentary in his January 2019 Op-Ed, including without limitation the alleged comments attributed to Dr. Bahry.

73.    When Dr. Henderson asked her why she was telling him this, as it was unrelated to any topic of their conversation, Dr. Bahry stated, "Well, you never know where people are coming from," or words to that effect. Dr. Henderson objected to these comments and told Dr. Bahry that these were racist tropes.

**RESPONSE:**   The allegations in Paragraph 73 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, and the terms of such document speak for themselves.  Penn State denies the alleged substance of Plaintiff's commentary in his January 2019 Op-Ed, including without limitation his account of a conversation he had with Dr. Bahry.

74.    Dr. Henderson complained about Dr. Bahry's comments to Dr. Welch, then the Dean of the College of Liberal Arts.  His concerns were dismissed, however, and ultimately Dr. Welch gave Dr. Bahry an award and a promotion.

**RESPONSE:**  Penn State admits that Dr. Welch was Dean of the College of Liberal Arts in 2008, and further admits that Dr. Bahry received an award from the College of Liberal Arts in 2010 for her significant work in alumni relations.  Penn State denies that Dr. Bahry received any "promotion" after 2008.   Penn State lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 74, and, therefore, Penn State denies those allegations.

75.    Dr. Henderson further complained in 2008 that Dr. Bahry would scream at him during meetings, often yelling at Dr. Henderson to stop talking.

**RESPONSE:**  Penn State denies that Dr. Bahry "would scream at him during meetings, often yelling at [him] to stop talking."  Penn State lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 75, and, therefore, Penn State denies those allegations.

76.     Despite Dr. Henderson's complaints about Dr. Bahry's inappropriate conduct, and the fact that other individuals witnessed some of these incidents, Dr. Bahry was never disciplined for engaging in this behavior.

**RESPONSE:**  Penn State admits that Penn State has never disciplined Dr. Bahry for any inappropriate conduct.  Penn State denies the remaining allegations in Paragraph 76.

77.     Penn State did not even interview Dr. Henderson in connection with his 2008 complaints about Dr. Bahry.

**RESPONSE:**  Penn State lacks knowledge or information sufficient to form a belief as to any alleged 2008 complaint Plaintiff made about Dr. Bahry to anyone (other than Dr. Bahry herself), and therefore denies that allegation.  Penn State therefore admits that it does not have any records of any formal "interview" of Plaintiff in connection with any alleged 2008 complaint.  Penn State denies any remaining allegations in Paragraph 77.

78.     However, in connection with Dr. Henderson's 2008 complaints, the former Head of the Political Science department – Dr. Frank Baumgartner – submitted a letter to the Affirmative Action Office in support of Dr. Henderson. In his November 2008 letter, Dr. Baumgartner stated that Dr. Bahry falsely accused Dr. Baumgartner of stating to her, regarding Dr. Henderson, "You said, 'he's a minority, he doesn't understand how universities work.'"

**RESPONSE:**   Penn State admits that Dr. Frank Baumgartner wrote a memorandum to himself dated November 7, 2008 concerning Plaintiff, and further states that the terms of such document speak for themselves.  Penn State denies the remaining allegations in Paragraph 78, including without limitation that such memorandum was submitted to Penn State's Affirmative Action Office in 2008.

79.    According to Dr. Baumgartner, after Dr. Bahry made that false and offensive accusation against him, Dr. Baumgartner adamantly denied saying – or even thinking – such a thing. Dr. Bahry then responded to Dr. Baumgartner that "it would be your word against mine."

**RESPONSE:** The allegations in Paragraph 79 purport to characterize a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

80.    Dr. Baumgartner included in his letter to the Affirmative Action Office that he is troubled by Dr. Bahry's comments, which he considered "to be an offensive racial characterization."

**RESPONSE:** The allegations in Paragraph 80 purport to characterize a written document, and the terms of such document speak for themselves.  Penn State denies that Dr. Baumgartner submitted a "letter" to Penn State's Affirmative Action Office in 2008 and denies the remaining allegations in Paragraph 80.

81.    Also in or around 2008, Dr. Henderson was accosted and verbally harassed by a student in his office. Dr. Henderson informed the administration about what had transpired and requested that this student be removed from the program because the student appeared to be a safety threat.

**RESPONSE:**   Penn State admits that in September 2008, Plaintiff had a verbal altercation with one of his teaching assistants after Plaintiff confronted the teaching assistant about being late to a meeting and that Plaintiff reported the incident to the police and Penn State's Director of Graduate Studies.  Penn State further admits that Plaintiff requested that, after this incident, his teaching assistant be transferred from his course and contact between them be suspended, and that Penn State implemented those requests.  Penn State denies the remaining allegations in Paragraph 81.

82.    Penn State allowed the student to remain in the program notwithstanding Dr. Henderson's articulated concerns.

**RESPONSE:**   Penn State admits that the graduate student with whom Plaintiff had the altercation remained in the program for a period of time after the incident, after Penn State implemented Plaintiff's requests described in Paragraph 81 above.  Penn State denies the remaining allegations in Paragraph 82.

83.    Instead of considering Dr. Henderson's suggestion, Dr. Bahry accused Dr. Henderson of instigating the altercation with the student, questioning whether it was Dr. Henderson who provoked or antagonized the student.

**RESPONSE:** Denied.

84.    Later, the same student aggressively confronted a white professor within the Political Science department.

**RESPONSE:** Denied.

85.    This time, Penn State removed the student from the program.

**RESPONSE:** Denied.

86.    On numerous occasions, Dr. Henderson complained to Dr. Banaszak about the unprofessional and biased behavior of several of his white colleagues.

**RESPONSE:** Penn State admits that Plaintiff has raised concerns on one or more occasions to Dr. Banaszak regarding what he perceived to be unprofessional or biased behavior by his colleagues, including white colleagues. Penn State denies any remaining allegations in Paragraph 86.

87.    For example, in or around 2015, Dr. Henderson raised complaints to Dr. Banaszak and other high-level officials at Penn State that he witnessed Dr. Palmer using the phrase "bitches" during a tenure committee meeting while discussing a potential candidate.

**RESPONSE:**  Penn State admits that in March 2015, Plaintiff complained to Dr. Banaszak about an incident where a white faculty member used the phrase "sons of bitches" during a Promotion and Tenure committee meeting, and that Plaintiff subsequently raised this complaint to Suzanne Adair in the Affirmative Action Office in December 2017 (more than 2.5 years later).   Penn State denies the remaining allegations in Paragraph 87, including without limitation that the faculty member used the phrase to refer to any potential candidate.

88.    Dr. Banaszak disregarded Dr. Henderson's complaint, remarking that the white professor's use of the word "bitch" was tantamount to the use of the word "dear."

**RESPONSE:**  Denied.

89.    Yet in 2015, Dr. Banaszak chastised Dr. Henderson for his alleged use of the word "dear."  Dr. Banaszak even accused Dr. Henderson of contributing to a hostile work environment due to his alleged use of the word "dear."

**RESPONSE:**  Penn State admits that in 2015, Dr. Banaszak explained to Plaintiff that she has witnessed him call her and other female faculty members "dear" and such language can be perceived as sexist.  Penn State denies the remaining allegations in Paragraph 89.

90.    Dr. Banaszak did not chastise Dr. Palmer for using the phrase "bitches" regarding a candidate. Instead, this white male professor has since been promoted.

**RESPONSE:**  Denied.

91.     Dr. Henderson at times was accused of, and reprimanded for, raising his voice at his colleagues during meetings.  However, on numerous occasions Dr. Henderson witnessed white colleagues scream at colleagues during faculty meetings, and upon information and belief, none faced any repercussion.

**RESPONSE:**  Penn State admits that Plaintiff has raised his voice at his colleagues and, in the process, spoken over his colleagues and made it difficult for them to speak during various faculty meetings.  Penn State further admits that it has attempted to address this behavior with Plaintiff.  Penn State lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 91 (including what Plaintiff may or may not have "witnessed"), and, therefore, Penn State denies them.

92.     On one occasion in 2016, Dr. Henderson (along with other members of the Political Science department) witnessed a white male professor – Dr. David Lowery – yelling at another white female professor, pointing and screaming in her face.  Dr. Lowery was never reprimanded for engaging in this conduct.

**RESPONSE:**  Denied.

93.     In the same meeting, and shortly after Dr. Lowery's outburst, Dr. Henderson raised his hand to speak on a subject. Dr. Banaszak then admonished

Dr. Henderson – who had said nothing to this point – to make sure that his forthcoming comments were not viewed as "silencing" anyone else's comments.

**RESPONSE:**  Denied.

94.     By way of further example of the hostility Dr. Henderson observed and experienced within the Political Science department, in or around November 2016, he witnessed Dr. Lowery storm out of a meeting in contempt of the idea of having a staff member from the Office of Educational Equity come to a department meeting to discuss "implicit bias."  This senior white male professor referred to the proposed meeting as "bullsh*t" before aggressively exiting the room and slamming the door behind him.

**RESPONSE:**  Denied.

95.     As Dr. Henderson wrote in his January 2019 Op-Ed, "What confidence can a black colleague have for such a white senior professor who will evaluate their teaching and research – especially that which focuses on white supremacism and patriarchy – and to vote on their promotion, who will not even tolerate a discussion of implicit bias, much less, racism?"

**RESPONSE:**  Penn State admits that Dr. Henderson wrote in his January 2019 Op-Ed the language quoted in Paragraph 95.  Penn State further states that the allegations in Paragraph 95 paraphrase, characterize, summarize, and/or quote from Plaintiff's January 2019 Op-Ed, which is a written document, and that the terms of

such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 95.

96.     By way of further example of the ongoing hostility at Penn State, Dr. Henderson complained in 2015 that Provost Jones made an offensive and stereotypical remark regarding an individual's ethnicity during an address to many faculty members of the College of Liberal Arts.

**RESPONSE**:  Penn State admits that Plaintiff complained in 2015 about a comment that the Provost made while addressing certain faculty members within the College of Liberal Arts.  Penn State denies the remaining allegations in Paragraph 96.

97.     While Dr. Henderson's complaints allegedly were investigated by Penn State, no action was taken to address the inappropriate actions and comments.

**RESPONSE**:  Denied.

98.     Instead, Dr. Banaszak accused Dr. Henderson of "harassing" her by continually raising his complaints about actions taken by his white colleagues to the detriment of racial minorities and women.

**RESPONSE**:  Penn State admits that in March 2015, Plaintiff was repeatedly asking Dr. Banaszak to get involved in Promotion and Tenure committee meetings under circumstances that Dr. Banaszak did not believe were appropriate for her to do so.  Penn State further admits that in explaining her position to Plaintiff, she told

36

Plaintiff it was inappropriate for her to become involved and, after Plaintiff continued to insist on her involvement, she used the word "harassment." Penn State denies the remaining allegations in Paragraph 98.

99.   In or around 2016, Dr. Henderson escalated his complaints and concerns to President Eric J. Barron (white). In meeting and corresponding with President Barron, Dr. Henderson described the racially hostile climate within the Political Science department of Penn State, which included long-standing discriminatory treatment by the department's leadership.

**RESPONSE:**   Penn State admits that Eric Barron is white and was the President of Penn State from 2014 until May 9, 2022, when Neeli Bendapudi became the President of Penn State.  Penn State further admits that Dr. Henderson raised concerns on one or more occasions in or around 2016 to former President Barron about his dissatisfaction with the Political Science department.  Penn State denies the remaining allegations in Paragraph 99.

100.   Again, Dr. Henderson's complaints were ignored or dismissed by Penn State.

**RESPONSE:**   Denied.

101.   Instead of addressing Dr. Henderson's complaints, Penn State retaliated against Dr. Henderson because he engaged in protected activity by complaining of ongoing race discrimination and a racially hostile work environment.

**RESPONSE:** Denied.

102.   In 2015, Dr. Henderson published a book entitled, *African Realism? International Relations Theory and Africa's Wars in the Postcolonial Era*.

**RESPONSE**:  Penn State admits that in 2015, Plaintiff authored a book titled *African Realism? International Relations Theory and Africa's Wars in the Postcolonial Era*, which was published by Rowman and Littlefield.  Penn State denies any remaining allegations in Paragraph 102.

103.   In or around 2017, after receiving an award and positive reviews for his publication, Dr. Henderson sought Dr. Banaszak's guidance in formally applying for a promotion to Full Professor.

**RESPONSE**:  Penn State admits that Plaintiff received an award and positive reviews for his book titled *African Realism?  International Relations Theory and Africa's Wars in the Postcolonial Era*.  Penn State further admits that Plaintiff discussed applying for Full Professor with Dr. Banaszak in or around 2017 (and on other occasions).  Penn State denies the remaining allegations in Paragraph 103.

104.   The position of Full Professor is a leadership role at Penn State which is also a stepping-stone to further promotions, more compensation, and added control over committee and departmental assignments.

**RESPONSE**:  Penn State admits that the position of Full Professor is a rank at Penn State that leads to more compensation and that this rank could lead to

additional responsibilities, but that such responsibilities are neither guaranteed nor necessarily exclusive to the rank of Full Professor.  Penn State denies the remaining allegations in Paragraph 104.

105.   Dr. Banaszak informed Dr. Henderson that his application would only move forward upon her recommendation or that of Dr. Welch.  She further stated that she would not be recommending Dr. Henderson for the promotion, allegedly due to purported deficiencies in Dr. Henderson's classroom skills and performance.

**RESPONSE**:   Penn State admits that, on more than one occasion, Dr. Banaszak described the process for promotion to Full Professor to Plaintiff.  Penn State also admits that Dr. Banaszak informed Plaintiff that she did not believe that Plaintiff was ready for promotion to Full Professor, including without limitation, due to longstanding and serious concerns regarding Plaintiff's performance in the classroom and frequent reports of Plaintiff's poor treatment of Penn State's students.  Penn State denies the remaining allegations in Paragraph 105.

106.   In or around December 2017, Dr. Henderson formally complained to Suzanne Adair (Black), Associate Vice President of Affirmative Action, about Dr. Banaszak's refusal to consider him for the position of Full Professor, among other discriminatory actions taken by Penn State's Political Science department against him.

**RESPONSE:**  Penn State admits that in or around November 2017, Plaintiff complained to Dr. Suzanne Adair (who is the Associate Vice President of Affirmative Action at Penn State and is Black), alleging that Dr. Banaszak's decision not to put him forward for promotion to Full Professor was discriminatory based on his race.  Penn State denies the remaining allegations in Paragraph 106 (including without limitation that Dr. Banaszak engaged in discriminatory conduct or otherwise denied Plaintiff the opportunity to be considered for promotion to Full Professor because of his race).

107.   In or around October 2018, Dr. Adair informed Dr. Henderson that she concluded her investigation and that his claim of race discrimination had been unsubstantiated.

**RESPONSE:**  Penn State admits that in or around October 2018, Dr. Adair informed Plaintiff that she completed her investigation into Plaintiff's allegation that he was not nominated to Full Professor as a result of race discrimination and the evidence was insufficient to support a finding of unlawful discrimination.  Penn State denies the remaining allegations in Paragraph 107.

108.  Thereafter, Dr. Banaszak took further action to retaliate against Dr. Henderson by refusing to provide subvention funds, or even considering the merits of his requests, for either of his two latest books, and by continuing to deny him the ability to be promoted to Full Professor.

**RESPONSE:**  Denied.

109.   Ultimately, Dr. Henderson took it upon himself to find a source for subvention through the University Libraries Department, which not only found merit to his applications but actually provided subvention for both books.

**RESPONSE:** Penn State admits that Plaintiff received subvention funds through the University Libraries Department.  Penn State denies the remaining allegations in Paragraph 109.

110.   Dr. Henderson has implored Penn State to take these issues of racial bias seriously, recommended additional oversight and intervention by the administration and the Provost, and suggested changes to combat racism on campus by amplifying the voices of those members of the community who have been subjected to the racially hostile environment.

**RESPONSE:**   Penn State admits that in his Op-Ed in 2019, Plaintiff expressed his disappointment with Penn State's diversity, inclusion and equality efforts; recommended additional oversight and intervention by the Provost's Office with respect to these issues; and encouraged individuals to vocalize any concerns they had regarding Penn State's efforts on these topics.  Penn State further states that the allegations in Paragraph 110 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 110.

111.   Dr. Henderson's suggestions on how to combat racism at Penn State were met with silence.

**RESPONSE:**  Denied.

112.   A few weeks after his January 2019 Op-Ed was published, Dr. Henderson learned from Dr. Adair that certain white colleagues had complained that *he* had created a racially hostile work environment for *them*.

**RESPONSE:**  Penn State admits that both before and after the publication of Plaintiff's January 2019 Op-Ed, Dr. Adair received multiple complaints from faculty members within the Political Science Department that Plaintiff was engaging in unprofessional and inappropriate behavior, such as belittling his colleagues; refusing to allow any of his colleagues to talk about diversity; and disrupting the department's ability to attend to research, academic, and personnel matters during department meetings.  Penn State denies the remaining allegations in Paragraph 112.

113.   Dr. Adair shared that certain colleagues – including, upon information and belief, Dr. Bahry, Dr. Hatemi, and Dr. Golder – had accused Dr. Henderson of harassment, stemming from his efforts to combat racism within the Political Science department and Penn State at large.

**RESPONSE:**  Penn State admits that Dr. Adair informed Plaintiff that her investigation was prompted by allegations by multiple faculty members that Plaintiff was engaging in unprofessional and inappropriate behavior that created a hostile

environment within the department.  Penn State further admits that Dr. Adair did not disclose the identities of the individuals who complained about Plaintiff.  Penn State denies the remaining allegations in Paragraph 113.

114.  Unlike how Penn State treated Dr. Henderson's 2008 complaint – where it issued a decision without even interviewing him – Penn State swiftly reached a conclusion on the complaints raised against Dr. Henderson for allegedly creating a hostile work environment.

**RESPONSE:**  Penn State admits that it reached a conclusion with respect to the complaints raised against Plaintiff for allegedly creating a hostile work environment in the Political Science Department.  Penn State denies the remaining allegations in Paragraph 114.

115.  On or around May 16, 2019, Dr. Adair provided to Dr. Henderson a formal letter of discipline, charging him with violating University Policy AD91 ("Discrimination and Harassment and Related Inappropriate Conduct").

**RESPONSE:**  Penn State admits that on May 16, 2019, Dr. Adair provided Plaintiff with (among other things) a determination letter concerning the multiple complaints raised by Plaintiff's colleagues in the Political Science Department about his behavior, and Penn State's determination that Plaintiff's behavior rose to the level of harassment in violation of university policy.  Penn State further states that the allegations in Paragraph 115 purport to characterize a written document, and that

the terms of such document speak for themselves.  Penn State denies the remaining allegations in Paragraph 115.

116.   Dr. Adair's investigation concluded that Dr. Henderson did "repeatedly refer to, and/or name, specific members of the department during faculty meetings and other forums when [he is] raising issues regarding perceived racist actions or practices," and such conduct rose to the level of harassment and the creation of a hostile work environment.

**RESPONSE:**  Penn State admits that its investigation reached the determination that Plaintiff's behavior rose to the level of harassment in violation of University policy, including without limitation that Plaintiff would "repeatedly refer to, and/or name, specific members of the department during faculty meetings and other forums when raising issues regarding perceived racist actions or practices." Penn State further states that the allegations in Paragraph 116 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 116.

117.   Thereafter, on May 23, 2019, Dr. Welch provided Dr. Henderson with a letter stating that his "behavior in the Political Science department and [his] public denunciations of colleagues have created a hostile work environment impeding the department from carrying out its normal business."

**RESPONSE:**  Penn State admits that Dr. Welch provided Plaintiff with a letter dated May 23, 2019 that stated (among other things) that Plaintiff's "behavior in the Political Science department and [his] public denunciations of colleagues have created a hostile work environment impeding the department from carrying out its normal business."  Penn State further states that the allegations in Paragraph 117 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 117.

118.   Dr. Welch further explained that Dr. Henderson immediately would be banned from all departmental meetings and events, and he would not be permitted to serve on any departmental committees, for over two years (through June 30, 2021).

**RESPONSE:**  Penn State admits that Dr. Welch's May 23, 2019 letter informed Plaintiff that he was not permitted to attend departmental meetings and events or serve on departmental committees through June 30, 2021.  Penn State further states that the allegations in Paragraph 118 purport to characterize a written document and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 118.

119.  Dr. Welch  additionally  mandated  that  Dr. Henderson  would  be prohibited from teaching any classes during the 2019-2020 school year, and during

that time he would be required to take remedial teaching courses to improve his classroom performance.

**RESPONSE:**  Penn State admits that the May 23, 2019 letter also released Plaintiff from teaching for the spring semester of 2020 so that he could spend an equivalent amount of time working to improve his teaching through certain courses, working and meeting with a mentor or coach, and reworking his syllabi and course plans based on what he learned.  Penn State further states that the allegations in Paragraph 119 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 119.

120.  Dr. Welch concluded her May 23, 2019, letter by stating that Dr. Henderson's failure to be abide by her edicts would result in further disciplinary action, including possible initiation of dismissal proceedings.

**RESPONSE:**  Penn State admits that the May 23, 2019 letter concludes with: "It is our desire that you use these requirements as a way to improve your performance as a Penn State faculty member and member of our university community.  However, if you do not satisfactorily address the issues outlined above and continue to fail to perform as a tenured faculty member, we intend to take disciplinary action, including possible initiation of AC70 dismissal proceedings."  Penn State further states that the allegations in Paragraph 120 purport to characterize

a written document and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 120.

121.   Around this same time in May 2019, Dr. Welch stated to Dr. Henderson that she would write a favorable recommendation for Dr. Henderson if he agreed to leave Penn State.

**RESPONSE:**  Penn State lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 121 and, therefore, Penn State denies those allegations.

122.   Dr. Henderson has complied with Penn State's requirements to attend "remedial" teaching courses and continues to hold the position of Associate Professor in the Political Science department.

**RESPONSE:**  Penn State admits that Plaintiff completed the *Course in College Teaching* offered by Penn State's Schreyer Institute for Excellence in Teaching and completed a certificate for *Take Action for Student Learning*, also offered by the Schreyer Institute.  Penn State denies the remaining allegations in Paragraph 122.

123.   Dr. Henderson still has not been promoted to Full Professor.

**RESPONSE:**  Penn State admits that, as of the date of this filing, Plaintiff has not been promoted to Full Professor.

124.   On or around August 30, 2021, after Dr. Henderson was reinstated following his two-year suspension from teaching, he contacted Dr. Banaszak to again request consideration for a promotion to Full Professor.

**RESPONSE:**  Penn State admits that on August 30, 2021, Plaintiff contacted Dr. Banaszak stating that he wanted to be considered for promotion to Full Professor. Penn State denies the remaining allegations in Paragraph 124.

125.   Dr. Banaszak responded that the department did not consider Dr. Henderson's promotion for the upcoming school year, and any discussions regarding promotion for the following school year would not take place until Spring 2022.

**RESPONSE:**  Penn State admits that Dr. Banaszak informed Plaintiff that the timetable for discussing promotion to Full Professor starts in the spring of the year before a candidate is to be considered, and further admits that Dr. Banaszak informed Plaintiff they did not have an opportunity to discuss Plaintiff's eligibility for promotion in the 2021-2022 academic year because he did not submit any annual review materials as he was supposed to do.  Penn State further states that the allegations in Paragraph 125 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies the remaining allegations in Paragraph 125.

126.   Dr. Henderson responded that the timeline that Dr. Banaszak outlined for the promotion decisions did not appear to be mandatory, and instead these decisions could be made at any time.   Further, Dr. Henderson reminded Dr. Banaszak that she had previously informed him that she had the authority, as the Head of the department, to initiate such discussions regarding promotion to Full Professor.

**RESPONSE:**   Penn State admits that Plaintiff responded stating that his review of the documents Dr. Banaszak referenced suggests that the timetable is not statutory and therefore can be modified by Dr. Banaszak as Head of the Political Science Department, and that she had previously informed him that she is the only one who can initiate the promotion process.   Penn State further states that the allegations in Paragraph 126 purport to characterize a written document, and that the terms of such document speak for themselves.   Penn State denies any remaining allegations in Paragraph 126.

127.   After several e-mails with Dr. Banaszak, in October 2021 Dr. Henderson contacted Dr. Clarence Lang (Black), the current Dean of the College of Liberal Arts, to again request consideration for promotion to Full Professor.

**RESPONSE:**   Penn State admits that Plaintiff exchanged email correspondence with Dr. Banaszak regarding the timeline for discussions concerning promotion to Full Professor and that on October 6, 2021, Plaintiff forwarded Dr.

Banaszak's response to Dean Lang asking whether the Political Science Department has the discretion to proceed with promotion to Full Professor on a timeline different than the one set forth in the University, College of Liberal Arts, and Political Science Department guidelines.   Penn State further states that the allegations in Paragraph 127 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 127.

128.   Dr. Lang explained that it is possible for a promotion to occur at any time, subject to approval from the Provost's office. Dr. Lang further stated that he would support Dr. Henderson's request to be promoted to Full Professor.

**RESPONSE:**  Penn State admits that Dr. Lang informed Plaintiff that the Political Science Department could request an out-of-sequence promotion, which must be granted by the University Provost's Office, but that such requests are only made in exceedingly rare circumstances, such as where there were procedural errors, and that Dr. Lang said he would support Plaintiff's request to be *considered* for promotion to Full Professor.  Penn State further states that the allegations in Paragraph 128 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies the remaining allegations in Paragraph 128.

129.   Despite Dr. Lang's support, Dr. Henderson has not been promoted to Full Professor.

**RESPONSE:**  Penn State admits that, as of the date of this filing, Plaintiff has not been promoted to Full Professor.  Penn State denies the remaining allegations in Paragraph 129.

130.  In March 2022, Dr. Henderson again requested that Dr. Banaszak consider promoting him, based on his accomplishments and tenure at Penn State.

**RESPONSE:**  Penn State admits that Plaintiff and Dr. Banaszak discussed promotion to Full Professor during Plaintiff's March 2022 annual review and that Dr. Banaszak informed Plaintiff in that meeting that she was nominating him to be considered for promotion to Full Professor.  Penn State denies the remaining allegations in Paragraph 130.

131.  Dr. Banaszak responded that Dr. Henderson is being considered for promotion and that no decisions have been made yet.

**RESPONSE:**  Penn State admits that Plaintiff and Dr. Banaszak discussed promotion to Full Professor during Plaintiff's March 2022 annual review and that Dr. Banaszak informed Plaintiff that she was nominating him to be considered for promotion to Full Professor.  Penn State further admits that, in subsequent email correspondence, Dr. Banaszak explained to Plaintiff that if he wants to be considered for promotion to Full Professor, the process began with their discussion during his annual review meeting and will continue into 2023.  Penn State denies the remaining allegations in Paragraph 131.

132.   Dr. Henderson's experiences as a Black professor at Penn State are not unique, as many Black faculty members have echoed his complaints about the institutional biases and barriers they face as Black employees and Penn State's stunning lack of progress in addressing the absence of diversity within the community.

**RESPONSE:**  Penn State admits that a variety of individuals in the university community, including but not limited to Black faculty members, have discussed ways in which the university can improve diversity within the community.  Penn State denies any remaining allegations in Paragraph 132.

133.   On April 4, 2019, shortly after Dr. Henderson was unlawfully disciplined by Penn State, a group of over 50 Black Penn State professors – led and organized by Dr. Gary King – convened on the University Park campus for a forum entitled, "*An Afternoon With African American Faculty at Penn State: More Rivers to Cross.*"

**RESPONSE:**  Penn State admits that a number of Black Penn State faculty members, led by Dr. Gary King, convened a forum called "*An Afternoon With African American Faculty at Penn State: More Rivers to Cross*" on April 4, 2019. Penn State denies the remaining allegations in Paragraph 133.

134. The date of the forum – April 4 – was purposely chosen to commemorate the date that Dr. Martin Luther King, Jr. was assassinated in Memphis, Tennessee (April 4, 1968).

**RESPONSE:** Penn State admits that "*An Afternoon With African American Faculty at Penn State: More Rivers to Cross*" occurred on April 4, 2019, and that Dr. Martin Luther King, Jr. was assassinated in Memphis, Tennessee on April 4, 1968. Penn State is without information sufficient to form a belief as to the purpose of choosing that date for the event. Penn State denies any remaining allegations in Paragraph 134.

135. The primary purpose of the forum was to discuss issues and concerns related to the status and equitable representation of Black professors in the academic community.

**RESPONSE:** Penn State admits that "*An Afternoon With African American Faculty at Penn State: More Rivers to Cross*" occurred on April 4, 2019, which included panel discussions as well as speaker presentations entitled "Trends and Patterns of African American Faculty at Penn State: 2004-2018" and "Being Black at Penn State #BBPSU…and other Unhappy Truths." Penn State is without information sufficient to form a belief as to the "primary purpose" of the event. Penn State denies any remaining allegations in Paragraph 135.

136.  Dr. Henderson was the keynote speaker at this event, where he delivered a speech entitled, "Being Black at Penn State #BBPSU . . . and other Unhappy Truths."

**RESPONSE:**  Admitted.

137.  Topics discussed during his forum included the lack of diversity among Penn State's faculty, the bias featured in student evaluations of Black professors, promotion and tenure issues, and the absence of institutional support for Black undergraduate and graduate students.

**RESPONSE:**  Penn State admits that Dr. Henderson served as the keynote speaker at the referenced forum, where he delivered a speech entitled, "Being Black at Penn State #BBPSU . . . and other Unhappy Truths."  Penn State lacks knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 137.

138.  Prior to this meeting on April 4, 2019, several editorials by Black professors – beyond Dr. Henderson – had been published in *The Daily Collegian* regarding the plight of Black faculty members at Penn State.

**RESPONSE:**  Penn State admits that prior to April 4, 2019, one or more Black faculty members at Penn State published articles or editorials in *The Daily Collegian*, including on topics concerning critiques as to the university's approach to improving diversity and challenges faced by Black faculty.  Penn State further

states that the allegations in Paragraph 138 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies the remaining allegations in Paragraph 138.

139.   One editorial was penned by Dr. Gary King, published on February 7, 2018.  At the time, Dr. Gary King was the only Black Full Professor in the College of Health and Human Development, which was the fourth largest student college on the University Park campus.

**RESPONSE:**  Penn State admits that on February 7, 2018, Dr. Gary King published an editorial in *The Daily Collegian* and that, as of 2018, the College of Health and Human Development was the fourth largest student college on the University Park campus.  The remaining allegations in Paragraph 139 purport to characterize a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

140.   In his article, Dr. Gary King wrote that the recent history of hiring Black faculty at Penn State was mired in a period of "benign neglect."  He further espoused that some departments seldom invite Black and minority faculty to present at colloquia and have few, if any, students from underrepresented minority communities.

**RESPONSE:**  Penn State admits that in his February 7, 2018 editorial Dr. Gary King wrote that "the recent history of hiring black and other underrepresented

faculty is still mired in a period of 'benign neglect'" and that "[s]ome departments in the College have seldom invited black and minority faculty to present at colloquia and have few if any graduate or undergraduate students from underrepresented minorities."  Penn State further states that the allegations in Paragraph 140 purport to characterize a written document, and the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 140.

141.   Dr. Gary King published another article in *The Daily Collegian* on November 29, 2018. In this article, Dr. Gary King recounted the experience of urging Penn State to recruit more Black professors and faculty members of color. Dr. Gary King explained that his efforts were met with skepticism from a Penn State administrator as to whether Black candidates would be qualified for these faculty positions.

**RESPONSE:**  Penn State admits that Dr. Gary King published an article in *The Daily Collegian* on November 29, 2018.  Penn State further states that the remaining allegations in Paragraph 141 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 141.

142.   Dr. Gary King further illuminated the disproportionate negative effects of Student Rating of Teaching Effectiveness ("SRTE") evaluations. Like Dr. Henderson did in his January 2019 Op-Ed, Dr. Gary King referenced studies

showing how racial and gender bias often infiltrates these student evaluations to the detriment of Black professors.

**RESPONSE:**   Penn State admits that Dr. Gary King's article addressed the topic of Student Rating of Teaching Effectiveness ("SRTE") evaluations.  Penn State further states that the remaining allegations in Paragraph 142 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 142.

143.   On January 20, 2020, Dr. Gary King and Dr. Darryl Thomas published a report "on behalf of concerned Black Faculty at Penn State University," including Dr. Henderson, entitled:  *More Rivers to Cross*:  A Report on the Status of African American Professors at Penn State University, Part 1."

**RESPONSE:**   Penn State admits that Dr. Gary King and Dr. Darryl Thomas published "*More Rivers to Cross:*  A Report on the Status of African American Professors at Penn State University, Part 1" on January 20, 2020.  Penn State further states that the remaining allegations in Paragraph 143 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 143.

144.   The January 2020 report noted:

> Many Black faculty at Penn State feel unsupported and blocked in their careers. Some cited heads of departments and deans who actively discouraged them from applying for promotions.  Others describe an exclusive system in which White colleagues "co-sign each other's

applications, share each other's teaching content, and support one another."

. . .

Penn State, as with many other predominantly White institutions of higher learning, is severely challenged to address the issues of racism and equity within the academy. The experiences documented in this report by African American professors are similar to those encountered by Black faculty at Penn State and demonstrate that racialized encounters are systemic and must not be cast off as "one-off" incidents. African American faculty are particularly impacted by the history of institutional intransigence and a culture of "benign neglect," which influences their professional satisfaction and emotional well-being as well as advancement and retention. One of the ancillary consequences is the negative effect on Black students and African American communities within Pennsylvania as well as their perceptions and views about Penn State as a welcoming and wholesome environment.

**RESPONSE:**  Penn State admits that the January 2020 report contains the language quoted in Paragraph 144.  Penn State further states that the allegations in Paragraph 144 purport to characterize a written document, and that the terms of such document speak for themselves.  Penn State denies that Paragraph 144 includes the entirety of the January 2020 report and denies any remaining allegations in Paragraph 144.

145.  Penn State itself commissioned a university-wide climate survey on diversity and inclusion in 2020.  In its report, 54% of Black faculty members who responded stated that they had "often" or "very often" felt discrimination or harassment because of their race.

**RESPONSE:**   Penn State responds that the allegations in Paragraph 145 paraphrase, characterize, summarize, and/or quote statements and/or statistics from an article by Nick Anderson entitled "Black professors push a major university to diversify and confront racism," which was published in *The Washington Post* on June 16, 2021.  Penn State further states that this article is a written document, and that the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 145.

146.   On June 10, 2020, in the wake of the murder of George Floyd, President Barron wrote to the Penn State community:

> Dear Members of the Penn State Community:
>
> Over the past two weeks I have heard from hundreds of students, faculty, alumni and community members about their concerns involving hate in the Penn State community.  People are justifiably upset about the events in our nation, and the limitations surrounding our institutional response.  We must acknowledge the pain, anger and frustration that such events inflict on our community.  We must recognize that Black Lives Matter, and that racism, bias and religious intolerance yield an inexcusable cost to life and liberty.
>
> We have an obligation to fight ignorance and intolerance, model inclusivity and embrace the power that diversity represents.  Yet we operate in a national environment where there is growing polarity on these issues, greater conflict and an amplification of hate speech.  The path forward will be challenging.  We must work together to address both immediate issues and the solutions to long-standing problems, and to be candid and direct about what public universities can accomplish, while still setting the bar high as a national leader in higher education.
>
> I write to you today to say that we are committed to making changes at Penn State that address these issues.

. . .

**RESPONSE:**  Penn State admits that on June 10, 2020, former President Barron issued a message to the Penn State community that contains the language quoted in Paragraph 146.  Penn State denies that Paragraph 146 includes the entirety of former President Barron's June 10, 2020 message.

147.   President Barron's letter to the community in June 2020 largely echoes the concerns, criticisms, and calls for action that Dr. Henderson has been advocating for years at Penn State.

**RESPONSE:**  Penn State admits that former President Barron's June 2020 letter to the community included several concerns, criticisms, and calls for action relating to Penn State's diversity, inclusion, and equality efforts, and that some of these concerns, criticisms, and/or calls for action have also been mentioned or raised by Plaintiff.  Penn State denies the remaining allegations in Paragraph 147.

148.   Moreover, President Barron announced various initiatives to combat racism at Penn State – including convening a task force, mandating bias training for all employees, and increasing the hiring and retention of minority faculty members – which mirror efforts that Dr. Henderson had been suggesting for many years.

**RESPONSE:**  Penn State admits that former President Barron's June 2020 letter announced various initiatives at Penn State to further its diversity, inclusion, and equality efforts—including convening a task force, mandating bias training for

all employees, and increasing the hiring and retention of minority faculty members—and that some of these initiatives have also been mentioned or raised by Plaintiff.  Penn State denies the remaining allegations in Paragraph 148.

149.   On February 22, 2021, President Barron announced additional plans to "develop recommendations for improving the climate for diversity, equity and inclusion at Penn State."  Such plans include remedying the significant historical failures by Penn State in addressing issues of racism and bias on campus – the very same issues that Dr. Henderson had been raising to no avail.

**RESPONSE:**  Penn State admits that on or about February 22, 2021, former President Barron announced additional plans to "develop recommendations for improving the climate for diversity, equity and inclusion at Penn State," and that some of these topics have been mentioned or raised by Plaintiff.  Penn State denies the remaining allegations in Paragraph 149.

150.   In 2021, President Barron stated in an interview with *The Washington Post*, in reference to the complaints raised by Black professors at Penn State, that "What they've said is very real," and that Penn State must do more to hire and support Black professors.

**RESPONSE:**  Penn State admits that former President Barron is quoted in an article by Nick Anderson entitled "Black professors push a major university to diversify and confront racism," which was published in *The Washington Post* on

June 16, 2021 as stating, "What they've said is very real," and is further paraphrased in the article as stating that the university must do more to hire and support Black professors and make all on campus feel welcome.   Penn State further states that the allegations in Paragraph 150 paraphrase, characterize, summarize, and/or quote statements and/or statistics from such article, that such article is a written document, and that the terms of such document speak for themselves.   Penn State denies any remaining allegations in Paragraph 150.

151.   But instead of supporting Dr. Henderson's prescient views that are now being championed by the institution, Penn State disciplined him, convicted him of creating a racially hostile work environment, and effectively placed him on the bench for two years while stifling his ability to move into a leadership position at Penn State.

**RESPONSE:**  Denied.

152.   On March 25, 2021, Dr. Gary King and other Black professors at Penn State published the sequel to their January 2020 report, entitled, "*More Rivers to Cross:*  Black Faculty and Academic Racism at Penn State (Part 2)."

**RESPONSE:**  Admitted.

153.   The March 2021 report, among other things, presented the results of a survey of Black professors at University Park regarding their experiences with campus racism and the academic culture in which they worked.

**RESPONSE:** The allegations in Paragraph 153 paraphrase, characterize, summarize, and/or quote statements, statistics, and/or surveys from *More Rivers to Cross:  Black Faculty and Academic Racism at Penn State University*, (Part 2), published on March 25, 2021 ("*More Rivers to Cross*, Part 2").[3]  *More Rivers to Cross*, Part 2 is a written document, and the terms of such document speak for themselves.

154.  Over 80% of the individuals who responded reported that they had personal experience with racism at Penn State.

**RESPONSE:** The allegations in Paragraph 154 paraphrase, characterize, summarize, and/or quote statements, statistics, and/or surveys from *More Rivers to Cross*, Part 2.  *More Rivers to Cross*, Part 2 is a written document, and the terms of such document speak for themselves.

---

[3] Plaintiff's allegations in Paragraph 153 and Paragraphs 154-59 concern or relate to statistics from *More Rivers to Cross*, Part 2, which is not an official Penn State publication and was not issued by an office of the university charged with collecting, collating, and interpreting data on student and faculty composition to measure progress toward equity goals in hiring and retention.  Therefore, for purposes of its responses to Paragraph 153 and Paragraphs 154-59 (and otherwise in this Answer), Penn State denies that such statistics or statements concerning such statistics reflect all available data or are a comprehensive representation of Penn State's record. Notwithstanding the denials of these allegations, Penn State values the perspectives and contributions of the authors and those who participated in the preparation of *More Rivers to Cross*, Part 2 and the important dialogues around diversity that this work has generated.

155.   More than half of the responding individuals reported that they had encountered experiences with racism in their interactions with administrators or supervisors.

**RESPONSE:** The allegations in Paragraph 155 paraphrase, characterize, summarize, and/or quote statements, statistics, and/or surveys from *More Rivers to Cross*, Part 2. *More Rivers to Cross*, Part 2 is a written document, and the terms of such document speak for themselves.

156.   Moreover, 59% of responding individuals reported that they "sometimes" or "often" felt uncomfortable in meetings with colleagues discussing racial issues.  Over 75% of Black professors reported that they have witnessed or had been apprised of racism experienced by other faculty.

**RESPONSE:** The allegations in Paragraph 156 paraphrase, characterize, summarize, and/or quote statements, statistics, and/or surveys from *More Rivers to Cross*, Part 2. *More Rivers to Cross*, Part 2 is a written document, and the terms of such document speak for themselves.

157.   Nearly 60% of the Black faculty at University Park stated that they had "sometimes" or "often" experienced racism from administrators or supervisors. Further, a majority of Black professors (56.2%) reported that they had experienced racism either "sometimes" or "often" from their colleagues within the last 3 years.

**RESPONSE:**   The allegations in Paragraph 157 paraphrase, characterize, summarize, and/or quote statements, statistics, and/or surveys from *More Rivers to Cross*, Part 2.  *More Rivers to Cross*, Part 2 is a written document, and the terms of such document speak for themselves.

158.  The vast majority of respondents (73.1%) who experienced racism chose not to report it to the administration, for various reasons.  One respondent stated, "Racism is normalized at Penn State so it's futile to report to white administrators or people of color who uphold whiteness about my experiences." Another respondent stated, "The culture of silence to racism is pervasive, and you become the monster by standing up for your rights."

**RESPONSE:** The allegations in Paragraph 158 paraphrase, characterize, summarize, and/or quote statements, statistics, and/or surveys from *More Rivers to Cross*, Part 2.  *More Rivers to Cross*, Part 2 is a written document, and the terms of such document speak for themselves.

159.  The March 2021 report concluded that "there are some significant structural and cultural barriers that preclude black professors from attaining fair and equitable representation among the Penn State faculty."

**RESPONSE:** The allegations in Paragraph 159 paraphrase, characterize, summarize, and/or quote statements, statistics, and/or surveys from *More Rivers to*

*Cross*, Part 2. *More Rivers to Cross*, Part 2 is a written document, the terms of which speak for themselves, and, therefore, Penn State denies those allegations.

160.   In its initial response to this March 2021 report, Penn State issued a public statement stating, among other things, "No one in our community should have to endure such treatment."

**RESPONSE:**  The allegations in Paragraph 160 are vague and ambiguous, particularly with respect to the date, author/speaker, and format of the alleged statement, and, therefore, Penn State denies the allegations. By way of further response, to the extent the allegations in Paragraph 160 purport to characterize a written statement, the terms of such statement speak for themselves, and, therefore, Penn State denies those allegations.

161.   Dr. Lang, the current (and first Black) Dean of Penn State's College of Liberal Arts, stated regarding the March 2021 report, it "says a lot of truth about the status and sentiments of Black faculty."

**RESPONSE:**  Penn State admits that Dr. Clarence Lang is the current (and first Black) Dean of Penn State's College of Liberal Arts.  Penn State further admits that he is quoted in an article by Nick Anderson entitled "Black professors push a major university to diversify and confront racism," which was published in *The Washington Post* on June 16, 2021, as stating that the Mach 2021 report "says a lot of truth about the status and sentiments of Black faculty."  The remaining allegations

in Paragraph 161 paraphrase, characterize, summarize, and/or quote statements from a written document, and the terms of such document speak for themselves.  Penn State denies any remaining allegations in Paragraph 161.

162.   Unfortunately, Dr. Henderson's experiences at Penn State – including being subjected to hostile treatment because of his race and his complaints of race discrimination, being stonewalled from being promoted, and being falsely accused of creating a hostile work environment – have not occurred within a vacuum.  Penn State's discriminatory and retaliatory actions towards him are a symptom of the cancer of racism that is pervasive at Penn State, as evidenced by the overwhelming data gathered from Black professors who simply want equitable treatment on campus.

**RESPONSE:**  Denied.

163.   Dr. Henderson's race was a motivating and/or determinative factor in Penn State's discriminatory treatment of Dr. Henderson, including subjecting him to a hostile work environment, failing to promote him, and removing him from his duties as a member of the Political Science department.

**RESPONSE:**  Denied.

164.   Dr. Henderson's complaining of discrimination and a hostile work environment was a motivating and/or determinative factor in Penn State's discriminatory and retaliatory treatment of him, including subjecting him to a hostile

work environment, failing to promote him, and removing him from his duties as a member of the Political Science department.

**RESPONSE:** Denied.

165.   The retaliatory actions taken against Dr. Henderson after he complained of discriminatory conduct would have discouraged a reasonable employee from complaining of discrimination.

**RESPONSE:** Denied.

166.   Penn State failed to prevent or address the harassing, discriminatory, and retaliatory conduct referred to herein and further failed to take corrective and remedial measures to make the workplace free of harassing, discriminatory, and retaliatory conduct.

**RESPONSE:** Denied.

167.   The conduct of Penn State, as set forth above, was severe or pervasive enough to make a reasonable person believe that the conditions of employment are altered and the working environment is hostile or abusive.

**RESPONSE:** Denied.

168.   As a direct and proximate result of the discriminatory and retaliatory conduct of Penn State, Dr. Henderson has in the past incurred, and in the future may incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering,

embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's

pleasures, the full extent of which is not known at this time.

**RESPONSE:** Denied.

169.   The conduct of Penn State, as set forth above, was outrageous under the

circumstances and warrants the imposition of punitive damages against Defendant.

**RESPONSE:** Denied.

170.   Dr. Henderson is now suffering and will continue to suffer irreparable

injury and monetary damages as a result of Defendant's discriminatory and

retaliatory acts unless and until this Court grants the relief requested herein.

**RESPONSE:** Denied.

## COUNT I – TITLE VII

171.   Plaintiff incorporates herein by reference paragraphs 1 through 170

above, as if set forth herein in their entirety.

**RESPONSE:** Penn State incorporates by reference its responses to the above

Paragraphs as though set forth fully herein.

172.   By committing the foregoing acts of discrimination, hostile work

environment, and retaliation against Plaintiff on the basis of Plaintiff's race and his

complaints of discriminatory conduct, Defendant has violated Title VII.

**RESPONSE:** Denied.

173.   Said violations were intentional and willful and warrant the imposition of punitive damages.

**RESPONSE:**  Denied.

174.   As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein.

**RESPONSE:**  Denied.

175.   Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

**RESPONSE:**  Denied.

## COUNT II – SECTION 1983

176.   Plaintiff incorporates herein by reference paragraphs 1 through 175 above, as if set forth herein in their entirety.

**RESPONSE:**  Penn State incorporates by reference its responses to the above Paragraphs as though set forth fully herein.

177.   By committing the foregoing acts of discrimination, hostile work environment, and retaliation against Plaintiff on the basis of Plaintiff's race and his complaints of discriminatory conduct, Defendant has violated Section 1983.

**RESPONSE:**  Denied.

178.   Defendant's actions stated above were committed under color of state law and were violations of Plaintiff's clearly established and well-settled Constitutional and other civil rights.

**RESPONSE:**  The allegations in Paragraph 178 state conclusions of law to which no responsive pleading is required.

179.   Said violations were intentional and willful and warrant the imposition of punitive damages.

**RESPONSE:**  Denied.

180.   As a direct and proximate result of Defendant's violation of Section 1983, Plaintiff has suffered the damages and losses set forth herein.

**RESPONSE:**  Denied.

181.   Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

**RESPONSE:**  Denied.

## COUNT III – PHRA

182.   Plaintiff incorporates herein by reference paragraphs 1 through 181 above, as if set forth herein in their entirety.

**RESPONSE:**  Penn State incorporates by reference its responses to the above Paragraphs as though set forth fully herein.

183.   Plaintiff's race and/or his complaining of discrimination was a substantial, motivating, and/or determinative factor in connection with Defendant's treatment of Plaintiff.

**RESPONSE:**  Denied.

184.   By committing the foregoing acts of discrimination, hostile work environment, and retaliation against Plaintiff, Defendant has violated the PHRA.

**RESPONSE:**  Denied.

185.   As a direct and proximate result of Defendant's violation of the PHRA, Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

**RESPONSE:**  Denied.

186.   Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

**RESPONSE:**  Denied.

## RELIEF

WHEREFORE, Plaintiff Errol A. Henderson respectfully requests that this Court enter judgment in his favor and against Defendant Penn State. Plaintiff seeks damages and legal and equitable relief in connection with Defendant's improper

conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a) Declaring the acts and practices complained of herein to be in violation of Title VII;

b) Declaring the acts and practices complained of herein to be in violation of Section 1983;

c) Declaring the acts and practices complained of herein to be in violation of the PHRA;

d) Enjoining and permanently restraining the violations alleged herein;

e) Entering judgment against Defendant and in favor of the Plaintiff in an amount to be determined;

f) Awarding compensatory damages to make the Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendant's improper conduct;

g) Awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered or may suffer as a result of Defendant's improper conduct;

h) Awarding punitive damages to Plaintiff under Title VII and Section 1983;

i) Awarding Plaintiff such other damages as are appropriate under Title VII, Section 1983 and the PHRA;

j) Awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorney's fees; and,

k) Granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

**RESPONSE:**  Having denied any liability to Plaintiff, Penn State denies that Plaintiff is entitled to any of the relief he demands in his unnumbered "Relief" Paragraph, including subparagraphs (a) through (k).

## GENERAL DENIAL

Penn State denies each and every allegation in Plaintiff's Second Amended Complaint not specifically admitted herein.

## DEFENSES

1.      Plaintiff's claims may be barred, in whole or in part, to the extent that he failed to timely exhaust his administrative, statutory, and/or jurisdictional remedies or prerequisites prior to the commencement of this action.

2.      To the extent Plaintiff is pursuing claims that are not described in, are broader than, or are not related to his PHRC/EEOC Charges of Discrimination,

Plaintiff has failed to exhaust his administrative remedies with respect to those claims.

3.      Plaintiff's claims are barred, in whole or in part, by the applicable statute(s) of limitations.

4.      All actions taken with respect to Plaintiff were taken in good faith and for legitimate, non-discriminatory, and non-retaliatory reasons.

5.      Penn State's actions taken with respect to Plaintiff were based on bona fide factors and justified by legitimate business reasons not related to Plaintiff's race, color, or any purported complaints of discrimination.

6.      Penn State denies that Plaintiff's race or any other impermissible factor played any role in the employment decisions relating to Plaintiff.  Alternatively, even if some impermissible factor had played a role in any of those decisions, which Penn State denies, the same decisions would have been reached for legitimate, non-discriminatory and non-retaliatory reasons.

7.      Penn State acted at all times in good faith and consistently maintained, implemented, and enforced a policy in the workplace against discrimination, harassment, and/or retaliation, and exercised reasonable care to prevent and promptly correct any alleged discrimination, harassment, and/or retaliation.

8.      Although Penn State denies any wrongdoing, if any improper, illegal, or discriminatory acts were taken by any of Penn State's employees against Plaintiff,

those acts were outside the course and scope of that employee's employment, contrary to Penn State's policies, and were not ratified, confirmed, or approved by Penn State. Thus, any such actions were independent, intervening, and unforeseeable acts that cannot be attributed or imputed to Penn State.

9.     Plaintiff is not entitled, on the law or the facts, to any of the damages claimed, including, but not limited to, compensatory or punitive damages.  An award of punitive damages under the circumstances of this case would constitute an excessive fine and otherwise would be in violation of Penn State's due process and other rights under the Unites States Constitution.

10.     Plaintiff's claims for punitive damages may be barred, in whole or in part, because Penn State's actions were not undertaken with willfulness, malice, or reckless indifference to Plaintiff's legally protected rights. Penn State at all times exercised good faith efforts to comply with all anti-discrimination statutes, and, at all relevant times, acted reasonably, in good faith, and without malice based upon relevant information and facts and circumstances known by Penn State at the time. Penn State is not vicariously liable for punitive damages for any decision of its managerial agents that were contrary to these good faith efforts.

11.     To the extent that Plaintiff has failed to mitigate his alleged damages, his claims and remedies are diminished or barred.

12.     Plaintiff's claims may be barred, in whole or in part, under the doctrines of qualified and/or conditional immunity.

13.     To the extent Plaintiff purports to allege a violation of the First Amendment, Plaintiff did not engage in conduct protected under the First Amendment to the United States Constitution.

14.     To the extent Plaintiff purports to allege a violation of the First Amendment, any and all actions taken or not taken by Penn State towards Plaintiff would have occurred even in the absence of conduct or speech which Plaintiff asserts is protected by the First Amendment or by federal law.

15.     Penn State alleges that to the extent that, during the course of the litigation, it acquires any evidence of wrongdoing by Plaintiff, which wrongdoing would have materially affected the terms and conditions of Plaintiff's employment and would have resulted in Plaintiff not being hired or being either demoted, disciplined, or terminated, such after-acquired evidence shall bar or limit Plaintiff's claims for liability and/or damages, assuming arguendo, Plaintiff is able to establish liability.

16.     Penn State reserves the right to raise additional defenses as may be discovered during the course of this litigation.

**WHEREFORE,** Penn State demands judgment dismissing Plaintiff's Second Amended Complaint and awarding Penn State its attorneys' fees, costs of suit, and such other and further relief as the Court may deem proper.

Respectfully Submitted,

Dated: June 15, 2022

By: */s/ Sarah E. Bouchard*

Sarah E. Bouchard (PA Bar No. 77088)
Ali M. Kliment* (PA Bar No. 318988)
Margaret M. McDowell* (PA Bar No. 322619)
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103
Tel: 215.963.5000
Fax: 215.963.5001
sarah.bouchard@morganlewis.com
ali.kliment@morganlewis.com
margaret.mcdowell@morganlewis.com

Ami N. Wynne*
MORGAN, LEWIS & BOCKIUS LLP
110 N. Wacker Drive
Chicago, IL  60606
Tel: 312.324.1000
Fax: 312.324.1001
ami.wynne@morganlewis.com

*Admitted pro hac vice*

*Counsel for The Pennsylvania State University*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2022, a copy of the foregoing Defendant The Pennsylvania State University's Answer and Defenses to the Second Amended Complaint was filed electronically and served via ECF on all parties indicated on the electronic filing receipt, listed below:

> Stephen G. Console
> Rahul Munshi
> Console Mattiacci Law, LLC
> 1525 Locust Street, 9th Floor
> Philadelphia, PA  19102
> console@consolelaw.com
> munshi@consolelaw.com

/s/ *Sarah E. Bouchard*
Sarah E. Bouchard